UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

PENSACOLA DIVISION

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY, ENDURANCE
AMERICAN SPECIALTY INSURANCE
COMPANY, EVEREST INDEMNITY
INSURANCE COMPANY, PRINCETON
EXCESS SURPLUS LINES INSURANCE
COMPANY, ARCH SPECIALTY INSURANCE
COMPANY, AXIS SURPLUS INSURANCE
COMPANY, COLONY INSURANCE
COMPANY, EVANSTON INSURANCE
COMPANY, ASPEN SPECIALTY
INSURANCE COMPANY, INDEPENDENT
SPECIALTY INSURANCE COMPANY,
INTERSTATE FIRE & CASUALTY
COMPANY, LLOYD'S OF LONDON,
JAMES RIVER INSURANCE COMPANY,
MAXUM INDEMNITY COMPANY,
LANDMARK AMERICAN INSURANCE
COMPANY, and HOMELAND INSURANCE
COMPANY OF NEW YORK,

     Plaintiffs,

v.                           CASE NO.

PORTOFINO MASTER HOMEOWNERS
ASSOCIATION INC., a Florida not-for-
profit Corporation, PORTOFINO MASTER
HOMEOWNERS ASSOCIATION AT
PENSACOLA BEACH, INC., a Florida not-for-
profit Corporation, PORTOFINO TOWER
ONE HOMEOWNERS ASSOCIATION AT
PENSACOLA BEACH, INC., a Florida not-for-
profit Corporation, PORTOFINO TOWER
TWO HOMEOWNERS ASSOCIATION AT

PENSACOLA BEACH, INC., a Florida not-for-profit Corporation, PORTOFINO TOWER THREE HOMEOWNERS ASSOCIATION AT PENSACOLA BEACH, INC., a Florida not-for-profit Corporation, PORTOFINO TOWER FOUR HOMEOWNERS ASSOCIATION AT PENSACOLA BEACH, INC., a Florida not-for-profit Corporation, PORTOFINO TOWER FIVE HOMEOWNERS ASSOCIATION AT PENSACOLA BEACH, INC., a Florida not-for-profit Corporation,

       Defendants.

_____/

## **COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES**

Plaintiffs Westchester Surplus Lines Insurance Company ("Westchester"), Endurance American Specialty Insurance Company ("Endurance"), Everest Indemnity Insurance Company ("Everest"), Princeton Excess Surplus Lines Insurance Company ("Princeton"), Arch Specialty Insurance Company ("Arch"), Axis Surplus Lines Insurance Company ("Axis"), Colony Insurance Company ("Colony"), Evanston Insurance Company ("Evanston"), Aspen Specialty Insurance Company ("Aspen"), Independent Specialty Insurance Company ("Independent"), Interstate Fire & Casualty Company ("Interstate"), Lloyd's of London ("Lloyd's"), James River Insurance Company ("James River"), Maxum Indemnity Company ("Maxum"), Landmark American Insurance Company ("Landmark"), and Homeland Insurance Company of New York ("Homeland") (collectively, "Plaintiffs"), hereby files this Complaint for Declaratory Judgment and Damages

2

against the Defendants, Portofino Master Homeowners Association, Inc., Portofino Master Homeowners Association at Pensacola Beach, Inc., Portofino Tower One Homeowners Association at Pensacola Beach, Inc., Portofino Tower Two Homeowners Association at Pensacola Beach, Inc., Portofino Tower Three Homeowners Association at Pensacola Beach, Inc., Portofino Tower Four Homeowners Association at Pensacola Beach, Inc., and Portofino Tower Five Homeowners Association at Pensacola Beach, Inc., (collectively, "Portofino" or "Defendants"), and states as follows:

## **INTRODUCTION**

1.    This matter involves an egregious and overinflated first-party Hurricane Sally insurance claim, where the Defendants seek over $230 Million for damages allegedly sustained to the Defendants' condominium buildings that remain standing and in good condition.[1]

2.    Within two months of the alleged loss, Defendants exercised their contractual right to appraisal.[2] On the same day they demanded the appraisal, Defendants submitted an unsolicited $6,479,380.60 sworn proof of loss as to certain

---

[1] Notably, since Hurricane Sally, condominiums in these buildings have sold for more than $800,000.

[2] As is explained below, Homeland was not aware of the loss until, at the earliest, July 2022. As such, Homeland was not aware of the appraisal proceedings until nearly two years after Defendants made their demand for appraisal. Homeland has and continues to reserve its rights as to whether it is bound by the appraisal proceedings.

of their insurers, which over time ballooned to an amount wholly detached from any actual damage resulting from the hurricane. In particular, the Defendants' selected appraiser submitted estimates to the appraisal panel that include charges that are wholly improper, overstated, unrelated, duplicative, and attempt to turn the Defendants' legitimate loss into a once-in-a-lifetime windfall at Plaintiffs' expense.

3.      Most recently, the appraiser increased the value of the claim from the unsolicited sworn proof of loss by over $225 million when he submitted an outrageous $233,030,601.80 claim to the appraisal panel, which raises significant questions concerning the appraiser's interest and honesty, as well as the fraudulent nature of the claim and its supporting documentation. As a result of these issues, and the Defendants' refusal to provide information during the investigation of the claim, Plaintiffs filed this action.

## NATURE OF THE CASE

4.      This is an action for Declaratory Judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, concerning Defendants' rights, if any, under insurance policies issued by Plaintiffs, under which Defendants seek indemnity and other benefits in excess of $75,000.00.

5.      Plaintiff Westchester is a Georgia corporation with its principal place of business in Pennsylvania.

6.    Plaintiff Endurance is a Delaware corporation with its principal place of business in Purchase, New York.

7.    Plaintiff Everest is a Delaware corporation with its principal place of business in Liberty Corner, New Jersey.

8.    Plaintiff Princeton is a Delaware corporation with its principal place of business in Princeton, New Jersey.

9.    Plaintiff Arch is a Missouri corporation with its principal place of business in Jersey City, New Jersey.

10.    Plaintiff Axis is an Illinois corporation with its principal place of business in Alpharetta, Georgia.

11.    Plaintiff Colony is a Virginia corporation with its principal place of business in Richmond, Virginia.

12.    Plaintiff Evanston is an Illinois corporation with its principal place of business in Rosemont, Illinois.

13.    Plaintiff Aspen is a North Dakota corporation with its principal place of business in Jersey City, New Jersey.

14.    Plaintiff Independent is a Delaware corporation with its principal place of business in Bedford, Texas.

15.    Plaintiff Interstate is an Illinois corporation with its principal place of business in Chicago, Illinois.

16.     Plaintiff Lloyd's[3] is a foreign corporation with its principal place of business in London, United Kingdom.

17.     Plaintiff James River is an Ohio corporation with its principal place of business in Richmond, Virginia.

18.     Plaintiff Maxum is a Connecticut corporation with its principal place of business in Connecticut.

19.     Plaintiff Landmark is a New Hampshire corporation with its principal place of business in Atlanta, Georgia.

20.     Plaintiff Homeland is a New York corporation with its principal place of business in Minnesota.

21.     Defendant Portofino Master Homeowners Association, Inc. is a Florida not-for-profit corporation with its principal place of business in Florida.

---

[3] Certain Underwriters at Lloyd's, London (Consortium #9226) share of the Policy was underwritten through the Lloyd's insurance market. Two underwriters ("Members") subscribed to this portion of the Policy through Syndicate 2357 and Syndicate 1458. Nephila 2357 Ltd. is the sole member of Syndicate Number 2357. Nephila 2357 Ltd is an English corporation and has its principal place of business in Walsingham House, 35 Seething Lane, London, EC3N 4AH, UK. Nephila 2357 Ltd. is a citizen of England. RenaissanceRe Corporate Capital (UK) Limited is the sole member of Syndicate Number 1458. RenaissanceRe Corporate Capital (UK) Limited is an English corporation and has its principal place of business in London, England. RenaissanceRe Corporate Capital (UK) Limited is a citizen of England.

22.      Defendant Portofino Tower One Homeowners Association at Pensacola Beach, Inc.is a Florida not-for-profit corporation with its principal place of business in Florida.

23.      Defendant Portofino Tower Two Homeowners Association at Pensacola Beach, Inc.is a Florida not-for-profit corporation with its principal place of business in Florida.

24.      Defendant Portofino Tower Three Homeowners Association at Pensacola Beach, Inc.is a Florida not-for-profit corporation with its principal place of business in Florida.

25.      Defendant Portofino Tower Four Homeowners Association at Pensacola Beach, Inc. is a Florida not-for-profit corporation with its principal place of business in Florida.

26.      Defendant Portofino Tower Five Homeowners Association at Pensacola Beach, Inc.is a Florida not-for-profit corporation with its principal place of business in Florida.

## **JURISDICTION AND VENUE**

27.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1332(a)(1) and (2) because each Plaintiff and Defendants are citizens of different states and the amount-in-controversy in this matter exceeds $75,000.00, exclusive of interest and costs.

28.    An actual justiciable controversy exists within the meaning of 28 U.S.C. § 2201 between Plaintiffs and Defendants regarding (1) whether Defendants have voided coverage under the Policies by failing to comply with the Cooperation Provision of the Policies, (2) whether Defendants have voided coverage under the Policies by engaging in fraud during the claim submission and appraisal process, (3) whether Defendants' chosen appraiser, George Keys and his company, Keys Claims Consultants, LLC ("KCC"), are qualified to serve as Defendants' appraiser, (4) whether the parties are entitled to an itemized appraisal award that includes amounts measured by trade and specific damage category with sufficient detail to allow for the application of Policy provisions, including but not limited to applicable Valuation Provisions and Coverage Sublimits, so that Defendants can satisfy their burden of establishing the existence and extent of coverage under the Policies, and (5) whether Defendants failed to comply with a condition precedent to coverage under the Homeland Policy by failing to provide prompt notice as required by the Homeland Policy.

29.    The relief requested in this Complaint is within the jurisdiction of this Court and the subject matter is within the jurisdiction of this Court.

30.    Venue is proper pursuant to 28 U.S.C. § 1392(a) because all or a substantial part of the events giving rise to the hereinafter-described insurance claim

LEGAL\60380428\2

occurred in this judicial district, and the property that is the subject of the insurance claim is located in this judicial district.

## STATEMENT OF FACTS

*The Insurance Policies*

31.    Plaintiffs issued seventeen (17) Commercial Property policies of insurance to Defendants, which were effective from April 1, 2020, through April 1, 2021, subject to the terms, conditions, limitations, and exclusions contained in the policies.

32.    The Plaintiffs and their relevant policy numbers are as follows: Westchester (D38064666 004), Endurance (ESP3000298003), Everest (policy nos. CA3P005801201 & CA3X001322201), Princeton (3VA3PP0000251-02), Arch (ESP1002326-00), AXIS (EAF645360-20), Colony (XP190091-1), Evanston (MKLC11XP007995), Aspen (PX005LG20), Independent (VUX-CN-0000328-04), Interstate (VRX-CN-0000328-04), Lloyd's (VPC-CN-0000328-04), James River (00090459-1), Maxum (MSP-6012522-11), Landmark (LHD912400), and Homeland (795012091) (collectively, the "Policies").[4]

33.    The Policies provided certain coverage to the properties located at 1-9 Portofino Drive, Pensacola Beach, FL 32561 and 913 Gulf Breeze Parkway,

---

[4] The Policies are attached hereto as Composite Exhibit "1".

Pensacola Beach, FL 32561 (collectively the "Properties" and individually the "Property").

34.     The Properties are located on a 28-acre property and consist of five (5) separate condominium buildings, each standing 27 stories, and fourteen other buildings.

35.     The Policies contain property valuation provisions ("Valuation Provisions"), which reads as follows:

> **11. PROPERTY VALUATION – The basis of loss adjustment shall be as follows:**
>
> **a) Valuable Papers & Records/Electronic Data Processing Media : the cost to repair or replace the property with other of like kind and quality including the cost of labor, service or supplies consumed in reconstructing, reproducing, recreating, transcribing or copying information; or, if not so replaced, the value blank.**
>
> **b) Raw materials and supplies: the replacement cost new.**
>
> **c) Stock in process: The value of raw materials plus labor expended plus the proper proportion of overhead charges.**
>
> **d) Finished stock and other merchandise for sale: The regular cash selling price less all discounts and charges to which such property would have been subject had no loss occurred.**
>
> **e) Real and personal property of others for which the Insured is liable: A valuation consistent with the liability of the Insured but only to the extent that such money is necessarily expended by the Insured.**

**f) Electronic data processing equipment, production machinery & equipment: The cost to repair or replace new with like kind and quality. In addition, the Insured may elect to replace such equipment with equipment having technological advances and/or representing an improvement in function and/or forming part of a program of system enhancement and/or more consistent with the Insured's technology strategy (without any reduction or offset for betterment) provided that such replacement can be accomplished without increasing the Insurer's liability.**

**g) Fine arts, at original cost to the Insured, per schedule, latest appraised value or current market value, all at the Insured's option.**

**h) Other property not otherwise provided for; at replacement cost new without deduction for depreciation. If the property is not repaired, rebuilt or replaced with similar property on the same or another site, the Company shall not be liable for more than the actual cash value of the property damaged or destroyed. Loss settlement on a replacement cost basis shall include Architect and Engineering Fees to the extent incurred as a result of a loss which would be payable under this policy and shall be subject to the following provisions:**

**i) The repairs, replacement or reinstatement must be executed with due diligence and dispatch.**

**ii) This Company's liability for loss or damage on a replacement cost basis shall not exceed the lesser of the replacement cost new of the property or any part thereof identical with such property intended for the same occupancy and use, including normal and customary profit and overhead even if the work is performed by the Insured;**
**or the amount actually and necessarily expended in repairing or replacing said property or any part thereof including normal and customary profit and overhead even if the work is performed by the Insured.**

11

36.    The Policies contain an appraisal provision ("Appraisal Provision")[5], [6],

which reads as follows:

**50. APPRAISAL - If the Insured and this Company fail to agree on the amount of loss, each, upon the written demand either of the Insured or of this Company made within 60 days after receipt of proof of loss by the Company, shall select a competent and disinterested appraiser. The appraisers shall then select a competent and disinterested umpire. If they should fail for 15 days to agree upon such umpire, then upon the request of the Insured or of this Company, such umpire shall be selected by a judge of a court of record in the county and state in which such appraisal is pending. Then, at a reasonable time and place, the appraisers shall appraise the loss, stating separately the value at the time of loss and the amount of loss. If the appraisers fail to agree, they shall submit their differences to the umpire. An award in writing by any two shall determine the amount of loss. The Insured and this Company shall each pay his or its chosen appraiser and shall bear equally the other expenses of the appraisal and of the umpire.**

---

[5] The insurance policy issued by Landmark contains an "Appraisal Clause Amendment" which provides, in pertinent part, as follows: "If we and you disagree on the value of the property or the amount of loss, either party may request, in writing, an appraisal of the value of the property and/or the amount of loss. An appraisal may then take place only if the other party agrees in writing to participate in the appraisal process pursuant to terms of a written agreement between the parties." Landmark did not agree to participate in the appraisal process.

[6] The insurance policy issued by Homeland contains a Loss Appraisal clause that provides: "If this Company and the Insured disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss…. Once appraisal proceeds, each appraiser will state separately the value of the property and the amount of loss as of the date and time of the loss or damage. If the appraisers fail to agree, they will submit their differences to the umpire. An itemized award in writing of any two will determine the amount of value and the amount of loss or damage to such items. . . ." Defendants did not timely provide notice of their claim, did not make a written demand for appraisal of the loss with Homeland, and Homeland has and continues to reserve its rights as to whether it is bound by the appraisal process.

37.    The Policies contain a cooperation provision ("Cooperation Provision"), which reads as follows:

> **56. ASSISTANCE AND COOPERATION OF THE INSURED - The Insured shall cooperate with this Company and, upon this Company's request and expense, shall attend hearings and trials and shall assist in effecting settlements, in securing and giving evidence, in obtaining the attendance of witnesses, and in conducting suits.**

38.    The Homeland Policy contains a Duties in the Event of Loss or Damage provision, which reads as follows:

> **G.    DUTIES IN THE EVENT OF LOSS OR DAMAGE**
> **1.**    The Insured must see that the following are done in the event of loss or damage to property covered under this Policy:
>> **a.**    Notify the police if a law may have been broken.
>> **b.**    Give this Company prompt notice of the loss or damage. Include a description of the property involved.
>> **c.**    As soon as possible, give this Company a description of how, when and where the loss or damage occurred.
>> **d.**    Take all reasonable steps to protect the property from further damage, and keep a record of expenses necessary to protect the property for consideration in the settlement of the claim. The expenses necessary to protect the property covered under this Policy will be apportioned between
>> the interests concerned in the ratio of their respective loss payments as finally settled. However, this will not increase the amount of insurance due under this Policy. This Company will not pay for any subsequent loss or damage resulting from a peril that is not covered under this Policy. Also, if feasible, set the damaged property aside and in the best possible order for examination.

13

**e.**   At this Company's request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**f.**   As often as may be reasonably required, permit this Company to inspect the property proving the loss or damage and examine the Insured's books and records. Also, permit this Company to take samples of damaged and undamaged property for inspection, testing and analysis, and permit this Company to make copies from the Insured's books and records.

**g.**   Send this Company a signed, sworn proof of loss containing the information we request to investigate the claim. The Insured must do this within 60 days after this Company's request. We will supply you with the necessary forms.

**h.**   Cooperate with this Company in the investigation or settlement of the claim.

39.   The Policies contain the following sublimits of liability ("Coverage Sublimits"), which reads as follows: SUBLIMIT(S) OF LIABILITY - This Company shall not be liable for more than its proportion of the following sublimits. Coverage Sublimits are part of and not in addition to the overall Limit of Liability and apply on a per occurrence basis unless otherwise noted:

a)   $15,000,000 in the annual aggregate in any one policy year as respects loss or damage caused by the peril of Flood.

b)   $1,000,000 per occurrence as respects Accounts Receivable

c)   $1,000,000 per occurrence as respects Contingent Time Element, Attraction Properties are excluded

d)   $1,000,000 per occurrence as respects Consequential Loss

14

e)  $10,000,000 per occurrence as respects Course of Construction Including Soft Costs

f)  Included per occurrence as respects Demolition and Increased Cost of Construction Coverage A

g)  $10,000,000 Included per occurrence as respects Demolition and Increased Cost of Construction Coverage B

h)  $10,000,000 Included per occurrence as respects Demolition and Increased Cost of Construction Coverage C

i)  $1,000,000 Included per occurrence as respects Demolition and Increased Cost of Construction Coverage D

j)  $10,000,000 per occurrence as respects Debris Removal

k)  25% of the Adjusted Loss Maximum, $10,000,000 per occurrence as respects Extra Expense

l)  $5,000,000 per occurrence as respects Expediting Expense

m)  The lesser of 30 days of $2,500,000 per occurrence as respects Ingress/Egress

n)  $5,000,000 per occurrence as respects Rental Value/Rental Income

o)  $2,500,000 per occurrence as respects Service Interruption. Property Damage and Time Element Combined.

p)  $1,000,000 per occurrence as respects Valuable Papers and Records

15

q)     The lesser of 30 days of $2,500,000 per occurrence as respects Civil or Military Authority

r)     $3,000,000 per occurrence as respects Landscaping, subject to a $25,000 maximum per item

s)     $1,000,000 per occurrence as respects Fine Arts, subject to a $25,000 maximum per item

40.     The Policies contain a windstorm deductible of $903,308 for each of the five condominium buildings of Defendants' Property; the total deductible for the five condominium buildings of Defendants' Property is $4,516,540.

41.     The Policies also contain windstorm deductibles for fourteen other buildings on Defendants' Property, which total $238,320.

42.     The Policies contain a total windstorm deductible of $4,754,860 for all nineteen insured buildings.

*Defendants' Claim Submission and the Appraisal Process*

43.     On or around September 17, 2020, Defendants reported a claim to McLarens for property damage arising on or around September 16, 2020, for damage which allegedly occurred as a result of Hurricane Sally.

44.     Plaintiffs Westchester, Princeton, Everest, and Endurance (collectively the "Primary Layer Carriers") through their independent adjuster (McLarens), moisture mapping consultant (American Environmental Group), and building

16

consultant/consulting engineering firm (JS Held, LLC), began inspecting the Properties on September 19, 2020.

45.    Six weeks later, on approximately December 2, 2020, a dispute arose between the Primary Layer Carriers and Defendants regarding the amount of payments due to Defendants as a result of the claim. At that time, Defendants had submitted invoices from water mitigation contractor "BMS CAT" totaling $732,363.44, which were subsequently reduced to $726,982.68. JS Held calculated the fair value of BMS CAT's services at $698,562.68, leaving a disputed amount of $28,420.

46.    On December 11, 2020, Defendants sent correspondence to the Primary Layer Carriers in which Defendants demanded appraisal of the amount of loss pursuant to the Appraisal Provision of the Policies.

47.    No other Plaintiffs received an appraisal demand from Defendants.

48.    On December 11, 2020, Defendants initially appointed Corinne Heller, Esq. as their appraiser.

49.    On December 11, 2020, Defendants also submitted a sworn proof of loss to the Primary Layer Carriers totaling $6,479,380.60, an amount within the Primary Layer of coverage.

50.    By submitting the sworn proof of loss, Defendants' demand totaled $1,962,840.60 after applying the Policies' deductibles for each of the five condominium buildings.

51.    Prior to February 5, 2021, the Primary Layer Carriers had issued advance payments totaling $2,000,000 to the Defendants.

52.    On February 26, 2021, after Defendants invoked the appraisal process, Defendants submitted an unsolicited sworn proof of loss to the Primary Layer Carriers totaling $13,625,952.43, an amount within the Primary Layer of coverage.

53.    Prior to July 6, 2021, the Primary Layer Carriers had issued advance payments totaling $6,000,000 to the Defendants.

*Defendants' Appraiser's Interest and Incompetence*

54.    On February 8, 2021, Defendants sent correspondence to the Primary Layer Carriers stating that George Keys and KCC would serve as Defendants' appraiser instead of Corinne Heller, Esq.

55.    On February 18, 2021, the Primary Layer Carriers sent correspondence to Defendants in which the Primary Layer Carriers advised Defendants that Mr. Keys had been disqualified as an appraiser on at least four occasions as a result of questions regarding his self-interest.

56.    Accordingly, in their February 18, 2021, correspondence, the Primary Layer Carriers asked Defendants to disclose certain information regarding Mr. Keys'

LEGAL\60380428\2

compensation in order to allow Plaintiffs to evaluate whether Mr. Keys is qualified to serve as Defendants' appraiser under the terms of the Policies.

57.     Specifically, in their February 18, 2021, correspondence, the Primary Layer Carriers asked Defendants to disclose: (1) whether Mr. Keys possesses a financial interest in the outcome of the appraisal; (2) whether Mr. Keys otherwise has an interest in the outcome of the appraisal that could impact his impartiality, such as a contingency fee arrangement with Defendants or a fiduciary relationship with the Defendants with respect to this claim or any other past or present pending legal matters; (3) the number of matters on which Mr. Keys has worked as a public adjuster, expert, and/or appraiser for Defendants' counsel's law firm, McDonald Fleming, and its clients; (4) the details of any services Mr. Keys provided as an expert to Defendants' counsel's law firm, McDonald Fleming; and (5) whether Mr. Keys is a family member of or an individual with whom Defendants and/or their representatives has a personal relationship.

58.     On February 24, 2021, Defendants sent correspondence to the Primary Layer Carriers in which Defendants asserted that that the Policies do not require Defendants to disclose the nature of compensation for their appraiser at the outset of the appraisal.

59.     On August 2, 2022, for the first time, Defendants, through their party appointed appraiser Mr. Keys, submitted their full claim demand in the amount of

$233,030,601.80 in damages allegedly resulting from Hurricane Sally, an amount more than seventeen times greater than Defendants' last unsolicited sworn proof of loss.

60.    The $233,030,601.80 claim demand contains numerous items with dollar values that are severely inflated and not based on actual costs.

61.    The $233,030,601.80 claim demand also contains numerous items with dollar values that are duplicative of other items contained within the same estimates.

62.    On August 10, 2022, for the first time, Defendants produced a copy of the purported contract between Defendants and Mr. Keys and his company, KCC, for the appraisal of the claim (the "Mr. Keys Contract"). A true and correct copy of the document provided by Defendants on August 10, 2022, is attached hereto as Exhibit "2."

63.    The dates on which Mr. Keys and the Defendants' Representative(s) appear to have executed the Mr. Keys Contract are between March 3, 2021, and March 8, 2021, despite the fact that Defendants retained Mr. Keys on or before February 8, 2021.

64.    During the Appraisal Panel hearings, Mr. Keys and his experts were unable to provide justification or support for numerous items that they included in their repair estimates and for which they seek payment from Plaintiffs.

65.     Mr. Keys and his experts presented at the Appraisal Panel hearings readings from moisture meters that were taken while the moisture meters were being incorrectly operated.

66.     At the Appraisal Panel hearings Mr. Keys and his experts presented incorrect general conditions calculations in their repair estimates and did not account for multiple trades sharing the same general costs.

67.     Due to the incompetence of Mr. Keys and his experts, their presented estimates did not include accurate costs for general conditions that Defendants will actually incur while performing repairs at the Property because the estimates did not consider that Defendants would benefit from economies of scale as a result of the cost reductions for the simultaneously performed construction operations.

68.     Mr. Keys and his experts presented at the Appraisal Panel hearings costs for general conditions for each individual trade involved in the project without considering that different trades will use the same items for general conditions.

69.     For example, Mr. Keys and his experts claimed in their presentation at the Appraisal Panel hearings the need for a separate crane for each trade at a condominium building, rather than allowing for the same crane to be used by various contractors for roof repair and repairs of the windows and doors.

70.     While Mr. Keys and his experts claimed that roof repairs would take nine months per building and the fenestration repairs would take twelve months per

building, the claimed crane rental costs for each individual condominium tower for fenestrations was approximately a quarter of the amount claimed for the crane rental costs for roof repairs.

71.     As another example, Mr. Keys and his experts submitted repair estimates that claimed 410 months of temporary toilets. This allocation amounts to two temporary toilets per building for each of the five condominium buildings for seventeen years.

72.     The repair estimates submitted by Mr. Keys and his experts also claim costs for project supervision amounting to 40 hours of supervision per week for 29.2 years.

*Defendants' Withholding of Information and Last-Minute Document Dump*

73.     In January 2022, the appraisal panel, including the appraiser appointed by the Primary Layer Carriers, Patrick Lewis of Lewis Claims Solutions, Defendants' appraiser (Mr. Keys and KCC) and the neutral umpire (Jon Doan of Claims Consultants Group) (collectively, the "Appraisal Panel") agreed to a final inspection schedule. Under their agreement, the Appraisal Panel's hearings would begin on August 15, 2022.

LEGAL\60380428\2

74. During the appraisal process, Plaintiffs[7] learned for the first time that Defendants possessed meeting minutes, condominium documents, repair records, and contracts (collectively, the "Requested Documents") that would assist the Appraisal Panel in determining which damages at the Properties may have predated Hurricane Sally and therefore would not be included in the appraisal award.

75. Mr. Lewis asked Mr. Keys for the Requested Documents on August 31, 2021.

76. Mr. Keys explicitly refused to provide any of the Requested Documents and referred Mr. Lewis to Defendants' counsel, McDonald Fleming, for any appraisal related documentation requests.

77. Certain Plaintiffs then sent Defendants a letter dated September 3, 2021, requesting access to the Requested Documents via Defendants' web portal.

78. Defendants did not send a timely, substantive reply to the September 3, 2021, letter.

---

[7] Homeland first received notice of Defendants' claim on or about July 6, 2022, when it received correspondence dated June 24, 2022 from Defendants' counsel requesting a copy of its insurance policy. Homeland timely provided a copy of its policy, but advised that it had not received a claim for damage caused by Hurricane Sally. Homeland did not learn of the appraisal demand made to the Primary Layer Carriers and ongoing appraisal proceedings until on or about July 25, 2022. As such, Homeland was not, and has not been, a participant in the appraisal process and has and continues to reserve its rights as to whether it is bound by that process.

79.     Mr. Lewis continued to request documentation from Defendants, including invoices for amounts incurred due to the alleged damages resulting from Hurricane Sally, to further the Appraisal Panel's duty to appraise the amount of the loss resulting from Hurricane Sally.

80.     Mr. Keys continued to refuse to provide any documentation, including refusing to provide invoices for amounts incurred due to the alleged damages resulting from Hurricane Sally.

81.     On March 21, 2022, certain Plaintiffs sent a second letter to Defendants requesting access to the Requested Documents.

82.     On March 22, 2022, Defendants responded to the March 21, 2022, letter, stating that Defendants would not provide blanket access to their computer storage system, but would provide condominium documents (including covenants, declarations, and bylaws) and meeting minutes.

83.     On April 1, 2022, certain Plaintiffs responded to Defendants requesting that they provide specific documents, including the following:

(1) All meeting minutes from each individual condominium tower's Homeowners Association and the Master Homeowners Association from 2012 through the present;

(2) A complete copy of all incurred invoices and costs with paid receipts from Incurred Invoice Submission 4, which was submitted by Defendants during the appraisal;

(3) All supporting documentation for bids, negotiations, solutions, and services provided since September 6, 2020;

(4) Maintenance records related to: roofs, glazing (fenestrations), railings, exterior stucco and paint (including the last time each building was painted and the last time each tower was wet sealed), HVAC, condo unit plumbing, parking lot pergolas, pools and associated equipment, docks, bridges, elevators, fire systems, tennis courts, and exterior lighting, and any history of parking lot pavers (repairs and replacements), for all towers, lifestyle buildings, and any other HOA-owned structures from 2012 through the present time, as well as any related supporting documentation; and

(5) All supporting documentation for services rendered in relation to any of the above.

84.    The April 1, 2022, letter asked that Defendants provide the Requested Documents by May 1, 2022, so that the Appraisal Panel would have sufficient time to review and analyze the Requested Documents before the Appraisal Panel hearings.

85.    Defendants did not provide a response to the April 1, 2022, letter.

86.    On June 3, 2022, certain Plaintiffs sent a subsequent letter to Defendants requesting the Requested Documents and asking that Defendants provide copies of the Requested Documents by June 15, 2022, so that the Appraisal Panel would have sufficient time to review and analyze the Requested Documents before the Appraisal Panel hearings, which were scheduled to begin on August 15, 2022.

87.    Defendants did not provide a response to the June 3, 2022, letter until July 19, 2022, less than a month before the Appraisal Panel hearings were scheduled to begin.

88.    The first documents Plaintiffs received from Defendants were in the form of a thumb drive received on July 19, 2022, which contained meeting minutes from the Portofino Master Homeowner's Association meetings.

89.    Between August 5, 2022, and August 12, 2022, Defendants transmitted additional documents to certain Plaintiffs through Dropbox.

90.    Defendants provided certain Plaintiffs with meeting minutes for the homeowners' associations for Towers 1 and 2 of the Property late in the day on Friday, August 5, 2022.

91.    Defendants provided certain Plaintiffs with meeting minutes for the Tower 3 homeowners' association of the Property on August 9, 2022.

92.     Defendants provided certain Plaintiffs with meeting minutes for the Tower 4 homeowners' association of the Property late in the day on August 10, 2022.

93.     Defendants provided certain Plaintiffs with meeting minutes for the Tower 5 homeowners' association of the Property on Friday, August 12, 2022.

94.     On August 10, 2022, Defendants also provided certain Plaintiffs with some documents responsive to certain Plaintiffs' other document requests.

95.     Just days before the Appraisal Panel hearings were scheduled to begin, Defendants sent more than 4,100 documents consisting of over 40,000 pages.

96.     As of the date this action was filed, Defendants have not provided all of the Requested Documents to Plaintiffs. For example, Defendants have failed to provide, among other things, records relating to roof repairs performed at the Property.

97.     On August 11, 2022, due to Defendants' last-minute production of the Requested Documents, Mr. Lewis requested that the Appraisal Panel hearings be postponed until he had the opportunity to review the voluminous documentation, which had been requested almost a year earlier.

98.     Mr. Keys opposed the request to delay the beginning of the Appraisal Panel hearings.

99.    Also on August 11, 2022, Mr. Keys stated that he had not seen and did not need to review any of the Requested Documents in order to participate in the Appraisal Panel hearings.

100.    On August 12, 2022, umpire Jon Doan decided the Appraisal Panel hearings would begin as scheduled on August 15, 2022.

101.    Thereafter, on August 12, 2022, Mr. Lewis informed the Appraisal Panel that he would participate in the Appraisal Panel hearings beginning on August 15, 2022, under protest.

*The Form of the Appraisal Award*

102.    Mr. Lewis requested that the Appraisal Panel's award include a detailed itemization of amounts due by trade and specific damage category, as well as a breakdown of amounts awarded for pertinent Coverage Sublimits listed in the Policies.

103.    Mr. Keys opposed the request that the Appraisal Panel's award include detailed itemization of amounts due by trade and specific damage category, as well as a breakdown of amounts awarded for pertinent Coverage Sublimits listed in the Policies.

104.    During the Appraisal Panel hearings, Mr. Keys opposed Mr. Lewis's request that the final award comply with requirements of the Valuation Provisions in the Policies.

*Defendants' Fraudulent Loss Submission to Plaintiffs*

105.    Defendants through Mr. Keys submitted documents to the Appraisal Panel and made representations during the Appraisal Panel hearings that may be fraudulent.

106.    Defendants' witnesses and Mr. Keys made false representations during the Appraisal Panel hearings regarding past damages and repairs at the Properties.

107.    Defendants' witnesses made false representations during the Appraisal Panel hearings regarding their whereabouts during Hurricane Sally.

108.    Before and during the Appraisal Panel hearings, Mr. Keys and his experts submitted written documents that contain misleading information.

109.    Mr. Keys and his experts submitted estimates and invoices with unsupported pricing for property repairs and equipment rentals.

110.    When confronted at the Appraisal Panel hearings, Mr. Keys and his experts could not provide evidence regarding, or otherwise justify, how they determined many of the costs for property repairs and equipment rentals.

111.    Mr. Keys and his experts submitted duplicate and overlapping items for the same or similar repairs and repair processes in their estimates, which could not all be performed by the contractors.

112.   Although Mr. Keys and his experts only tested one swinging balcony door, which did not leak or fail during the test, they claimed that all balcony swinging doors must be replaced in their estimates and at the Appraisal Panel hearings.

113.   Even though Mr. Keys and his experts included the costs for replacement of all exterior windows and doors due to paint damage, they acknowledged that only approximately 6% of the exterior windows and doors showed signs of paint damage.

114.   In addition to requesting payment to replace all of the exterior windows and doors at the Property, Mr. Keys and his experts have submitted estimates to the Appraisal Panel requesting payments to re-seal all of the existing windows at the Property.

115.   In other words, Mr. Keys and his experts have claimed that Plaintiffs should pay for both (1) re-sealing the existing windows and doors, and (2) removing and replacing those same windows and doors with new windows and doors.

116.   Since Hurricane Sally, Defendants have obtained nineteen permits to replace rooftop HVAC units. Only four of those permits specifically mention Hurricane Sally as the cause of damage to the individual HVAC units.

117.   Even though only nineteen rooftop HVAC units have been replaced since Hurricane Sally, Mr. Keys and his experts claimed that 93 rooftop HVAC units need to be replaced as a result of Hurricane Sally.

118.    During the Appraisal Panel hearings, Mr. Keys and his experts claimed the replacement of 93 rooftop HVAC units even though they could not explain how the units were damaged.

119.    Mr. Keys and his experts claimed during the Appraisal Panel hearings approximately $18.8 million for crane rental costs, which are not based on any actual price quotes.

120.    Instead, crane vendors provided estimates to Plaintiffs' appraiser establishing that the actual rental costs will be below $6 million.

121.    Mr. Keys and his experts have submitted estimates to the Appraisal Panel requesting payment for two different methods of waterproofing numerous balconies at the Property (the Kemper system and the Hydrostop system), when only one waterproofing system would be used at any individual balcony.

122.    Furthermore, the prices that Mr. Keys and his experts submitted to the Appraisal Panel for the waterproofing systems are significantly inflated and do not reflect the actual costs of applying those systems.

123.    Based on photographs of the damages to the Property sustained as a result of Hurricane Ivan in 2004, Defendants are asserting a claim for the same damages, claiming they are now a result of Hurricane Sally.

124.    The photographs demonstrate that the damages claimed by Defendants, as well as Mr. Keys and his experts, as resulting from Hurricane Sally to numerous

exterior windows, doors, balconies, and guardrails are the same damages that were present in 2004 after Hurricane Ivan.

125.   Mr. Keys and his experts claimed the cost for metal lath and stucco repairs to certain fenestrations even though the Property does not contain any metal lath and stucco fenestration construction.

126.   Although the Policies specify that the amount of the loss must be measured at the time of the loss (September 2020), Mr. Keys and his experts have claimed repair costs based on price lists from April 2022, which are significantly higher than September 2020 price lists.

127.   Certain Plaintiffs asked Defendants for the Requested Documents in order to determine whether any of the claimed damages occurred before Hurricane Sally.

128.   Although certain Plaintiffs sought the Requested Documents from Defendants and their representatives in August 2021, Defendants intentionally withheld many of the Requested Documents until August 2022 and did not provide many of the Requested Documents to certain Plaintiffs until only three days before the Appraisal Panel hearings were scheduled to begin.

129.   The Requested Documents demonstrate that many of the damages claimed by Defendants as well as Mr. Keys and his experts occurred before Hurricane Sally.

130.   Defendants, as well as Mr. Keys and his experts, intentionally failed to provide any of the Requested Documents to Plaintiffs for more than ten months despite knowing that the Requested Documents contained information that is material to determining whether the damages claimed by Defendants resulted from Hurricane Sally.

131.   Defendants, as well as Mr. Keys and his experts, intentionally withheld and concealed material information from Plaintiffs.

## RELIEF SOUGHT BY PLAINTIFFS

132.   Plaintiffs seek a declaration from this Court that Plaintiffs do not have any obligation to pay the claimed damages because Defendants failed to comply with the Appraisal Provision and the Cooperation Provision of the Policies.[8]

133.   In the alternative, Plaintiffs seek a declaration from this Court that the coverage under the Policies is void because Defendants have engaged in fraudulent conduct during the claim submission and appraisal process.

134.   In the alternative, Plaintiffs seek a declaration from this Court that Mr. Keys and KCC is disqualified from serving as Defendants' appraiser because Mr.

---

[8] As is set forth below, Homeland seeks a declaration that Defendants violated its policy conditions by failing to provide prompt notice. Further, as noted, Homeland has and continues to reserve its rights as to whether it is bound by the appraisal process, particularly since its policy expressly requires an itemized award. Accordingly, Homeland joins in the relief requested herein in the alternative to its primary requested relief that coverage under its policy is barred for failure of notice.

Keys and KCC are not "disinterested" as required under the terms of the Appraisal Provision of the Policies.

135.   Additionally, in the alternative, Plaintiffs seek a declaration from this Court that the Appraisal Panel's award must include a detailed itemization of amounts due by trade and specific damage category with sufficient detail to allow for the application of Policy provisions, including but not limited to applicable Valuation Provisions and Coverage Sublimits, so that Defendants can satisfy their burden of establishing the existence and extent of coverage under the Policies. [9]

136.   In addition, Homeland seeks a declaration that coverage is barred under its Policy due to Defendants' failure to provide prompt notice of loss.

## COUNT I – DECLARATORY JUDGMENT– AGAINST ALL DEFENDANTS

137.   Plaintiffs reallege the facts set forth in paragraphs 1 – 136 above as if fully set forth herein.

138.   This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine questions of actual controversy between the parties as set forth below.

139.   Compliance with the Cooperation Provision is a condition of recovery under the Policies.

140.   Moreover, "in every contract there exists an implied promise that a party will not do anything to prevent or delay the other party from performing the

---

[9] See footnotes 5 & 6.

34

contract." *Keener v. Sizzler Family Steak Houses*, 424 F. Supp. 482, 484 (N.D.Tex. 1977), *affirmed on this point*, 597 F.2d 453, 458 (5th Cir. 1979) *Tex. Nat'l Bank v. Sandia Mortg. Corp.,* 872 F.2d 692, 698 (5th Cir. 1989). "The duty to cooperate, which is an implied condition in the performance of a contract []." *Bombardier Aero. Corp. v. Signature Flight Support Corp.*, 123 So. 3d 128, 132 (Fla. 5th DCA 2013)(*citing SP Terrace, L.P. v. Meritage Homes of Texas, LLC*, 334 S.W.3d 275, 285 (Tex. App. 2010) (reiterating that duty to cooperate is implied in every contract to extent necessary for contract's performance, and thus, when one party prevents another from timely performing its contractual obligations, failure to timely perform is excused). *See Cont'l Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1344 (M.D. Fla. 2007) (a "duty to cooperate arises as a matter of law independent of the particular terms and conditions of the insurance policies.").

141.   By failing to comply with certain Plaintiffs' requests for documents until less than a week before the Appraisal Panel hearings were scheduled to begin, Defendants failed to comply with their duty to cooperate and the terms of the Cooperation Provision, as well as prevented Plaintiffs from completing their investigation and from being able to timely review and present all relevant, probative evidence during the Appraisal Panel hearings.

142.   Defendants have purposefully withheld or concealed documentation concerning the damages allegedly resulting from Hurricane Sally.

143.   The late document dump by Defendants was intended to prejudice Plaintiffs' and the Appraisal Panel's ability to review and analyze documentation that has a direct bearing on the Appraisal Panel's ability to determine the amount of damages that resulted from Hurricane Sally.

144.   Plaintiffs have been or will be substantially prejudiced by Defendants' failure to cooperate.

145.   As a result of Defendants' failure to cooperate and comply with the terms of the Policies, Defendants are barred from recovering any amount under the Policies.

146.   This Count is not made for purposes of seeking a legal opinion, but rather, the parties have an actual, present, adverse, and antagonistic dispute relating to the Policies as described above. As such, there is a bona fide, practical need for a declaration from this Court concerning the parties' legal rights, responsibilities, and obligations under the Policies issued by Plaintiffs to Defendants.

147.   Plaintiffs seek a declaration concerning their obligations under the Policies, specifically that Defendants' actions are contrary to the terms, conditions, and obligations of the Policies, and therefore Defendants have no right to any recovery under the Policies.

LEGAL\60380428\2

## COUNT II –DECLARATORY JUDGMENT – AGAINST ALL DEFENDANTS

148.   Plaintiffs reallege the facts set forth in paragraphs 1 – 136 above as if fully set forth herein.[10]

149.   This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine a question of actual controversy between the parties as set forth below.

150.   Mr. Keys actions have caused Plaintiffs to believe that he is not "competent" and/or "disinterested" and is therefore ineligible to serve as Defendants' appraiser.

151.   Mr. Keys and the employees of KCC are not "competent" and/or "disinterested."

152.   Mr. Keys has been disqualified by several courts from serving as a disinterested and competent appraiser due to his well-documented lack of impartiality and improper advocacy on behalf of policyholders. *See Auto-Owners Ins. Co. v. Summit Park Townhome Assn.*, No. 14-CV- 03417-LTB, 2016 WL 1321507 (D. Colo. Apr. 5, 2016), aff'd, 886 F.3d 852 (10th Cir. 2018); *Axis Surplus Insurance Co. v. City Center West LP*, No. 2015 CV 30453 (Colo. Dist. Ct., Weld County Mar. 14, 2016); *Church Mutual Ins. Co. v. Broadmoor Cmty. Church*, No. 2015CV32454 (Colo. Dist. Ct. El Paso County July 6, 2016); *Copper Oaks Master*

---

[10] See footnotes 5 & 6.

*Home Owners Assn. v. Am. Fam. Mut. Ins. Co*., 15-CV-01828-MSK-MJW, 2018 WL 3536324 (D. Colo. July 23, 2018); *State Farm Fla. Ins. Co. v. Parrish*, 312 So. 3d 145 (Fla. 2d DCA 2021); *Creekside Crossing Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, 2022 WL 962743 (M.D. Fla. Jan. 31, 2022); *see also Prattley Enterprises Limited v. Vero Insurance New Zealand Limited*, No. CA400/2015, Court of Appeal of New Zealand (Mar. 14, 2016).

153.   Based on Mr. Keys' and KCC's conduct, Plaintiffs suspect that Mr. Keys and KCC will be compensated based on a percentage of the appraisal award.

154.   Mr. Keys either: (1) has an actual conflict of interest, or (2) knew of, but failed to disclose, information that would lead a reasonable person to believe that a potential conflict exists.

155.   Mr. Keys' refusal to review the Requested Documents, including property records, repair records, and other documents in Defendants' possession before preparing and/or presenting repair estimates to the Appraisal Panel demonstrates that Mr. Keys did not intend to evaluate Defendants' claim fairly or accurately as is required by the Policies.

156.   Instead, Mr. Keys refused to review the Requested Documents, indicating that he did not intend to evaluate the "amount of loss" and instead intended to maximize Defendants' recovery in the appraisal.

157.    Mr. Keys intended to maximize Defendants' recovery in the appraisal without any consideration of whether the estimates he submitted during the appraisal accurately reflect the damages that resulted from Hurricane Sally.

158.    Mr. Keys and KCC are not qualified to serve as Defendants' "disinterested" appraiser due to their clear partiality.

159.    Additionally, Mr. Keys refused to review the Requested Documents, demonstrating that he is not competent to evaluate Defendants' "amount of loss" that resulted from Hurricane Sally.

160.    Although Mr. Keys and his experts did not use moisture meters properly while measuring moisture intrusion at the Property, resulting in incorrect moisture readings, Mr. Keys and his experts presented those incorrect moisture readings during the Appraisal Panel hearings in support of Defendants' claim for damages.

161.    Mr. Keys and his experts produced repair estimates containing numerous items with hyper-inflated dollar amounts and containing items that were duplicates of other items contained in the same estimates.

162.    Mr. Keys' reliance on and use of improper moisture meter readings and estimates that contained inflated, duplicated, and inexplicable items and dollar amounts demonstrates that Mr. Keys and KCC are not qualified to serve as Defendants' appraisers because they are not "competent."

163.    Section 682.13(1), Florida Statutes, reads as follows:

Vacating an award.—

(1)   Upon motion of a party to an arbitration proceeding, the court shall vacate an arbitration award if:

(a)   The award was procured by corruption, fraud, or other undue means;

(b)   There was:

1.   Evident partiality by an arbitrator appointed as a neutral arbitrator;

2.   Corruption by an arbitrator; or

3.   Misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;

(c)   An arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to hear evidence material to the controversy, or otherwise conducted the hearing contrary to s. 682.06, so as to prejudice substantially the rights of a party to the arbitration proceeding;

(d)   An arbitrator exceeded the arbitrator's powers;

(e)   There was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection under s. 682.06(3) not later than the beginning of the arbitration hearing; or

(f)   The arbitration was conducted without proper notice of the initiation of an arbitration as required in s. 682.032 so as to prejudice substantially the rights of a party to the arbitration proceeding.

164.   This Count is not made for purposes of seeking a legal opinion, but rather, the parties have an actual, present, adverse, and antagonistic dispute relating to the Policies as described above. As such, there is a bona fide, practical need for a declaration from this Court concerning the parties' legal rights, responsibilities, and obligations under the Policies issued by Plaintiffs to Defendants.

165.   Plaintiffs seek a declaration concerning their rights and obligations under the Policies, specifically that the Policies preclude Mr. Keys and KCC from serving as Defendants' appraiser.

## COUNT III –DECLARATORY JUDGMENT – AGAINST ALL DEFENDANTS

166.   Plaintiffs reallege the facts set forth in paragraphs 1 – 136 above as if fully set forth herein.

167.   This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine a question of actual controversy between the parties as set forth below.

168.   Mr. Keys has prejudiced the Plaintiffs' ability to apply the Policies' provisions as written, and instead seeks an appraisal award that does not include a detailed itemization of amounts due by trade and specific damage category, a breakdown of amounts awarded for each of the Coverage Sublimits listed in the Policies, or otherwise allow the Policies to be applied as written.

169.   Plaintiffs are entitled to an appraisal award which includes a detailed itemization of amounts due by trade and specific damage category, as well as a breakdown of amounts awarded for each of the Coverage Sublimits listed in the Policies so the Policies can be applied as written.

170.   This Count is not made for purposes of seeking a legal opinion, but rather, the parties have an actual, present, adverse, and antagonistic dispute relating to the Policies as described above. As such, there is a bona fide, practical need for a

41

declaration from this Court concerning the parties' legal rights, responsibilities, and obligations under the Policies issued by Plaintiffs to Defendants.

171.    Plaintiffs seek a declaration requiring that any Appraisal Panel award must include a detailed itemization of amounts due by trade and specific damage category, as well as a breakdown of amounts awarded for each of the Coverage Sublimits listed in the Policies, and the applicable Valuation Provisions, so the Policies can be applied as written.

## COUNT IV –DECLARATORY JUDGMENT AND DAMAGES – FRAUD – AGAINST ALL DEFENDANTS

172.    Plaintiffs reallege the facts set forth in paragraphs 1 – 136 above as if fully set forth herein.

173.    Defendants, as well as Mr. Keys and his experts, have presented written and oral statements as part of, or in support of, Defendants' claim for payment under the Policies, knowing that those statements contain false, incomplete, or misleading information concerning facts or things material to Defendants' claim, in particular the "amount of loss" that resulted from Hurricane Sally.

174.    Defendants, as well as Mr. Keys and his experts, have prepared and made written and oral statements that are intended to be presented to Plaintiffs in connection with, or in support of, Defendants' claim for payment under the Policies, knowing that those statements contain false, incomplete, or misleading information

42

concerning any fact or thing material to Defendants' claim, in particular the "amount of loss" that resulted from Hurricane Sally.

175.  Defendants, as well as Mr. Keys and his experts, have engaged in fraudulent conduct during the claim submission and appraisal process.

176.  Defendants, as well as Mr. Keys and his experts, have intentionally concealed and misrepresented material facts concerning Defendants' claim for damages that resulted from Hurricane Sally.

177.  The Requested Documents contain information regarding the damages sustained at the Property both before and after Hurricane Sally that is directly relevant and material to Plaintiffs' investigation of Defendants' claim for damages resulting from Hurricane Sally.

178.  Defendants intentionally withheld and concealed all of the Requested Documents from Plaintiffs for more than ten months.

179.  To date, Defendants still have not produced all of the Requested Documents to Plaintiffs.

180.  Defendants intentionally misrepresented and concealed material facts to Plaintiffs throughout the claim submission and appraisal process.

181.  Defendants have violated Fla. Stat. § 817.234 (False and fraudulent insurance claims) during the claim submission and appraisal process.

182.   By engaging in fraudulent conduct during the claim submission and appraisal process, coverage under the Policies is void.[11]

183.   Plaintiffs have been damaged by Defendants' fraudulent conduct during the claim submission and appraisal process.

184.   As a result of Defendants' fraudulent conduct, Defendants should be required to disgorge and return all amounts that have already been paid to Defendants by the Primary Layer Carriers. Additionally, Plaintiffs are entitled to recover damages as a result of Defendants' fraudulent conduct during the claim submission and appraisal process in an amount to be determined at trial.

185.   This Count is not made for purposes of seeking a legal opinion, but rather, the parties have an actual, present, adverse, and antagonistic dispute relating to the Policies as described above. As such, there is a bona fide, practical need for a declaration from this Court concerning the parties' legal rights, responsibilities, and obligations under the Policies issued by Plaintiffs to Defendants.

186.    Plaintiffs seek a declaration concerning their obligations under the Policies, specifically that coverage under the Policies is void and that Plaintiffs are entitled to recover damages due to the fraudulent conduct, and misrepresentation and concealment of material facts, during the claim submission and appraisal process by Defendants, Mr. Keys, and KCC.

---

[11] *See e.g.* [D.E. 1-1] at p. Plaintiffs 000404.

LEGAL\60380428\2

## COUNT V –DECLARATORY JUDGMENT – LATE NOTICE AS TO HOMELAND – AGAINST ALL DEFENDANTS

187.    Plaintiff Homeland realleges the facts set forth in paragraphs 1 – 136 above as if fully set forth herein.

188.    This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine questions of actual controversy between the parties as set forth below.

189.    The Homeland Policy contains a Duties in the Event of Loss or Damage provision, which requires, among other things, that the Insureds give Homeland "prompt notice of loss or damage" including a description of the property involved, and requires the Insureds to give Homeland "a description of how, when and where the loss or damage occurred."

190.    Hurricane Sally occurred on or around September 16, 2020.

191.    Homeland first learned that there may have been a loss on or about July 6, 2022 when counsel for Defendants sent a letter dated June 24, 2022 requesting a copy of its insurance policy referencing a Hurricane Sally claim.

192.    Defendants' June 24, 2022 letter did not include any details regarding the loss or damage and did not provide a description of the property involved or the extent of damage.

193.    Defendants did not provide prompt notice of the loss or damage to Homeland.

45

194.   Defendants breached their duties in the Policy's Duties in the Event of Loss or Damage provision.

195.   Compliance with the Homeland Policy's Duties in the Event of Loss or Damage provision is a condition of recovery under the Homeland Policy.

196.   Homeland has been substantially prejudiced by Defendants' late notice of their claim.

197.   As a result of Defendants' late notice in breach of the Homeland Policy's Duties in the Event of Loss or Damage provision, Defendants are barred from recovering any amount under the Homeland Policy.

198.   This Count is not made for purposes of seeking a legal opinion, but rather, the parties have an actual, present, adverse, and antagonistic dispute relating to the Homeland Policy as described above. As such, there is a bona fide, practical need for a declaration from this Court concerning the parties' legal rights, responsibilities, and obligations under the Policy issued by Homeland to Defendants.

199.   Homeland seeks a declaration concerning its obligations under its Policy, specifically that Defendants' actions are contrary to the terms, conditions, and obligations of the Homeland Policy, and therefore Defendants have no right to any recovery under the Homeland Policy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that Defendants be summoned to appear and answer herein, and that this honorable Court adjudicate and decree as follows:

A.    That Defendants are not entitled to any recovery under the Policies by their failure to comply with the Cooperation Provision of the Policies,

B.    That Defendants are not entitled to any recovery under the Policies by their failure to comply with the Appraisal Provision of the Policies,

C.    That Defendants are not entitled to any recovery under the Homeland Policy by their failure to comply with the Duties in the Event of Loss or Damage provision of the Homeland Policy,

D.    That coverage under the Policies is void because the Defendants engaged in fraudulent conduct and misrepresented and concealed material facts during the claim submission and appraisal process,

E.    That Defendants are required to disgorge all advance payments issued by the Primary Layer Carriers as a result of Defendants' fraudulent conduct during the claim submission and appraisal process and failure to comply with relevant provisions under the Policies,

F.    That Defendants are required to pay Plaintiffs' damages sustained as a result of Defendants' fraudulent conduct during the claim submission

and appraisal process and failure to comply with relevant provisions under the Policies,

G.    Alternatively, that Mr. Keys and KCC be disqualified from serving as Defendants' appraiser because they are not "competent" and/or "disinterested" as is required under the terms of the Appraisal Provision of the Policies,

H.    Alternatively, that any Appraisal Panel award must include a detailed itemization of amounts due by trade and specific damage category with sufficient detail to allow for the application of Policy provisions, including but not limited to applicable Valuation Provisions and Coverage Sublimits, so that Defendants can satisfy their burden of establishing the existence and extent of coverage under the Policies, and

I.    Any other relief that this Court deems just and proper.

Dated this __ day of January, 2023.

Respectfully submitted,


 /s/  John David Dickenson

John David Dickenson
Florida Bar No. 575801
jdickenson@cozen.com
Evan M. Holober
Florida Bar No. 1012320
eholober@cozen.com

48

**COZEN O'CONNOR**
1801 N. Military Trail, Suite 200
Boca Raton, FL 33431
Telephone: (561) 515-5250
Facsimile: (561) 515-5230

*Counsel for Plaintiffs Westchester Surplus
Lines Insurance Company, Endurance
American Specialty Insurance Company,
Everest Indemnity Insurance Company,
Princeton Excess Lines Insurance Company,
Arch Specialty Insurance Company, Axis
Surplus Insurance Company, Evanston
Insurance Company, Aspen Specialty
Insurance Company, and Maxum Indemnity
Company*

*/s/ Wayne D. Taylor*
Wayne D. Taylor, Esq.
Georgia Bar No. 701275
*Admitted in USDC NDFL*
wtaylor@mfllaw.com
**MOZLEY, FINLAYSON & LOGGINS
LLP**
1050 Crown Pointe Parkway, Suite 1500
Atlanta, GA 30338
Telephone: (404) 256-0700 (Telephone)
Facsimile: (404) 250-9355 (Facsimile)
wtaylor@mfllaw.com

-and-

Elizabeth D. Salinas, Esq.
Florida Bar No. 113394
esalinas@mfllaw.com
**MOZLEY, FINLAYSON & LOGGINS
LLP**
4767 New Broad Street

49

Orlando, Florida 32814
Telephone: (404) 256-0700

*Counsel for Plaintiff Landmark American
Insurance Company*


/s/ Heidi Hudson Raschke
Heidi Hudson Raschke
Florida Bar No. 61183
hraschke@carltonfields.com
Madison E. Wahler
Florida Bar No. 1019015
mwahler@carltonfields.com
**CARLTON FIELDS, P.A.**
4221 W. Boy Scout Blvd
Suite 1000
Tampa, Florida 33607
Telephone: 813-223-7000
Facsimile: 813-229-4133

*Counsel for Plaintiff Homeland Insurance
Company of New York*


/s/ David C. Bibb
David C. Bibb (Fla. Bar No. 190330)
**ROLFES HENRY CO., LPA**
3191 Maguire Boulevard, Suite 160
Orlando, FL 32803
Telephone: (407) 284-4990
Email: dbibb@rolfeshenry.com
        wgonzalez@rolfeshenry.com

Brian P. Henry, Esq. (Fla. Bar No. 0089069)
**ROLFES HENRY CO., LPA**
5577 Broadcast Court
Sarasota, FL 34240
Telephone: (941) 684-0100
Email: bhenry@rolfeshenry.com

50

kdeglman@rolfeshenry.com

*Counsel for Plaintiffs Independent Specialty Insurance Company, Interstate Fire & Casualty Company, and Lloyd's Of London*


*/s/ Jack R. Reiter*
Jack R. Reiter, Esq.
Florida Bar No.: 0028304
jack.reiter@gray-robinson.com
Jordan S. Kosches, Esq.
Florida Bar No.: 49881
jordan.kosches@gray-robinson.com
**GrayRobinson, P.A.**
333 SE 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

*Counsel for Plaintiff Colony Insurance Company*


*/s/ Aaron Konstam*
**ERIC A. HILLER**
Florida Bar No. 27920
eric.hiller@kennedyslaw.com
**AARON KONSTAM**
Florida Bar No. 104765
aaron.konstam@kennedyslaw.com
**Kennedys CMK LLP**
1395 Brickell Avenue, Suite 610
Miami, Florida 33131
Telephone: (305) 371-1111

*Counsel for Plaintiff James River Insurance Company*