UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

PENSACOLA DIVISION

CASE NO. 3:23-cv-00453-MCR-HTC

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY, ARCH SPECIALTY
INSURANCE COMPANY, AXIS SURPLUS
INSURANCE COMPANY, COLONY INSURANCE
COMPANY, EVANSTON INSURANCE
COMPANY, ASPEN SPECIALTY
INSURANCE COMPANY, INDEPENDENT
SPECIALTY INSURANCE COMPANY,
INTERSTATE FIRE & CASUALTY
COMPANY, CERTAIN UNDERWRITERS
AT LLOYD'S, LONDON (CONSORTIUM #9226),
JAMES RIVER INSURANCE COMPANY,
MAXUM INDEMNITY COMPANY,
LANDMARK AMERICAN INSURANCE
COMPANY, and HOMELAND INSURANCE
COMPANY OF NEW YORK,

      Plaintiffs,

v.

PORTOFINO MASTER HOMEOWNERS
ASSOCIATION INC. d/b/a PORTOFINO MASTER
HOMEOWNERS ASSOCIATION AT
PENSACOLA BEACH, INC., a Florida not-for-
profit Corporation, PORTOFINO TOWER
ONE HOMEOWNERS ASSOCIATION AT
PENSACOLA BEACH, INC., a Florida not-for-
profit Corporation, PORTOFINO TOWER
TWO HOMEOWNERS ASSOCIATION AT
PENSACOLA BEACH, INC., a Florida not-for-
profit Corporation, PORTOFINO TOWER
THREE HOMEOWNERS ASSOCIATION AT

PENSACOLA BEACH, INC., a Florida not-for-
profit Corporation, PORTOFINO TOWER
FOUR HOMEOWNERS ASSOCIATION AT
PENSACOLA BEACH, INC., a Florida not-for-
profit Corporation, PORTOFINO TOWER
FIVE HOMEOWNERS ASSOCIATION AT
PENSACOLA BEACH, INC., a Florida not-for-
profit Corporation,

       Defendants.

_____/

## FIRST AMENDED COMPLAINT
## <u>FOR DECLARATORY JUDGMENT AND DAMAGES</u>[1]

Plaintiffs, Westchester Surplus Lines Insurance Company ("Westchester"),

Arch Specialty Insurance Company ("Arch"), AXIS Surplus Lines Insurance

Company ("Axis"), Colony Insurance Company ("Colony"), Evanston Insurance

Company ("Evanston"), Aspen Specialty Insurance Company ("Aspen"),

Independent Specialty Insurance Company ("Independent"), Interstate Fire &

Casualty Company ("Interstate"), Certain Underwriters at Lloyd's of London

(Consortium #9226) ("Lloyd's"), James River Insurance Company ("James River"),

Maxum Indemnity Company ("Maxum"), Landmark American Insurance Company

("Landmark"), and Homeland Insurance Company of New York ("Homeland")

---

[1] This Amended Complaint is filed in accordance with Rule 15(a)(2) of the Federal
Rules of Civil Procedure and in compliance with the deadline to amend pleadings
[D.E. 96].  Edward Fleming, Esq., counsel for Defendants, confirmed via email on
August 14, 2023 that Defendants consent to the filing of this Amended Complaint.

LEGAL\65393599\1

(collectively, "Plaintiffs"), hereby file this Complaint for Declaratory Judgment and Damages against the Defendants, Portofino Master Homeowners Association, Inc. d/b/a Portofino Master Homeowners Association at Pensacola Beach, Inc. ("Master"), Portofino Tower One Homeowners Association at Pensacola Beach, Inc. ("Tower One"), Portofino Tower Two Homeowners Association at Pensacola Beach, Inc. ("Tower Two"), Portofino Tower Three Homeowners Association at Pensacola Beach, Inc. ("Tower Three"), Portofino Tower Four Homeowners Association at Pensacola Beach, Inc. ("Tower Four"), and Portofino Tower Five Homeowners Association at Pensacola Beach, Inc. ("Tower Five"), (collectively, "Portofino" or "Defendants"), and states as follows:

## <u>INTRODUCTION</u>

1.      This matter involves an egregiously overinflated first-party Hurricane Sally insurance claim, where the Defendants sought over $230 Million for damages allegedly sustained from a Category 1 storm to the Defendants' condominium buildings that remain standing and in good condition.[2]

2.      Within two months of the alleged loss, Defendants exercised their contractual right to appraisal as to certain of their insurers.[3] On the same day they

---

[2] Notably, since Hurricane Sally, condominiums in these buildings have sold for more than $1,600,000.

[3] Specifically, and as discussed further below, the four insurers who received an appraisal demand from Defendants were Westchester, Endurance American Specialty Insurance Company ("Endurance"), Everest Indemnity Insurance

demanded the appraisal, Defendants submitted an unsolicited $6,479,380.60 sworn proof of loss as to certain of their insurers, which over time ballooned to an amount wholly detached from any actual damage resulting from the hurricane. In particular, the Defendants' selected appraiser submitted estimates to the appraisal panel that include charges that are wholly improper, overstated, unrelated, duplicative, and attempt to turn the Defendants' legitimate loss into a once-in-a-lifetime windfall at Plaintiffs' expense.

3.      Defendants' appraiser increased the value of the claim from the unsolicited sworn proof of loss by over $225 million when he submitted an outrageous $233,030,601.80 claim to the appraisal panel, which raises significant questions concerning the appraiser's interest and honesty, as well as the fraudulent nature of the claim and its supporting documentation. As a result of these issues, and the Defendants' refusal to provide information during the investigation of the claim, Plaintiffs filed this action.

## <u>NATURE OF THE CASE</u>

4.      This is an action for Declaratory Judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, concerning Defendants'

---

Company ("Everest"), and Princeton Excess Surplus Lines Insurance Company ("Princeton").  Endurance, Everest, and Princeton were previously plaintiffs in this suit but have since dismissed their claims against Defendants.

rights, if any, under insurance policies issued by Plaintiffs, under which Defendants seek indemnity and other benefits in excess of $75,000.00.

5.     Plaintiff Westchester is a Georgia corporation with its principal place of business in Pennsylvania.

6.     Plaintiff Arch is a Missouri corporation with its principal place of business in Jersey City, New Jersey.

7.     Plaintiff AXIS is an Illinois corporation with its principal place of business in Alpharetta, Georgia.

8.     Plaintiff Colony is a Virginia corporation with its principal place of business in Richmond, Virginia.

9.     Plaintiff Evanston is an Illinois corporation with its principal place of business in Rosemont, Illinois.

10.     Plaintiff Aspen is a North Dakota corporation with its principal place of business in Jersey City, New Jersey.

11.     Plaintiff Independent is a Delaware corporation with its principal place of business in Bedford, Texas.

12.     Plaintiff Interstate is an Illinois corporation with its principal place of business in Chicago, Illinois.

13.     Plaintiff Lloyd's[4] is a foreign corporation with its principal place of business in London, United Kingdom.

14.     Plaintiff James River is an Ohio corporation with its principal place of business in Richmond, Virginia.

15.     Plaintiff Maxum is a Connecticut corporation with its principal place of business in Connecticut.

16.     Plaintiff Landmark is a New Hampshire corporation with its principal place of business in Atlanta, Georgia.

17.     Plaintiff Homeland is a New York corporation with its principal place of business in Minnesota.

18.     Defendant Master is a Florida not-for-profit corporation with its principal place of business in Florida.

19.     Defendant Tower One is a Florida not-for-profit corporation with its principal place of business in Florida.

---

[4] Certain Underwriters at Lloyd's, London (Consortium #9226) share of the Policy was underwritten through the Lloyd's insurance market. Two underwriters ("Members") subscribed to this portion of the Policy through Syndicate 2357 and Syndicate 1458. Nephila 2357 Ltd. is the sole member of Syndicate Number 2357. Nephila 2357 Ltd is an English corporation and has its principal place of business in Walsingham House, 35 Seething Lane, London, EC3N 4AH, UK. Nephila 2357 Ltd. is a citizen of England. RenaissanceRe Corporate Capital (UK) Limited is the sole member of Syndicate Number 1458. RenaissanceRe Corporate Capital (UK) Limited is an English corporation and has its principal place of business in London, England. RenaissanceRe Corporate Capital (UK) Limited is a citizen of England.

20.     Defendant Tower Two is a Florida not-for-profit corporation with its principal place of business in Florida.

21.     Defendant Tower Three is a Florida not-for-profit corporation with its principal place of business in Florida.

22.     Defendant Tower Four is a Florida not-for-profit corporation with its principal place of business in Florida.

23.     Defendant Tower Five is a Florida not-for-profit corporation with its principal place of business in Florida.

## JURISDICTION AND VENUE

24.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1332(a)(1) and (2) because each Plaintiff and Defendants are citizens of different states and the amount-in-controversy in this matter exceeds $75,000.00, exclusive of interest and costs.

25.     An actual justiciable controversy exists within the meaning of 28 U.S.C. § 2201 between Plaintiffs and Defendants regarding (1) whether Defendants have voided coverage under the Policies by failing to comply with the Cooperation Provision of the Policies, (2) whether Defendants have voided coverage under the Policies by engaging in fraudulent conduct during the claim submission and appraisal process, (3) whether Defendants' chosen appraiser, George Keys and his company, Keys Claims Consultants, LLC ("KCC"), are qualified to serve as

LEGAL\65393599\1

Defendants' appraiser, (4) whether the appraisal award is invalid because it was not itemized, did not include amounts measured by trade and specific damage category with sufficient detail to allow for the application of Policy provisions, including but not limited to applicable Valuation Provisions and Coverage Sublimits, so that Defendants can satisfy their burden of establishing the existence and extent of coverage under the Policies, (5) whether Defendants failed to comply with a condition precedent to coverage under the Homeland Policy by failing to provide prompt notice as required by the Homeland Policy; (6) whether Defendants failed to comply with the notice of loss provision in the Policies as to Maxum, James River, and Landmark; (7) whether Defendants properly invoked appraisal as to Arch, AXIS, Colony, Evanston, Aspen, Independent, Interstate, Lloyd's, James River, Maxum, Landmark, and Homeland; and (8) other coverage issues as set forth herein.

26. The relief requested in this Complaint is within the jurisdiction of this Court and the subject matter is within the jurisdiction of this Court.

27. Venue is proper pursuant to 28 U.S.C. § 1392(a) because all or a substantial part of the events giving rise to the hereinafter-described insurance claim occurred in this judicial district, and the property that is the subject of the insurance claim is located in this judicial district.

## STATEMENT OF FACTS

*The Insurance Policies*

28.    Plaintiffs issued thirteen (13) Commercial Property policies of insurance to Defendants, which were effective from April 1, 2020, through April 1, 2021, subject to the terms, conditions, limitations, and exclusions contained in the policies.

29.    The Plaintiffs and their relevant policy numbers are as follows: Westchester (D38064666 004) ("Westchester Policy"), Arch (ESP1002326-00) ("Arch Policy"), AXIS (EAF645360-20) ("AXIS Policy"), Colony (XP190091-1) ("Colony Policy"), Evanston (MKLC11XP007995) ("Evanston Policy"), Aspen (PX005LG20) ("Aspen Policy"), Independent (VUX-CN-0000328-04) ("Independent Policy"), Interstate (VRX-CN-0000328-04) ("Interstate Policy"), Lloyd's (VPC-CN-0000328-04) ("Lloyd's Policy"), James River (00090459-1) ("James River Policy"),[5] Maxum (MSP-6012522-11) ("Maxum Policy"), Landmark (LHD912400) ("Landmark Policy"), and Homeland (795012091) ("Homeland Policy") (collectively, the "Policies").[6]

---

[5] The "Conflicting Provision Clause" endorsement in the James River Policy provides that the James River Policy does not provide broader coverage than any of the underlying policies. Accordingly, any, and all, limitations or conditions of coverage, and exclusions within the underlying policies are incorporated into the James River Policy.

[6] The Policies are attached hereto as Composite Exhibit "1".

30.     The Policies provided certain coverage to the properties located at 1-9 Portofino Drive, Pensacola Beach, FL 32561 and 913 Gulf Breeze Parkway, Pensacola Beach, FL 32561 (collectively the "Properties" and individually the "Property").

31.     The Properties are located on a 28-acre property and consist of five (5) separate condominium buildings, each standing 27 stories, and fourteen other buildings.

32.     The Policies provide coverage for the following property, subject to the Policies' terms and conditions:

**9. PROPERTY COVERED - Except as hereinafter excluded, this policy covers the interest of the Insured in all real and personal property owned, used, leased or intended for use by the Insured or in which the Insured may have an insurable interest, or for which the Insured may be responsible for the insurance, or real or personal property hereafter constructed, erected, installed, or acquired including while in course of construction, erection, installation, and assembly including Improvements and Betterments. In the event of loss or damage, this Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary. This policy is extended to include:**

**a) The interest of the Insured in the real and personal property of others in the Insured's care, custody, or control and the Insured's liability imposed by law or assumed by written contract for such property, including the cost to defend any allegations of liability for loss or damage to such property.**

**b) At the option of the Insured, personal property of the Insured's officials and employees while on the premises of the Insured.**

10

c) **Contractors' and/or subcontractors' (of any tier) and/or vendors' interests in property covered to the extent of the Insured's liability imposed by law or assumed by written contract.**

33. The Policies contain property valuation provisions ("Valuation Provisions"), which read as follows:

**11. PROPERTY VALUATION - The basis of loss adjustment shall be as follows:**

***

**h) Other property not otherwise provided for; at replacement cost new without deduction for depreciation. If the property is not repaired, rebuilt or replaced with similar property on the same or another site, the Company shall not be liable for more than the actual cash value of the property damaged or destroyed. Loss settlement on a replacement cost basis shall include Architect and Engineering Fees to the extent incurred as a result of a loss which would be payable under this policy and shall be subject to the following provisions:**

**i) The repairs, replacement or reinstatement must be executed with due diligence and dispatch.**

**ii) This Company's liability for loss or damage on a replacement cost basis shall not exceed the lesser of the replacement cost new of the property or any part thereof identical with such property intended for the same occupancy and use, including normal and customary profit and overhead even if the work is performed by the Insured; or the amount actually and necessarily expended in repairing or replacing said property or any part thereof including normal and customary profit and overhead even if the work is performed by the Insured.**

34.     The Policies contain an appraisal provision ("Appraisal Provision")[7], [8], [9]

which reads as follows:

**50. APPRAISAL - If the Insured and this Company fail to agree on the amount of loss, each, upon the written demand either of the**

---

[7] The Landmark Policy contains an "Appraisal Clause Amendment" which provides, in pertinent part, as follows: "If we and you disagree on the value of the property or the amount of loss, either party may request, in writing, an appraisal of the value of the property and/or the amount of loss. An appraisal may then take place only if the other party agrees in writing to participate in the appraisal process pursuant to terms of a written agreement between the parties." Defendants did not request in writing that Landmark participate in the appraisal process, and Landmark did not agree in writing to participate in the appraisal process. Accordingly, Landmark is not bound by the appraisal process.

[8] The Homeland Policy contains a Loss Appraisal clause that provides: "If this Company and the Insured disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss.... Once appraisal proceeds, each appraiser will state separately the value of the property and the amount of loss as of the date and time of the loss or damage. If the appraisers fail to agree, they will submit their differences to the umpire. An itemized award in writing of any two will determine the amount of value and the amount of loss or damage to such items. . . ." Defendants did not timely provide notice of their claim, and did not make a written demand for appraisal of the loss with Homeland. Accordingly, Homeland is not bound by the appraisal process and continues to reserve its rights under the terms of the Homeland Policy, including but not limited to the Loss Appraisal clause.

[9] The Evanston Policy contains the following appraisal clause: "If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss within 60 days after the receipt of proof of loss by us. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree within 15 days, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will: a. Pay its chosen appraiser; and b. Bear the other expenses of the appraisal and umpire equally. If there is an appraisal, we will still retain our right to deny the claim."

**Insured or of this Company made within 60 days after receipt of proof of loss by the Company, shall select a competent and disinterested appraiser. The appraisers shall then select a competent and disinterested umpire. If they should fail for 15 days to agree upon such umpire, then upon the request of the Insured or of this Company, such umpire shall be selected by a judge of a court of record in the county and state in which such appraisal is pending. Then, at a reasonable time and place, the appraisers shall appraise the loss, stating separately the value at the time of loss and the amount of loss. If the appraisers fail to agree, they shall submit their differences to the umpire. An award in writing by any two shall determine the amount of loss. The Insured and this Company shall each pay his or its chosen appraiser and shall bear equally the other expenses of the appraisal and of the umpire.**

35.    The Policies contain a cooperation provision ("Cooperation Provision"), which reads as follows:[10]

**56. ASSISTANCE AND COOPERATION OF THE INSURED - The Insured shall cooperate with this Company and, upon this Company's request and expense, shall attend hearings and trials and shall assist in effecting settlements, in securing and giving evidence, in obtaining the attendance of witnesses, and in conducting suits.**

36.    The Policies contain a payment of loss provision, which reads as follows:

**48. PAYMENT OF LOSS - All adjusted claims shall be due and payable no later than thirty (30) days after presentation of acceptable proofs of loss by the Insured or its appointed representative.**

---

[10] In addition, the James River, Maxum, Evanston, Arch, and Aspen Policies provide that those insurers may examine the insured's books and records as they relate to this policy at any time during the policy period and for a period of time afterward.

37.     The Policies contain a notice of loss provision ("Notice Provision"),

which reads as follows:

**44. NOTICE OF LOSS - As soon as practicable after any loss or damage occurring under this policy is known to the Insured's home office insurance department, the Insured shall report such loss or damage with full particulars to Arthur J. Gallagher Risk Management Services, Inc., 1900 West Loop South #1600, Houston, TX 77027 for transmission to the designated loss adjuster and to this Company.**

38.     The Homeland Policy contains a Duties in the Event of Loss or Damage

provision ("Homeland Duties Provision"), which reads as follows:

**G.    DUTIES IN THE EVENT OF LOSS OR DAMAGE**

    **1.    The Insured must see that the following are done in the event of loss or damage to property covered under this Policy:**

        **a.    Notify the police if a law may have been broken.**

        **b.    Give this Company prompt notice of the loss or damage. Include a description of the property involved.**

        **c.    As soon as possible, give this Company a description of how, when and where the loss or damage occurred.**

        **d.    Take all reasonable steps to protect the property from further damage, and keep a record of expenses necessary to protect the property for consideration in the settlement of the claim. The expenses necessary to protect the property covered under this Policy will be apportioned between**
        **the interests concerned in the ratio of their respective loss payments as finally settled. However, this will not increase the amount of insurance due under this Policy. This Company will not pay for any subsequent loss or damage resulting from a peril that is not covered under**

14

> **this Policy. Also, if feasible, set the damaged property aside and in the best possible order for examination.**
>
> **e.    At this Company's request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.**
>
> **f.    As often as may be reasonably required, permit this Company to inspect the property proving the loss or damage and examine the Insured's books and records. Also, permit this Company to take samples of damaged and undamaged property for inspection, testing and analysis, and permit this Company to make copies from the Insured's books and records.**
>
> **g.    Send this Company a signed, sworn proof of loss containing the information we request to investigate the claim. The Insured must do this within 60 days after this Company's request. We will supply you with the necessary forms.**
>
> **h.    Cooperate with this Company in the investigation or settlement of the claim.**

39.    The Policies contain the following sublimits of liability ("Coverage Sublimits"), which reads as follows: SUBLIMIT(S) OF LIABILITY - This Company shall not be liable for more than its proportion of the following sublimits. Coverage Sublimits are part of and not in addition to the overall Limit of Liability and apply on a per occurrence basis unless otherwise noted:

a)    $15,000,000 in the annual aggregate in any one policy year as respects loss or damage caused by the peril of Flood.

b)    $1,000,000 per occurrence as respects Accounts Receivable

15

c)      $1,000,000 per occurrence as respects Contingent Time Element, Attraction Properties are excluded

d)      $1,000,000 per occurrence as respects Consequential Loss

e)      $10,000,000 per occurrence as respects Course of Construction Including Soft Costs

f)      Included per occurrence as respects Demolition and Increased Cost of Construction Coverage A

g)      $10,000,000 Included per occurrence as respects Demolition and Increased Cost of Construction Coverage B

h)      $10,000,000 Included per occurrence as respects Demolition and Increased Cost of Construction Coverage C

i)      $1,000,000 Included per occurrence as respects Demolition and Increased Cost of Construction Coverage D

j)      $10,000,000 per occurrence as respects Debris Removal

k)      25% of the Adjusted Loss Maximum, $10,000,000 per occurrence as respects Extra Expense

l)      $5,000,000 per occurrence as respects Expediting Expense

m)      The lesser of 30 days of $2,500,000 per occurrence as respects Ingress/Egress

n)      $5,000,000 per occurrence as respects Rental Value/Rental Income

16

o)      $2,500,000 per occurrence as respects Service Interruption. Property Damage and Time Element Combined.

p)      $1,000,000 per occurrence as respects Valuable Papers and Records

q)      The lesser of 30 days of $2,500,000 per occurrence as respects Civil or Military Authority

r)      $3,000,000 per occurrence as respects Landscaping, subject to a $25,000 maximum per item

s)      $1,000,000 per occurrence as respects Fine Arts, subject to a $25,000 maximum per item

40.    The Policies contain a Named Storm deductible, which states as follows:

**DEDUCTIBLE CLAUSE - The Company will adjust all losses, damages or expenses arising out of any one occurrence as one loss. The Company will deduct the following from such loss:**

\*\*\*

**NAMED STORM:**
**With respect to loss or damage to property in Tier 1 Counties resulting from the period of Named Windstorm (a storm that has been declared by the National Weather Service to be a Hurricane, Typhoon, Tropical Cyclone or Tropical Storm), the deductible shall be 2% of such unit of insurance at each location in accordance with policy valuation at the time of loss. A minimum $100,000 each occurrence shall apply.**

41.    The Policies contain a windstorm deductible of $903,308 for each of the five condominium buildings of Defendants' Property; the total deductible for the five condominium buildings of Defendants' Property is $4,516,540.

17

42.     The Policies also contain windstorm deductibles for fourteen other buildings on Defendants' Property, which total $238,320.

43.     The Policies contain a total windstorm deductible of $4,754,860 for all nineteen insured buildings.

44.     The Policies contain exclusions for certain perils, such as:

**28. PERILS EXCLUDED - This policy does not insure:**
***
**b) against the cost of making good defective design or specifications, faulty material, or faulty workmanship; however, this exclusion shall not apply to loss or damage resulting from such defective design or specifications, faulty material, or faulty workmanship;**

**c) against ordinary wear and tear or gradual deterioration unless other loss or damage from a peril insured against herein ensues and then this policy shall cover for ensuing loss or damage;**

45.     The Arch Policy contains a Pre-Existing Damage Exclusion endorsement, which reads as follows:

**It is agreed that this policy does not cover any loss or damage directly or indirectly caused by, resulting from or contributed to by any pre-existing property damage.**

46.     Further, the Policies define "occurrence" as follows:

**29.     DEFINITIONS**
* * *
**c)     The term "occurrence" is defined as follows:**
**i) Except as hereinafter defined, "loss occurrence" shall mean an accident or occurrence or series of accidents or occurrences arising out of one event.**
* * *

18

**vii) However, we shall not be liable hereunder for any loss or damage:**
**viii) Occurring before this policy becomes effective; or**
**ix) Arising from an "occurrence" which is in progress at the time this policy becomes effective, even if such loss or damage occurs after this policy becomes effective [ ]**

47. The Policies contain the following provision regarding proof of loss:

**46. PROOF OF LOSS - Proof of loss is required as soon as practicable following the Company's written request for signed Proof from Insured; however, Insured, at its option, may elect to file Proof with the Company prior to the Company's request. It shall be necessary for the Insured to render a signed and sworn proof of loss to the Insurer or its appointed representative stating: the place, time and cause of loss, interest of the Insured and of all others, the value of the property involved, and the amount of loss, damage or expense sustained.**

*Defendants' Governing Documents*

48. Tower One, Tower Two, Tower Three, Tower Four, and Tower Five are each respectively governed by a Declaration of Condominium (collectively, the "Condominium Declarations").[11]  The Condominium Declarations are identical in all material respects.

49. The Condominium Declarations contain certain relevant provisions regarding maintenance, alterations, and improvements.

---

[11] The Declarations of Condominium for Tower One, Tower Two, Tower Three, Tower Four, and Tower Five are attached as "Composite Exhibit 2."

50.    Paragraph 9. of the Condominium Declarations states as follows, in relevant part:

**9.    Maintenance, Alterations and Improvements.**

**Subject to the terms and conditions of the Master Declaration, responsibility for the maintenance of the Condominium Property and restrictions upon its alterations and improvements shall be as follows:**

**\*\*\***

**9.1.2 By the Unit Owner.  The responsibility of the unit owner to maintain, repair and replace shall be as follows:**

**9.1.2.1 To keep and maintain his unit, its equipment and appurtenances in good working order, condition and repair, and to perform promptly all maintenance and repair work within the unit which, if omitted, would affect the Condominium in its entirety or in a part belonging to others, with the unit owner being expressly responsible for the damages and liability which his failure to do so may cause. Notwithstanding anything contained in this Declaration, the owner of each unit shall be liable and responsible for the maintenance, repair and replacement, as the case may be, of all windows and exterior doors, including sliding glass doors, storm doors and windows, and all air-conditioning and heating equipment, whether located with or without the unit, stoves, refrigerators, fans and other appliances and equipment, including pipes, wiring, ducts, fixtures and/or their connection required to provide water, light, power, air-conditioning and heating, telephone, sewage and sanitary service to his unit which may now or hereafter be situated in his unit. Provided, however, should a unit owner not repair or replace a broken window, exterior door, sliding glass door, or storm door and window within 12 hours of its having been broken, then either the Association or the Master Association shall have the right and authority to cause the same to be fixed, repaired or replaced, at the sole expense of the unit owner, and such expense shall be due and owing from the unit owner to the**

**Association or the Master Association, as appropriate, and the payment of the same shall be secured by a lien against said unit.**

*Defendants' Claim Submission and the Appraisal Process*

51.    On or around September 17, 2020, Defendants reported a claim to Westchester, Princeton, Everest, and Endurance (collectively the "Primary Layer Carriers") for property damage arising on or around September 16, 2020, for damage which allegedly occurred as a result of Hurricane Sally.

52.    The Primary Layer Carriers, through their independent adjuster (McLarens), moisture mapping consultant (American Environmental Group), and building consultant/consulting engineering firm (JS Held, LLC), began inspecting the Properties on September 19, 2020.

53.    Six weeks later, on approximately December 2, 2020, a dispute arose between the Primary Layer Carriers and Defendants regarding the amount of payments due to Defendants as a result of the claim. At that time, Defendants had submitted invoices from water mitigation contractor "BMS CAT" totaling $732,363.44, which were subsequently reduced to $726,982.68. JS Held calculated the fair value of BMS CAT's services at $698,562.68, leaving a disputed amount of $28,420.

54.    On December 11, 2020, Defendants sent correspondence to the Primary Layer Carriers in which Defendants demanded appraisal of the amount of loss pursuant to the Appraisal Provision of the Policies.

LEGAL\65393599\1

55.     At no point did Defendants issue an appraisal demand to any other Plaintiffs.

56.     On December 11, 2020, Defendants initially appointed Corinne Heller, Esq. as their appraiser.

57.     On December 11, 2020, Defendants also submitted a sworn proof of loss to the Primary Layer Carriers totaling $6,479,380.60, an amount within the Primary Layer of coverage.

58.     By submitting the sworn proof of loss, Defendants' demand totaled $1,962,840.60 after applying the Policies' deductibles for each of the five condominium buildings.

59.     Prior to February 5, 2021, the Primary Layer Carriers had issued advance payments totaling $2,000,000 to the Defendants.

60.     On February 26, 2021, after Defendants invoked the appraisal process, Defendants submitted an unsolicited sworn proof of loss to the Primary Layer Carriers totaling $13,625,952.43, an amount within the Primary Layer of coverage.

61.     Prior to July 6, 2021, the Primary Layer Carriers had issued advance payments totaling $6,000,000 to the Defendants.

*Defendants' Appraiser's Interest and Incompetence*

62.    On February 8, 2021, Defendants sent correspondence to the Primary Layer Carriers stating that George Keys and KCC would serve as Defendants' appraiser instead of Corinne Heller, Esq.

63.    On February 18, 2021, the Primary Layer Carriers sent correspondence to Defendants in which the Primary Layer Carriers advised Defendants that Mr. Keys had been disqualified as an appraiser on at least four occasions as a result of questions regarding his self-interest.

64.    Accordingly, in their February 18, 2021, correspondence, the Primary Layer Carriers asked Defendants to disclose certain information regarding Mr. Keys' compensation in order to allow Plaintiffs to evaluate whether Mr. Keys is qualified to serve as Defendants' appraiser under the terms of the Policies.

65.    Specifically, in their February 18, 2021, correspondence, the Primary Layer Carriers asked Defendants to disclose: (1) whether Mr. Keys possesses a financial interest in the outcome of the appraisal; (2) whether Mr. Keys otherwise has an interest in the outcome of the appraisal that could impact his impartiality, such as a contingency fee arrangement with Defendants or a fiduciary relationship with the Defendants with respect to this claim or any other past or present pending legal matters; (3) the number of matters on which Mr. Keys has worked as a public adjuster, expert, and/or appraiser for Defendants' counsel's law firm, McDonald

23

Fleming, and its clients; (4) the details of any services Mr. Keys has provided as an expert to Defendants' counsel's law firm, McDonald Fleming; and (5) whether Mr. Keys is a family member of or an individual with whom Defendants and/or their representatives has a personal relationship.

66.     On February 24, 2021, Defendants sent correspondence to the Primary Layer Carriers in which Defendants asserted that that the Policies do not require Defendants to disclose the nature of compensation for their appraiser at the outset of the appraisal.

67.     On August 2, 2022, for the first time, Defendants, through their party-appointed appraiser Mr. Keys, submitted their full claim demand in the amount of $233,030,601.80 in damages allegedly resulting from Hurricane Sally, an amount more than seventeen times greater than Defendants' last unsolicited sworn proof of loss.

68.     The $233,030,601.80 claim demand contains numerous items with dollar values that are severely inflated and not based on actual costs.

69.     The $233,030,601.80 claim demand also contains numerous items with dollar values that are duplicative of other items contained within the same estimates.

70.     On August 10, 2022, for the first time, Defendants produced a copy of the purported contract between Defendants and Mr. Keys and his company, KCC, for the appraisal of the claim (the "Mr. Keys Contract"). A true and correct copy of

the document provided by Defendants on August 10, 2022, is attached hereto as Exhibit "2."

71.    The dates on which Mr. Keys and the Defendants' Representative(s) appear to have executed the Mr. Keys Contract are between March 3, 2021, and March 8, 2021, despite the fact that Defendants retained Mr. Keys on or before February 8, 2021.

72.    During the Appraisal Panel hearings, Mr. Keys and his experts were unable to provide justification or support for numerous items that they included in their repair estimates and for which they seek payment from Plaintiffs.

73.    Mr. Keys and his experts presented at the Appraisal Panel hearings readings from moisture meters that were taken while the moisture meters were being incorrectly operated.

74.    At the Appraisal Panel hearings Mr. Keys and his experts presented incorrect general conditions calculations in their repair estimates and did not account for multiple trades sharing the same general costs.

75.    Due to the incompetence of Mr. Keys and his experts, their presented estimates did not include accurate costs for general conditions that Defendants will actually incur while performing repairs at the Property because the estimates did not consider that Defendants would benefit from economies of scale as a result of the cost reductions for the simultaneously performed construction operations.

76.    Mr. Keys and his experts presented at the Appraisal Panel hearings costs for general conditions for each individual trade involved in the project without considering that different trades will use the same items for general conditions.

77.    For example, Mr. Keys and his experts claimed in their presentation at the Appraisal Panel hearings the need for a separate crane for each trade at a condominium building, rather than allowing for the same crane to be used by various contractors for roof repair and repairs of the windows and doors.

78.    While Mr. Keys and his experts claimed that roof repairs would take nine months per building and the fenestration repairs would take twelve months per building, the claimed crane rental costs for each individual condominium tower for fenestrations was approximately a quarter of the amount claimed for the crane rental costs for roof repairs.

79.    As another example, Mr. Keys and his experts submitted repair estimates that claimed 410 months of temporary toilets. This allocation amounts to two temporary toilets per building for each of the five condominium buildings for seventeen years.

80.    The repair estimates submitted by Mr. Keys and his experts also claim costs for project supervision amounting to 40 hours of supervision per week for 29.2 years.

*Defendants' Withholding of Information and Last-Minute Document Dump*

81.    In January 2022, the appraisal panel, including the appraiser appointed by the Primary Layer Carriers, Patrick Lewis of Lewis Claims Solutions, Defendants' appraiser (Mr. Keys and KCC) and the neutral umpire (Jon Doan of Claims Consultants Group) (collectively, the "Appraisal Panel") agreed to a final inspection schedule. Under their agreement, the Appraisal Panel's hearings would begin on August 15, 2022.

82.    During the appraisal process, the Primary Layer Carriers learned for the first time that Defendants possessed meeting minutes, condominium documents, repair records, and contracts (collectively, the "Requested Documents") that would assist the Appraisal Panel in determining which damages at the Properties may have predated Hurricane Sally and therefore would not be included in the appraisal award.

83.    Mr. Lewis asked Mr. Keys for the Requested Documents on August 31, 2021.

84.    Mr. Keys explicitly refused to provide any of the Requested Documents and referred Mr. Lewis to Defendants' counsel, McDonald Fleming, for any appraisal related documentation requests.

85.    The Primary Layer Carriers then sent Defendants a letter dated September 3, 2021, requesting access to the Requested Documents via Defendants' web portal.

27

86.    Defendants did not send a timely, substantive reply to the September 3, 2021, letter.

87.    Mr. Lewis continued to request documentation from Defendants, including invoices for amounts incurred due to the alleged damages resulting from Hurricane Sally, to further the Appraisal Panel's duty to appraise the amount of the loss resulting from Hurricane Sally.

88.    Mr. Keys continued to refuse to provide any documentation, including refusing to provide invoices for amounts incurred due to the alleged damages resulting from Hurricane Sally.

89.    On March 21, 2022, certain Plaintiffs[12],[13] sent a second letter to Defendants requesting access to the Requested Documents.

---

[12] Plaintiffs reiterate that appraisal was only ever invoked as to Westchester, Endurance, Everest, and Princeton.  Certain other Plaintiffs had become aware of the appraisal and requested to be kept up to date on the appraisal, though no formal claim submission had been made as to those carriers.

[13] Homeland first received notice of Defendants' claim on or about July 6, 2022, when it received correspondence dated June 24, 2022 from Defendants' counsel requesting a copy of its insurance policy. Homeland timely provided a copy of its policy but advised that it had not received a claim for damage caused by Hurricane Sally. Homeland did not learn of the appraisal demand made to the Primary Layer Carriers and ongoing appraisal proceedings until on or about July 25, 2022. As such, Homeland was not, and has not been, a participant in the appraisal process. Accordingly, Homeland is not bound by the appraisal process and continues to reserve all rights under the Homeland Policy, at law, and in equity.

LEGAL\65393599\1

90.    On March 22, 2022, Defendants responded to the March 21, 2022, letter, stating that Defendants would not provide blanket access to their computer storage system, but would provide condominium documents (including covenants, declarations, and bylaws) and meeting minutes.

91.    On April 1, 2022, certain Plaintiffs[14] responded to Defendants requesting that they provide specific documents, including the following:

(1) All meeting minutes from each individual condominium tower's Homeowners Association and the Master Homeowners Association from 2012 through the present;

(2) A complete copy of all incurred invoices and costs with paid receipts from Incurred Invoice Submission 4, which was submitted by Defendants during the appraisal;

(3) All supporting documentation for bids, negotiations, solutions, and services provided since September 6, 2020;

(4) Maintenance records related to: roofs, glazing (fenestrations), railings, exterior stucco and paint (including the last time each building was painted and the last time each tower was wet sealed), HVAC, condo unit plumbing, parking lot pergolas, pools and associated equipment, docks, bridges,

---

[14] See footnotes 12 and 13.

LEGAL\65393599\1

elevators, fire systems, tennis courts, and exterior lighting, and any history of parking lot pavers (repairs and replacements), for all towers, lifestyle buildings, and any other HOA-owned structures from 2012 through the present time, as well as any related supporting documentation; and

(5) All supporting documentation for services rendered in relation to any of the above.

92.    The April 1, 2022, letter asked that Defendants provide the Requested Documents by May 1, 2022, so that the Appraisal Panel would have sufficient time to review and analyze the Requested Documents before the Appraisal Panel hearings.

93.    Defendants did not provide a response to the April 1, 2022 letter.

94.    On June 3, 2022, certain Plaintiffs[15] sent a subsequent letter to Defendants requesting the Requested Documents and asking that Defendants provide copies of the Requested Documents by June 15, 2022, so that the Appraisal Panel would have sufficient time to review and analyze the Requested Documents before the Appraisal Panel hearings, which were scheduled to begin on August 15, 2022.

---

[15] See footnotes 12 and 13.

95.    Defendants did not provide a response to the June 3, 2022, letter until July 19, 2022, less than a month before the Appraisal Panel hearings were scheduled to begin.

96.    The first documents Plaintiffs received from Defendants were in the form of a thumb drive received on July 19, 2022, which contained meeting minutes from the Portofino Master Homeowner's Association meetings.

97.    Between August 5, 2022, and August 12, 2022, Defendants transmitted additional documents to certain Plaintiffs through Dropbox.

98.    Defendants provided certain Plaintiffs[16] with meeting minutes for the homeowners' associations for Towers 1 and 2 of the Property late in the day on Friday, August 5, 2022.

99.    Defendants provided certain Plaintiffs[17] with meeting minutes for the Tower 3 homeowners' association of the Property on August 9, 2022.

100.    Defendants provided certain Plaintiffs[18] with meeting minutes for the Tower 4 homeowners' association of the Property late in the day on August 10, 2022.

---

[16] See footnotes 12 and 13.

[17] See footnotes 12 and 13.

[18] See footnotes 12 and 13.

LEGAL\65393599\1

101.    Defendants provided certain Plaintiffs[19] with meeting minutes for the Tower 5 homeowners' association of the Property on Friday, August 12, 2022.

102.    On August 10, 2022, Defendants also provided certain Plaintiffs[20] with some documents responsive to certain Plaintiffs' other document requests.

103.    Just days before the Appraisal Panel hearings were scheduled to begin, Defendants sent more than 4,100 documents consisting of over 40,000 pages.

104.    As of the conclusion of the appraisal, Defendants still had not provided all of the Requested Documents to Plaintiffs. For example, Defendants failed to provide, among other things, records relating to roof repairs performed at the Property.

105.    On August 11, 2022, due to Defendants' last-minute production of the Requested Documents, Mr. Lewis requested that the Appraisal Panel hearings be postponed until he had the opportunity to review the voluminous documentation, which had been requested almost a year earlier.

106.    Mr. Keys opposed the request to delay the beginning of the Appraisal Panel hearings.

---

[19] See footnotes 12 and 13.

[20] See footnotes 12 and 13.

107.    Also on August 11, 2022, Mr. Keys stated that he had not seen and did not need to review any of the Requested Documents in order to participate in the Appraisal Panel hearings.

108.    On August 12, 2022, umpire Jon Doan decided the Appraisal Panel hearings would begin as scheduled on August 15, 2022.

109.    Thereafter, on August 12, 2022, Mr. Lewis informed the Appraisal Panel that he would participate in the Appraisal Panel hearings beginning on August 15, 2022, under protest.

*The Form of the Appraisal Award*

110.    Mr. Lewis requested that the Appraisal Panel's award include a detailed itemization of amounts due by trade and specific damage category, as well as a breakdown of amounts awarded for pertinent Coverage Sublimits listed in the Policies.

111.    Mr. Keys opposed the request that the Appraisal Panel's award include detailed itemization of amounts due by trade and specific damage category, as well as a breakdown of amounts awarded for pertinent Coverage Sublimits listed in the Policies.

112.    During the Appraisal Panel hearings, Mr. Keys opposed Mr. Lewis's request that the final award comply with requirements of the Valuation Provisions in the Policies.

*Defendants' Fraudulent Loss Submission to Plaintiffs*

113.   Defendants through Mr. Keys submitted documents to the Appraisal Panel and made representations during the Appraisal Panel hearings that may be fraudulent.

114.   Defendants' witnesses and Mr. Keys made false representations during the Appraisal Panel hearings regarding past damages and repairs at the Properties.

115.   Defendants' witnesses made false representations during the Appraisal Panel hearings regarding their whereabouts during Hurricane Sally.

116.   Before and during the Appraisal Panel hearings, Mr. Keys and his experts submitted written documents that contain misleading information.

117.   Mr. Keys and his experts submitted estimates and invoices with unsupported pricing for property repairs and equipment rentals.

118.   When confronted at the Appraisal Panel hearings, Mr. Keys and his experts could not provide evidence regarding, or otherwise justify, how they determined many of the costs for property repairs and equipment rentals.

119.   Mr. Keys and his experts submitted duplicate and overlapping items for the same or similar repairs and repair processes in their estimates, which could not all be performed by the contractors.

120.    Although Mr. Keys and his experts only tested one swinging balcony door, which did not leak or fail during the test, they claimed that all balcony swinging doors must be replaced in their estimates and at the Appraisal Panel hearings.

121.    Even though Mr. Keys and his experts included the costs for replacement of all exterior windows and doors due to paint damage, they acknowledged that only approximately 6% of the exterior windows and doors showed signs of paint damage.

122.    In addition to requesting payment to replace all of the exterior windows and doors at the Property, Mr. Keys and his experts have submitted estimates to the Appraisal Panel requesting payments to re-seal all of the existing windows at the Property.

123.    In other words, Mr. Keys and his experts have claimed that Plaintiffs should pay for both (1) re-sealing the existing windows and doors, and (2) removing and replacing those same windows and doors with new windows and doors.

124.    Since Hurricane Sally, Defendants have obtained nineteen permits to replace rooftop HVAC units. Only four of those permits specifically mention Hurricane Sally as the cause of damage to the individual HVAC units.

125.    Even though only nineteen rooftop HVAC units have been replaced since Hurricane Sally, Mr. Keys and his experts claimed that 93 rooftop HVAC units need to be replaced as a result of Hurricane Sally.

126.   During the Appraisal Panel hearings, Mr. Keys and his experts claimed the replacement of 93 rooftop HVAC units even though they could not explain how the units were damaged.

127.   Mr. Keys and his experts claimed during the Appraisal Panel hearings approximately $18.8 million for crane rental costs, which are not based on any actual price quotes.

128.   Instead, crane vendors provided estimates to Plaintiffs' appraiser establishing that the actual rental costs will be below $6 million.

129.   Mr. Keys and his experts have submitted estimates to the Appraisal Panel requesting payment for two different methods of waterproofing numerous balconies at the Property (the Kemper system and the Hydrostop system), when only one waterproofing system would be used at any individual balcony.

130.   Furthermore, the prices that Mr. Keys and his experts submitted to the Appraisal Panel for the waterproofing systems are significantly inflated and do not reflect the actual costs of applying those systems.

131.   Based on photographs of the damages to the Property sustained as a result of Hurricane Ivan in 2004, Defendants are asserting a claim for the same damages, claiming they are now a result of Hurricane Sally.

132.   The photographs demonstrate that the damages claimed by Defendants, as well as Mr. Keys and his experts, as resulting from Hurricane Sally to numerous

exterior windows, doors, balconies, and guardrails are the same damages that were present in 2004 after Hurricane Ivan.

133.   Mr. Keys and his experts claimed the cost for metal lath and stucco repairs to certain fenestrations even though the Property does not contain any metal lath and stucco fenestration construction.

134.   Although the Policies specify that the amount of the loss must be measured at the time of the loss (September 2020), Mr. Keys and his experts have claimed repair costs based on price lists from April 2022, which are significantly higher than September 2020 price lists.

135.   Certain Plaintiffs asked Defendants for the Requested Documents in order to determine whether any of the claimed damages occurred before Hurricane Sally.

136.   Although certain Plaintiffs sought the Requested Documents from Defendants and their representatives in August 2021, Defendants intentionally withheld many of the Requested Documents until August 2022 and did not provide many of the Requested Documents to certain Plaintiffs until only three days before the Appraisal Panel hearings were scheduled to begin.

137.   The Requested Documents demonstrate that many of the damages claimed by Defendants as well as Mr. Keys and his experts occurred before Hurricane Sally.

138.   Defendants, as well as Mr. Keys and his experts, intentionally failed to provide any of the Requested Documents to Plaintiffs for more than ten months despite knowing that the Requested Documents contained information that is material to determining whether the damages claimed by Defendants resulted from Hurricane Sally.

139.   Defendants, as well as Mr. Keys and his experts, intentionally withheld and concealed material information from Plaintiffs.

*Issuance of the Appraisal Award*

140.   The appraisal panel has issued an appraisal award in seven parts (collectively, "Appraisal Award").

141.   On February 15, 2023, the appraisal panel issued a partial appraisal award for amounts incurred ("Incurred Part").   The Incurred Part totaled $14,180,798.64.

142.   On March 12, 2023 and April 5, 2023, Westchester requested a signed and sworn proof of loss from Defendants in accordance with the Policy.

143.   On April 20, 2023, Defendants refused to submit a signed and sworn proof of loss.

144.   On March 15, 2023, the appraisal panel issued a partial award for Tower 1 ("Tower 1 Part").  The Tower 1 Part consisted of a replacement cost value ("RCV") of $34,464,099.75, depreciation in the amount of $2,533,668.65, and an actual cash

value ("ACV") of $31,930,431.10.  The Tower 1 Part was signed only by Mr. Keys and Mr. Doan.

145.   On March 27, 2023, the appraisal panel issued a partial award for Tower 2 ("Tower 2 Part").  The Tower 2 Part consisted of an RCV of $33,467,612.23, depreciation in the amount of $2,437,720.28, and an ACV of $31,029,891.95.  The Tower 2 Part was signed only by Mr. Keys and Mr. Doan.

146.   On April 12, 2023, the appraisal panel issued a partial award for Tower 3 ("Tower 3 Part").  The Tower 3 Part consisted of an RCV of $35,254,620.14, depreciation in the amount of $2,587,832.68, and an ACV of $32,666,787.46.  The Tower 3 Part was signed only by Mr. Keys and Mr. Doan.

147.   On April 28, 2023, the appraisal panel issued a  partial award for Tower 4 ("Tower 4 Part").  The Tower 4 Part consisted of an RCV of $33,039,274.47, depreciation in the amount of $2,277,672.52, and an ACV of $30,761,601.95.  The Tower 4 Part was signed only by Mr. Keys and Mr. Doan.

148.   On May 30, 2023, the appraisal panel issued a partial award for Tower 5 ("Tower 5 Part").  The Tower 5 Part consisted of an RCV of $33,289,526.44, depreciation in the amount of $2,357,618.05, and an ACV of $30,931,908.39.  The Tower 5 Part was signed only by Mr. Keys and Mr. Doan.

149.   On July 16, 2023, the appraisal panel issued a partial award for "Various Buildings" ("Various Buildings Part").  The Various Buildings Part consisted of an

RCV of $3,200,111.90, depreciation in the amount of $154,178.95, and an ACV of $3,045,932.95.  The Various Buildings Part was signed only by Mr. Keys and Mr. Doan.

150.   The Various Buildings Part contained a line item for Loss Adjustment Expense in the amount of $2,027,373.24.

151.   Each part of the Appraisal Award incorporated a Statement of Loss, but Mr. Doan did not prepare any estimates to substantiate the Statement of Loss.

## **RELIEF SOUGHT BY PLAINTIFFS**

152.   Plaintiffs seek a declaration from this Court that Plaintiffs do not have any obligation to pay the Appraisal Award because Defendants failed to comply with the Appraisal Provision and the Cooperation Provision of the Policies.[21]

153.   In the alternative, Plaintiffs seek a declaration from this Court that the coverage under the Policies is void because Defendants have engaged in fraudulent conduct during the claim submission and appraisal process.

---

[21] As is set forth below, Homeland seeks a declaration that Defendants violated its policy conditions by failing to provide prompt notice. Further, as noted, Homeland is not bound by the appraisal process, particularly since the Homeland Policy expressly requires an itemized award. Accordingly, Homeland joins in the relief requested herein in addition to its primary requested relief that coverage under its policy is barred for failure of notice.

154.    In addition, Homeland, James River, and Maxum seek a declaration that coverage is barred under their Policies due to Defendants' failure to provide prompt notice of loss.

155.    In the alternative, Plaintiffs seek a declaration from this Court that Mr. Keys and KCC are disqualified from serving as Defendants' appraiser because Mr. Keys and KCC are not "disinterested" as required under the terms of the Appraisal Provision of the Policies.

156.    Additionally, in the alternative, Plaintiffs seek a declaration from this Court that they are not bound by the Appraisal Award because the Appraisal Award did not include a detailed itemization of amounts due by trade and specific damage category with sufficient detail to allow for the application of Policy provisions, including but not limited to applicable Coverage Sublimits, so that Defendants can satisfy their burden of establishing the existence and extent of coverage under the Policies.

157.    Additionally, in the alternative, Plaintiffs seek a declaration that some or all of the damages set forth in the Appraisal Award are not covered, or coverage is otherwise limited by the terms and conditions of the Policies.

## COUNT I – DECLARATORY JUDGMENT– AGAINST ALL DEFENDANTS (COOPERATION PROVISION)

158.    Plaintiffs reallege the facts set forth in paragraphs 1 – 157 above as if fully set forth herein.

LEGAL\65393599\1

159.   This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine questions of actual controversy between the parties as set forth below.

160.   Compliance with the Cooperation Provision is a condition of recovery under the Policies.

161.   Moreover, "in every contract there exists an implied promise that a party will not do anything to prevent or delay the other party from performing the contract." *Keener v. Sizzler Family Steak Houses*, 424 F. Supp. 482, 484 (N.D.Tex. 1977), *affirmed on this point*, 597 F.2d 453, 458 (5th Cir. 1979) *Tex. Nat'l Bank v. Sandia Mortg. Corp.,* 872 F.2d 692, 698 (5th Cir. 1989). "The duty to cooperate, which is an implied condition in the performance of a contract []." *Bombardier Aero. Corp. v. Signature Flight Support Corp.*, 123 So. 3d 128, 132 (Fla. 5th DCA 2013)(*citing SP Terrace, L.P. v. Meritage Homes of Texas, LLC*, 334 S.W.3d 275, 285 (Tex. App. 2010) (reiterating that duty to cooperate is implied in every contract to extent necessary for contract's performance, and thus, when one party prevents another from timely performing its contractual obligations, failure to timely perform is excused). *See Cont'l Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1344 (M.D. Fla. 2007) (a "duty to cooperate arises as a matter of law independent of the particular terms and conditions of the insurance policies.").

162.   By failing to comply with certain Plaintiffs' requests for documents until less than a week before the Appraisal Panel hearings were scheduled to begin,

Defendants failed to comply with their duty to cooperate and the terms of the Cooperation Provision, as well as prevented Plaintiffs from completing their investigation and from being able to timely review and present all relevant, probative evidence during the Appraisal Panel hearings.

163. Defendants purposefully withheld or concealed documentation concerning the damages allegedly resulting from Hurricane Sally.

164. The late document dump by Defendants was intended to prejudice Plaintiffs' and the Appraisal Panel's ability to review and analyze documentation that has a direct bearing on the Appraisal Panel's ability to determine the amount of damages that resulted from Hurricane Sally.

165. Plaintiffs have been or will be substantially prejudiced by Defendants' failure to cooperate.

166. Further, by delaying Plaintiffs' ability to review the requested documents, Defendants failed to comply with the policy condition permitting Plaintiffs to examine the insureds' books and records.

167. As a result of Defendants' failure to cooperate and comply with the terms of the Policies, Defendants are barred from recovering any amount under the Policies.

168. This Count is not made for purposes of seeking a legal opinion, but rather, the parties have an actual, present, adverse, and antagonistic dispute relating

to the Policies as described above. As such, there is a bona fide, practical need for a declaration from this Court concerning the parties' legal rights, responsibilities, and obligations under the Policies issued by Plaintiffs to Defendants.

169.   Plaintiffs seek a declaration concerning their obligations under the Policies, specifically that Defendants' actions are contrary to the terms, conditions, and obligations of the Policies, and therefore Defendants have no right to any recovery under the Policies.

## COUNT II –DECLARATORY JUDGMENT – AGAINST ALL DEFENDANTS (DEFENDANTS' APPRAISER)

170.   Plaintiffs reallege the facts set forth in paragraphs 1 – 157 above as if fully set forth herein.[22]

171.   This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine a question of actual controversy between the parties as set forth below.

172.   Mr. Keys' actions caused Plaintiffs to believe that he is not "competent" and/or "disinterested" and is therefore ineligible to serve as Defendants' appraiser.

173.   Mr. Keys and the employees of KCC are not "competent" and/or "disinterested."

174.   Mr. Keys has been disqualified by several courts from serving as a disinterested and competent appraiser due to his well-documented lack of

---

[22] See footnotes 7, 8, and 9.

LEGAL\65393599\1

impartiality and improper advocacy on behalf of policyholders. *See Auto-Owners Ins. Co. v. Summit Park Townhome Assn.*, No. 14-CV- 03417-LTB, 2016 WL 1321507 (D. Colo. Apr. 5, 2016), aff'd, 886 F.3d 852 (10th Cir. 2018); *Axis Surplus Insurance Co. v. City Center West LP*, No. 2015 CV 30453 (Colo. Dist. Ct., Weld County Mar. 14, 2016); *Church Mutual Ins. Co. v. Broadmoor Cmty. Church*, No. 2015CV32454 (Colo. Dist. Ct. El Paso County July 6, 2016); *Copper Oaks Master Home Owners Assn. v. Am. Fam. Mut. Ins. Co*., 15-CV-01828-MSK-MJW, 2018 WL 3536324 (D. Colo. July 23, 2018); *State Farm Fla. Ins. Co. v. Parrish*, 312 So. 3d 145 (Fla. 2d DCA 2021); *Creekside Crossing Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, 2022 WL 962743 (M.D. Fla. Jan. 31, 2022); *see also Prattley Enterprises Limited v. Vero Insurance New Zealand Limited*, No. CA400/2015, Court of Appeal of New Zealand (Mar. 14, 2016).

175.    Based on Mr. Keys' and KCC's conduct, Plaintiffs suspect that Mr. Keys and KCC will be compensated based on a percentage of the Appraisal Award.

176.    Mr. Keys either: (1) has an actual conflict of interest, or (2) knew of, but failed to disclose, information that would lead a reasonable person to believe that a potential conflict exists.

177.    Mr. Keys' refusal to review the Requested Documents, including property records, repair records, and other documents in Defendants' possession before preparing and/or presenting repair estimates to the Appraisal Panel

demonstrates that Mr. Keys did not intend to evaluate Defendants' claim fairly or accurately as is required by the Policies.

178.   Instead, Mr. Keys refused to review the Requested Documents, indicating that he did not intend to evaluate the "amount of loss" and instead intended to maximize Defendants' recovery in the appraisal.

179.   Mr. Keys intended to maximize Defendants' recovery in the appraisal without any consideration of whether the estimates he submitted during the appraisal accurately reflect the damages that resulted from Hurricane Sally.

180.   Mr. Keys and KCC are not qualified to serve as Defendants' "disinterested" appraiser due to their clear partiality.

181.   Additionally, Mr. Keys refused to review the Requested Documents, demonstrating that he is not competent to evaluate Defendants' "amount of loss" that resulted from Hurricane Sally.

182.   Although Mr. Keys and his experts did not use moisture meters properly while measuring moisture intrusion at the Property, resulting in incorrect moisture readings, Mr. Keys and his experts presented those incorrect moisture readings during the Appraisal Panel hearings in support of Defendants' claim for damages.

183.   Mr. Keys and his experts produced repair estimates containing numerous items with hyper-inflated dollar amounts and containing items that were duplicates of other items contained in the same estimates.

184.   Mr. Keys' reliance on and use of improper moisture meter readings and

estimates that contained inflated, duplicated, and inexplicable items and dollar

amounts demonstrates that Mr. Keys and KCC are not qualified to serve as

Defendants' appraisers because they are not "competent."

185.   Section 682.13(1), Florida Statutes, reads as follows:

> Vacating an award.—
> (1)   Upon motion of a party to an arbitration proceeding, the court shall vacate an arbitration award if:
> (a)   The award was procured by corruption, fraud, or other undue means;
> (b)   There was:
> 1.   Evident partiality by an arbitrator appointed as a neutral arbitrator;
> 2.   Corruption by an arbitrator; or
> 3.   Misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;
> (c)   An arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to hear evidence material to the controversy, or otherwise conducted the hearing contrary to s. 682.06, so as to prejudice substantially the rights of a party to the arbitration proceeding;
> (d)   An arbitrator exceeded the arbitrator's powers;
> (e)   There was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection under s. 682.06(3) not later than the beginning of the arbitration hearing; or
> (f)   The arbitration was conducted without proper notice of the initiation of an arbitration as required in s. 682.032 so as to prejudice substantially the rights of a party to the arbitration proceeding.

186.   This Count is not made for purposes of seeking a legal opinion, but

rather, the parties have an actual, present, adverse, and antagonistic dispute relating

to the Policies as described above. As such, there is a bona fide, practical need for a declaration from this Court concerning the parties' legal rights, responsibilities, and obligations under the Policies issued by Plaintiffs to Defendants.

187.    Plaintiffs seek a declaration concerning their rights and obligations under the Policies, specifically that the Policies preclude Mr. Keys and KCC from serving as Defendants' appraiser.

## COUNT III – DECLARATORY JUDGMENT – AGAINST ALL DEFENDANTS (FORM OF APPRAISAL AWARD)

188.    Plaintiffs reallege the facts set forth in paragraphs 1 – 157 above as if fully set forth herein.

189.    This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine a question of actual controversy between the parties as set forth below.

190.    Mr. Keys has prejudiced the Plaintiffs' ability to apply the Policies' provisions as written, and instead sought an appraisal award that does not include a detailed itemization of amounts due by trade and specific damage category, a breakdown of amounts awarded for each of the Coverage Sublimits listed in the Policies, or otherwise allow the Policies to be applied as written.

191.    Specifically, the Policies contain a sublimit of $15,000,000 in the annual aggregate in any one policy year as respects loss or damage caused by the peril of Flood.

LEGAL\65393599\1

192.   The Policies contain a sublimit of $10,000,000 Included per occurrence as respects Demolition and Increased Cost of Construction Coverage C.

193.   Plaintiffs are entitled to an appraisal award which includes a detailed itemization of amounts due by trade and specific damage category, as well as a breakdown of amounts awarded for each of the Coverage Sublimits listed in the Policies so the Policies can be applied as written.

194.   This Count is not made for purposes of seeking a legal opinion, but rather, the parties have an actual, present, adverse, and antagonistic dispute relating to the Policies as described above. As such, there is a bona fide, practical need for a declaration from this Court concerning the parties' legal rights, responsibilities, and obligations under the Policies issued by Plaintiffs to Defendants.

195.   Plaintiffs seek a declaration that the Appraisal Award is invalid because it does not include a detailed itemization of amounts due by trade and specific damage category, as well as a breakdown of amounts awarded for each of the Coverage Sublimits listed in the Policies, and the applicable Valuation Provisions, so the Policies can be applied as written.

## COUNT IV – DECLARATORY JUDGMENT– AGAINST ALL DEFENDANTS (APPRAISAL DEMAND)

196.   Plaintiffs Arch, AXIS, Colony, Evanston, Aspen, Independent, Interstate, Lloyd's, James River, and Maxum, reallege the facts set forth in paragraphs 1 – 157 above as if fully set forth herein.

49

197.   This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine questions of actual controversy between the parties as set forth below.

198.   The Appraisal Provision states, in relevant part, "If the Insured and this Company fail to agree on the amount of loss, each, upon the written demand either of the Insured or of this Company made within 60 days after receipt of proof of loss by the Company, shall select a competent and disinterested appraiser."

199.   The appraisal provision in the Evanston Policy states, in relevant part: "If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss . . . ."

200.   Defendants never made a written demand for appraisal as to Plaintiffs, Arch, AXIS, Colony, Evanston, Aspen, Independent, Interstate, Lloyd's, James River, or Maxum.  Thus, none of these carriers had an opportunity to "select a competent and disinterested appraiser" or otherwise have input into the makeup of the appraisal Panel.

201.   Plaintiffs seek a declaration concerning their rights and obligations under the Policies, specifically that they are not bound by the Appraisal Award due to Defendants' failure to comply with the respective appraisal provisions in the Policies.

### COUNT V – DECLARATORY JUDGMENT – AGAINST ALL DEFENDANTS (FAILURE TO COMPLY WITH LANDMARK POLICY'S APPRAISAL CLAUSE AMENDMENT)

202.   Plaintiff Landmark realleges the facts set forth in paragraphs 1 – 157 above as if fully set forth herein.

203.   This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine questions of actual controversy between the parties as set forth below.

204.   Defendants failed to comply with the Landmark Policy's Appraisal Clause Amendment, which states as follows:

> This endorsement replaces any and all other provisions regarding appraisal.

> If we and you disagree on the value of the property or the amount of loss, either party may request, in writing, an appraisal of the value of the property and/or the amount of loss. An appraisal may then take place only if the other party agrees in writing to participate in the appraisal process pursuant to terms of a written agreement between the parties. At a minimum, the written agreement between the parties will specify a protocol for the selection of a disinterested, competent, and impartial appraiser (who does not have a financial interest in the claim and/or appraisal award, including a contingent interest in the outcome of the claim or appraisal award), the inspection of the property by the appraisers, the selection of an umpire, communications between and among the appraisers and umpire, specific itemization of each item in dispute, and an award form. If the parties cannot agree on a written agreement specifying the protocol, an appraisal will not take place.

> If appraisal moves forward, the two appraisers will select an umpire, who is disinterested, competent, and impartial. If the two appraisers cannot agree to an umpire within 15 days of either appraiser proposing one or more umpires, the two appraisers may jointly request that the selection of a competent and impartial umpire be made by a judge of a court in the county of the loss or damage. If either party to the appraisal,

without notice to the other party, asks a judge to select an umpire, any such umpire selection shall be invalidated and the selection of a new umpire shall be required. If the appraisers do not agree to jointly request the appointment of an umpire, either the insurer or insured can unilaterally end the appraisal with written notice to the other. The appraisers will state separately the value of the property and amount of loss. Specific itemization of each item and amount in dispute is required, including, but not limited to, building-by-building, floor-by-floor, unit-by-unit, and area-by-area allocation. If the appraisers fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

Each party will:
    a.  pay its chosen appraiser; and
    b.    bear the other expenses of the appraisal and the umpire's fee equally.

In connection with the appraisal proceeding, neither the appraisers nor the umpire shall have authority to decide questions of law. Neither the appraisers nor the umpire shall attempt to resolve any issue of insurance coverage, policy exclusions, compliance with the policy terms and conditions, or any issues concerning the Limits of Insurance available under the Policy.

At any time after the request for appraisal, we will retain our right to demand compliance with all applicable Duties in the Event of Loss as described in this Policy. We may require completion of any of the Duties in the Event of Loss, or any other policy condition, prior to continuance of the appraisal proceeding.

If there is an appraisal, we will still retain our right to deny the claim.

Where applicable, the parties agree that during the pendency of an appraisal all required responses and cures to any Civil Remedy Notices are extended until 30 days after the appraisal is concluded.

By voluntarily agreeing to the appraisal process, both parties acknowledge that there are irreconcilable differences that exist regarding the value of the property and/or the amount of loss. Since

appraisal is voluntary, you are not required to submit to, or participate in, any appraisal of the loss as a precondition to action against us.

205.  Defendants never advised Landmark that they disagreed with Landmark on the value of the property or the amount of loss.

206.  Defendants never submitted a request in writing to Landmark for an appraisal on the value of the property or the amount of loss, as required by the Landmark Policy's Appraisal Clause Amendment.

207.  Landmark never submitted a request in writing to Defendants for an appraisal on the value of the property or the amount of loss, as required by the Landmark's Policy's Appraisal Clause Amendment.

208.  Landmark never agreed in writing to participate in an appraisal with Defendants pursuant to the terms of a written agreement between Defendants and Landmark, as required by the Landmark Policy's Appraisal Clause Amendment.

209.  The Primary Layer Carriers and Defendants already had selected their respective appraisers for the appraisal process before March 18, 2022, the date Landmark was first given notice of the loss or damage.

210.  Because Landmark did not receive notice of the loss or damage until March 18, 2022, and the Primary Layer Carriers and Defendants already had selected their respective appraisers before that date, Landmark was not given the opportunity to, and did not, participate in the selection of a disinterested, competent, and

LEGAL\65393599\1

impartial appraiser for an appraisal, as required by the Landmark Policy's Appraisal Clause Amendment.

211.   Landmark did not have the opportunity to have an appraiser selected by Landmark investigate and state the value of the property and amount of the loss as of the date of the loss or damage or submit any differences concerning the amount of the loss to an umpire in an attempt to resolve those differences, as required by the Landmark Policy's Appraisal Clause Amendment.

212.   The appointed appraisers of the Primary Layer Carriers and Defendants already had selected the umpire for the appraisal process before March 18, 2022, the date Landmark was first given notice of the loss for damage.

213.   Because Landmark did not receive notice of the loss or damage until March 18, 2022, and the Primary Layer Carriers and Defendants already had selected their respective appraisers, Landmark' was not given the opportunity to have an appraiser selected by Landmark participate in the selection of the umpire for the appraisal, as required by the Landmark Policy's Appraisal Clause Amendment.

214.   The Appraisal Award issued during the appraisal did not state separately the value of the property and amount of loss, specifically itemizing each item and amount in dispute, including, but not limited to, building-by building, floor-by-floor, unit-by-unit, and area-by-area allocation, as required by the Landmark Policy's Appraisal Clause Amendment.

LEGAL\65393599\1

215.   Landmark seeks a declaration concerning its rights and obligations under the Landmark Policy, specifically that it is not bound by the appraisal process or the Appraisal Award due to Defendants' failure to comply with the Landmark Policy's Appraisal Clause Amendment.

## COUNT VI –DECLARATORY JUDGMENT AND DAMAGES – FRAUD – AGAINST ALL DEFENDANTS

216.   Plaintiffs reallege the facts set forth in paragraphs 1 – 157 above as if fully set forth herein.

217.   Defendants, as well as Mr. Keys and his experts, have presented written and oral statements as part of, or in support of, Defendants' claim for payment under the Policies, knowing that those statements contain false, incomplete, or misleading information concerning facts or things material to Defendants' claim, in particular the "amount of loss" that resulted from Hurricane Sally.

218.   Defendants, as well as Mr. Keys and his experts, have prepared and made written and oral statements that are intended to be presented to Plaintiffs in connection with, or in support of, Defendants' claim for payment under the Policies, knowing that those statements contain false, incomplete, or misleading information concerning any fact or thing material to Defendants' claim, in particular the "amount of loss" that resulted from Hurricane Sally.

LEGAL\65393599\1

219.    Defendants, as well as Mr. Keys and his experts, have engaged in fraudulent conduct during the claim submission and appraisal process.

220.    Defendants, as well as Mr. Keys and his experts, have intentionally concealed and misrepresented material facts concerning Defendants' claim for damages that resulted from Hurricane Sally.

221.    The Requested Documents contain information regarding the damages sustained at the Property both before and after Hurricane Sally that is directly relevant and material to Plaintiffs' investigation of Defendants' claim for damages resulting from Hurricane Sally.

222.    Defendants intentionally withheld and concealed all of the Requested Documents from Plaintiffs for more than ten months.

223.    As of the conclusion of the appraisal, Defendants still had not produced all of the Requested Documents to Plaintiffs.

224.    Defendants, through their appraiser, Mr. Keys, submitted estimates with repair figures reflecting 2023 costs, while the Policies specify that the amount of the loss must be measured at the time of the loss (September 2020).

225.    Defendants intentionally misrepresented and concealed material facts to Plaintiffs throughout the claim submission and appraisal process.

226.    Defendants have violated Fla. Stat. § 817.234 (False and fraudulent insurance claims) during the claim submission and appraisal process.

227.   By engaging in fraudulent conduct during the claim submission and appraisal process, coverage under the Policies is void.[23]

228.   Plaintiffs have been damaged by Defendants' fraudulent conduct during the claim submission and appraisal process.

229.   Additionally, Plaintiffs are entitled to recover damages as a result of Defendants' fraudulent conduct during the claim submission and appraisal process in an amount to be determined at trial.

230.   This Count is not made for purposes of seeking a legal opinion, but rather, the parties have an actual, present, adverse, and antagonistic dispute relating to the Policies as described above. As such, there is a bona fide, practical need for a declaration from this Court concerning the parties' legal rights, responsibilities, and obligations under the Policies issued by Plaintiffs to Defendants.

231.   Plaintiffs seek a declaration concerning their obligations under the Policies, specifically that coverage under the Policies is void, under the terms of any applicable fraud and/or misrepresentation provisions in the Policies, applicable law, or public policy, and that Plaintiffs are entitled to recover damages due to the fraudulent conduct, and misrepresentation and concealment of material facts, during the claim submission and appraisal process by Defendants, Mr. Keys, and KCC.

---

[23] *See e.g.* [D.E. 104-1] at p. Plaintiffs 000404.

## COUNT VII –DECLARATORY JUDGMENT – FAILURE TO COMPLY WITH NOTICE AND LOSS APPRAISAL POLICY PROVISIONS AS TO HOMELAND – AGAINST ALL DEFENDANTS

232.   Plaintiff Homeland realleges the facts set forth in paragraphs 1 – 157 above as if fully set forth herein.

233.   This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine questions of actual controversy between the parties as set forth below.

234.   The Homeland Policy contains a Duties in the Event of Loss or Damage provision, which requires, among other things, that the Insureds give Homeland "prompt notice of loss or damage" including a description of the property involved, and requires the Insureds to give Homeland "a description of how, when and where the loss or damage occurred."

235.   Hurricane Sally occurred on or around September 16, 2020.

236.   Homeland first learned that there may have been a loss on or about July 6, 2022, when counsel for Defendants sent a letter dated June 24, 2022 requesting a copy of its insurance policy referencing a Hurricane Sally claim.

237.   Defendants' June 24, 2022 letter did not include any details regarding the loss or damage and did not provide a description of the property involved or the extent of damage.

238.   Defendants did not provide prompt notice of the loss or damage to Homeland.

239.    Defendants breached their duties in the Policy's Duties in the Event of Loss or Damage provision.

240.    Compliance with the Homeland Policy's Duties in the Event of Loss or Damage provision is a condition of recovery under the Homeland Policy.

241.    Homeland has been substantially prejudiced by Defendants' late notice of their claim.

242.    As a result of Defendants' late notice in breach of the Homeland Policy's Duties in the Event of Loss or Damage provision, Defendants are barred from recovering any amount under the Homeland Policy.

243.    Further, even if coverage were potentially available under the Homeland Policy, Defendants failed to comply with the Loss Appraisal provision of the Homeland Policy, which states as follows:

**I.      LOSS APPRAISAL**

If this Company and the Insured disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and will notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 30 days upon such umpire, the Insured and this Company may file a joint motion requesting that a judge of a court having jurisdiction appoint a competent and impartial umpire after a joint hearing before the court. Along with the joint motion requesting the appointment of the umpire, each party will submit to the court sworn affidavits which describe the efforts their appraiser has taken to reach agreement regarding the appointment of the umpire. If either party does not agree to a joint motion, the Insured or this Company may unilaterally file a

59

motion to compel appraisal in a court having jurisdiction. Such motion to compel must include a request for a joint hearing, and notice of hearing must be sent to the non-requesting party's appraiser by certified mail 7 days prior to the hearing.

Once appraisal proceeds, each appraiser will state separately the value of the property and amount of loss as of the date and time of the loss or damage. If the appraisers fail to agree, they will submit their differences to the umpire. An itemized award in writing of any two will determine the amount of value and the amount of the loss or damage to such items. Each party will:

**1.** Pay its chosen appraiser; and
**2.** Bear the other expenses of the appraisal and umpire equally.

This Company will not waive any of its rights by any act relating to appraisal. If there is an appraisal, this Company retains its right to deny the claim.

244. Defendants never made a written demand for an appraisal of the loss to Homeland.

245. Because Defendants did not make a written demand for an appraisal of the loss (or otherwise provide notice of the loss to Homeland until July 6, 2022), Homeland did not have the opportunity to select a competent and impartial appraiser or have its appraiser participate in the selection of an umpire, as required by the Loss Appraisal provision of the Homeland Policy. By extension, Homeland did not have the opportunity for its appraiser to investigate and state the value of the property and the amount of the loss as of the date and time of the loss or damage or submit any differences to an umpire.

LEGAL\65393599\1

246. Further, the Appraisal Award is not itemized as required by the Loss Appraisal provision of the Homeland Policy.

247. Because Defendants did not comply with the terms of the Loss Appraisal provision, Homeland is not bound by the appraisal process or the Appraisal Award entered therein.

248. This Count is not made for purposes of seeking a legal opinion, but rather, the parties have an actual, present, adverse, and antagonistic dispute relating to the Homeland Policy as described above. As such, there is a bona fide, practical need for a declaration from this Court concerning the parties' legal rights, responsibilities, and obligations under the Policy issued by Homeland to Defendants.

249. Homeland seeks a declaration concerning its obligations under its Policy, specifically that Defendants' actions are contrary to the terms, conditions, and obligations of the Homeland Policy, and therefore Defendants have no right to any recovery under the Homeland Policy, and Homeland is not bound by the appraisal process or the Appraisal Award entered in connection therewith.

LEGAL\65393599\1

## <u>COUNT VIII – DECLARATORY JUDGMENT – LATE NOTICE AS TO JAMES RIVER, MAXUM, AND LANDMARK - AGAINST ALL DEFENDANTS</u>

250.    Plaintiffs James River, Maxum, and Landmark reallege the facts set forth in paragraphs 1 – 157 above as if fully set forth herein.

251.    This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine questions of actual controversy between the parties as set forth below.

252.    The Policies contain a Notice Provision, which requires Defendants to report loss or damage as soon as practicable to Defendants' agent with full particulars for transmission to the designated loss adjuster and to each insurer.

253.    Hurricane Sally occurred on or around September 16, 2020.

254.    Neither Defendants, nor their agent, ever notified James River, Maxum, and Landmark of the loss.

255.    James River was first notified of the loss on March 17, 2022 by correspondence from AXIS.

256.    Maxum and Landmark were first notified of the loss on March 18, 2022, by correspondence from Cozen O'Connor, which at the time was representing other Plaintiffs in this action.

257.    Defendants did not provide notice of the loss or damage as soon as practicable to James River, Maxum, and Landmark.

258.    Defendants breached their duties in the Notice Provision.

62

259.   Compliance with the Loss Notice provision is a condition of recovery under the James River, Maxum, and Landmark Policies.

260.   James River, Maxum, and Landmark have been substantially prejudiced by Defendants' late notice of their claim.

261.   As a result of Defendants' late notice in breach of the Notice Provision, Defendants are barred from recovering any amount under the James River, Maxum, and Landmark Policies.

262.   This Count is not made for purposes of seeking a legal opinion, but rather, the parties have an actual, present, adverse, and antagonistic dispute relating to the James River, Maxum, and Landmark Policy as described above. As such, there is a bona fide, practical need for a declaration from this Court concerning the parties' legal rights, responsibilities, and obligations under the James River, Maxum, and Landmark Policies to Defendants.

263.   James River, Maxum, and Landmark seek a declaration concerning their obligations under their Policies, specifically that Defendants' actions are contrary to the terms, conditions, and obligations of the James River, Maxum, and Landmark Policies, and therefore Defendants have no right to any recovery under the James River, Maxum, and Landmark Policies.

63

## COUNT IX –DECLARATORY JUDGMENT– AGAINST ALL DEFENDANTS (COVERAGE)

264.    Plaintiffs reallege the facts set forth in paragraphs 1 – 157 above as if fully set forth herein.

265.    This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine questions of actual controversy between the parties as set forth below.

266.    In the alternative, if the Appraisal Award is determined to be valid and is confirmed, Plaintiffs seek a declaration regarding certain coverage issues, including but not limited to the following:

A.    The Policies do not provide coverage for repair or replacement of windows and doors, as the Condominium Declarations requires that unit owners are liable and responsible for the maintenance, repairs, and replacement of all windows and exterior doors, including sliding glass doors, storm doors, and windows;

B.    Loss Adjustment Expense, as included in the Various Buildings Award, is not covered under the Policies as part of appraisals;

C.    Pursuant to paragraph 11(h) of the Master Property Policy, Plaintiffs are not liable for more than the actual cash value of the property unless and until the Properties are repaired, rebuilt, or replaced;

D.    Pursuant to paragraph 28(b) of the Master Property Policy, defective design or specifications, faulty material, or faulty workmanship are not covered perils;

E.    Pursuant to paragraph 28(c) of the Master Property Policy, ordinary wear and tear or gradual deterioration are not covered perils;

F.    Pursuant to paragraph 28(d) of the Master Property Policy, inherent vice or latest defect are not covered perils;

G.    Pursuant to paragraph 28(n) of the Master Property Policy, corrosion, depletion, deterioration, erosion, wet rot, dry rot, decay, evaporation, rust, and shrinkage are not covered perils;

H.    Pursuant to paragraph 28(o) of the Master Property Policy, changes of temperature or humidity, whether atmospheric or not, are not covered perils;

I.    Pursuant to paragraph 28(p) of the Master Property Policy, settling, cracking, bulging, shrinking, or expansion of foundations; machinery pedestals, pads, or platforms; floors, pavements, walls, ceilings, or roofs; or the cumulative effects of smog, smoke, soot, vapor liquid, or dust, are not covered perils;

J.    Pursuant to paragraphs 5 and 33, the Master Property Policy contain a $10,000,000 Sublimit for Demolition and Increased Cost of Construction Coverage C;

K.    Pursuant to paragraph 5 of the Master Property Policy, the Policies contain a sublimit of $15,000,000 in the annual aggregate in any one policy year as respects loss or damage caused by the peril of Flood;

L.    Pursuant to paragraph 50 of the Master Property Policy, the appraisers were obligated to appraise the amount of the loss at the time of the hurricane.

M.    Pursuant to the Pre-Existing Damage Exclusion, any loss or damage directly or indirectly caused by, resulting from or contributed to by any pre-existing property damage is not a covered peril.

N.    Pursuant to the definition of "occurrence" under the Policies, there is no coverage for any loss or damage occurring before the Policies become effective or arising from an "occurrence" which is in progress at the time the Policies become effective, even if such loss or damage occurs after the Policies become effective.

O.    Pursuant to Paragraph 6 of the Master Property Policy, any award is subject to deduction of the Named Storm deductible.

P.    Pursuant to Paragraph 46 of the Master Property Policy, there is no coverage owed because Defendants refused to submit a signed and sworn proof of loss when Westchester requested that they do so.

65

Q.   There is no coverage under any Policies excess of the primary layer because Defendants did not comply with their post-loss obligations and never submitted an estimate implicating the excess Policies prior to demanding appraisal, and accordingly, appraisal was premature.

267.   Plaintiffs seek a declaration concerning their obligations under the Policies, specifically that coverage some or all of the damages in the Appraisal Award is barred or limited by the terms of the Policies.

## COUNT X – DECLARATORY JUDGMENT – AGAINST ALL DEFENDANTS (FLA. STAT. § 682.13)

268.   Plaintiffs reallege the facts set forth in paragraphs 1 – 157 above as if fully set forth herein.

269.   This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine questions of actual controversy between the parties as set forth below.

270.   Fla. Stat. § 682.13 states, in relevant part:

**(1) Upon motion of a party to an arbitration proceeding, the court shall vacate an arbitration award if:**
> **(a) The award was procured by corruption, fraud, or other undue means;**
> **(b) There was:**
>> **1. Evident partiality by an arbitrator appointed as a neutral arbitrator;**
>> **2. Corruption by an arbitrator; or**
>> **3. Misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;**
> **(c) An arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to hear evidence material to the controversy, or otherwise conducted the hearing contrary to s. 682.06, so as to prejudice**

**substantially the rights of a party to the arbitration proceeding;**

271. The award was procured by corruption, fraud, or other undue means.

272. Defendants, as well as Mr. Keys and his experts, engaged in fraudulent conduct during the claim submission and appraisal process and intentionally concealed and misrepresented material facts concerning Defendants' claim for damages that resulted from Hurricane Sally.

273. Mr. Keys engaged in corruption and/or misconduct by failing or refusing to provide requested documents, artificially inflating and duplicating costs in his estimates, refusing to consider evidence of prior damage and repairs, and other acts and omissions to be revealed in discovery.

274. Plaintiffs' rights were prejudiced as a result.

275. Mr. Lewis and the Primary Layer Carriers made multiple requests for the Requested Documents[24] from the Defendants beginning on August 31, 2021, including but not limited to requests made on August 31, 2021, September 3, 2021, March 21, 2022, April 1, 2022, and June 3, 2022.

276. Defendants did not provide any documents until July 19, 2022.

---

[24] See ¶¶81 – 109.

LEGAL\65393599\1

277.   Between August 5, 2022 and August 12, 2022, Defendants sent more than 4,100 documents consisting of over 40,000 pages which had first been requested nearly a year before.

278.   Defendants never produced requested documents relating to roof repairs.

279.   The appraisal hearing was scheduled to begin on August 15, 2022.

280.   On August 11, 2022, Mr. Lewis requested that the appraisal hearing be postponed to allow him the opportunity to review the documents.

281.   Mr. Keys opposed the request to postpone the appraisal hearing, and Mr. Doan decided to proceed with the appraisal hearing beginning on August 15, 2022.

282.   There was sufficient cause for the postponement, as these documents were relevant to prior repairs and prior damage to the property, they had been requested nearly a year in advance and on multiple occasions, and Mr. Lewis was not able to review 40,000 pages of documents just days before the appraisal hearings were to begin.

283.   Plaintiffs' rights were substantially prejudiced due to the failure to postpone the appraisal hearing.

284.   Plaintiffs seek a declaration that the Appraisal Award must be vacated pursuant to Fla. Stat. § 682.13.

LEGAL\65393599\1

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that Defendants be summoned to appear and answer herein, and that this honorable Court adjudicate and decree as follows:

A.     That Defendants are not entitled to any recovery under the Policies by their failure to comply with the Cooperation Provision of the Policies,

B.     That Defendants are not entitled to any recovery under the Policies by their failure to comply with the Appraisal Provisions of the Policies,

C.     That Defendants are not entitled to any recovery under the Homeland Policy by their failure to comply with the Duties in the Event of Loss or Damage and Loss Appraisal provisions of the Homeland Policy,

D.     That Defendants are not entitled to any recovery under the Maxum, James River, and Landmark Policies due to their failure to comply with the Loss Notice provision in the Policies;

E.     That coverage under the Policies is void because the Defendants engaged in fraudulent conduct and misrepresented and concealed material facts during the claim submission and appraisal process,

F.     That the Appraisal Award should be vacated pursuant to Fla. Stat. §682.13;

G.    That Defendants are required to pay Plaintiffs' damages sustained as a result of Defendants' fraudulent conduct during the claim submission and appraisal process and failure to comply with relevant provisions under the Policies,

H.    Alternatively, that Mr. Keys and KCC be disqualified from serving as Defendants' appraiser because they are not "competent" and/or "disinterested" as is required under the terms of the Appraisal Provision of the Policies,

I.    Alternatively, that the Appraisal Award is invalid because it does not contain a detailed itemization of amounts due by trade and specific damage category with sufficient detail to allow for the application of Policy provisions, including but not limited to applicable Valuation Provisions and Coverage Sublimits, so that Defendants can satisfy their burden of establishing the existence and extent of coverage under the Policies,

J.    Alternatively, that the damages in the Appraisal Award are not covered or are limited in coverage;

K.    Any other relief that this Court deems just and proper.

Dated this 15th day of August 2023.

Respectfully submitted,

/s/  John David Dickenson
John David Dickenson
Florida Bar No. 575801
jdickenson@cozen.com
Alexandra J. Schultz, Esq.
Florida Bar No. 122100
aschultz@cozen.com
**COZEN O'CONNOR**
1801 N. Military Trail, Suite 200
Boca Raton, FL 33431
Telephone: (561) 515-5250
Facsimile: (561) 515-5230

*Counsel for Plaintiffs Westchester Surplus
Lines Insurance Company, Arch Specialty
Insurance Company, Axis Surplus Insurance
Company, Evanston Insurance Company,
Aspen Specialty Insurance Company, and
Maxum Indemnity Company*

/s/ Wayne D. Taylor
Wayne D. Taylor, Esq.
Georgia Bar No. 701275
*Admitted in USDC NDFL*
wtaylor@mfllaw.com
**MOZLEY, FINLAYSON & LOGGINS
LLP**
1050 Crown Pointe Parkway, Suite 1500
Atlanta, GA 30338
Telephone: (404) 256-0700 (Telephone)
Facsimile: (404) 250-9355 (Facsimile)
wtaylor@mfllaw.com

LEGAL\65393599\1

-and-

Elizabeth D. Salinas, Esq.
Florida Bar No. 113394
esalinas@mfllaw.com
**MOZLEY, FINLAYSON & LOGGINS LLP**
4767 New Broad Street
Orlando, Florida 32814
Telephone: (404) 256-0700

*Counsel for Plaintiff Landmark American Insurance Company*


*/s/ Heidi Hudson Raschke*
Heidi Hudson Raschke
Florida Bar No. 61183
hraschke@carltonfields.com
Madison E. Wahler
Florida Bar No. 1019015
mwahler@carltonfields.com
**CARLTON FIELDS, P.A.**
4221 W. Boy Scout Blvd
Suite 1000
Tampa, Florida 33607
Telephone: 813-223-7000
Facsimile: 813-229-4133

*Counsel for Plaintiff Homeland Insurance Company of New York*


/s/ David C. Bibb
David C. Bibb (Fla. Bar No. 190330)
**ROLFES HENRY CO., LPA**
3191 Maguire Boulevard, Suite 160
Orlando, FL  32803
Telephone: (407) 284-4990
Email:  dbibb@rolfeshenry.com
        wgonzalez@rolfeshenry.com

72

Brian P. Henry, Esq. (Fla. Bar No. 0089069)
**ROLFES HENRY CO., LPA**
5577 Broadcast Court
Sarasota, FL 34240
Telephone:  (941) 684-0100
Email:    bhenry@rolfeshenry.com
            kdeglman@rolfeshenry.com

*Counsel for Plaintiffs Independent Specialty Insurance Company, Interstate Fire & Casualty Company, and Lloyd's Of London*


*/s/ Jack R. Reiter*
Jack R. Reiter, Esq.
Florida Bar No.: 0028304
jack.reiter@gray-robinson.com
Jordan S. Kosches, Esq.
Florida Bar No.: 49881
jordan.kosches@gray-robinson.com
**GrayRobinson, P.A.**
333 SE 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

*Counsel for Plaintiff Colony Insurance Company*


*/s/ Aaron Konstam*
**ERIC A. HILLER**
Florida Bar No. 27920
eric.hiller@kennedyslaw.com
**AARON KONSTAM**
Florida Bar No. 104765
aaron.konstam@kennedyslaw.com
**Kennedys CMK LLP**
1395 Brickell Avenue, Suite 610

Miami, Florida 33131
Telephone: (305) 371-1111

*Counsel for Plaintiff James River*
*Insurance Company*

LEGAL\65393599\1