**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**WESTCHESTER SURPLUS LINES INSURANCE COMPANY**, et al.,

Case No. 3:23-cv-453-MCR-HTC

Plaintiffs,

vs.

**PORTOFINO MASTER HOMEOWNERS ASSOCIATION INC.**, et al.,

Defendants.
_________________________________/

**PORTOFINO DEFENDANTS' ANSWER BRIEF TO PLAINTIFFS' OBJECTION TO PROTECTIVE ORDER REGARDING THIRD-PARTY SUBPOENAS**

Defendants,[1] by and through undersigned counsel, hereby respond to Plaintiffs' Objection [Doc. 159] to the Protective Order Regarding Third-Party Subpoenas [Doc. 153], stating as follows:

[1] Portofino Master Homeowners Association, Inc., d/b/a Portofino Master Homeowners Association at Pensacola Beach, Inc., a Florida not-for-profit corporation; Portofino Tower One Homeowners Association at Pensacola Beach, Inc., a Florida not-for-profit corporation; Portofino Tower Two Homeowners Association at Pensacola Beach, Inc., a Florida not-for-profit corporation; Portofino Tower Three Homeowners Association at Pensacola Beach, Inc., a Florida not-for-profit corporation; Portofino Tower Four Homeowners Association at Pensacola Beach, Inc., a Florida not-for-profit corporation; Portofino Tower Five Homeowners Association at Pensacola Beach, Inc., a Florida not-for-profit corporation (collectively "Portofino Defendants").

### *Introduction and Background*

The three insurance companies[2] "objecting" to the GRANTING of a Protective Order by Magistrate Judge Hope Cannon were among 16 insurers who have collectively called themselves "Insurers,"[3] or "market insurers."

These 16 market insurers[4] agreed to indemnify the Portofino Defendants against losses sustained as a result of an insured event. Given the fact that these "objections" are effectively treated as an appeal,[5] these three insurers will collectively be called "Appellants."

### *Uncontroverted Facts / Legal Framework*

Hurricane Sally was an insured event, for which the Portofino Defendants paid premiums year after year. The policies at issue were in effect at the time of

---

[2] Homeland Insurance Company of New York ("Homeland"), James River Insurance Company ("James River"), and Landmark American Insurance Company ("Landmark").

[3] *See* definition of "Insurers" at Doc. 104-1, p. 5 of 826.

[4] Three of the market insurers, Princeton Excess Surplus Lines Insurance Company, Endurance American Specialty Insurance Company, and Everest Indemnity Insurance Company, have paid what they deemed to be owed under the Appraisal Awards, and filed voluntary dismissals of their challenges. [Docs. 84, 85, and 86, respectively].

[5] The Order GRANTING the Motion for Protective Order, unlike a recommended order from the Magistrate, is reviewed under an abuse of discretion, or clear departure from the essential requirements of law, standard of review – not de novo.

the hurricane. The Portofino Defendants' properties sustained major damages as a result of the storm.[6]

The policy drafted by the market insurers contained an alternative dispute resolution ("ADR") procedure known as "Appraisal." *See* paragraph 34 of Plaintiffs' Amended Complaint [Doc. 104], for the full text of that provision. Market insurers are challenging the issued Appraisal Awards under Fla. Stat. § 682.13. As a matter of public policy, ADR is a favored means of resolving disputes. *See generally Timber Pines Plaza, LLC v. Zabrzyski*, 211 So.3d 1147, 1150 (Fla. 5th DCA 2017). "Appraisal clauses provide a mechanism for prompt resolution of claims and discourage the filing of needless lawsuits." *Merrick Pres. Condo. Ass'n, Inc. v. Cypress Prop. & Cas. Ins. Co.*, 315 So.3d 45, 49 (Fla. 4th DCA 2021) (citing *Fla. Ins. Guar. Ass'n v. Olympus Ass'n*, 34 So.3d 791, 794 (Fla. 4th DCA 2010) ). "The appraisers determine the amount of the loss, which includes calculating the cost of repair or replacement of property damaged, and

---

[6] These damages were so severe that just one small aspect of those damages, damages to railings, prompted an engineer for the market insurers, William Bracken of J.S. Held, to contact the Building Official to report those damages as a life-safety issue. *See* correspondence from Insurers' Engineer to the City of Pensacola dated September 29, 2021, attached as Exhibit "1." From the inception, the agent for the market insurers, the Designated Adjuster, who had the duty to investigate and determine the scope and amount of hurricane damages, knew that the damages were "significant. " *See* correspondence from Defendants' Director of Maintenance to Designated Adjuster, Jeff Hellman, dated September 16, 2020, attached as Exhibit "2."

ascertaining how much of the damage *was caused* by a covered peril *as opposed to* things such as 'normal wear and tear, dry rot, or various other designated, excluded causes.' " *Merrick*, 315 So.3d 45 at 49 (internal citations omitted) (emphasis supplied). Those issues were clearly before an Appraisal Panel that, collectively, has more than 100 years of experience in ferreting out conflicting testimony and evidence to determine the amount of the loss.[7]

Submitting the amount of loss to the Appraisal process waives any right to a jury trial or the right of access to the courts as to the amount of loss. *Progressive Am. Ins. Co. v. Glassmetics*, 343 So.3d 613, 625 (Fla. 2d DCA 2022); *see also First Protective Ins. Co. v. Hess*, 81 So.3d 482, 485 (Fla. 2011). The Magistrate was required, for purposes of determining relevance, to determine what issues were properly before the Court. "After the parties have gone through the appraisal process, the trial court may not consider evidence beyond the face of the appraisal award." *Island Roofing and Restoration LLC v. Empire Indemnity Ins. Co*., 2022 WL 4305922 * 5 (M.D. Fla. 2022); *Citizens Property Ins. Corp. v. River Manner Condo. Ass'n, Inc*., 125 So.3d 846, 854 (Fla. 4th DCA 2013). "The division of responsibility between the appraisers and court is therefore clear. The appraisers determine the amount of the loss, which includes calculating the cost of repair or

[7] *See* CVs of the three members of the Appraisal Panel, attached as Composite Exhibit "3."

replacement of the property damaged, and ascertaining how much of the damage was caused by a covered peril." *Gratkowski v. ASI Preferred Ins. Corp*., 351 So.3d 1216, 1219 (Fla. 2022). Here, the market insurers agreed there was a covered loss.

This Court, as well as the Court below, followed well-settled authorities in finding that the Appraisal Panel had exclusive authority to determine amount of the loss, which included causation,[8] and that this Court would not "look behind" the findings of that agreed-upon tribunal.[9] Thus, the Honorable Judge Cannon found that the "relevance" analysis would be limited to only those issues over which this Court has jurisdiction.

The Appellants also have alleged lack of notice of the claim and/or lack of participation in the Appraisal, but do not claim that the sale transaction documents have any relevance to those issues. Specially, Appellants allege that "…the requested documentation goes to the *true condition* of the property," and is therefore "relevant to prove numerous claims asserted in the Amended Complaint, including the fraud allegations. [Doc. 159, p. 11]. "True condition of the

---

[8] Determining causation required the Panel to exclude non-covered items, such as prior existing damages.

[9] "In other words, while a court may vacate an appraisal award if there has been fraud, a court cannot look underneath the hood and re-evaluate an appraisal award." *See* Order Granting Amended Motion for Protective Order [Doc. 153, p. 6].

property" was the issue before the Appraisal Panel, i.e., identifying the property damaged by Hurricane Sally.

In addition to the materials presented in the Motion for Protective Order [Doc. 137] and Response [Doc. 145], Judge Cannon heard and considered arguments and facts presented during a two-hour hearing held on December 15, 2023.

During the two-year Appraisal process, more than a dozen experts evaluated the hurricane damages, and testified before the Appraisal Panel.[10] The party-appointed appraisers hired nationally and internationally-known experts collectively spent more than $3 million, more than $4,000 per unit, testing and evaluating the windows, doors, and other exterior elements for potential Hurricane Sally damages.[11] This testing took months to complete and required the use of scaffolding, swing stages, vacuum chambers, and other specialized equipment and technology. Extensive written reports were exchanged, and are in the possession of the market insurers' attorneys.[12] It was those experts, not Keys, Lewis, unit

[10] *See* correspondence from Umpire Doan discussing the experts for the Appraisal Hearing, attached as Exhibit "4."

[11] *See* cost summary of the expert investigations, attached as Composite Exhibit "5."

[12] *See* correspondence from Umpire Doan discussing the experts for the Appraisal Hearing, attached as Exhibit "4."

owners, and certainly not any officer, director, or agent for Portofino Defendants, who testified as to what damages were, or were not, caused by Hurricane Sally. Keys arranged for a nationally-known expert, Paul Beers and GCI Consultants, LLC ("GCI"), to test and evaluate the windows, doors, and other exterior elements.[13] Lewis arranged for multiple experts, including Allison Brown, an internationally known window and door expert, to test and evaluate the windows and doors – the most expensive building components to repair or replace.[14]

Appellants claim that "Plaintiffs sued Portofino alleging, *inter alia*, that Portofino made material misrepresentations … *regarding the scope of damage* caused by the hurricane."[15] As discussed below, "scope of damages," including credibility of witnesses who testified to such damages, was exclusively within the jurisdiction of the Appraisal Panel who heard the evidence. There was no evidence that a pre-sale "home inspection" would have performed the extensive testing and evaluations performed by experts for consideration by the Appraisal Panel. Typical cost for a home inspection in Florida ranges from $250 to $400, and

[13] Paul Beers' CV, attached as Exhibit "6."

[14] Allison Brown's CV, attached as Exhibit "7."

[15] Doc. 159, p. 1. (emphasis supplied).

testing performed at the direction of the Appraisers costs more than $4,000 per unit.[16]

There was no showing that the Appellants and other market insurers would have been relying *on anyone other than their experts*, retained at a cost of more than $1.8 million, to determine the scope of damages to windows and doors.[17] Thus, nothing in a sales contract or record of sale would have been relied on by the market insurers. No such information was sought or introduced at the Appraisal hearing although such information was clearly in existence during the two-year appraisal process.[18]

---

[16] *See* attached Exhibit "8," article citing cost of typical home inspection, and attached Composite Exhibit "5," invoice summaries by Portofino Defendants, and J.S. Held, consultant for the market insurers.

[17] *See* attached Exhibit "5."

[18] A search of the public records show that 169 sales of units at Portofino occurred from the date of the insured event, Hurricane Sally (09/20/20), and the date that the Appraisal hearings began (08/15/2022). Thus, this information was available had it been considered relevant by either party. Appellants offer no excuse or reason why it was not developed and presented if relevant. There is no allegation that the information was concealed or withheld, and no allegation that it was even requested. The long list of information requested by the "market attorney" does not ask for sale records; nor is there any information that such evidence (much of it easily obtained from public records) was withheld or concealed. *See* correspondence from Dickenson to Fleming dated April 1, 2022, attached as Exhibit "9."

It should be noted that the market insurers have identified no one from the Portofino Defendants who made "representations" as to the scope of hurricane damages to windows and doors.[19] No part of that expert evaluation was done by unit owners. No portion was done by the Appraisers, George Keys or Patrick Lewis. It was done by well-qualified experts using expensive equipment, and specialized knowledge at a cost of millions of dollars.

As noted by the Magistrate,[20] information regarding sales of units – had it been deemed relevant – was readily available by public records. Those records show that 169 sales took place at Portofino between the date of the storm, and the date of the first appraisal hearing.[21] Those records show that 121 sales occurred between the date of the storm, and the date expert reports were exchanged.[22] Yet there is no evidence that any expert, whether retained by the market insurers, their party-appointed Appraiser, Portofino Defendants, or its party-appointed appraiser,

[19] Appellants reference one of the Appraisers, George Keys, and reference unnamed "experts." Neither Keys nor experts who testified at the Appraisal proceedings are "agents" (i.e., under the control of) the Portofino Defendants. Well-established law on the issue of an appraiser not being an agent is discussed herein.

[20] *See* Doc. 153, p. 9.

[21] *See* printout of public records search, attached as Exhibit "10."

[22] *See* printout of public records search, attached as Exhibit "11."

considered pre-storm or post-storm sales records to be relevant to their evaluation of damages to windows and doors. Nor is there any showing by the Appellants as to why that evidence, had it been deemed relevant, could not have been developed and submitted to the Appraisal Panel at any time before the Appraisal Awards were issued starting in February of 2023.

## *ARGUMENTS AND LEGAL AUTHORITIES*

I. Issue Before the Court:

> Did the Magistrate Judge's granting of a Protective Order constitute an "abuse of discretion," or show a "clear departure from the essential mandates of law"?

The Appellants issued non-party subpoenas to 125 of the 765 unit owners at the five towers of Portofino. Those subpoenas sought copies of sales contracts, inspection reports, and appraisals of the units, from a period ranging from 2020 to 2023. Records of sales occurring both before and after the insured event were subpoenaed.

Appellants concede that the information sought has no relevance to "lack of notice," or "lack of participation in the appraisal," or "lack of cooperation by the Associations," allegations in their Complaint. The only allegation in which they claim relevance is the issue of whether there was "fraud" by the Portofino Defendants that would void the millions of dollars in hurricane coverage purchased by the Portofino Defendants. A showing of fraud requires a plaintiff plead or

prove "(1) a false statement regarding a material fact; (2) the statement maker's knowledge that the representation is false; (3) intent that the representation induces another's reliance; and (4) consequent injury to the party *acting in* reliance." *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1315 (11th Cir. 2007); *Sheridan v. Rennhack*, 200 So.3d 255, 258 (Fla. 1st DCA 2016).

Unit owners are not agents of the Portofino Defendants. Thus, no statements by unit owners in sales contracts; i.e., disclosures or lack thereof, could be deemed "false statements" by the Portofino Defendants intended to induce reliance by the Appellants. Nor do the Appellants make any showing that any representation by unit owners was communicated to the market insurers, or that such statements were reasonably relied upon by the market insurers. Logic, common sense, and the factual record before the Court negates any argument that the market insurers relied on anything other than the findings of their own experts to whom they paid more than $1.8 million to evaluate Hurricane Sally damage.[23]

It is important to note that unit owners are required to carry their own policies against damages to their units.[24] No claim under unit owner policies is before this Court.

---

[23] *See* Lewis Claims cost summary, attached as Exhibit "5."

[24] *See* excerpt from Portofino Tower One's Declaration, attached as Exhibit "12." The other Towers have a similar provision.

No one from the Portofino Defendants testified at the hearing as to the scope of damages.[25] It was a matter on which the two appraisers, Patrick Lewis and George Keys, hired experts to evaluate. The market insurers made no showing that they acted in reliance on anyone other than their experts.

Appellants' insurers appear to take the position that Keys was an agent for Portofino Defendants[26] by virtue of being selected by Portofino Defendants as an appraiser, and that the sales information at issue might call his testimony into question. Two points need to be made here:

(1) It is well settled that a party's appointment of an appraiser does not make that appraiser the "agent" of the party. Thus, neither of the two party-appointed Appraisers can be deemed "agents" of the party who appointed them absent a showing of *control* by the party making the appointment. No such evidence has been alleged nor proffered. *See*, e.g., *Norwich Union Fire Ins. Soc. v. Cohn*, 68 F.2d 42, 44 (10th Cir. 1933). In *Cohn*, the federal circuit court found that

[25] The only Association employee who testified at the Appraisal Hearing was the Director of Maintenance, Dmitri Krivosheyev. He was not identified as an expert witness as to any issue, and testified solely as to maintenance, and the physical condition of Portofino before and after Hurricane Sally.

[26] Insurers allege that Mr. Keys made false statements, and that those statements constitute fraud by the Portofino Defendants. For that to be true, Mr. Keys would have to be deemed an agent of the Portofino Defendants. He was not, as established by well-settled law regarding agency, as discussed herein.

"while the appraisers are appointed by the parties, they are not subject to the control of the parties." Thus, "[appraisers] are not agents in law and ought not to be in practice. If appraisers were subject to the direction of the parties, the whole proceeding would be a useless ceremony, for if the parties cannot agree upon the loss by direct negotiation (and the appraisal clause is operative only in case of disagreement) they could not agree through agents subject to their direction. Fault of an appraiser is therefore not the fault of the party appointing him." *Id*. *See, also, Connecticut Fire Ins. Co., v. Cohen*, 55 A. 675, 677 (Md. Ct. App. 1903) (expressly rejecting the argument that the appraiser named by a party under a policy "is to be regarded as the agent of the party who nominated him in so far at least that he can, without the co-operation or connivance of that party, deprive him of the entire fruits of his insurance by pursuing a policy of inaction or bad faith in performing the duties of the appraisement"); *Figi v. New Hampshire Ins. Co*., 108 Cal. App.3d 772, 777 (Cal. Ct. App. 1980) ("Both parties agree appraisers are not agents of the parties nor subject to their direction and control, a fact crucial to a disinterested status"); *Bell v. Pine Needles Country Club*, Inc., 2019 NCBC LEXIS 27, *21 (N.C. Sup. Ct. April 23, 2019) ("Arbitrators, and appraisers serving in arbitration-like proceedings, are generally not agents of the parties that appoint them, but neutral and disinterested third parties*"); L. D. Jennings Co. v. North*

*River Ins. Co.*, 172 S.E. 700, 701 (S.C. 1934) ("arbitrators or appraisers are not agents, representatives, or advocates of the party by whom they are selected").

(2) Keys was not identified as an expert as to scope of damages, or cost of repairs.[27] There is no evidence that he testified as to the scope of hurricane damages or costs of repairs other than to summarize opinions of expert witnesses he retained to assist him in his duty to independently determine amount of loss.

Under these facts, the Magistrate found no showing of a connection between private sales transactions by unit owner, and allegations of intentional false statements by the Portofino Defendants to the market insurers that were intended to induce reliance by the market insurers, and did induce reliance. Unit owners had no involvement in the Appraisal. Thus, if (for example) a unit owner knew that the Appraisal Panel had found, based on expert analysis, damages to their sliding glass doors, and did not disclose that fact, this may very well constitute a violation of the "*Johnson v. Davis*" rule[28] regarding seller disclosures. That violation, however, would not be deemed as fraud by the Portofino Defendants.

---

[27] *See* correspondence from Umpire Doan discussing the experts for the Appraisal Hearing, attached as Exhibit "4."

[28] *Johnson v. Davis*, 480 So.2d 625 (Fla. 1985), held that "where the seller of a home knows of facts materially affecting the value of the property which are not readily observable and are not known to the buyer, the seller is under a duty to disclose them to the buyer."

Another fact supporting the Magistrate's conclusions is that even if sales information regarding units could be deemed relevant to determining the amount of the loss, it was readily available to the market insurers before the Appraisal hearings began. A search of the public records of Escambia County, in fact, show a total of 188 sales between the date of the Hurricane, September 16, 2020, and the date of the first Appraisal Award.[29] Those records, if deemed relevant by the Appraisers or experts, were not submitted for consideration to the Appraisal Panel. Appellants offer no explanation as to why sales information could not have been developed and presented to the Appraisal Panel. As the Magistrate correctly held in the Order:

> "Also, it is notable the Insurers did not request these documents or complain about needing them at any time during the appraisal proceedings. At no point, for example, did the Insurers argue the prices at which units sold for post-Hurricane Sally made a difference, even though that information was publicly available. And the Insurers cannot vacate the Appraisal Award on information that could have uncovered at the time of the hearings. *See Davenport v. Dimitrijevic*, 857 So.2d 957, 962 (Fla. 4th DCA 2003) ("A claim of fraud under section 682.13(1)(a) is not an opportunity to obtain a second bite of the apple to correct a party's deficiencies of proof at an arbitration")."

Doc. 153, p. 9.

The issue of credibility of the experts who testified before the Appraisal Panel was wholly within the province of that panel to decide. Even if this Court

[29] *See* printout of public records search, attached as Exhibit "13."

had a transcript of the two-week evidentiary hearing before the Appraisal Panel, it would not second guess the decision of the Panel as to which testimony was most credible. Doing so would require re-trying the case before that Panel, a process that took years and millions of dollars in expert costs alone to conclude. That is something courts will not and cannot by law do. *See Baptist Coll. of Fla., Inc. v. Church Mut. Ins. Co.*, SI, 5:22cv158-MW/MJF, 2023 WL 4358781, at *5 (N.D. Fla. March 7, 2023) (finding that plaintiff's attempt to "introduce evidence meant to modify the face of the Appraisal Award … runs contrary to Florida law) (citing *First Protective Ins. Co. v. Hess*, 81 So.3d 482, 486 (Fla. 1st DCA 2011) ("[A] trial court may not look beyond the face of an appraisal award and consider extrinsic evidence to determine the basis for the award.") ).

These facts and law amply support the decision of the Magistrate.

***Appellants' Misconstrue Magistrate's Order***

The Appellants falsely claim that the Magistrate "…framed the relevancy analysis *solely* as a challenge to the amount of Appraisal Award as excessive," and "overlooked" the other allegations of the Complaint. [Doc. 159, p. 10]. *See, also,* Doc. 159, p. 3 alleging that Magistrate deemed their third-party discovery as "*merely* an attack on the amount of the appraisal." [Doc. 159, p. 3]. Even a cursory reading of the Order refutes those allegations.

The Magistrate's Order spends pages analyzing the issues properly before the Court, and considering whether the sales records had any relevance to any of those issues – including the non-specific allegations of "fraud." [Doc. 153, pp. 3-4]. The Order expressly notes that "[t]he Issuing Insurers contend [that the information sought] is relevant to their attempts to show that the HOAs, Keys, and their experts committed fraud during the appraisal process. For the reasons discussed below, the Court disagrees." [*Id*. at p. 4]. Judge Cannon then considers the possible relevance of the information sought, and compares it to the allegations. Thus, the claim that the only "relevance" considered by the Court below relates to amount of the award is, quite simply, an allegation that has no merit.

To be sure, the Magistrate pointed out that Portofino Defendants argued that the "true basis for the Insurers declaratory judgment action and the motion to vacate the appraisal award is that they are unhappy with the award." [*Id*. at pp. 5-6]. And that statement is supported by the Appellants' own description of the issues now before this Court in their response to the Motion for Protective Order. In the first sentence of their "Introduction," Appellants state that "the heart of this matter involves an egregiously overinflated" claim…." Appellants claim that sales records and sales contracts involving the 125 non-parties now before the Court are relevant to their position that the amount of loss was "overinflated," and that is,

using their own words, "the heart" of the issue before the Court. The market insurers' pleadings alleged "inflated, overstated, ballooned, outrageous claim" or other words directly challenging the *amount of loss* no less than 10 times. [Doc. 104, ¶¶ 1, 2, 68, 130, 182, 184, and 273].

They attack the means and methods used to compute the amount of the loss, alleging duplication, overlapping, improper, lack of justification or support, not caused by insured event, windfall, outrageous, not based on actual costs, another 23 times. [Doc. 104, ¶¶ 2, 68, 69, 72, 74, 75, 76, 77, 79, 80, 119, 123, 129, 183, 184, 273, and 132].

Thus, their statement that "the heart of this matter involves an egregiously overinflated" claim is accurate. All issues that could arguably be related to the discovery sought from 125 non-parties are, at their core, attacks on the amount of the loss as established in a two-year Appraisal process.

It is important to note that under the terms of the Appraisal provision of the policies, if the two party-appointed Appraisers disagreed as to amount of loss, the person charged with resolving their dispute was the mutually-selected Umpire, Jon Doan. Mr. Doan has served as the mutually-selected or court-appointed umpire in more than 1,000 appraisals. His credentials have been lauded by two federal judges. After listing the qualifications of Jon Doan, against whom no allegations of "fraud" are made, one court wrote:

> "Therefore, the Undersigned is confident that Mr. Doan has the necessary experience and knowledge to serve as an umpire in this case.

*Mont Claire at Pelican Marsh Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, 2020 WL 620339 (M.D. Fla. Jan. 10, 2020), report and recommendation adopted, 2020 WL 619082 (M.D. Fla. Feb. 10, 2020) (internal citations omitted).

Yet another federal judge reached that same conclusion:

> "With his experience, Mr. Doan is highly qualified to act as umpire in this case."

*St. Lucia Condominium Association, Inc. v. Lexington Insurance Company*, 2020 WL 13882084, at *1 (M.D. Fla. Oct. 29, 2020) (emphasis supplied).

Judge Cannon looked at those allegations, considered legal authorities stating that those type of allegations are challenges to the amount of the Award, and noted: "[I]t is well settled that only an appraisal panel can determine the amount of loss; it is not an issue for the courts. In other words, while a court may vacate an appraisal award if there has been fraud, a court cannot look underneath the hood and re-evaluate an appraisal award." [Doc. 153, p. 6] [citations to authority omitted].

"The HOA [Portofino] points to the Insurers' use of words such as "overinflated," "duplicative," "unsupported," and "overlapping" to describe the problem with the award amount as evidence the Insurers' claim has nothing do with fraud, and is, instead, a veiled attempt to reargue the amount of loss. Thus,

the HOA argues the subpoenas seek information which has "zero" relevance to the litigation." [*Id.*] In analyzing that issue, the Magistrate made the following findings that were well supported:

1. "First, the Insurers' claim of fraud is premised on representations made by the HOAs, Keys, or his experts regarding the condition of the properties, not on any conduct or misrepresentations made by owners of the units."

2. "Second, regardless of what may be in sales documents, there is no allegation the HOAs, Keys, or his experts, had access to those documents or reviewed those documents when making their presentation to the Panel or submitting their claims."

The Magistrate concludes her "lack of relevance as to fraud" analysis by noting the absence of the reasonable reliance element:

> "…[T]he Insurers had inspectors, consultants, and experts on site within weeks, if not days, of Hurricane Sally, and thus had first-hand knowledge regarding the damage the Towers sustained. [Footnote omitted]. Thus, if there were any intentional misrepresentations (an element of fraud) regarding the condition of the properties, they can be established *through the Insurers own inspection notes and observations – particularly when compared to those of Keys and his experts*. In contrast, even if the individual owners' appraisals or inspections show, as the Insurers suggest, that inspections or damage assessments were made of HOA-owned or maintained structures, that information would be *merely the opinion of those professionals*, which, once again, would have no bearing on whether Keys or the HOAs' experts made any misrepresentations."

[Doc. 153, pp. 8-9]. Thus, far from ignoring the fact that market insurers had alleged fraud by Keys or HOA or HOA experts, the Magistrate addressed that issue head on, applied the elements of fraud to the facts before the court, and concluded

that nothing that the Appellants speculated *might* be within sales documents generated by non-parties was relevant to the fraud allegations. Even if those documents included expert testimony that conflicted with that obtained by the parties and submitted to the Appraisal Panel, conflicting opinions by experts do not equate to fraud by Portofino Defendants. The experts listed by Keys included experts for every damage issue that was before the Panel, and there is no evidence that he testified as a factual or expert witness on any of those issues. Likewise, Lewis identified 16 experts on the issue of damages.[30] And as with Keys, there is no evidence that Lewis testified as a factual or expert witness on any issue before the Panel. It was the role of the Appraisers to independently appraise the claim, and that required identifying the hurricane damages as well as the costs of replacing or repairing such damages. Both Appraisers, as is typical, relied on expert testimony to accomplish that task. And if they failed to agree on the amount of the loss, the issue was submitted to the jointly selected Umpire for resolution – which is precisely what occurred. The Umpire did not adopt the opinion of either of the Appraisers, but reached his own based on months of investigation, weeks of evidentiary hearing, and months of deliberations.

[30] *See* correspondence from Umpire Jon Doan discussing appraisers' experts, dated July 13, 2022, attached as Exhibit "4."

This Court, and courts throughout this nation, frequently deal with conflicting expert opinions. Courts have to resolve conflicting expert opinions through determining credibility and logic of the testifying experts. That is precisely a role wholly within the exclusive jurisdiction of the evidentiary tribunal here – the Appraisal Panel. After all, if the 20 experts hired by the Appraisers had agreed on the scope of damages, and costs of remediating those damages, there would have been no need for the involvement of the Umpire to resolve the disputes. If expert opinions rejected are deemed fraudulent because they were rejected, at least half of the experts who testify would be guilty of fraud. And in any event, mistakes or wrongdoing by an expert would not be imputed to the Portofino Defendants who did not even select the experts – much less control their conclusions.

The Insurers obviously deemed experts necessary to determine the scope of damages to the Portofino Defendants' properties, hired experts (16 of them), and relied on their conclusions at the Appraisal hearing. The Umpire had to sort through and determine credibility of those experts, and spent months of factual investigation and testing, weeks of evidentiary hearings, and sorted through thousands of pages of photographs and expert reports for months after the evidentiary hearing to reach his conclusions. This Court, in following well-settled law, has made it clear that its role is not to re-try the case, but rather to examine

separate and distinct policy defenses.[31] Whether an expert hired by a buyer, seller, or lender, during a real estate transaction (the documents that were the subject of the Protective Order) failed to discover damages, or discovered damages not discovered by experts for the insurers, or reached opinions as to value different from those of experts who spent months and millions of dollars evaluating those issues, simply has not relevance to allegations of fraud. The market insurers relied

[31] This Court, in denying the Plaintiffs efforts to derail the appraisal process, surveyed controlling Florida law on the dividing line between this Court's role, and the role of the Appraisal Panel, and held:

> "Here, the parties engaged in "their contractual right to appraisal "the parties engaged in "their contractual right to appraisal" after they *disagreed as to the amount of losses*; therefore the appraisal panel *must* [not may, not might] now determine the amount to be paid," [Judge Casey Rogers Order Denying Emergency Motion to Stay Appraisal, Doc. 78, p. 4, citing to the 2002 Florida Supreme Court's decision in *Johnson v. Nationwide Mut. Ins. Co*.] *See, also*, Senior U.S. District Court Judge Walker, in *Baptist v. Church Mutual*, quoting the 1st DCA (controlling law) from the *First Protective* case, that "a trial court may not look beyond the face of an appraisal award and consider extrinsic evidence to determine the basis for the award." The appraisal panel DID conclude its work. It did determine the amount of the loss. And it did so after months of investigation in which the market insurers hired, and ostensibly relied on, the independent investigations concluded by some experts hired by the Appraiser they appointed, Patrick Lewis.

The Market Insurers do not like the result, but well-settled legal authorities say the court will not re-try or second guess the decision of the evidentiary tribunal that has exclusively authority over that issue.

on their own experts to evaluate the scope and dollar amounts, and had every opportunity to develop and present such evidence before the Appraiser Panel. What they cannot do is to try to re-open that two-year, multi-million-dollar investigation by subpoenaing documents that no expert deemed relevant for the purposes of determining amount of the loss.

The Court below noted that "the Insurers did not request these documents or complain about needing them at any time during the appraisal proceedings." At no point, for example, did the Insurers argue the prices at which units sold for post-Hurricane Sally made a difference, even though that information was publicly available. And the Insurers cannot vacate the Appraisal Award on information that could have been uncovered at the time of the hearings. *See Davenport v. Dimitrijevic*, 857 So.2d 957, 962 (Fla. 4th DCA 2003) (A claim of fraud under section 682.13(1)(a) is not an opportunity to obtain a second bite of the apple to correct a party's deficiencies of proof at an arbitration." [Doc. 153, p. 9].

Judge Cannon "reviewed the "improprieties" alleged both in the Amended Complaint and the Motion to Vacate, compared those to what the Appellants proffered as being in those documents, and found no relevance to the issues before the Court. "The post-Hurricane Sally sales documents for individual units have no bearing on whether (1) the HOAs or Keys delayed their production of crucial documents or withheld documents until the eve of the hearing, (2) the HOA's

submitted duplicative or hyper-inflated costs in their repair estimates. Doc. 116, pp. 14-16, (3) Keys made misrepresentations regarding past damages and repairs, or (4) the witnesses did not accurately disclose their whereabouts during Sally. [Doc. 104, pp. 34-38]. Even assuming these types of alleged improprieties can be considered "fraud," their support, if any, lien in the documents that were generated by the Insurers' own appraisals, inspectors, and experts, or in the documents eventually produced by the HOAs." [Doc. 153, pp.10-11].

"While there can certainly be instances when discovery is relevant to an action seeking to vacate an appraisal award, the discovery sought here from the third parties is simply not relevant." See *Continuum on S. Beach Condo. v. QBE Ins. Corp.*, 338 F.R.D. 668, 671 (S.D. Fla. 2021) (granting motion for protective order as to the subpoenas issued to 32 non-party unit owners in an action seeking to compel appraisal).

***Appellants Make No Showing that Magistrate Failed to Follow "Clear Mandates" of the Law.***

It is respectfully submitted that the Appellants, not the Court below, misapprehend controlling law. In their "Objection," they rely on case after case applying the pre-amended version of Rule 26(b)(1), and ignore the fact that the

"reasonably calculated" inquiry was *intentionally narrowed* by revisions that went into effect on December 1, 2015.[32]

While a case that Appellants rely on, *Matter of Application of O'Keeffe*,[33] was decided in 2015, footnote one makes it clear that was applying the broader definition of "relevancy" from the pre-2015 amendment. They seek to distinguish two cases directly on point, and ignore the most closely analogous case that was before the court below.

Appellants rely on the *O'Keefe* case as support for their claim that discovery of sales contracts and related documents are not a "fishing expedition." However, in that case, "the discovery sought pertaining to [Plaintiffs] use of foul language during his business interactions with [the would-be witness] is relevant to the truth of [Defendant's] charge that Adelson is foul-mouthed." *Id.* at 1365. Under those facts, the court (under the old rule) found the discovery sought in that original action to be relevant or "reasonably calculated" (old standard) to lead to relevant evidence. Here, the Appellants cannot even proffer what information in third-party

[32] *Adelman v. Boy Scouts of Am.,* 276 F.R.D. 681, 688 (S.D. Fla. 2011); *Dunkin' Donuts, Inc. v. Mary's Donuts, Inc.*, No. 01-0392, 2001 WL 34079319, at *2 (S.D. Fla. Nov. 1, 2001); *Mt. Hawley Ins. Co. v. Plymouth Plaza, LLC*, 0:22-CV-62333, 2023 WL 8678893, at *2 (S.D. Fla. Nov. 6, 2023); *Wrangen v. Pennsylvania Lumbermans Mut. Ins. Co.*, 593 F. Supp. 2d 1273, 1278 (S.D. Fla. 2008).

[33] 184 F. Supp. 3d 1362, 1371 (S.D. Fla. 2016).

sales documents, documents their own experts did not deem relevant in the original proceeding (the Appraisal), could support fraud by the Associations.

Appellants also rely on two other cases, *Summit Towers Condominium Ass'n, Inc. v. QBE Insurance Corporation*,[34] and *Coconut Key Home Owners Ass'n*,[35] that involve discovery at the trial court level, and not a post-arbitration/appraisal challenge to issues over which the ADR tribunals had exclusive jurisdiction.

Appellants claim that *Summit Towers* supports the proposition that allowing an amendment to assert an affirmative defense that insured "intentionally made material misrepresentations of fact and fraudulently inflated its claim" supports the discovery sought in this case. [Doc. 159, p. 10]. However, the Plaintiffs, in stating a very general principle of law, gloss over the facts of *Summit Towers* that make it distinguishable from the matter before this Court. In *Summit Towers*, the Court allowed discovery, which was limited to a "narrow subset of information," and compelled the deponent to produce any information that ***he relied on***, other than his experts, that would support the insurer's affirmative defense that the insured had fraudulently inflated its claim. This is significant in that the court in *Summit*

[34] 2012 WL 1440894, U.S.D.C. (S.D. Fla.).

[35] 649 F. Supp3d 1362 (S.D. Fla. 2016).

*Towers* allowed for discovery of information and documents that one of the parties actually ***relied on***. In the present matter, there is no evidence that any member of the appraisal panel, expert, fact witness, Plaintiff, or Defendant ever relied on any of the sales records from the various condominium units to arrive at their opinions as to the amount of the loss. And in *Summit Towers*, three was no appraisal award in which an evidentiary tribunal addressed the amount of the loss after years of investigations, and more than $3 million of expert analysis.

In *Coconut Key*, this discovery issue had nothing to do with a post-appraisal challenge. The issue was whether an insurer could amend their claim to assert an affirmative defense that "insured intentionally made material misrepresentations of fact and fraudulently inflated its claim…." That case did not involve seeking to "go behind" findings by an evidentiary tribunal that was wholly within its jurisdiction, such as determining causation, but involved evidence discovered after a discovery deadline that directly related to conduct by the insured; i.e., testimony from the insured's representative that he had not reviewed the damages figure in an interrogatory before verifying it, and insurer's failure to find any additional damages during its inspection. Here, the insurers had months to investigate damages, spent millions doing so, and there was no evidence that sales documents from non-parties supported the elements of fraud against the insured. In fact, the evidence before the Magistrate showed that the Appellants could not even

speculate as to what closing-of-sale document could have been relied on by the market insurers who conducted their own independent investigation as to what the Appellants called "the true condition of the property." [Doc. 159, p. 11].

Appellants' efforts to factually distinguish the case of *Davenport v. Dimitrijic* are without merit. The Court below found that *Davenport*'s holding that a "fraud" challenge under Chapter 682.13(1)(a) is not "an opportunity to obtain a second bite of the apple to correct a party's deficiencies of proof at an arbitration" was applicable in the case at bar. [Doc. 153, p. 9, citing to *Davenport*]. In *Davenport*, the plaintiff sought to discovery evidence, after the arbitration, that a witness had committed perjury during the arbitration. The *Davenport* court, citing to well-settled law, noted that:

> "Review of arbitration proceedings is extremely limited. *Boyhan v. Maquire*, 693 So.2d 659, 662 (Fla. 4th DCA 1997). A high degree of conclusiveness attaches to an arbitration award because the parties themselves have chosen to go this route in order to avoid and expense and delay of litigation."

The Court went on to hold, as cited by Judge Cannon, that "[a] litigants failure to prove a case in arbitration cannot be absolved by the discovery of evidence that could have been uncovered in time for the original hearing." The Magistrate found that even if sales records could somehow be deemed relevant to

fraud by the Portofino Defendants,[36] that Appellants made no showing as to why that evidence could not have been developed and presented during the Appraisal. Out of the 125 sales transactions that were the subject of the subpoenas, over 100 of those occurred before the hearings began. The documents were never requested by the market insurers, and were not deemed relevant to their expert consultants, who spent months and more than $1.8 million in developing their case.

Credibility of a witness is an issue that is always before an evidentiary tribunal, and "failure to considerable credibility evidence is not a ground for vacation of an arbitration award." *Davenport*, at p. 963, citing to *Sherson Hayden Stone, Inc.; v. Liang*, 653 F.2d 310, 313 (7th Cir. 1981). That was the role of the Panel before whom the witnesses appeared. Whatever evidence as to credibility,

---

[36] As noted in *Davenport*, Florida Rule of Civil Procedure 1.120(b) requires fraud "be stated with such particularity as the circumstances may permit." Federal Rule 9(b) has the same "with particularity" requirement. This means that a claim of fraud must set forth "the essential facts" (i.e., the elements), and must "specify the fraud." Here, the allegations sound in terms such as "overstated," or "exaggerated," or "duplicative," which does not specify with particularity the allegedly false statement of fact (not opinion). In any event, the market insurers here, not in pleadings, or responses to interrogatories, have been able to allege a single "false statement of fact" by the Portofino Defendants that was reasonably relied upon by the insurers. But even if they had, they give no explanation as to how sales documents of sales by third parties would provide proof that such statements had been made, that they were false, known by the maker to be false, and reasonably relied upon by the market insurers who independently investigated the condition of the property, and the scope of damages, at a cost of more than $1.8 million, including the employment of a global consulting firm (J.S. Held), multiple attorneys, and more than 16 nationally and internationally known experts.

including accuracy of the opinions offered, should have been developed and presented to the Panel.

Appellants also attempt to distinguish a case in the Magistrate Judge's Order, *Continuum on S. Beach Condo. v. QBE Ins. Corp.*[37] In *Continuum* the Court, as did Judge Cannon here, "look[ed] to the claims in the lawsuit, the relevance of the requested information, proportionality to the case, and whether the sought-after discovery is obtainable from a more convenient source." The Court in *Continuum* determined that the subpoenas to the unit owners were "overbroad" and had "little to no relevance to Plaintiff's claim or Defendant's available defenses." *Id.* at 670. Appellants are correct in that *Continuum* dealt with a motion to compel appraisal versus the claims pending in this Court. However, the analysis remained the same, the Court is to look at the claims in the lawsuit and make a determination as to the relevance of the information requested. Judge Cannon did just that and found the 125 subpoenas to the unit owners were not relevant.

Appellants make no attempt to distinguish, or even discuss, the most analogous federal case that was before the Magistrate – *Island Roofing and Restoration*[38], cited in our Motion [Doc. 137, p. 4]. *Island Roofing* raised the same

[37] 338 F.R.D. 668, 671 (S.D. Fla. 2021).

[38] No. 2:21-CV-211-JLB-KCD, 2022 WL 4305922, at *5 (M.D. Fla. Sept. 19, 2022).

issues in its pleadings, involved the same controlling law (Florida law), and same issue as to relevance of third-party discovery.

Under those facts and law, the U.S. District Court found that Insurer was not entitled to discovery directed at the Insurers' allegations that the amount of the appraisal awards was based on "*inflated pricing*," or "*unsupported estimates*," or that enforcement of the award would "*result in a windfall*" for the insured. Thus, the Insured *was* entitled to a Protective Order. The same facts, same law, same result, should be applied in the case now before this Court.

The *Island Roofing* court found that to determine the relevance of post-award discovery directed to the "overinflated" claim allegations as a purported grounds for fraud, it had to first determine, "*As a threshold issue*" … *the grounds on which an insurer "may challenge the appraisal award*." [P. 5, *Island Roofing*, cited on page 4 of the Amended Motion for Protective Order, Doc. 137]. The Magistrate did just that, and found no relevance of the subpoenaed documents and the issues properly before this Court.

## ***CONCLUSION***

The findings by the Magistrate Judge were well supported by the record, and she correctly applied controlling law in Granting the Motion for Protective Order. Appellants make no showing that the Magistrate Judge abused her discretion, or

departed from the essential requirements of law. Thus, the Order should be AFFIRMED.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Memorandum was prepared in Times New Roman 14-point font, in compliance with Local Rule 5.1(C) of the Northern District of Florida, and contains approximately 7,795 words, which conforms to the word count permitted by Local Rule 7.1(F). Counsel relies on the word count of the computer program used to prepare this Motion.

Respectfully Submitted,

*/s/ Kurtis Jay Keefer*
KURTIS JAY KEEFER
Florida Bar No. 0668011
**GOEDE, DEBOEST & CROSS, PLLC**
6609 Willow Park Drive, Suite 201
Naples, Florida 34109
(239) 331-5100 – Telephone
(239) 260-7677 – Facsimile
kkeefer@gadclaw.com
curbanowski@gadclaw.com
*Counsel for Defendants*

*/s/ Charles F. Beall, Jr.*
CHARLES F. BEALL, JR.
Florida Bar No. 66494
**MOORE, HILL & WESTMORELAND, P.A.**
350 W. Cedar Street
Maritime Place, Suite 100

/s/ Edward P. Fleming
EDWARD P. FLEMING
Florida Bar No. 615927
MATTHEW A. BUSH
Florida Bar No. 58312
AARON T. McCURDY
Florida Bar No. 106499
**McDONALD FLEMING, LLP**
719 S. Palafox Street
Pensacola, Florida 32502
(850) 202-8529 – Telephone
(850) 411-4510 – Facsimile
flemingservice@pensacolalaw.com
cat@pensacolalaw.com
mabush@pensacolalaw.com
bushservice@pensacolalaw.com
amccurdy@pensacolalaw.com
asluberti@pensacolalaw.com
*Counsel for Defendants*

P.O. Box 13290 (32591-3290)
Pensacola, Florida 32502
(850) 434-3541 – Telephone
(850) 435-7899 – Facsimile
cbeall@mhw-law.com
tstokes@mhw-law.com
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing has been electronically filed with the Clerk of Court by using the CM/ECF system on this 2nd day of February, 2024, which will send an electronic notice to all counsel of record.

*/s/ Edward P. Fleming*
Edward P. Fleming, Esquire
McDONALD FLEMING, LLP