## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY, et al.,

     Plaintiffs,

v.

PORTOFINO MASTER
HOMEOWNERS
ASSOCIATION, INC., a Florida not-
for-profit Corporation, et al.,

     Defendants.

CASE NO.  3:23-cv-00453-MCR-HTC

## PLAINTIFFS' DAUBERT MOTION TO EXCLUDE THE OPINION TESTIMONY OF DEFENDANTS' EXPERT RICHARD G. HENNING AND SUPPORTING MEMORANDUM

Plaintiffs Westchester Surplus Lines Insurance Company, Arch Specialty Insurance Company, AXIS Surplus Insurance Company, Colony Insurance Company, Evanston Insurance Company, Aspen Specialty Insurance Company, Independent Specialty Insurance Company, Interstate and Fire Casualty Company, Lloyd's of London (Consortium # 9226), James River Insurance Company, Maxim Indemnity Company, Landmark American Insurance Company, and Homeland Insurance Company of New York, pursuant to Federal Rule of Evidence 702 as well

as *Daubert*[1] and its progeny, file this motion and supporting memorandum of law requesting that the Court enter an order excluding the opinion testimony of defendants' expert Richard G. Henning ("Henning") because Henning's opinions are not based upon sufficient facts or data, they are not the product of reliable principles and methods, and Henning did not reliably apply the principles and methods to the facts.

## I.    OVERVIEW

This matter arises from a first-party Hurricane Sally insurance claim on a property owned by defendants. On September 16, 2020, Hurricane Sally impacted defendants' property, consisting of five (5) separate condominium buildings, each standing 27 stories, and fourteen other buildings on a 28-acre property. The property addresses ranged from 1-9 Portofino Drive, Pensacola Beach, FL 32561 (the "Portofino Property"). On January 12, 2023, plaintiffs filed this declaratory judgment action to address their concerns related to fraud and other issues in the claim submission and appraisal process. [D.E. 1]. On August 15, 2023, plaintiffs filed an amended complaint. [D.E. 104]. Defendants filed their answer, affirmative Defenses, and counterclaim on September 15, 2023. [D.E. 108].

## II.    STATEMENT OF FACTS

Pursuant to Federal Rule of Civil Procedure 26(a)(2), defendants disclosed

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Richard G. Henning as an expert meteorologist in their expert witness disclosure dated June 28, 2024. (*See* Defendants-Counterclaimants' Expert Witness Disclosure, attached to this motion as Exhibit "1," at ¶ 4). Defendants' disclosure follows the language of Rule 26(a)(2)(B)(i-vi), which in pertinent part states that the disclosed expert's report must contain (i) a complete statement of all opinions the witness will express and the basis and reasons for them, (ii) the facts or data considered by the witness in forming them, and (iii) any exhibits that will be used to summarize or support them. *Id.*; Fed. R. Civ. P. 26(a)(2)(B)(i-iii). Defendants have asserted that Henning's report, including all appendices, was provided contemporaneously with their disclosures. *Id.* Henning's report, titled "Summary of Meteorological Data for Hurricane Sally's Impact to Portofino Master Homeowners Association 9 Portofino Drive Pensacola Beach, FL 32561 (30.34N 87.08W)," details his investigation of the storm. (*See* Henning's Report attached to this motion as Exhibit "2"). Appendix A, incorporated in Henning's report, purports to be a timeline of wind events for the ground floor of the Portofino Master Homeowners Association at 9 Portofino Drive, Pensacola Beach, FL 32561. (*See* Appendix A attached to this motion as Exhibit "3"). Appendix B, incorporated in Henning's report, purports to be a timeline of wind events for the uppermost 21st floors of the Portofino Master Homeowners Association at 9 Portofino Drive, Pensacola Beach, FL 32561. (*See* Appendix B attached to this motion as Exhibit "4").

**A. Henning's Investigation**

Henning's investigation is purportedly based on United States Air Force ("USAF") and National Oceanic and Atmosphere Administration ("NOAA") reconnaissance missions, surface wind observations, and analysis of WSR-88D NEXRAD Doppler Level II radar files from the site of Eglin Air Force Base. (Ex. 2 at p. 13).

Henning asserts that dropsonde (a/k/a dropwindsondes) data from NOAA and USAF reconnaissance mission 1219A and 1319A[2] "paints a depiction of the intensity of the storm quadrant that would later rotate ashore above the client property" (Ex. 2 at p. 4). Henning further asserts that wind speeds reached 121 mph in Fort Morgan, AL, and 104 mph on Dauphin Island, AL (*Id.*), without stating the distance of these two wind speed readings from the Portofino Property or what storm quadrant passed over the locations where the readings were made. Henning also asserts WSR-88D NEXRAD Doppler radar data from 12:39 pm cdt on September 15, 2020 shows "the first significant feeder bands reaching Pensacola Beach with sustained tropical storm force winds and gusts to over 50 MPH", and "the first bands reaching Pensacola Beach with gusts to hurricane force winds of 75 mph" at 8:56 pm cdt on September 15, and "[t]he most intense feeder bands outside of the eyewall

---

[2] These are the only missions specifically identified in Henning's report. Mission 1319A is denoted as the "final reconnaissance mission prior to landfall[.]" (Ex. 2 at pp. 4, 6).

4

moved over Pensacola Beach at 12:47 AM" on September 16, causing "surface winds gusts approaching 100 mph" and likely "wind damage" at the Portofino Property. " (*Id.* at p. 10, Fig. 9a, p. 11, Fig. 9b, and p. 11).

Utilizing data from the National Weather Service WSR-88D NEXRAD Doppler Level II at Eglin Air Force Base, Henning asserts that a mesocyclone was embedded in the northeast eyewall of the hurricane at 12:14 am cdt on September 16. (*Id.* at p. 7). However, Henning does not clearly assert that a mesocyclone occurred at the Portofino Property at any time.

### B. Henning's Methodology and Conclusions

Henning concluded that a peak wind gust of 100 mph affected the ground level of the Portofino Property. (*See id.* at p. 13). Henning reached this conclusion despite the fact that none of the gust readings in the Pensacola area reached 100 mph.[3] Henning's reasoning in his report for arriving at an increased gust speed at the Portofino Property is unclear.

Henning also concluded that wind gusts potentially as high as 115 mph affected the 21st floor of the Portofino Property. (Ex. 2 at p. 13). Indeed, Henning

---

[3] According to the National Hurricane Center, the Pensacola Naval Air Station recorded a maximum sustained wind speed of 74 mph and a peak gust speed of 92 mph, the highest wind speeds recorded in the Pensacola area during Hurricane Sally (*See* National Hurricane Center's Tropical Cyclone Report in Table 3, attached to this motion as Exhibit "5"*).

does not provide any reasoning or justification for his opinion that there was a 115-mph peak wind gust speed. Henning opines on the wind speeds on the uppermost floors of the Portofino Property by purportedly creating an "empirically derived" equation from an "examination of a composite of all the vertical wind profiles of soundings made by dropsondes in the eyewall of Sally." (Ex. 2 at p. 5, 13; Ex. 4). Henning's equation is $y = 0.7893e^{0.1496x}$, where x is the height above the ground and y is the corresponding wind speed. (Ex. 2 at p. 5). Henning does not, however, provide any of the reasoning or methodology he used to create this equation from the dropsonde data. Henning also does not even indicate whether x is measured in feet or meters or some other unit of distance, or whether y is measured in knots, as in the dropsonde data, miles per hour, or some other unit of velocity. Only by utilizing his own contrived equation could one conclude that a peak wind speed of 115 mph affected the uppermost 21st floors of the Portofino Property. (Ex. 2 at pp. 5, 13; Ex. 4 at p. 2).

## III.    <u>LEGAL STANDARD</u>

Rule 702 of the Federal Rules of Evidence requires, in part, that if scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion if (1) the testimony is based on sufficient facts or data, (2) the

testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Rule 702 requires the Court to function as a "gatekeeper" when determining the admissibility of expert scientific or technical evidence. *See Sumner v. Biomet, Inc.*, 434 F. App'x 834, 840-41 (11th Cir. 2011) (*citing Daubert*, 509 U.S. at 589 n.7, 597, 2798-99; *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)(en banc)); *see also Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

The purpose of a *Daubert* inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The proponent of expert testimony "carries the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of evidence." *Bello v. DHL Express, Inc.*, 2023 U.S. Dist. LEXIS 237404 at *6 (S.D. Fla. Nov. 10, 2023) (*citing Allison v. McGhan Med. Corp.*, 184 F.3 1300, 1206 (11th Cir. 1999)); *Frazier*, 387 F.3d at 1260; *see also* Fed. R. Evid. 702 advisory committee's note, 2000 Amendments ¶ 1; *McCorvey v. Baxter Healthcare Corp.*, 298 F. 3d 1253, 1256 (11th Cir. 2022).

To qualify as an expert witness, the witness must possess "such skill,

experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank,* 374 F.3d 917, 928 (10th Cir. 2004) (*citing Graham v. Wyeth Labs.*, 906 F.2d 1399, 1408 (10th Cir. 1990)); *Bridger v. Union Ry. Co.*, 355 F.2d 382, 387 (6th Cir. 1966); *see also* **Frazier**, 387 F.3d at 1261 ("As the Supreme Court put it, 'the Rules of Evidence -- especially Rule 702 -- . . . assign to the trial judge the task of ensuring that an expert's testimony . . . rests on reliable foundation' [*Daubert*, 509 U.S.] at 597, 113 S. Ct. at 2799)." The Court's focus "should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." *Daubert,* 509 U.S. at 595.

For assessing the reliability of methodology used by experts, the Eleventh Circuit has reiterated *Daubert* factors to consider, including: (1) If it can be tested, has it?; (2) Has it been subjected to peer review and/or publication?; (3) If error rates can be determined, have they?; (4) Are there standards controlling the technique's operation, and if so, have they been maintained?; and (5) Is the methodology generally accepted as reliable within the scientific community? *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir 2001).

When "the relevant reliability concerns … focus upon personal knowledge or experience," *Kumho Tire*, 526 U.S. at 150, the expert's testimony "must be 'based

on actual knowledge, and not mere subjective belief or unsupported speculation.'" *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Trust v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341-42 (10th Cir. 2017) (*quoting Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 780 (10th Cir. 1999) (*quoting Daubert*, 509 U.S. at 590)). An expert witness's testimony based solely on experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) (*quoting* Fed. R. Evid. 702 advisory committee's note (2000)); *see also United States v. Moncrieffe*, No. 22-10351, 2023 U.S. App. LEXIS 12988 at *4 (11th Cir. May 25, 2023) (*quoting Frazier*, 387 F.3d at 1261). The Eleventh Circuit has explained the reason for this requirement: "The trial court's gatekeeping function requires more than simply taking the expert's word for it." *Frazier*, 387 F.3d at 1261 (*citing* Fed. R. Evid. 702 advisory committee's note (2000)). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Hughes v. Kia Motors Corp*, 766 F.3d 1317, 1331 (11th Cir. 2014) (*quoting Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

When expert opinion "is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict" and will be excluded.

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). When the only connection between the facts and the expert's opinion is "the *ipse dixit* of the expert," the opinion will not help the trier of fact, making it inadmissible under Fed. R. Evid. 702. *Prudential Ins. Co. v. Textron Aviation, Inc.*, No. 16-2380-DDC-JPO, 2018 U.S. Dist. LEXIS 71019 at *15-16 (D. Kan. April 27, 2018) (*quoting Joiner*, 522 U.S. at 146; *United States v. Fredette***,** 315 F.3d 1235, 1240 (10th Cir. 2003) (affirming district court's exclusion of expert testimony as unreliable because expert "never explained why his personal experience was a sufficient basis for his opinion" and thus his "proposed testimony did not 'rest on a reliable foundation'").

## IV.   <u>HENNING DOES NOT QUALIFY UNDER RULE 702 AND DAUBERT</u>

Here, defendants have not met their burden of laying a proper foundation for Henning's testimony. Further, the deficient "foundation" Henning provided in his report reveals that his testimony fails under all three criteria of admissibility set out by Rule 702.

### A.    Henning's Conclusions are Not Based on Sufficient Facts or Data

Henning builds the factual foundation for his conclusion on a blend of three sources, including dropsonde data, surface wind readings, and Doppler weather radar data. However, upon closer inspection, this factual foundation is inherently deficient and unsuited for use in drawing reliable scientific conclusions regarding

wind speeds at the Portofino Property.

### 1. Dropsonde Data

The dropsonde data utilized by Henning is not useful for estimating the wind speeds that occurred at the Portofino Property, in part, because the dropsonde data is obtained over water and not land. Henning has previously testified that the dropsonde wind measurements do not relate to windspeeds on land. (*See Deposition of* Richard Henning dated February 7, 2024 attached to this motion as Exhibit "6" at 62:7-62:10). Indeed, Henning has conceded that hurricane winds decrease when they flow from the ocean onshore to land. (Ex. 6 at 40:22-41:8). Therefore, the dropsonde data necessarily is limited to an analysis of wind speed over water. (Ex. 2 at p. 4, Figure 5; Ex. 6 at 59:10-59:12). In addition, none of the dropsonde readings for Hurricane Sally were even taken in the water in the vicinity of the Portofino Property. (Ex. 2 at p. 4, Figure 5). The dropsonde data sourced over water and 37 miles away from the Portofino Property is not a sufficient or reliable basis to provide insight into what the wind speeds may have been at the Portofino Property.

### 2. Surface Wind Speeds

Fort Morgan, AL, is approximately 56 miles west of the Portofino Property and Dauphin Island, AL, is approximately 61 miles west of the Portofino Property. Incredibly, apart from the wind speed readings from the weather station at Pensacola Naval Air Station, which is approximately 14 miles west of the Portofino Property and 14 miles closer to where the center of Hurricane Sally made landfall, Henning

did not consider surface wind speed readings from stations located closer to the Portofino Property. The National Hurricane Center ("NHC"), which is an agency within NOAA, published the maximum surface wind speeds recorded at several locations in the Pensacola Beach area during Hurricane Sally between September 11, 2020 and September 17, 2020. (Ex. 5).

For example, the Santa Rosa Sound DB127 (XSRS) weather station is situated near coordinates 30.38 N and 87.00 W, 5.2 miles from the Portofino Property. *Id*. at 23. Santa Rosa Sound DB 127 recorded a maximum sustained surface wind speed of 60 mph and a peak surface gust of 71 mph. *Id*. The Fair Point Light 2 (XFPL) weather station is situated near coordinates 30.37 N and 87.21 W, 7.6 miles from the Portofino Property. *Id*. at 22. Fair Point Light 2 recorded a maximum sustained surface wind speed of 61 mph and a peak surface gust of 82 mph. *Id*. Both of these locations are considerably closer to the Portofino Property than the reading locations Henning used to support his opinions.

Not only do the surface wind readings from the closer locations belie Henning's speculative description of the strength of the wind at the Portofino Property, but his failure to incorporate this relevant data (or at least credibly explain its exclusion from his analysis) completely undermines the reliability of his factual foundation.

### 3. NEXRAD Doppler Weather Radar Data

Based on his interpretation of WSR-88D NEXRAD Doppler radar images showing bands of rain, or feeder bands, Henning opined that sustained tropical storm force winds and gusts to over 50 mph reached Pensacola Beach at 12:39 pm cdt on September 15, hurricane force wind gusts of 75 mph reached Pensacola Beach at 8:56 pm cdt on September 15, and gusts approaching 100 mph reached Pensacola Beach at 12:47 am cdt on September 16. Henning should have verified his wind speed interpretation of the radar images of rain by examining the surface wind speeds that were recorded around those times by weather stations in the Pensacola Beach area. Henning's report gives no indication that he performed that verification. Indeed, the surface wind speeds recorded at those weather stations were 15 to 30 mph lower than Henning's opinions.

Henning's report does not clearly indicate if he assumed mesocyclones that he purports appeared in the Doppler radar data increased the peak wind speeds that affected the Portofino Property. If Henning utilized mesocyclones in his calculation of wind speed at the Portofino Property, by his own admission, he would have done so without evidentiary foundation.

Henning has previously conceded that "no one would be able to tell" if a mesocyclone actually touched down at a property. (Ex. 6 at 102:3-102:7). Direct evidence of a mesocyclone cannot be obtained because the "radar horizon has

limitations" as it is taken "1,500 to 2,000 feet above the surface" and there is a sight limitation due to the earth's curvature. (Ex. 6 at 101:11-101:19; 80:6-80:12). Henning also testified that it is possible a mesocyclone can *slow down* the hurricane winds, (Ex. 6 at 102:8-102:17) (emphasis added), so the effect of a mesocyclone is variable. Therefore, if Henning included mesocyclones to reach his conclusion of peak wind speeds at the Portofino Property, then his reasoning is purely speculative.

### B. Henning's Conclusions are Not the Product of Reliable Standards, Principles, or Methods

To ascertain the peak sustained wind speeds and peak gust speeds for the uppermost 21st floors of the Portofino Property, Henning utilized an equation he created out of thin air, which he presents as $y = 0.7893e^{0.1496x}$ ("Henning's equation"). Henning's report defines the "x" in his equation as the height above the ground but does not explain what measurement unit (*e.g.*, feet, yards, centimeters, meters, etc.) is appropriate when calculating the wind speed, y. Henning's equation is an exponential function, so the wind speeds, y, increase exponentially at higher altitudes. The Court should exclude any opinion derived from Henning's equation because the equation is an aberration in the meteorology field. *Cf. Tall v. Fed. Ins. Co.*, No. 6:20-cv-1125-RBD-LRH, 2021 U.S. Dist. LEXIS 256501 at *9 (M.D. Fla. May 5, 2021) (denying motion to exclude meteorological opinion where expert used standard engineering formulas to reach his conclusions); *Ctr. Hill Courts Condo. Ass'n v. Rockhill Ins. Co*, No. 19-cv-80111-BLOOM/Reinhart, 2020 U.S. Dist.

LEXIS 14012, at *17-18 (S.D. Fla. Jan. 27, 2020) (denying *Daubert* motion challenging expert meteorologist opinion where utilized methodology still in use throughout the National Weather Service and Department of Defense); *In re Complaint of Atl. Marine Prop. Holding Co.*, 570 F. Supp. 2d 1363, 1368-69 (S.D. Ala. 2008) (denying motion to exclude opinion where expert utilized formula widely recognized as standard in the meteorological community).

Henning's equation has not been peer-reviewed, tested, or subjected to any form of scientific scrutiny. (*See* Affidavit of Lee E. Branscome at ¶¶ 6-7 attached to this motion as Exhibit "7"). It also directly contradicts an industry standard for calculating height adjustment, known as the logarithmic wind profile. (*See* Mark D. Powell, Peter J. Vickery, Timothy A. Reinhold, *Reduced drag coefficient for high windspeeds in tropical cyclones*, 44 Nature 279 (2003) attached to this motion as Exhibit "8"; Ex.7 at ¶ 8). In the logarithmic wind profile, "there is a sharp reduction of wind speed that is nearly logarithmically linear below 300M." (*See* James L. Franklin, Michael L. Black, Krystal Valde, *GPS Dropwindsonde Wind Profiles in Hurricanes and Their Operational Implications*, 18 Weather 32 (2002) attached to this motion as Exhibit "9"). Therefore, an exponential increase in wind speeds with height as Henning uses in his equation is an inaccurate methodology for calculating wind speeds at higher altitudes.

Henning also asserts in his report that his equation was created from the

unique dropsonde data gathered from Hurricane Sally's eyewall. (Ex. 2 at p. 5). However, his equation is duplicative of the equation he used for Hurricane Irma while rendering an opinion in another case. Indeed, Henning cited his equation in his report titled "Summary of Mereological Data for Hurricane Irma's Impact to the Arlen House & Arlen House West Condominium 300-500 Bayview Drive Sunny Isles Beach, FL 33160." (Ex. 7 at ¶¶ 10-12 and Exhibit B to affidavit of Lee E. Branscome). This other report states that an "examination of a composite of all the vertical wind profiles of sounding made by dropsondes in the eyewall of Irma shows a best-fit statistical curve that follows the empirically derived formula" of $y = 0.7893e^{0.1496x}$. *Id*. Unlike Hurricane Sally, Hurricane Irma made landfall in the Florida Keys on September 10, 2017, as a Category 4 hurricane on the Saffir-Simpson Hurricane Wind Scale. (Ex. 7 at ¶ 13). Hurricane Sally made landfall on the Gulf Coast of Alabama on September 16, 2020, as a Category 2 hurricane on the Saffir-Simpson Hurricane Wind Scale. (Ex. 7 at ¶ 14). Henning has not explained how he computed the identical equation from dropsonde data collected from two different hurricanes. That the dropsonde data sourced from these two different hurricanes would lead to the identical equation, down to four decimal places, is, for all practical purposes, impossible, absent biases or miscalculations in the procedures Henning employed. (Ex. 7 at ¶ 15).

### C. Henning's Conclusions are Not the Result of Applying the Principles or Methods Reliably to the Facts of the Case

To the extent that Henning could justify using his own made-up equation to ascertain the peak wind speeds and peak gust speeds for the uppermost 21st floors of the Portofino Property, he nevertheless does not correctly apply the equation.

For Wednesday, September 16, 2020, at 6:30 am, Henning concluded that the top floor was affected by a sustained wind of 100 mph, which constituted a 20 mph or 25% increase from the sustained wind affecting the ground floor. (Ex. 4 p. 2). At the exact date and time, Henning concluded that the top floors had a gust of 115 mph, which constituted a 15 mph or 15% increase from the gust on the ground floor. *Id*. The difference in percentage change between the sustained wind and short-lived gusts is mathematically impossible if the same equation was used. Therefore, either Henning utilized an unknown method or the data was entered incorrectly. This makes it unreliable, misleading, and unhelpful to the jury. S*ee Cordoves v. Miami-Dade Cnty.,*104 F. Supp. 3d 1350, 1362 (S.D. Fla. 2015) (*citing Jones v. Otis Elevator Co*., 861 F.2d 655, 662 (11th Cir. 1988)) ("[T]estimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation."); *McDowell v. Brown*, 392 F.3d 1283, 1301-02 (11th Cir. 2004) ("an expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions."); *Browder v. General Motors Corp*., 5 F. Supp.

17

2d 1267 (M.D. Ala. 1998) (basing an "expert" opinion on facts not in evidence is not helpful to the trier of fact in understanding the evidence or determining a factual issue).

## V.    CONCLUSION

Henning's opinions should be excluded because they are not based upon sufficient facts or data, are not the product of reliable principles or methods, and are not the result of applying the principles or methods reliability to the facts of the case as required under Federal Rule of Evidence 702 and the standards established in *Daubert*.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to N.D. Fla. Local Rule 7.1(B) and (C), counsel for plaintiffs conferred with counsel for the defendants on October 23, 2024. Defendants oppose the relief sought in this motion.

## CERTIFICATE OF WORD COUNT

Pursuant to N.D. Fla. Local Rule 7.1(F), the undersigned certifies that this motion contains 3994 words, excluding case style, signature block, and certificate of service.

Respectfully submitted this 25th day of October, 2024.

*/s/ Elizbeth D. Salinas*
ELIZABETH D. SALINAS
Florida Bar No. 113394

MOZLEY, FINLAYSON & LOGGINS LLP
4767 New Broad Street
Orlando, FL 32814
(407) 514-2765 Ext. 2317
esalinas@mfllaw.com

-and-

WAYNE D. TAYLOR
Georgia Bar No. 701275
*Admitted pro hac vice*
MOZLEY, FINLAYSON & LOGGINS LLP
1050 Crown Pointe Parkway, Suite 1500
Atlanta, GA 30338
Tel: (404) 256-0700
wtaylor@mfllaw.com
*Counsel for Plaintiff Landmark American*
*Insurance Company*

*/s/ David C. Bibb*
David C. Bibb (Fla. Bar No. 190330)
**ROLFES HENRY CO., LPA**
3165 McCroy Place, Suite 174
Orlando, FL  32803
Telephone:  (407) 284-4990
dbibb@rolfeshenry.com


Brian P. Henry, Esq.
Fla. Bar No. 0089069
**ROLFES HENRY CO., LPA**
5577 Broadcast Court
Sarasota, FL  34240
Telephone:  (941) 684-0100
bhenry@rolfeshenry.com
kdeglman@rolfeshenry.com

*Counsel for Plaintiffs Independent Specialty*
*Insurance Company, Interstate Fire & Casualty*
*Company, and Lloyd's of London*

19

*/s/ Jack R. Reiter*
Jack R. Reiter, Esq.
Florida Bar No.: 0028304
jack.reiter@gray-robinson.com
Jordan S. Kosches, Esq.
Florida Bar No.: 49881
jordan.kosches@gray-robinson.com
**GrayRobinson, P.A.**
333 SE 2nd Avenue, Suite 3200
Miami, FL  33131
Telephone:  (305) 416-6880

*Counsel for Plaintiff Colony Insurance Co.*

*/s/ Aaron Konstam*
**ERIC A. HILLER**
Florida Bar No. 27920
eric.hiller@kennedyslaw.com
**AARON KONSTAM**
Florida Bar No. 104765
aaron.konstam@kennedyslaw.com
**BRYAN M. WALSH**
Florida Bar No. 1019565
Bryan.walsh@kennedyslaw.com
**JUNAID N. SAVANI**
Florida Bar No. 88816
Junaid.savani@kennedyslaw.com
**ILIRIANA FETEJA**
Florida Bar No. 1039423
Iliriana.Fteja@kennedyslaw.com
**Kennedys CMK LLP**
1111 Brickell Avenue, Suite 1300
Miami, FL  33131
Telephone:  (305) 371-1111

*Counsel for Plaintiff James River*
*Insurance Company*

/s/ Heidi Hudson Raschke
Heidi Hudson Raschke
Florida Bar No. 61183
hraschke@carltonfields.com
Madison E. Wahler
Florida Bar No. 1019015
mwahler@carltonfields.com
**CARLTON FIELDS, P.A.**
4221 W. Boy Scout Blvd, Suite 1000
Tampa, Florida 33607
Telephone: 813-223-7000

-and-

Amanda D. Proctor (*admitted pro hac vice*)
Georgia Bar No. 776848
**CARLTON FIELDS, P.A.**
1201 West Peachtree Street, Suite 3000
Atlanta, Georgia 30309
Telephone: 404-815-3400
aproctor@carltonfields.com

*Counsel for Plaintiff Homeland Insurance Company of New York*

/s/ John David Dickenson
John David Dickenson
Florida Bar No. 575801
jdickenson@cozen.com
Alexandra J. Schultz
Florida Bar No. 122100
aschultz@cozen.com
Juan P. Garrido
Florida Bar No. 118678
jgarrido@cozen.com
**COZEN O'CONNOR**
1801 N. Military Trail, Suite 200
Boca Raton, FL  33431
Telephone:  (561) 515-5250

21

*Counsel for Plaintiffs Westchester Surplus Lines Insurance Company, Arch Specialty Insurance Company, AXIS Surplus Insurance Company, Evanston Insurance Company, Aspen Specialty Insurance Company, and Maxum Indemnity Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed ***Plaintiffs' Daubert Motion To Exclude The Opinion Testimony Of Defendants' Expert Richard G. Henning And Supporting Memorandum*** with the Clerk of the Court using CM/ECF, which will automatically serve all counsel of record.

Heidi Hudson Raschke, Esq.
Madison E. Wahler, Esq.
Amanda D. Proctor (*admitted pro hac vice*)
**CARLTON FIELDS, P.A.**
hraschke@carltonfields.com
mwahler@carltonfields.com
aproctor@carltonfields.com
*Counsel for Plaintiff Homeland Insurance Company of New York*

David C. Bibb, Esq.
Brian P. Henry, Esq.
**ROLFES HENRY CO., LPA**
dbibb@rolfeshenry.com
wgonzalez@rolfeshenry.com
bhenry@rolfeshenry.com
kdeglman@rolfeshenry.com
*Counsel for Plaintiffs Independent Specialty Insurance Company, Interstate Fire & Casualty Company, and Lloyd's Of London*

Jack R. Reiter, Esq.
Jordan S. Kosches, Esq.
**GRAY ROBINSON, P.A.**
jack.reiter@gray-robinson.com
jordan.kosches@gray-robinson.com
*Counsel for Plaintiff Colony Insurance Company*

Eric A. Hiller Esq.
Aaron Konstam, Esq.
Bryan M. Walsh, Esq.
Junaid N. Savani, Esq.
Iliriana Feteja, Esq.
**KENNEDYS CMK LLP**
eric.hiller@kennedyslaw.com
aaron.konstam@kennedyslaw.com
bryan.walsh@kennedyslaw.com
Junaid.savani@kennedyslaw.com
Iliriana.Fteja@kennedyslaw.com
*Counsel for Plaintiff James River Insurance Company*

John David Dickenson, Esq.
Alexandra J. Schultz, Esq.
Juan P. Garrido, Esq.
**COZEN O'CONNOR**
jdickenson@cozen.com
aschultz@cozen.com
jgarrido@cozen.com
*Counsel for Plaintiffs Westchester*
*Surplus Lines Insurance Company,*
*Arch Specialty Insurance Company,*
*Axis Surplus Insurance Company,*
*Evanston Insurance Company, Aspen*
*Specialty Insurance Company, and*
*Maxum Indemnity Company*

Edward P. Fleming, Esq.
Matthew A. Bush, Esq.
Aaron T. McCurdy, Esq.
**MCDONALD FLEMING, LLP**
epfleming@pensacolalaw.com
cat@pensacolalaw.com
mabush@pensacolalaw.com
bushservice@pensacolalaw.com
amccurdy@pensacolalaw.com
absomerset@pensacolalaw.com

Kurtis Jay Keefer
**GOEDE, DEBOEST & CROSS,**
**PLLC**
kkeefer@gadclaw.com
curbanowski@gadclaw.com

Charles F. Beall, Jr., Esq.
**MOORE, HILL &**
**WESTMORELAND, P.A.**
cbeall@mhw-law.com
tstokes@mhw-law.com
*Counsel for Defendants*

This 25th day of October, 2024.

/s/  Elizabeth D. Salinas
Elizabeth D. Salinas

24