UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

PENSACOLA DIVISION

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY, *et. al.*

     Plaintiffs,

v.                            CASE NO. 3:23-cv-00453-MCR-HTC

PORTOFINO MASTER HOMEOWNERS
ASSOCIATION INC., a Florida not-for-
profit Corporation, *et. al.*

     Defendants.

_____/

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (APPRAISAL
PROCESS) AND INCORPORATED MEMORANDUM OF LAW[1]**

     Plaintiffs, Westchester Surplus Lines Insurance Company ("Westchester"),

Arch Specialty Insurance Company ("Arch"), AXIS Surplus Insurance Company

("AXIS"), Colony Insurance Company ("Colony"), Evanston Insurance Company

("Evanston"), Aspen Specialty Insurance Company ("Aspen"), Independent

Specialty Insurance Company ("Independent"), Interstate Fire & Casualty

Company ("Interstate"), Lloyd's of London (Consortium #9226) ("Lloyd's"),

---

[1] The depositions in this case contain numerous exhibits. For the Court's convenience, Plaintiffs
have attached copies of the transcripts without exhibits to this Motion with pertinent sections
highlighted. Plaintiffs have separately filed the deposition transcripts of Westchester [D.E. 234],
Portofino (Kim Lamar) [D.E. 231], Larry McCallister [D.E. 230], George Keys [D.E. 225],
Maxum [D.E. 237], Evanston [D.E. 242], Aspen [D.E. 233], and AXIS [D.E. 243] with all
exhibits.

James River Insurance Company ("James River"), and Maxum Indemnity Company ("Maxum") (collectively, "Plaintiffs"), file this Motion for Summary Judgment and Incorporated Memorandum of Law, and state as follows.

## INTRODUCTION

On September 16, 2020, the insured property, a condominium complex located in Pensacola, Florida and owned by the Defendants, sustained damage from Hurricane Sally. At the time of the loss, the property was insured under separate primary and excess commercial property policies issued by different Plaintiffs, with coverage totaling $242,232,927.

In December 2020, Defendants made a demand for appraisal to the primary insurers. Thereafter, in January 2023, Plaintiffs filed this declaratory judgment action in January 2023 following the submission of a $233 million claim—approximately 96 percent of the available coverage under policies—on behalf of Defendants. The suit asserts numerous improprieties in the appraisal process, which ultimately led to the issuance of a $187 million appraisal award, rendered in seven parts from February 2023 to July 2023.

Although Defendants never demanded appraisal from any of the excess carriers, they now seek to enforce the award against all the insurers. More specifically, Defendants seek to enforce the award against those that never had appraisal invoked against them, never had an opportunity to weigh in on the appraisal panel, and in some cases, were completely unaware of the claim until

many months into—or even over a year into—the appraisal process, a clear deprivation of due process. The Plaintiffs seek to have the award set aside, or a finding that it is not binding on some or all Plaintiffs, on various grounds, including fraud and other policy defenses.

The subject of this motion is the appraisal process itself, and the actions of the Defendants and their appraiser, George Keys, in the appraisal process. Based on information provided to Plaintiffs by the appraiser for the primary layer carriers, Pat Lewis, Plaintiffs became aware that Mr. Keys' estimates were riddled with redundancies, effectively inflating the Defendants' claim submission by tens of millions of dollars.

When confronted with the irregularities in Defendants' claim submission, and with their clients facing a fraud claim in this suit, Mr. Keys and his costing expert, Larry McCallister, changed their story. They had no choice but to admit that the estimates were simply not an amount that anyone would ever pay to perform repair work for damages caused by Hurricane Sally. Instead, they contended in their depositions that the estimates' redundancies were by design, and that what Mr. Keys presented as a Statement of Loss was in fact an "a la carte" menu of costs for the umpire to use when making his own determination of the scope of the damage.

While this explanation may be the basis for Defendants' attempted defense to Plaintiffs' fraud claim (not at issue in this motion), the converse is that by

submitting an "a la carte" menu as opposed to a statement of loss, Mr. Keys did not comply with the appraisal provisions in the Policies, which expressly and unambiguously require each appraiser to state the amount of loss caused by Hurricane Sally, not a "menu" of pricing.

This Motion for Summary Judgment focuses on the appraisal provisions that appear in the Policies and asserts two primary arguments.  First, Westchester is entitled to summary judgment on Defendants' counterclaim for breach of contract because there was never a disagreement with Westchester as to any amounts in excess of Defendants' $13,625,952.43 proof of loss.  Second, the excess carriers, defined below, cannot be bound by the appraisal award because they never had appraisal demanded of them and never had a disagreement with Defendants as to the amount of loss.  Third, as to all of the Plaintiffs, accepting Mr. Keys' and Mr. McCallister's testimony as true, Defendants' appraiser failed to comply with the appraisal provision of the policies, which requires the appraisers to each state the amount of loss.  For the reasons set forth below, summary judgment should be granted in favor of Plaintiffs.

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

<u>**The Policies**</u>

1.    At the time of the Hurricane Sally loss that is the subject of this litigation, the Property was insured by a tower of property insurance, with coverage totaling $242,232,927 (collectively, the "Policies").  The Policies were

issued by the Plaintiffs in this suit. The insureds under the Policies are the

Defendants in this suit (collectively, "Portofino").[2]

2.      Each insurer in the tower issued its own separate Policy, but all

Policies contain the Participation Page and the Master Property Policy form.[3]

3.      The Participation Page states, in relevant part:

> In consideration of the premium charged, the subscribers hereto,
> hereinafter referred to as the Insurer(s) and/or Company(ies) , do
> severally, but not jointly, agree to indemnify the Insured for the
> amount recoverable in accordance with the terms and conditions
> of the Policy.
>
> Provided that:
>
> 1. The collective liability of Insurers shall not exceed the Limit
> of Liability or any appropriate Sublimit of Liability or any
> Annual Aggregate limit.
>
> 2. The liability of each of the Insurers shall not exceed the
> Participation Limit set against its name.[4]

4.      The Participation Page further identifies each of the separate

"Insurer(s) and/or Company(ies)" subscribing to the tower of insurance and sets

forth their respective limits and attachment points.[5]

5.      Westchester, Princeton Excess Surplus Lines Insurance Company

("Princeton"), Endurance American Specialty Insurance Company ("Endurance"),

and Everest Indemnity Insurance Company ("Everest") (collectively, the "Primary

---

[2] Insurance Policies, D.E. 222-1 – 222-11.

[3] *See, e.g.*, Evanston Policy, D.E. 222-6 at EVANSTON000841-72.

[4] *See, e.g.*, Evanston Policy, D.E. 222-6 at EVANSTON000841.

[5] *See, e.g.*, Evanston Policy, D.E. 222-6 at EVANSTON000841-42.

Layer Carriers") provided the primary layer of coverage, which totals $15 million in coverage, subject to a $4,707,418.50 deductible.[6]

6.    Arch, AXIS, Aspen, Colony, Evanston, Independent, Interstate, Lloyd's,[7] James River, Landmark, Maxum, Homeland, (collectively, "the Excess Carriers") and Everest Indemnity Company provided the remaining $227,232,927 in coverage above the Primary Layer Carriers.[8]

7.    Arch and AXIS provided the first layer of excess coverage in the total amount of $10 million in excess of the $15 million Primary Layer coverage.[9]

8.    Aspen, Evanston, Colony, and the Velocity Carriers provided the second layer of excess coverage in the total amount of $25 million, excess of $25 million.[10]

9.    Landmark, James River, Maxum, and the Velocity Carriers provided the third layer of excess coverage in the total amount of $50 million, excess of $50 million.[11]

10.    Coverage in excess of $100 million was provided by Landmark, Homeland, and the Velocity Carriers in varying amounts and percentages.[12]

---

[6] *See, e.g.*, Evanston Policy, D.E. 222-6 at EVANSTON000841-42.

[7] Independent, Interstate, and Lloyd's will collectively be referred to as "the Velocity Carriers."

[8] *See, e.g.*, Evanston Policy, D.E. 222-6 at EVANSTON000841-42.

[9] *See, e.g.*, Evanston Policy, D.E. 222-6 at EVANSTON000841-42.

[10] *See, e.g.*, Evanston Policy, D.E. 222-6 at EVANSTON000841-42.

[11] *See, e.g.*, Evanston Policy, D.E. 222-6 at EVANSTON000841-42.

11.    The Master Property Policy, which is included and incorporated in each of the Policies, contains the following appraisal provision:

> 50. APPRAISAL - If the Insured and this Company fail to agree on the amount of loss, each, upon the written demand either of the Insured or of this Company made within 60 days after receipt of proof of loss by the Company, shall select a competent and disinterested appraiser. The appraisers shall then select a competent and disinterested umpire. If they should fail for 15 days to agree upon such umpire, then upon the request of the Insured or of this Company, such umpire shall be selected by a judge of a court of record in the county and state in which such appraisal is pending. Then, at a reasonable time and place, the appraisers shall appraise the loss, stating separately the value at the time of loss and the amount of loss. If the appraisers fail to agree, they shall submit their differences to the umpire. An award in writing by any two shall determine the amount of loss. The Insured and this Company shall each pay his or its chosen appraiser and shall bear equally the other expenses of the appraisal and of the umpire.[13]

12.    Certain insurers in the tower have individual endorsements modifying the provisions in the Master Property Policy.  For example, the Evanston Policy contains an Additional Property Exclusions and Conditions endorsement, which states that "[t]his endorsement modifies insurance provided under all Property, Difference In Conditions and similar or related coverage forms attached to this policy."  This form contains the following appraisal provision:

2. Appraisal

---

[12] The highest layer of coverage in the tower attaches at $200 million, a policy issued by Everest Indemnity Company.  This policy was not implicated by the appraisal award and accordingly Everest is not a party in this litigation.

[13] *See, e.g.*, Evanston Policy, D.E. 222-6 at EVANSTON000869.

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss within 60 days after the receipt of proof of loss by us. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree within 15 days, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and
b. Bear the other expenses of the appraisal and umpire equally.
If there is an appraisal, we will still retain our right to deny the claim.[14]

13.    The Master Property Policy contains the following proof of loss provision:

46. PROOF OF LOSS - Proof of loss is required as soon as practicable following the Company's written request for signed Proof from Insured; however, Insured, at its option, may elect to file Proof with the Company prior to the Company's request. It shall be necessary for the Insured to render a signed and sworn proof of loss to the Insurer or its appointed representative stating: the place, time and cause of loss, interest of the Insured and of all others, the value of the property involved, and the amount of loss, damage or expense sustained.[15]

### The Appraisal Demand

14.    On or about September 16, 2020, Hurricane Sally struck Pensacola Florida, where the insured Property is located.  The following day, September 17,

---

[14] *See, e.g.*, Evanston Policy, D.E. 222-6 at EVANSTON000874-75.

[15] *See, e.g.*, Evanston Policy, D.E. 222-6 at EVANSTON000868.

2020, Portofino's agent, Gallagher, placed only the Primary Layer Carriers on notice of the loss.[16]

15.   Jeffrey Hellman of McLarens, the Designated Adjuster on the Policies, retained J.S. Held as the building consultant and engineer and began adjusting the loss.[17]

16.   In early December 2020, a dispute arose between the Primary Layer Carriers and Portofino regarding the amount of payments due to Portofino as a result of the claim.[18]

17.   On December 10, 2020, Portofino, through Gallagher, formally notified Arch and AXIS of the loss.[19]

18.   The next day, on December 11, 2020, Portofino, through its counsel, Ed Fleming, sent correspondence to the Primary Layer Carriers and Jeff Hellman demanding appraisal of the loss ("Appraisal Demand Letter") and appointing Corinne Heller, Esq. as Portofino's appraiser.  The Appraisal Demand Letter's "Re" line read: "Portofino – Hurricane Sally property damage claim."  The letter stated that it "relate[d] to the following insurance policies, for which you have been designated by the insurers as the adjuster" and specifically listed the four

---

[16] Composite Ex. 1- September 17, 2020 Property Loss Notices to Westchester, Endurance, Everest, and Princeton.

[17] Ex. 2 - Deposition of Jeff Hellman p. 33 ln 19 – p. 38 ln. 8.

[18] D.E. 104 – Amended Complaint and D.E. 108 – Answer and Affirmative Defenses at ¶53.

[19] Comp. Ex. 3 - December 10, 2020 property loss notices.

Primary Layer policies and carriers by name, policy number, and claim number. The letter further stated that "Pursuant to requirements of the insurance policies (see paragraph 50 of the 'Master Policy Form' of the above-referenced insurance policies), the Insureds listed above are initiating the appraisal process. The Insureds demand an appraisal of the loss at issue in the above-referenced matter."[20]

19.    Additionally, on December 11, 2020, Portofino sent separate correspondence submitting a sworn proof of loss to the Primary Layer Carriers totaling $6,479,380.60, an amount within the Primary Layer of coverage.[21]

20.    The Primary Layer Carriers disputed the amount in the sworn proof of loss submitted with the appraisal demand.[22]

21.    That same day, Portofino submitted Civil Remedy Notices of Insurer Violation against the Primary Layer Carriers only.[23]

22.    Portofino did not send the Appraisal Demand Letter or the December 11, 2020 proof of loss letter to Arch or AXIS, or any of the Excess Carriers. Portofino never demanded appraisal of Arch and/or AXIS.[24]

23.    On December 31, 2020, John David Dickenson, Esq., who was retained by the Primary Layer Carriers, responded to the Appraisal Demand Letter

---

[20] Ex. 4 - Appraisal Demand Letter.

[21] Ex. 5 - Dec. 11, 2020 Proof of Loss letter.

[22] Ex. 6 - 30b6 Deposition of Westchester (Ashley Argyle) p. 299 ln. 11 – 17.

[23] Composite Ex. 7 - Civil Remedy Notices.

[24] Ex. 5 - Dec. 11, 2020 Proof of Loss letter; Ex. 4 - Appraisal Demand Letter; Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 87 ln. 2- 22, p. 88 ln. 23-25, p. 153 ln. 14 - 19.

and appointed Patrick Lewis of Lewis Claims Solutions as the appraiser for the Primary Layer Carriers.[25]

24.    On February 8, 2021, Portofino replaced Ms. Heller with George Keys of Keys Claim Consultants ("Keys Claims").[26]

25.    On February 19, 2021, Jeff Hellman asked Portofino's counsel to submit the rest of their Hurricane Sally claim.[27]

26.    In response, Portofino advised on February 26, 2021 that the "investigative work [was] underway" and that it was "anticipated that it [would] be completed in 30 to 60 days."  Portofino then submitted a supplemental proof of loss as part of that correspondence, increasing their total claim to $13,625,952.43, an amount within the Primary Layer.[28]

27.    On March 8, 2021, Portofino, through Gallagher, formally notified Aspen, Colony, and Evanston of the loss.[29]

28.    On March 10, 2021, Portofino through Gallagher, formally notified the Velocity Carriers of the loss.[30]

---

[25] Ex. 9 - Dec. 31, 2020 Letter.

[26] D.E. 104 – Amended Complaint and D.E. 108 – Defendants' Answer and Affirmative Defenses at ¶ 62.

[27] Ex. 10 – February 19, 2021 email from Jeff Hellman to Edward Fleming, Esq.

[28] Ex. 11 - February 26, 2021 Proof of Loss Letter.  The $13,625,952.43 proof of loss incorporated the December 11, 2020 $6,479,380.60 proof of loss and was not in addition to it.

[29] Ex. 12 - March 8, 2021 Property Loss Notices.

[30] Ex. 13 - Notice of Loss to Velocity.

29.    Portofino never demanded appraisal of Aspen, Colony, Evanston, and/or the Velocity Carriers.[31]

30.    On March 24, 2021, Portofino took the position that the Appraisal Demand Letter only demanded appraisal of the interior damage, rather than the loss as a whole, and further took the position that the Primary Layer Carriers were obligated to continue to adjust the exterior portions of the loss.[32]

31.    However, on February 8, 2021, Mr. Keys was retained to appraise the entire loss, not simply part of the loss.  Indeed, Mr. Keys testified that there is no way to appraise only a portion of a loss.[33]

32.    On April 7, 2021, Jackie Collins and Wes Brandt of Gallagher, two insurance professionals with several decades of experience, advised Portofino's counsel that once appraisal is invoked, the entire loss (not just part of the loss) must be appraised, and that it is the insured who has a duty to present and prove a claim, stating:

> The entire loss is under appraisal since the policy covers an occurrence, not portions of an occurrence. Either it's all in appraisal as to the amount of the claim, or none of it.
>
> As to the insurers obligations, it is their duty to adjust the claim to include investigation, but fundamentally it's the insured who must present and prove their claim. Adjusting means reviewing

---

[31] Ex. 4 - Appraisal Demand Letter; Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 87 ln. 2 – 22, p. 88 ln. 23-25, p. 153 ln. 14 - 19.

[32] Ex. 14 - March 24, 2021 Letter from E. Fleming.

[33] Ex 15 - Keys Claims Contract; Ex. 17 - Deposition of George Keys p. 277 ln. 13 – p. 278 ln. 10, p. 119 ln. 3-13; Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 130 ln. 13 – 131 ln. 3.

what is presented and making such modifications as necessary
due to differences in scope (if any) and reasonableness of repair
costs, etc. sometimes adjustments include deductions for wear
and tear, pre-existing damage and so forth. I'm assuming
Portofino has scope and costs for the exterior damage, which
should be provided to the insurers (and adjusters) for the
appraiser to consider.[34]

33.    The Primary Layer Carriers objected to Portofino's assertion that only

part of the loss was in appraisal.  While the Primary Layer Carriers maintained that

Portofino had demanded appraisal of the entire loss, by letter dated April 5, 2021,

they "echoed" Portofino's appraisal demand and clarified that the appraisal was for

the entire loss.[35]

34.    The party-appointed appraisers selected Jon Doan of Claims

Consultants Group to serve as the umpire.[36]

35.    Portofino never completed its claim submission despite Mr.

Hellman's requests, and accordingly, Plaintiffs were unaware of the amount of

Portofino's claim.[37]

36.    By March 2022, the insurers whom Portofino had placed on notice at

that time (the Primary Layer Carriers, Arch, AXIS, Aspen, Colony, Evanston, and

the Velocity Carriers) had learned from Mr. Lewis that Mr. Lewis suspected that

---

[34] Ex. 18 - April 2 – 8, 2021 Emails between Edward Fleming and Gallagher personnel.

[35] Ex. 19 - April 5, 2021 Letter.

[36] D.E. 108 – Defendants' Counterclaim and Plaintiffs' Answers to Counterclaim [D.E. 123 – 133] at ¶44.

[37] Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 88 ln. 1-5, p. 97 ln 7-19; Ex. – February 19, 2021 email from Jeff Hellman to Edward Fleming, Esq.

Mr. Keys could submit a claim in excess of $50 million, and potentially as high as $150 million or more, to the umpire.[38]

37.    Though neither Portofino nor Gallagher had notified any carriers whose attachment point was in excess of $50 million of the claim, in light of the information provided by Mr. Lewis, Cozen O'Connor, who at the time was representing the Primary Layer Carriers, Arch, AXIS, Colony, Aspen, and Evanston, sent an email on March 18, 2022 to representatives of James River, Landmark, and Maxum to make them aware of the claim.[39]  James River, however, became aware of the claim potentially implicating its policy one day earlier on March 17, 2022, when it exchanged correspondences with AXIS relating to the renewal of the James River policy.[40]

38.    Neither Portofino nor Gallagher ever notified James River, Landmark, Maxum, or Homeland of the claim at any time.[41]

39.    Portofino never demanded appraisal of James River, Landmark, Maxum, or Homeland.[42]

---

[38] Ex. 20 - March 18, 2022 email.

[39] Ex. 20 - March 18, 2022 email.

[40] Ex. 21 - March 17, 2022 email exchange between James River and AXIS personnel.

[41] Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 236 ln. 20 – p. 237 ln 6, p. 238 ln. 8 – 10, p. 221 ln. 22 – p. 222 ln. 23, p. 145 ln. 8 – p. 146 ln. 9.

[42] Ex. 22 - 30b6 Deposition of Maxum (Greg Crocker) p. 223 ln. 12 – 14, Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 237 ln. 7 – 11, p. 152 ln. 20 – 22, p. 228 ln. 4 – 8.

40.    The only proofs of loss submitted by Portofino were the December 11, 2020 and February 26, 2021 proofs of loss, for $6,479,380.60 and $13,625,952.43, respectively, amounts within the Primary Layer.[43]

41.    Portofino never submitted any proofs of loss implicating the limits of any of the Excess Carriers.[44]

42.    Until the Keys appraisal claim submission, Portofino never presented a claim that implicated the limits of any of the Excess Carriers.[45]

43.    At the time appraisal was demanded of the Primary Layer Carriers on December 11, 2020, and the time Mr. Lewis was selected to serve as the appraiser for the Primary Layer Carriers on December 31, 2020, Aspen, Colony, Evanston, the Velocity Carriers, James River, Maxum, Landmark, and Homeland, were entirely unaware of Portofino's Hurricane Sally claim.[46]

44.    At the time appraisal was demanded of the Primary Layer Carriers on December 11, 2020, AXIS and Arch had been on notice of Portofino's Hurricane

---

[43] Ex. 5 - Dec. 11, 2020 Proof of Loss Letter; Ex. 11 - Feb. 26, 2021 Proof of Loss; Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 97 ln. 20 – p. 98 ln. 4.

[44] Ex. 5 - Dec. 11, 2020 Proof of Loss Letter; Ex. 11 - Feb. 26, 2021 Proof of Loss; Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 97 ln. 20 – p. 98 ln. 4; Ex. 23 - 30b6 Deposition of Evanston (Jeff Warner) p. 61 ln. 17-23; Ex. 24 - 30b6 Deposition of Aspen (Anthony Anniello) p. 109 ln. 4-14.

[45] Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 96 ln. 18 – p. 98 ln. 4.

[46] Ex. 4 - Appraisal Demand Letter; Ex. 9 - December 31, 2020 Letter; Ex. 12 - March 8, 2021 Notices; Ex. 13 - Notice of Loss to Velocity; Ex. 20 - March 18, 2022 email.

LEGAL\73740315\2

Sally claim for one day, following Gallagher's December 10, 2020 Property Loss Notice to AXIS and Arch.[47]

45.    At the time appraisal was demanded of the Primary Layer Carriers on December 11, 2020, none of the Excess Carriers were aware of the scope or amount of Portofino's claim.[48]

46.    The December 11, 2020 appraisal demand letter sent to the four Primary Layer Carriers was the only appraisal demand made by Portofino of any insurer.[49]

47.    Notwithstanding Portofino's failure to demand appraisal of the Excess Carriers, and in some cases, failure to notify certain of the Excess Carriers of the claim at all, upon learning of the claim, the appraisal, and the identity of Portofino's appraiser, certain Excess Carriers began to contribute to certain appraisal expenses.  They did so, with knowledge of the identity of Portofino's appraiser, to have access to information in order to monitor the claim and the appraisal.[50]

---

[47] Ex. 4 - Appraisal Demand Letter; Comp. Ex. 3 - December 10, 2020 Notices.

[48] Ex. 4 - Appraisal Demand Letter; Comp. Ex. 3 - December 10, 2020 Notices; Ex. 12 - March 8, 2021 Notices; Ex. 13 - Notice of Loss to Velocity; Ex. 20 - March 18, 2022 email.

[49] Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 153 ln 14-19.

[50] *See, e.g.,* Ex. 24 - 30b6 Deposition of Aspen (Anthony Anniello) p. 69 ln. 16 – p. 71 ln 3; Ex. 25 - 30b6 Deposition of AXIS (Steve Lajewski) p. 64 ln. 17 – 65 ln. 7; Ex. 22 - 30b6 Deposition of Maxum (Greg Crocker) p. 86 ln. 8-15, p. 100 ln. 16 – 102 ln. 13; Ex. 23 - 30b6 Deposition of Evanston (Jeff Warner) p. 98 ln. 5 – 25, p. 193 ln. 22 – 194 ln. 4, p. 226 ln. 8 – 227 ln. 2.

## The Keys Claim Submission

48.    On July 11, 2022, Keys Claims submitted their "estimates for the above referenced appraisal."[51]  In response to an inquiry from Mr. Lewis about Mr. Keys' "position on total loss and damage values," Mr. Keys explained in a July 21, 2022 email that the estimates submitted were the "estimate[s] of damages for all towers."[52]

49.    On  July 22, 2022, at the request of Mr. Doan and Mr. Lewis, Keys Claims provided a Statement of Loss in the amount of $212,949,543.49.[53]

50.    On August 2, 2022, Keys Claims submitted amended estimates and an amended Statement of Loss, increasing the amount of the loss to $233,030,601.80. Keys Claims' $233,030,601.80 statement of loss constituted approximately 96% of the total $242,232,927 combined limit of liability under the Policies.[54]

51.    The submission by Keys Claims was the first full claim submission of any kind made by or on behalf of Portofino.[55]

52.    Of  the  $233,030,601.80,  approximately  $217  million ($216,645,159.39 to be exact) was comprised of estimates prepared by Keys Claims' costing expert, Larry McCallister of LJB Restorations Services ("LJB").[56]

---

[51] Ex. 26 - July 11, 2022 Email from Ashley Adkins to Jon Doan.

[52] Ex. 30 - July 21, 2022 email from George Keys.

[53] Ex. 27 - July 22, 2022 Email from Tim Rothring to Nick Cervellera et al.

[54] Ex. 28 - August 2, 2022 Email from Tim Rothring and Amended Statement of Loss.

[55] Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 96 ln. 2 – p. 98 ln. 4.

53.     The Keys Claims Statement of Loss included line items for "Repairs as Per LJB Restoration Estimate" for each tower.[57]

54.     However, at his deposition, Mr. McCallister testified that he was "tasked with giving a la carte pricing based on trade based on the building"[58] and that he "wouldn't describe" his $217 million estimate as a market price for performing the work that needed to be done and doesn't think that anyone would pay $217 million to do the work.[59]

55.     For example, Mr. McCallister's estimates called for the assembly and reassembly of a 600-ton crane a total of 50 times – 10 times for each tower.[60]  Mr. McCallister testified that in the "real world" Tower 1 would not require a 600-ton crane be assembled and disassembled ten times in order to complete the work on Tower 1.[61]

56.     As another example, Mr. McCallister's estimates called for 11,520 hours of on-site supervision for each tower, totaling 57,600 hours (the equivalent of having an on-site construction supervisor, 40 hours a week, for 27.7 years).  Mr. McCallister admitted in his deposition that that is not how much supervision would be required for a project with a 36-month period of restoration.  Mr. McCallister

---

[56] Ex. 29 - Keys Claims Statement of Loss.

[57] Ex. 29 - Keys Claims Statement of Loss.

[58] Ex. 16 - Deposition of Larry McCallister p. 42 ln 10-12.

[59] Ex. 16 - Deposition of Larry McCallister p. 43 ln 8-16.

[60] Ex. 16 - Deposition of Larry McCallister p. 58 ln 21-25.

[61] Ex. 16 - Deposition of Larry McCallister p. 58 ln 3-9.

LEGAL\73740315\2

explained that his "testimony, to put it short, is not 57,000 hours. However, if you were to a la carte this and do it piece by piece, which [he] wouldn't advise, that's what's presented."[62]

57.     Mr. McCallister testified that rather than estimating the damage caused by Hurricane Sally, he was tasked with "producing a la carte pricing so that later on once the scope was determined and awarded by the umpire, he had the pricing in front of him."[63]

58.     Mr. McCallister explained that the $217 million bid was comprised of "a la carte" pricing containing "redundancies."[64]

59.     Mr. Keys explained that the figures in Mr. McCallister's estimate were a "starting point" for the umpire to reduce down.[65]

60.     Nevertheless, Keys Claims submitted a Statement of Loss to the umpire claiming each of the LJB Estimates in full.  In doing so, Keys Claims submitted the estimates as the damages caused to the towers by Hurricane Sally. [66]

61.     Later, in his sworn deposition, Mr. Keys testified that Mr. McCallister's estimates were not submitted as the cost of repairs to put the

---

[62] Ex. 16 - Deposition of Larry McCallister p. 40 ln 11 – p. 42 ln. 12.

[63] Ex. 16 - Deposition of Larry McCallister p. 58 ln. 11-16.

[64] Ex. 16 - Deposition of Larry McCallister p. 47 ln. 11 – 13.

[65] Ex. 17 - Deposition of George Keys p. 341 ln. 18 – p. 342 ln. 20.

[66] Ex. 17 - Deposition of George Keys p. 95 ln. 15 – 21; Ex. 26 - July 11, 2022 Email from Ashley Adkins to Jon Doan; Ex. 30 - July 21, 2022 email from George Keys.

property back in its pre-loss condition, and that the figures as stated in Mr. McCallister's estimate would have been redundant if awarded.[67]

## LAW AND ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court "must view all the evidence and draw all reasonable factual inferences in favor of the nonmovant." *Moore v. GEICO Gen. Ins. Co.*, 633 F. App'x 924, 927 (11th Cir. 2016).  In ruling on a motion for summary judgment, "[i]t is not the court's role to weigh conflicting evidence or to make credibility determinations." *Id.*  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inference from the facts are jury functions." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). "[A] a general denial unaccompanied by any evidentiary support will not suffice." *Perdido Sun Condo. Ass'n, Inc. v. Nationwide Mut. Fire Ins. Co.*, 545 F. Supp. 2d 1225, 1230 (N.D. Fla. 2008).  "The mere existence of some evidence to support the nonmoving party is not sufficient for denial of summary judgment; there must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for

---

[67] Ex. 17 - Deposition of George Keys  p. 340 ln. 19 – p. 342 ln. 20.

that party." *Snell v. United Specialty Ins. Co.*, 102 F.4th 1208, 1214 (11th Cir. 2024).

## II.   PRINCIPLES OF APPRAISAL

### a.   INVOCATION OF APPRAISAL

Appraisal clauses in insurance policies "are valid and binding upon the parties if they are appropriately invoked." *State Farm Fire & Cas. Co. v. Middleton*, 648 So. 2d 1200, 1202 (Fla. 3d DCA 1995).  "Appraisals are creatures of contract and the subject or scope of appraisal depends on the contract provision." *NCI, LLC v. Progressive Select Ins. Co.*, 350 So. 3d 801, 806 (Fla. 5th DCA 2022); *see also Certain Underwriters at Lloyd's v. Lago Grande 5-D Condo. Ass'n, Inc.*, 337 So. 3d 1277, 1280 (Fla. 3d DCA 2022) ("In matters of appraisal, the contract language controls.").  "The goal of appraisal provisions is to settle disputes without litigation." *NCI,* 350 So. 3d at 806.  "Once a party to an insurance contract properly invokes appraisal, the parties should conduct those proceedings in accord with the agreed-on policy provisions." *Id.*

"Appraisal is ripe where post-loss conditions are met, and the insurer has had a reasonable opportunity to investigate and adjust the claim and there is a disagreement regarding the value of the property or the amount of loss." *Clockwork PH3, LLC v. Clear Blue Specialty Ins. Co.*, No. 2:23-CV-407-SPC-KCD, 2023 WL 6247595, at *3 (M.D. Fla. Sept. 26, 2023).  It is a prerequisite to appraisal that the parties to an appraisal must have a "disagreement" informed by

reasonable competing estimates. *See Redlhammer v. ASI Preferred Ins. Corp.*, 337 So. 3d 421, 423 (Fla. 3d DCA 2021); *see also People's Tr. Ins. Co. v. Ortega*, 306 So. 3d 280, 284-85 (Fla. 3d DCA 2020) ("The appraisal paragraph in the policy presupposes that there is a disagreement about a loss entitled to coverage pursuant to the terms of the policy.")  "[T]he disagreement necessary to trigger appraisal cannot be unilateral." *U.S. Fid. & Guar. Co. v. Romay*, 744 So. 2d 467, 469-70 (Fla. 3d DCA 1999).  "The insurer and insured must 'fail to agree' about the amount of the loss once the parties agree that the loss at issue is entitled to coverage." *Ortega*, 306 So. 3d at 285.

"Triggering the appraisal provision requires the insured to timely comply with providing the insurance company information that substantiates the existence of a disagreement." *Id.*  "For there to be a disagreement, the insurance company must be put on notice that the insured's damages estimate is different from the insurer's estimate and scope of repairs." *Id.*  "Only when there is a 'real difference in fact, arising out of an actual and honest effort to reach an agreement between the insured and the insurer,' is an appraisal warranted." *Citizens Prop. Ins. Corp. v. Galeria Villas Condo. Ass'n, Inc*., 48 So. 3d 188, 191 (Fla. 3d DCA 2010) (quoting 14 Couch on Insurance 2d § 50:56 (1982)).  Indeed, "appraisal is premature when one party has not provided a meaningful exchange of information sufficient to substantiate the existence of a genuine disagreement." *Redlhammer,* 337 So. 3d at 423.  Thus, "insureds must comply with the post-loss terms of their … policies,

which enables the insurance companies to investigate the insureds' claims and to disagree with the loss amount before the appraisal term becomes effective." *Galindo v. ARI Mut. Ins. Co*., 203 F.3d 771, 777 (11th Cir. 2000).

### b. SCOPE OF APPRAISAL

Florida courts have explained that "when [an] insurer admits that there is a covered loss, any dispute on the amount of loss suffered is appropriate for appraisal." *Cincinnati Ins. Co. v. Cannon Ranch Partners, Inc*., 162 So. 3d 140, 143 (Fla. 2d DCA 2014). While "issues of coverage and liability under an insurance policy are for the court or jury, respectively" questions "regarding the amount of loss to be covered under the policy [are] subject to appraisal if so provided in the insurance policy." *State Farm Fla. Ins. Co. v. Hernandez*, 172 So. 3d 473, 476 (Fla. 3d DCA 2015). Further, "when an insurer admits coverage and disputes the amount of loss, causation is to be determined by an appraisal panel." *People's Tr. Ins. Co. v. Tracey*, 251 So. 3d 931, 933 (Fla. 4th DCA 2018). In other words, "causation is a coverage question for the court when an insurer wholly denies that there is a covered loss and an amount-of-loss question for the appraisal panel when an insurer admits that there is covered loss, the amount of which is disputed." *Johnson v. Nationwide Mut. Ins. Co*., 828 So. 2d 1021, 1022 (Fla. 2002).

Once appraisal is properly invoked, the appraisers determine the amount of the loss, which "necessarily includes determinations as to the cost of repair or

replacement and whether or not the requirement for a repair or replacement was caused by a covered peril or a cause not covered, such as normal wear and tear, dry rot, or various other designated, excluded causes." *State Farm Fire & Cas. Co. v. Licea*, 685 So. 2d 1285, 1288 (Fla. 1996); *see also Merrick Pres. Condo. Ass'n, Inc. v. Cypress Prop. & Cas. Ins. Co*., 315 So. 3d 45, 49 (Fla. 4th DCA 2021) ("The appraisers determine the amount of the loss, which includes calculating the cost of repair or replacement of property damaged, and ascertaining how much of the damage was caused by a covered peril . . . .")  "[A] determination of the amount of loss for appraisal purposes "necessarily includes determining both the extent of the covered damage and the monetary amount necessary to repair or replace the damaged property." *First Acceptance Ins. Co., Inc. v. At Home Auto Glass, LLC*, 365 So. 3d 1278, 1280 (Fla. 6th DCA 2023). Accordingly, "in evaluating the amount of loss, an appraiser is necessarily tasked with determining both the *extent* of covered damage and the *amount* to be paid for repairs." *Cincinnati Ins. Co. v. Cannon Ranch Partners, Inc*., 162 So. 3d 140, 143 (Fla. 2d DCA 2014) (emphasis in original).

The *Galindo* court further recognized that "the disagreement necessary to trigger appraisal cannot be unilateral." *Id*. Rather, the contract terms "contemplated that the parties would engage in some meaningful exchange of information sufficient for each party to arrive at a conclusion before a disagreement could exist." *Id*. Otherwise, an insured, after sustaining a loss, "could immediately

24

LEGAL\73740315\2

invoke appraisal and secure a binding determination as to the amount of loss" and "the post-loss obligations would be struck from the contract by way of judicial fiat and the bargained-for contractual terms would be rendered surplusage." *Id*. The court concluded that "[t]here exists but one reasonable interpretation of the terms of the policy at issue here: The insured must comply with all of the policy's post-loss obligations before the appraisal clause is triggered." *Id*. *See also Vintage Bay Condo. Assn., Inc. v. Lexington Ins. Co.*, No. 2:18-CV-729-FTM-99CM, 2019 WL 211433, at *3 (M.D. Fla. Jan. 16, 2019) (finding that the insured's conduct in submitting a third, post-suit proof of loss for over $7 million—after invoking appraisal—deprived the insurer of its ability to conduct a proper investigation of the loss).

## III.   WESTCHESTER IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIM FOR BREACH OF CONTRACT

The Proof of Loss and Appraisal provisions in the policy form a process designed to ensure clarity, transparency, accountability and fairness in the claims process. Paragraph 46 of the policy—the Proof of Loss requirement—explicitly obligates the insured to submit a signed and sworn statement detailing "**the amount of loss**" to the insurer. This sworn statement enables the insurer to fully investigate and verify the claim. Only after a disagreement arises on the "**amount of loss**" specified in the sworn Proof of Loss does Paragraph 50 of the policy—the Appraisal Clause—permit either party to invoke appraisal. Crucially, the Policy

conditions the initiation of appraisal upon the receipt of a sworn Proof of Loss detailing the "**amount of loss**", underscoring that appraisal is meant solely for resolving disputes about the "**amount of loss**" stated in the sworn Proof of Loss. (Emphasis added).

The Policy, therefore, ties the Proof of Loss and Appraisal provisions to each other, requiring each to fulfill its role within the claims process. In this case, the insured initially submitted a sworn Proof of Loss identifying the **"amount of loss"** as $6,479,380.60. Subsequently, the insured submitted an amended sworn Proof of Loss identifying the "amount of loss" as $13,625,952.43. At no point did the insured submit a sworn Proof of Loss reflecting any amount above the $13 million Proof of Loss. As such, that sworn Proof of Loss remained the last documented and sworn "**amount of loss**" in the entire claim and thus the only "**amount of loss**" subject to appraisal under the policy. The later submission of a $233 million unsworn estimate—without an accompanying sworn Proof of Loss for that amount—violates the Proof of Loss and Appraisal provision and the agreed-upon claims process. It also deprives Westchester of the contractual right to conduct a thorough investigation to evaluate the veracity of the claimed "**amount of loss**". The $13 million sworn Proof of Loss submitted by the Defendants provides as follows:

> The said loss did not originate by any act, design or procurement on the part of your insured, nothing has been done by or with the privity or consent of your insured to violate the conditions of the policy, or

render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss, no property saved has in any manner been concealed, and no attempt to deceive the said insurer as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

FRAUD WARNING NOTICE: Pursuant to s. 817.234, Florida Statutes, any person who, with the intent to injure, defraud, or deceive any insurer or insured, prepares, presents, or causes to be presented a proof of loss or estimate of cost or repair of damaged property in support of a claim under an insurance policy knowing that the proof of loss or estimate of claim or repairs contains any false, incomplete, or misleading information concerning any fact or thing material to the claim commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, Florida Statutes.[68]

Pursuant to section 817.234, Florida Statutes, the fraud warning states that the insured must not submit any Proof of Loss with "false, incomplete, or misleading information" and clarifies that any attempt to present a claim with such information "with the intent to injure, defraud, or deceive" constitutes a third-degree felony under Florida law. This language underpins the Policy's intent to safeguard both the insurer and the insured by requiring transparency and honesty in the claimed "amount of loss" before appraisal proceeds.

The *Galindo* decision underscores that an insurer must have the opportunity to review and, if necessary, contest the claimed amount of loss in a sworn proof of loss. *Galindo v. ARI Mut. Ins. Co.*, 203 F.3d 771, 777 (11th Cir. 2000). By dramatically increasing the unsworn estimate after invoking appraisal without

---

[68] Ex. 11 - February 26, 2021 Proofs of Loss.

submitting a corresponding sworn Proof of Loss, Defendants created a one-sided process where Westchester was deprived of the ability to meaningfully assess, investigate and determine the veracity of this new estimate.

Moreover, the $233 million estimate was never sworn to under oath as required by Paragraph 46, leaving the claimed amount unverified and in violation of the policy's clear intent for sworn Proofs of Loss to protect both parties' rights. This deviation mirrors the conduct prohibited in *Vintage Bay,* where the court found that an insured's submission of a significantly higher proof of loss post-appraisal demand undermined the insurer's ability to conduct a full investigation and placing the insurer at a considerable disadvantage entering the appraisal process. 2019 WL 211433 at *3. Here, Defendants' unverified $233 million estimate, submitted 18 months after appraisal was invoked, deprived Westchester of the fair and transparent appraisal process envisioned by the policy.

Further, the insured's ability to submit a new estimate without verifying the amount in a sworn Proof of Loss nullifies the purpose of the Proof of Loss and Appraisal provisions, which are inextricably linked by their mutual reliance the phrase "amount of loss." If policy terms are disregarded to this extent, it opens a loophole allowing insureds to strategically inflate claim amounts after appraisal, stripping insurers of their right to determine the veracity of the claim through a thorough and timely assessment.

In submitting the $233 million figure without a corresponding sworn Proof of Loss, Defendants bypassed the accountability and the integrity controls built into the Proof Loss requirement as well as Florida Statutes. This omission not only prevented Westchester from investigating the claim's accuracy, but also deprived Westchester of the process as well as the legal and ethical safeguards that a sworn Proof of Loss is designed to ensure.

Based on the foregoing, Westchester is entitled to summary judgment on Defendants counterclaim for breach of contract and any appraisal award in excess of the last submitted sworn Proof of Loss is not binding on Westchester.

## IV.    THE EXCESS CARRIERS CANNOT BE BOUND BY THE APPRAISAL

The Excess Carriers cannot be bound by the appraisal because it is undisputed that Portofino never demanded appraisal of them. Moreover, even if Portofino had demanded appraisal of all Plaintiffs, which indisputably did not occur, appraisal would have been premature as to the excess carriers because there was no disagreement as to the amount of loss and Portofino never provided a sworn proof of loss to the excess carriers, both of which are established conditions precedent to a party's right to demand appraisal.

As addressed above, Plaintiffs issued separate Policies to Portofino, and each of the Policies included the Participation Page and Master Property Policy, as well as additional endorsements unique to each Plaintiff. The appraisal provision in the Master Property Policy, which appears in all of the Policies (but is modified

by endorsement in the Evanston, Homeland, and Landmark Policies) states, in relevant part, as follows: "If the Insured and ***this Company*** fail to agree on the amount of loss, each, upon the written demand either of the Insured or of this Company made within 60 days after receipt of proof of loss by the Company, shall select a competent and disinterested appraiser." (Emphasis added). [69] The Participation Page, incorporated into each of the Policies, confirms that each of the insurers is a separate "Company." Thus, an appraisal demand made to one "Company," does not equate to an appraisal demand to any other "Company." This is especially true where the Excess Carriers were not even on notice of the claim. It would defy logic to argue that Portofino had an explicit disagreement as to the amount of the loss with Plaintiffs that were completely unaware of the claim itself.

It is undisputed that the only Plaintiffs who received an appraisal demand were the four Primary Layer carriers. As a result, it was only the four Primary Layer Carriers who made the decision to appoint Pat Lewis as their appraiser and who agreed to move forward with the appraisal without formally contesting Portofino's appointment of Mr. Keys. Portofino now seeks to bind the Excess Carriers to the award, when the Excess Carriers had no say in the selection of the appraisers, the umpire, or whether appraisal was ripe to begin with. The Excess

---

[69] The Evanston Appraisal Provision states, in relevant part, "If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss within 60 days after the receipt of proof of loss by us."

Carriers cannot be bound by an appraisal process when appraisal was never invoked as to them.

While there are some variances between the Plaintiffs' applicable appraisal provisions, each provision necessitates a requisite "disagreement" as to the amount of loss before appraisal can be invoked. Florida courts have enforced this requirement, holding that the ripeness of appraisal is conditioned on a failure to agree on the amount of loss. *See U.S. Fid. & Guar. Co. v. Romay*, 744 So. 2d 467, 469 (Fla. 3d DCA 1999) ("It is therefore axiomatic that an arbitrable issue exists between parties whose agreement provides for appraisal when there is a disagreement in the dollar amount of the loss being claimed."). Further, "by the terms of the contract, it [is] contemplated that the parties would engage in some meaningful exchange of information sufficient for each party to arrive at a conclusion before a disagreement could exist." *Id.*

At the time Portofino demanded appraisal on December 11, 2020, the only carriers that had a disagreement with Portofino as to the amount of loss were the Primary Layer Carriers—the only carriers who actually received an appraisal demand. Indeed, other than Arch and AXIS, whom Gallagher had notified regarding the claim the day before, none of the Excess Carriers even knew about Portofino's claim on December 11, 2020, much less had a disagreement about its worth. Even Arch and AXIS had not had any meaningful opportunity to

investigate the claim, had received no claim submission from Portofino, and therefore had no appreciation of the claim's value.

As the Excess Carriers began to learn of the claim, it is undisputed that Portofino never made a full claim submission,[70] despite requests from Mr. Hellman[71] and clear direction from Portofino's own broker.[72] Prior to the Keys Claims claim submission made in July 2022, Portofino submitted proofs of loss totaling $13,625,952.43, an amount well within the $15 million Primary Layer. The Excess Carriers, whose coverage attaches at various points excess of the $15 million Primary Layer, never received a claim that implicated their attachment points. There was nothing for these carriers to disagree with. And there was no meaningful exchange of information, because no scope or estimate that could potentially implicate the excess carriers' Policies was ever provided.

Moreover, in conjunction with the requirement that there be a disagreement as to the amount of loss before appraisal is ripe, the Master Property Policy states that appraisal may be demanded "within 60 days after receipt of proof of loss by the Company." Here, it is undisputed that the only proofs of loss that Portofino

---

[70] Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 88 ln. 1-5, p. 97 ln 7-19.

[71] Ex. 10 – February 19, 2021 email from Jeff Hellman to Edward Fleming, Esq.

[72] Ex. 18 - April 2 – 8, 2021 Emails between Edward Fleming and Gallagher personnel.

ever submitted were amounts within the Primary Layer, submitted only to the Primary Layer Carriers.[73]  No proofs of loss were ever sent to the Excess Carriers.

Accordingly, appraisal was never ripe as to the Excess Carriers.  The Excess Carriers cannot be bound by an appraisal award that was obtained via a process that was not invoked as to them, entered by appraisers they had no say in selecting or objecting to, and where the necessary prerequisites for contractual appraisal were not in place.[74]

## V.    PORTOFINO'S APPRAISER DID NOT COMPLY WITH THE APPRAISAL PROVISIONS

Each of the applicable appraisal provisions requires that the appraisers separately state the amount of loss, and if the appraisers disagree, they may submit their disagreements to the umpire.  By Mr. Keys' own admission, Portofino did not comply with the appraisal provision because Portofino's appraiser never stated the amount of loss.

---

[73] Ex. 5 - Dec. 11, 2020 Proof of Loss Letter; Ex. 11 - Feb. 26, 2021 Proof of Loss; Ex. 8 - 30b6 Deposition of Portofino (Kim Lamar) p. 97 ln. 20 – p. 98 ln. 4; Ex. 23 - 30b6 Deposition of Evanston (Jeff Warner) p. 61 ln. 17-23; Ex. 24 - 30b6 Deposition of Aspen (Anthony Anniello) p. 109 ln. 4-14.

[74] While slightly different, and as set forth in Section III above, this principle applies to Westchester as well.  At the time appraisal was demanded, the only proof of loss that had been provided by Portofino to Westchester was $6,479,380.60, and two months later, increased to $13,625,952.43.  Westchester disagreed with each of these proofs of loss.  However, there was never a disagreement between Westchester and Portofino as to any amount in excess of $13,625,952.43, as Westchester never had an opportunity to consider documentation of this damage prior to the appraisal demand.  Defendants' conduct of submitting a statement of loss of more than 17 times the amount of the prior proof of loss created a unilateral and unsupported disagreement, rather than a genuine dispute about the dollar amount of the loss, as required under the policy.

When questioned in his deposition about the 57,600 hours of construction supervision called for in the LBJ estimates incorporated in full in Keys Claims' statement of loss, Mr. Keys testified as follows:

> Q. Okay. So my question is simple. Is 57,600 hours for all five towers for onsite construction supervision a real world estimate of how much supervision would be cost -- how much supervision would be required to perform the work contemplated in these estimates?
>
> MR. MARANGES: Object to form.
>
> MR. FLEMING: Objection as to form.
>
> A. Not from a cumulative basis, but on the basis that we agreed to proceed forward on, it's absolutely proper.
>
> Q. All right. So it's not real world because it's cumulative?
>
> A. No, it is real world. You've just got to know what's going to be awarded so that you know -- so that you know how many supervisors you need and for how long. That's the -- that's the issue here that I don't think that ever got out of Larry McCallister when I read his transcript.
>
> Q. Okay. Is that -- isn't that an issue of scope, meaning what has to be repaired?
>
> A. No. The scope itself came right from the experts' reports.
>
> Q. Well, that was my next question. Who provided the scope here?
>
> A. The experts themselves wrote the reports and Mr. McCallister's directions were to use those reports to create pricing so that the umpire could use that should he find the damages to be storm-related.
>
>                             ***
>
> Q. As the estimates were submitted, prepared by LJB and submitted by you, would you agree with me that the onsite supervision numbers were redundant?
>
> MR. FLEMING: Objection as to form. Go ahead.

A. If they were all awarded, they would be redundant, but they weren't and they never were intended to be submitted in a cumulative basis.

Q. But isn't it true that you submitted those numbers, LJB's estimates, as the amount of money required to repair the damages associated with Hurricane Sally?

MR. FLEMING: Objection as to form.

A. Not true.

Q. Well, previously marked is your statement of loss.

A. Yes.

\*\*\*

Q. So I'll ask again, didn't you submit those estimates as the cost of repairs to put the property back in its pre-Sally condition?

A. No, sir.

MR. FLEMING: Objection as to form; asked and answered.

\*\*\*

A. We submitted this document as a starting point. We actually offered to make the corrections and do it piecemeal, if you could, in the very first morning of the hearing, when it started, and the umpire and Pat and I all agreed we didn't need to make any changes until the umpire had a chance to decide what it was he was going to award and then we could reduce it down to a number. That's exactly what the whole panel agreed to.

Q. And did you ever reduce it down to a number?

A. The umpire did and that's exactly what should have happened.

Q. That's -- did Keys Claims ever reduce these estimates at any time after submitting them on August 2nd, 2022?

A. We were advised by the umpire that he would do that, just like Pat was advised by the umpire that Mr. Doan would be setting the amount of the damages after the meeting with Mr. McCallister and Mr. Bryant.[75]

---

[75] Ex. 17 Deposition of George Keys p. 339 ln. 7 – p. 342 ln. 20.

Mr. Keys' testimony is consistent with how Mr. McCallister justified his estimates, explaining that they were prepared without any consideration of scope, which they relied on the umpire to determine:

> Q. So let me ask you this here. You say that the redundancies were put in here for the appraisal process, and you've said that a few times?
>
> A. Yeah. I'm stating that we were tasked with putting together these tasks one by one. And inherently they will have redundancies. There were no redundancies intentionally placed. They're just inherent if you don't know what the scope is. … At this point, we did not have a scope, so we just put together pricing.
>
> ***
>
> Q. And when Mr. Keys tasked you with this, did you turn to him and say, George, that's going to make my estimate about 10 million more per building, that's not how much it would really cost? Was there any such conversation like that?
>
> MR. FLEMING: Objection as to form.
>
> THE WITNESS: No.
>
> MR. KOSCHES:
>
> Q. Okay. Why not?
>
> A. It was understood. If I give you a menu for an entire restaurant, I would say most people wouldn't eat all the food on it.
>
> ***
>
> Q. And Mr. Keys understood that; correct?
>
> A. I assume that in the years of doing this that you have no idea what's going to be awarded or what's damaged until you assess the damage and you actually have a scope. No one had a scope at that time. This was simply a price list to apply to a scope.
>
> ***
>
> Q. So help me understand, sir. You said that that's the way it happened. Can you explain that.
>
> A. Yes. We presented the pricing from the beginning for each piece of the project, and then once Mr. Doan had decided that these were

actually damaged and a covered peril, he applied that pricing as best he could to the scope that he developed.

Q. So would it be correct to say that the redundancies were removed only because Mr. Doan awarded less than what was estimated?

***

MR. FLEMING: Objection as to form.

THE WITNESS: Yes. Again, I believe your use of the redundancies is put words in my mouth. You have a price sheet for which you don't have a scope. Again, if you have -- if you go to Subway and you look at all their sandwiches, you're not going to order all their sandwiches. There might be some redundancies here. If you have a crane that can be used on Tower 1 and Tower 2 because it's sitting between them, that would be a decision to be made, but there's a lot of factors that would have to go into that. But the long and short of it is that you have pricing that would be applied to a scope. That's what we were tasked with. How he applies that pricing was the task of the umpire, not us.[76]

As discussed above, the Policies and Florida law require the appraisers to separately state the amount of loss. This task requires the appraisers to state "the cost of repair or replacement of property damaged" and "how much of the damage was caused by a covered peril." *Merrick*, 315 So. 3d and 49.

Accepting Mr. Keys' and Mr. McCallister's sworn testimony as true, by their own admission, they failed to state the amount of loss. Instead, they claim to have prepared an "a la carte" menu of pricing without themselves presenting to the umpire their position on the scope of damage caused by Hurricane Sally. This is not what the appraisal provisions require. In effect, they stated the cost of repair or

---

[76] Ex. 16 - Deposition of Larry McCallister p. 121 ln. 10 – p. 125 ln. 12

replacement of property damaged but apparently took no position on how much of the damage was caused by a covered peril. Doing it this way, of course, massively inflates the appraisal submission, as Mr. McCallister conceded.[77]

Indeed, if this were a proper way to conduct an appraisal, it leaves no possibility of the two party-appointed appraisers coming to an agreement on their own. While the appraisal provisions require the party-appointed appraisers to select an umpire at the outset, the appraisal provisions only require the umpire's involvement in the process if the two appraisers fail to agree. *See Liberty Mut. Fire Ins. Co. v. Hernandez*, 735 So. 2d 587, 588-89 (Fla. 3d DCA 1999) ("The appraisal clause in this case provides that '[t]he appraisers will *separately* set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. *If they fail to agree, they will submit their differences to the umpire*.' Whether the party-appointed appraisers visit the premises together or separately, the clause contemplates inspection and valuation by each appraiser individually, not a trial-type hearing.") (Emphasis in original); *May S&P, LLC v. Axis Surplus Ins. Co*., No. 8:22-CV-2254-JSM-UAM, 2023 WL 9953408, at *1 (M.D. Fla. Sept. 11, 2023) ("Appraisals are less formal proceedings, where the umpire independently attempts to resolve any differences in the appraisals offered by both sides.").

---

[77] Ex. 16 - Deposition of Larry McCallister p. 42 ln 13 – 17.

The appraisal provisions expressly contemplate that the appraisers may be able to reach an agreement on some or all of the amount of loss without the need for involving the umpire at all.  By failing to specify the scope of the damage caused by Hurricane Sally, Mr. Keys did not perform the task required of him under the Policies.  Instead, he submitted a massively inflated appraisal claim submission without regard to scope.  The Plaintiffs, accordingly, cannot be bound by the award, as the appraisal process was not properly followed.

## VI.    DEFENDANTS' BREACH OF CONTRACT COUNTERCLAIM FAILS

For the reasons set forth above, the Plaintiffs cannot be bound by the appraisal award.  Consequently, if Plaintiffs are not bound by the appraisal award, Defendants' breach of contract counterclaim, in which Defendants allege that Plaintiffs failed to pay the appraisal award and seeks recovery of the appraisal award, must fail.

Moreover, as discussed above, the Excess Carriers, cannot be found to have breached the contract, as Portofino never presented a claim to them. *See Morton v. Auto. Ins. Co. of Hartford, Conn*., 102 F. Supp. 3d 1248, 1260 (N.D. Ala. 2015) ("Accordingly, an insurer's obligation to pay or evaluate the validity of the claim does not arise until the insured has complied with the terms of the contract with respect to submitting claims.").

## **CONCLUSION**

Public policy requires that the insurance appraisal process remains a fair mechanism for resolving legitimate disputes over loss amounts, not a tool for strategic maneuvering that pressures insurers into appraisal or settlement without proper investigation. Allowing such conduct would rewrite the insurance contract to favor insureds, undermining the contractual and legal obligations essential to a fair claims process and setting a dangerous precedent that encourages abuse of the system.

For the reasons set forth above, summary judgment should be entered in favor of the Plaintiffs. Westchester is entitled to summary judgment because there was never a disagreement with Westchester as to any amounts in excess of Defendants' $13,625,952.43 proof of loss. Further, the Excess Carriers cannot be bound by an appraisal award entered by appraisers they had no say in selecting, and they further cannot be bound by an appraisal award when there was no requisite disagreement and no invocation of the appraisal process against them. Finally, all of the Plaintiff carriers are entitled to summary judgment because Portofino's appraiser did not state the amount of loss as required by the appraisal provisions, the appraisal process was not properly followed and thus the award cannot be enforced. Accordingly, the Court should grant summary judgment in favor of the Plaintiffs.

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to N.D. Fla. Local Rule 7.1(F), the undersigned certifies that this motion contains 10,333 words, excluding case style, signature block, and certificate of service.

Respectfully submitted,

*/s/ John David Dickenson*
John David Dickenson
Florida Bar No. 575801
jdickenson@cozen.com
Alexandra J. Schultz
Florida Bar No. 122100
aschultz@cozen.com

**COZEN O'CONNOR**
1801 N. Military Trail, Suite 200
Boca Raton, FL  33431
Telephone:  (561) 515-5250
Facsimile:  (561) 515-5230
*Counsel for Plaintiffs Westchester Surplus Lines Insurance Company, Arch Specialty Insurance Company, AXIS Surplus Insurance Company, Evanston Insurance Company, Aspen Specialty Insurance Company, and Maxum Indemnity Company*

*/s/ Wayne D. Taylor*
Wayne D. Taylor, Esq.
Georgia Bar No. 701275
*Admitted in USDC NDFL*
wtaylor@mfllaw.com
**MOZLEY, FINLAYSON & LOGGINS LLP**
1050 Crown Pointe Parkway, Suite 1500
Atlanta, GA  30338
Telephone:  (404) 256-0700 (Telephone)
Facsimile:  (404) 250-9355 (Facsimile)

LEGAL\73740315\2

wtaylor@mfllaw.com

-and-

Elizabeth D. Salinas, Esq.
Florida Bar No. 113394
esalinas@mfllaw.com
**MOZLEY, FINLAYSON & LOGGINS LLP**
4767 New Broad Street
Orlando, FL  32814
Telephone:  (404) 256-0700

*Counsel for Plaintiff Landmark American Insurance Company*


   /s/ David C. Bibb
David C. Bibb (Fla. Bar No. 190330)
Brian P. Henry, Esq. (Fla. Bar No. 0089069)
**ROLFES HENRY CO., LPA**
3165 McCrory Pl., Suite 174
Orlando, FL  32803
Telephone:  (407) 284-4990
Email: dbibb@rolfeshenry.com
          rkitchens@rolfeshenry.com
          bhenry@rolfeshenry.com
          kmcclintock@rolfeshenry.com

*Counsel for Plaintiffs Independent Specialty Insurance Company, Interstate Fire & Casualty Company, and Lloyd's of London*

   /s/ Jack R. Reiter
Jack R. Reiter, Esq.
Florida Bar No.: 0028304
jack.reiter@gray-robinson.com
Jordan S. Kosches, Esq.
Florida Bar No.: 49881
jordan.kosches@gray-robinson.com

**GrayRobinson, P.A.**
333 SE 2nd Avenue, Suite 3200
Miami, FL  33131
Telephone:  (305) 416-6880
Facsimile:  (305) 416-6887

*Counsel for Plaintiff Colony Insurance Co.*

/s/ Aaron Konstam
ERIC A. HILLER
Florida Bar No. 27920
eric.hiller@kennedyslaw.com
AARON KONSTAM
Florida Bar No. 104765
aaron.konstam@kennedyslaw.com
**Kennedys CMK LLP**
1395 Brickell Avenue, Suite 610
Miami, FL  33131
Telephone:  (305) 371-1111

*Counsel for Plaintiff James River
Insurance Company*

*/s/ Heidi Hudson Raschke*
Heidi Hudson Raschke
Florida Bar No. 61183
hraschke@carltonfields.com
Madison E. Wahler
Florida Bar No. 1019015
mwahler@carltonfields.com
**CARLTON FIELDS, P.A.**
4221 W. Boy Scout Blvd, Suite 1000
Tampa, Florida 33607
Telephone: 813-223-7000
Facsimile: 813-229-4133

-and-

Amanda D. Proctor (*admitted pro hac vice*)
Georgia Bar No. 776848
**CARLTON FIELDS, P.A.**

LEGAL\73740315\2

1201 West Peachtree Street
Suite 3000
Atlanta, Georgia 30309
Telephone: 404-815-3400
Facsimile: 404-815-3415
aproctor@carltonfields.com

*Counsel for Plaintiff Homeland Insurance Company of New York*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 25, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will automatically serve all counsel of record.

*/s/ John David Dickenson, Esq.*
John David Dickenson, Esquire

LEGAL\73740315\2