# EXHIBIT “16”




August 16, 2022

**J.D. Dickenson**
Direct Phone 561-515-5260
Direct Fax 561-515-5229
jdickenson@cozen.com

**Evan M. Holober**
Direct Phone 786-871-3959
Direct Fax 786-871-7996
eholober@cozen.com

**VIA E-MAIL (EPFLEMING@PENSACOLALAW.COM, MABUSH@PENSACOLALAW.COM, FLEMINGDEPT@PENSACOLALAW.COM)**

Edward P. Fleming
McDonald Fleming
719 S. Palafox St.
Pensacola, Florida 32502

| Re: | Insureds: | Portofino Master Homeowners Association at Pensacola Beach, Inc.; Portofino Tower One Homeowners Association at Pensacola Beach, Inc.; Portofino Tower Two Homeowners Association at Pensacola Beach, Inc.; Portofino Tower Three Homeowners Association at Pensacola Beach, Inc.; Portofino Tower Four Homeowners Association at Pensacola Beach, Inc.; and Portofino Tower Five Homeowners Association at Pensacola Beach, Inc. (collectively, the "Insureds") |
|---|---|---|
| | Insured Location: | 10 Portofino Drive, Gulf Breeze, Florida 32561 |
| | Date of Loss: | September 16, 2020 (Hurricane Sally) (the "Loss") |

**RESPONSE TO AUGUST 10, 2022, LETTER AND RESERVATION OF RIGHTS**

Dear Mr. Fleming:

As you are aware, our office has been engaged by certain insurers subscribing to a program of insurance (collectively, the "Insurers") [i] [ii] covering the above referenced Insured Location and with respect to the above-referenced claim(s). We write in response to your August 10, 2022 letter. Your letter contains numerous inaccuracies and misrepresentations that are easily corrected by a review of the history of this appraisal and our correspondence throughout this claim.

**i. The Insurers' Requests for Documents and the Insureds' Failure to Provide Requested Documents**

Your letter notes that the appraisal panel has not requested information or documentation related to the claim. This is obviously untrue. Your clients' appraiser, George Keys of Keys Claims Consultants ("Mr. Keys"), blocked the initial request from the Insurers' appraiser, Pat Lewis of Lewis Claims Solutions ("Mr. Lewis" and "LCS"). As we have previously pointed out (in fact we provided you the email correspondence), on August 31, 2021, Mr. Lewis emailed Mr. Keys to request access to Condominium Association meeting notes so that Mr. Lewis could evaluate "the history of construction issues, maintenance, repairs, causation of issues and potential incurred costs from Hurricane Sally." Mr. Keys responded the same day, denying Mr. Lewis' request and stating "The Appraisal process is not a discovery process. All of the needed documents should

LEGAL\59157417\1

have been asked for prior to going to Appraisal. As far as I know the docs were requested and given but I have no idea. It is not my place to ask for such documents. May I refer you to legal counsel for Portofino and perhaps you can ask him."

We are enclosing a copy of such correspondence with this letter for your reference. The position, that it is not the "place" of a competent and disinterested appraiser to ask for and provide causation related background documentation concerning the property subject to the appraisal, is irrational and unsupportable.

It is uncontroverted that it was your clients' appraiser that directed that these documents go through counsel's offices. We did not ask for this role; it was dictated by your clients' representative in relation to the documents required by the Insurer's appraiser. Mr. Lewis requested these materials because he thought they were necessary for him to do his job, to appraise damages caused by Hurricane Sally, as outlined in the Policy. Your insinuation that my office somehow sought out this role is improper and is contradicted by the clear record in this matter.

Accordingly, and pursuant to the directive of your client's appraiser, we requested from you access to the Association's web portal by letter dated September 3, 2021. We spoke on the phone regarding these requests, which I explained, and at which time you did not voice any objections to the requests. Having received no substantive written reply from you, we sent a follow-up letter on March 21, 2022, again requesting access to the web portal. You responded to our letter on March 22, 2022, stating that you would not provide "blanket access to [the insureds'] computer storage system," but would provide condominium documents (including covenants, declarations, and bylaws) and meeting minutes. By letter dated April 1, 2022, we provided you with a list of specific documents that we were seeking, including the following:

(1) All meeting minutes from each individual condominium tower's Homeowners Association and the Master Homeowners Association from 2012 through the present;

(2) A complete copy of all incurred invoices and costs with paid receipts from Incurred Invoice Submission 4 (beginning December 22, 2020), through the present;

(3) All supporting documentation for bids, negotiations, solutions, and services provided since September 6, 2020;

(4) Maintenance records related to: roofs, glazing (fenestrations), railings, exterior stucco and paint (including the last time each building was painted and the last time each tower was wet sealed), HVAC, condo unit plumbing, parking lot pergolas, pools and associated equipment, docks, bridges, elevators, fire systems, tennis courts, and exterior lighting, and any history of parking lot pavers (repairs and replacements), for all towers, lifestyle buildings, and any other HOA-owned structures from 2012 through the present time, as well as any related supporting documentation; and

(5) All supporting documentation for services rendered in relation to any of the above.

We asked that the requested documents be provided by May 1, 2022. Had the documents been provided as requested, the Insurers' appraisal team would have had more than three months before the appraisal panel hearings were scheduled to begin on August 15, 2022, within which to review those materials. The Insurers' appraisal team, which includes only LCS personnel and

their experts, could review and evaluate the documents for the purpose of determining whether certain items claimed in connection with the loss predated the reported date of loss.

Pursuant to your clients' directive, we asked your office over and over for these materials. We asked in written correspondence and we asked over the phone. We were advised that these materials would be provided.

The first documents we received from you were in the form of a thumb drive we received on July 19, 2022, which contained meeting minutes from the Portofino Master Homeowner's Association meetings. We subsequently received additional documents, including meeting minutes for the homeowners' associations for Towers 1 and 2 late on Friday, August 5, 2022, meeting minutes for the Tower 3 association on August 9, 2022, meeting minutes for the Tower 4 association after hours on August 10, 2022, and meeting minutes for the Tower 5 association on Friday, August 12, 2022, only one business day before the appraisal panel hearings were scheduled to commence. We also received some documents which were responsive to requests no. 2, 3, and 4 above on August 10, 2022.

These last minute document dumps contained more than 3,900 documents totaling tens of thousands of pages. It apparently took you nearly a year to review and provide these documents, yet you sent them to my office within days of the commencement of the Panel Hearings. What's more, the contents of many of these documents (at least those that have been reviewed) appear to be highly relevant to whether Hurricane Sally caused many of the damages being claimed in your clients' $230MM+ estimates.

Your statement that these materials "have nothing to do with identifying and remediating damages caused by Hurricane Sally" is demonstrably false. A cursory review of some of these materials, as that is all we have been able to accomplish thus far due to your clients' actions, demonstrates that these materials are directly relevant to the cause of alleged damages to fenestrations, roofs, exteriors, railings, and more. I am sure more critical documents will be uncovered as time permits. Additionally, despite having had more than eleven months to provide these documents, the documents we received appear to be incomplete. Notably, we received a folder titled "Bayshore Roofing" which should presumably contain records related to roofing repairs dating back to at least 2012. However, the folder we received is conspicuously empty.

This purposeful delay and gamesmanship has undoubtedly and substantially prejudiced the Insurers. It has further substantially prejudiced the appraisal panel's ability to adequately prepare for the panel hearings and come to competent and disinterested conclusions concerning the "value at the time of loss and the amount of loss" as provided by the Policies. While it is of course true that the appraisers have exchanged expert reports, estimates, and other documentation, these critical causation-related documents were withheld until the 11th hour, and many documents simply not provided.

The above is a complete and accurate recitation of the history of document requests from my office to your clients and your responses to those requests. Unless some documents were transmitted directly from your office to Mr. Lewis, which would certainly be improper, your e-mail statement that, "We had earlier provided drop box links with hundreds of pages of invoices, timesheets and other supporting documents for the work performed" is inaccurate to the extent it implies otherwise. Our office received no such documents, despite numerous requests. We received no Dropbox links from your office until 5:49pm on Friday, August 5, 2022, just 5 business days before the Panel Hearings.

**ii. Procedural History of the Claim and the Appraisal Process**

It is uncontroverted that this appraisal was initiated at your request. On December 11, 2020, seven weeks after Hurricane Sally, you filed Civil Remedy Notices against the four members of the primary layer who insure for claims up to $15 million: Westchester Surplus Lines Insurance Company, Endurance American Specialty Insurance Company, Everest Indemnity Insurance Company, and Princeton Excess and Surplus Lines Insurance Company (the "Primary Layer"). Evidently, at the time, you did not believe that your clients' claim would exceed the Policies' primary layer or exceed $15 million. Five months later, on May 7, 2021, and after the appraisal had commenced, you filed a second round of Civil Remedy Notices against the same four members of the Primary Layer.

On the same day that the original Civil Remedy Notices were filed, December 11, 2020, you transmitted a letter to the Insurers demanding appraisal. Your demand specifically referenced the same four carriers in the Primary Layer and specifically provided that "this letter relates to the following insurance policies" before listing the four members of the Primary Layer. Your letter demanding appraisal provides as follows: "Pursuant to the requirements of the insurance policies (see paragraph 50 of the "Master Policy Form" of the above-referenced insurance policies), the Insureds listed above are initiating the appraisal process. The Insureds demand an appraisal of the loss at issue in the above-referenced matter." You named Corinne Heller as your clients' appraiser and requested that the Primary Layer name its appraiser by December 31, 2020.

The Primary Layer complied with your request. By letter dated December 31, 2020, the Primary Layer named Patrick Lewis of Lewis Claim Solutions as its appraiser. We further requested that you confirm that Corrine Heller was "competent and disinterested." This request required a confirmation that your clients' appraiser did not have a financial interest in the outcome of the appraisal.

After almost six weeks of no response, on February 8, 2021, we received a response to the December 31, 2020 letter. In this February 8 correspondence, Portofino advised that it no longer designated Corinne Heller as appraiser and was instead designating Mr. George Keys of Keys Claims Consultants as appraiser. However, your clients again failed to confirm that their designated appraiser, now Mr. Keys, was "competent and disinterested," as is required by the terms of the Policies. Because Mr. Keys has previously been disqualified as an appraiser for a failure to act in a disinterested manner, we responded to this correspondence on February 18, 2021, requesting additional information to confirm that Mr. Keys was eligible to serve as Portofino's appraiser under the terms of the Policy and Florida law. Your clients' delay in responding, as well as the reversal and appointment of a new appraiser, caused substantial delay in the commencement of the appraisal process.

On February 24, 2021, we received a response to our February 18, 2021, correspondence, wherein your clients advised that they were considering challenging the Primary Layer's selected appraiser and requesting additional information regarding Mr. Lewis. The February 24 letter further reiterated your clients' commitment to the appraisal process, noting that you wanted to set an "appraisal hearing" as early as possible and requesting a response by March 3, 2021. The Primary Layer responded to this February 24 letter on March 3, 2021, providing responses to your clients' inquiries regarding Mr. Lewis and noting the Primary Layer's desire to begin the appraisal process despite your clients' obstruction of the appraisal process that it initiated.

---

On February 26, 2021, we received a letter (the "February 26 letter") from your clients which contained new proofs of loss totaling $1.2 million. These proofs of loss brought the total amount claimed by your clients up to $13,625,952.43. The February 26 letter acknowledged the Primary Layer's initial advance payments of $6,000,000, but contended that your clients were unable to allocate the payments among the various Insureds. The February 26 letter further demanded additional payments pursuant to the Proofs of Loss and alleged that the Primary Layer had not acted upon its prior Proofs of Loss in a timely manner and had failed to timely adjust the claim. The February 26 letter was the first indication that your clients were requesting payment outside of the appraisal process that your clients initiated.

On March 22, 2021, we responded to the February 26 letter, advising your clients that the February 26 letter was inaccurate, in part because your clients had initiated the appraisal process while the Primary Layer was still in the process of adjusting the claim, thereby requiring both the Primary Layer and your clients to participate in appraisal to determine the amount of the loss. Additionally, the March 22 letter advised your clients that the Primary Layer remained committed to the appraisal process.

On March 24, 2021, we received a letter (the "March 24 letter") from your office wherein your clients took the position that their appraisal demand only related to work that has already been performed and did not apply to exterior damages to the roof, windows and doors, railings, cladding and other exterior structures. This March 24 letter directly contradicts your original December 11 letter, in which your clients demanded "an appraisal of the loss at issue." Unlike the March 24 letter, the December 11 letter did not purport to restrict the scope of the appraisal and did not attempt to violate the terms of the Policies. Your improper attempts to manipulate the scope of the contractual appraisal process elected by your clients also substantially delayed the meaningful commencement of the appraisal process.

Finally, as noted above, we wrote to you on February 18, 2021 with what we needed in order to confirm that Mr. Keys was "competent and disinterested." No documents were provided at that time. We note that, as part of your purposefully prejudicial last minute document dump, we have just received a copy of a contract with Keys Claims Consulting for work on this appraisal. Interestingly, we note that this contract is dated March 3, 2021, the same day we received your response to our February 18, 2021 letter advising what needed to be confirmed regarding his retention. Because you advised of Mr. Keys' retention one month earlier, this begs the question: is there another fee agreement that exists between your clients and their appraiser? We are formally requesting any other agreements between your clients and Keys Claims Consulting or Mr. Keys entered at any time, before or after March 3, 2021, whether or not you claim such agreement is still in force.

We remain concerned that your clients' selected appraiser is not disinterested as required by the Policy. The massively inflated estimate generated by Mr. Keys, and his apparent disinterest in reviewing prior repair records to discern whether damages were actually caused by Hurricane Sally, validates this concern. The coordinated method in which your clients' appraiser and your office purposefully withheld critical documentation from the Insurers further validates this concern.

**iii. <u>Cooperation During the Appraisal Process</u>**

In your August 10, 2022 letter, you provided a list of items that you believe establish that your clients have complied with the Policies' "assistance and cooperation" clause. The Insurers do not contest that your clients have generally permitted the Insurers and their appraisal team to inspect

---

the property, notwithstanding several issues that arose as a result of your clients' and their appraisers' conduct during the inspection process. These issues related to unsafe drone surveillance during swing stage inspections of the exterior of the building, your clients' mandate that the appraisers utilize certain specific vendors for roof testing, and your clients' requirement that the appraisal team and their experts adhere to certain restrictions on the use of swing stages. Tellingly, your clients did not place any similar restrictions on their own appraisal team. Further, your clients regularly took the position that the Insurers would not be granted access to the Insured Locations to complete their inspections if the Insurers failed to agree with your clients' unreasonable restrictions.

Additionally, the Insurers understand that your clients have taken the position that the Insurers are required to continue to adjust the claim even after you and your clients initiated appraisal. This position is not supported by Florida law and runs contrary to your clients' own initiation of the appraisal process. As with the rest of the Insureds' claim, the invoices which the Insureds have submitted will be evaluated by the appraisal panel. Further, your clients' alleged inability to comply with their contractual obligations to BMS-Cat and Phoenix Coatings did not result from any actions by the Insurers. Your clients initiated appraisal of the claim on December 11, 2020, less than two months after the reported date of loss.

Further, you referenced our March 23, 2021 letter and claimed that Landmark "was not excluded from the 'Insurers'" who are participating in the appraisal. However, your appraisal demand letter dated December 11, 2020 specifically states that "this letter relates to the following insurance policies" before listing the four members of the Primary Layer. Further, our March 23, 2021 letter also clearly identifies the primary layer of insurance, including Westchester Surplus Lines Insurance Company, Endurance American Specialty Insurance Company, Everest Indemnity Insurance Company, and Princeton Excess and Surplus Lines Insurance Company. Our office did not, and never has, stated that it represents Landmark American Insurance Company in this appraisal. Our office does not represent Landmark in this claim and cannot speak for Landmark. You are free to communicate with Landmark's representative.

Next, you filed a third set of Civil Remedy Notices, this time against all sixteen members of the insurance market, on July 25, 2022. This third set of Civil Remedy Notices was evidently filed in response to our July 22, 2022 letter, wherein we advised your clients that they had breached the terms of the Policies by failing to provide the documents that had been requested by the Insurers more than 10 months earlier and on multiple subsequent occasions. This third round of baseless Civil Remedy Notices was filed only days after your clients' appraiser, for the first time, presented massively inflated estimates of damages in excess of $210MM. This has resulted in new lawyers being retained for insurers beyond the Primary Layer.

It took your clients almost two years to generate their alleged damages estimate for this claim. However, according to your correspondence throughout this claim, your early conversations with Jeff Hellman, and your multiple rounds of baseless Civil Remedy Notices, the Insurers were somehow in bad faith for their inability to fully adjust this claim within weeks of Hurricane Sally. This position defies rational thought and is obviously hypocritical.

We understand that you first requested copies of the policies of those Insurers above the Primary Layer on June 24, 2022. In fact, as I understand it, you had received a reservation of rights letter from Landmark concerning its appraisal provision before you had even requested copies of these policies. Accordingly, our communication of Landmark's position with respect to appraisal, as is noted in our August 3, 2022 letter, should not have "shocked and appalled" you. To the extent

you have any questions regarding Landmark's involvement in this claim, please contact Landmark's counsel, Wayne D. Taylor of Mozley Finlayson Loggins LLP.[iii]

**iv. Request for Additional Documents and Reservation of Rights**

As is noted above, we still have not received all of the documents that we have requested in connection with this claim. Please provide those documents listed above, which are still outstanding. Additionally, as we have previously requested, please provide any documents reflecting all insurance available to respond to this loss. As you know, your clients are bound by the terms and obligations under the relevant insurance policies' cooperation provision:

> **56. ASSISTANCE AND COOPERATION OF THE INSURED - The Insured shall cooperate with this Company and, upon this Company's request and expense, shall attend hearings and trials and shall assist in effecting settlements, in securing and giving evidence, in obtaining the attendance of witnesses, and in conducting suits.**

Your clients are in direct breach of the policy's cooperation provision. Due to your clients' failure to comply with the terms of the policy, the Insurers reserve the right to deny coverage for this claim altogether. The Insurers additionally reserve the right to assert additional policy provisions or coverage defenses that may become apparent at a later date. Your clients' continued failure to comply with these requests threatens your clients' insurance coverage under the Policies.

**v. Preservation Obligations for All Documents, Records, and Electronically Stored Information**

The Insurers are issuing a litigation hold in relation to this Loss. Your clients and their representatives have been identified as custodians with documents and/or knowledge of the Loss. Your clients and/or their representatives, appraisers, contractors, employees, or members may be witnesses in this matter and may be subject to a subpoena for the production of documents and things. We write to request that you and your clients preserve all documents, hard copies and electronic copies, related to the above-referenced Loss.

This would include, but is not limited to:

1. Any and all documents, records, and electronically stored information relating to the Loss;

2. Any and all communications, including e-mails, text messages, voicemails, and letters, relating to the Loss;

3. Any and all notes, estimates, photographs, videos, invoices, memoranda, reports, surveys, drawings, and diagrams relating to the Loss;

4. All documents, records, and communications relating to inspections of the Insured Premises performed by your clients and/or their employees;

5. Any and all documents relating to communications with Portofino residents (i.e., residents of the Insured Premises), including members of the Board of Directors;

6. Any documents or communications pertaining to investigations of the Loss; and

7. Any and all documents you deem relevant to this Loss.

We also remind you that electronic information includes not only e-mail, but might also include word processing documents, spreadsheets, databases, calendars, networks, computer systems, servers, archives, laptops, personal computers and other storage devices. Electronic data may also be stored on such devices as portable hard drives, memory cards, "thumb drives," and smartphones. If you or your staff use a home computer please ensure the preservation of relevant information from those computers as well.

The term "documents" has been interpreted by the courts to be quite broad. "Documents" may include handwritten notes, drafts, tabulations, calculations, summaries, work papers, letters, correspondence, memoranda, reports, minutes, brochures, press releases, transcripts, and forecasts.

Please note that the list of electronic data and documents is not exhaustive. They are examples only. The law requires the preservation and production of any type of information in any format, wherever it is stored, if that information is relevant to the above captioned Loss. There may be other categories of documents, records and/or electronically stored information, relevant to the Loss. If you are unsure about the relevance of a document or data, be cautious and preserve it. Accordingly, please suspend any policy or practice that may alter, delete, or render inaccessible any relevant information. Please advise your clients and their representatives to do the same.

If you have any questions, please do not hesitate to contact the undersigned right away.

Sincerely,

COZEN O'CONNOR

JD Dickenson

By: J.D. Dickenson
Evan M. Holober
JDD/emh

cc: Jeff Hellman (via Email- Jeff.Hellman@mclarens.com)
Wayne Taylor, Esq. (via Email – Wtaylor@MFLLaw.com)
Aaron Konstam, Esq. (via Email - Aaron.Konstam@Kennedyslaw.com)
David Bibb, Esq. (via Email – dbibb@rolfeshenry.com)
Jack Reiter, Esq. (via Email – Jack.Reiter@gray-robinson.com)

[i] Westchester Surplus Lines Insurance Company, Endurance American Specialty Insurance Company, Everest Indemnity Company, Princeton Excess Surplus Lines Insurance Company, Arch Specialty Insurance Company, Axis Surplus Insurance Company, Colony Insurance Company, Evanston Insurance Company, Aspen Specialty Insurance Company, and Maxum Indemnity Company join in this letter. While our office does not represent James River Insurance Company, Independent Specialty Insurance

---

Company, Interstate Fire & Casualty Company, Certain Underwriters at Lloyd's, London, or Landmark American Insurance Company, they join in this letter.

[ii] Landmark American Insurance Company is not participating in the appraisal process.

[iii] Mr. Taylor can be reached by email at [WTaylor@MFLLaw.com].

# ATTACHMENT

**From:** George Keys
**To:** Pat Lewis
**Cc:** Tim Rothring; Jon Doan
**Subject:** Re: Portofino Appraisal
**Date:** Tuesday, August 31, 2021 12:36:12 PM

---

Pat

The Appraisal process is not a discovery process. All of the needed documents should have been asked for prior to going to Appraisal. As far as I know the docs were requested and given but I have no idea. It is not my place to ask for such documents. May I refer you to legal counsel for Portofino and perhaps you can ask him. Thanks

Kindest regards,

**George W. Keys, Jr., SPPA**
For the Firm
Keys Claims Consultants, LLC
Bayfront Professional Center
1333 3rd Ave. South
Suite 407
Phone: 239-774-5040
Fax: 239-774-4027
**Email: georgekeys@keysclaims.com**
**Web: www.keysclaims.com**
**George Wilton Keys, Jr., SPPA**
FL Public Adjusters License #A140365
CO Public Adjusters License #370084
TX Public Adjusters License #1553539
**Keys Claims Consultants, LLC**
TX License# 1553540
CO License# 497644




This e-mail may be privileged and/or confidential, and the sender does not waive any related rights and obligations. Any distribution, use or copying of this email or the information it contains by other than the intended recipient is unauthorized. Please advise me immediately by return e-mail or otherwise if you receive this e-mail in error. We do not guarantee that this material is free from viruses or any other defects although due care has been taken to minimize the risk.

On Aug 31, 2021, at 12:13 PM, Pat Lewis <plewis@ics-llcinc.com> wrote:

Hi George,

I would like to request access to all Condominium Association meeting notes, from the time the building was built, through current. This may be as simple as providing us with access to any online files, portals, or sites where these may be stored. The purpose of this request is to see the history of construction issues, maintenance, repairs, causation of issues and potential incurred costs from Hurricane Sally as determined by the Board of Directors of the Association.

Also, have we decided on any dates for panel inspections with experts in November?

Thank you and please let me know if you have any questions,

Respectfully,



**PATRICK E LEWIS | CEO**
Lewis Claim Solutions
www.lewisclaimsolutions.com
**M:** 407.466.6626 **| O:** 407.466.6626

The contents of this e-mail message and any attachments are intended for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable client and/or work product privileges.. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and, if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments.