## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

### CASE NO. 3:23-cv-00453-MCR-HTC

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY, *et. al.*

      Plaintiffs,

v.

PORTOFINO MASTER HOMEOWNERS
ASSOCIATION INC., *et. al.*,

      Defendants.

_____/

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNT II OF THE AMENDED COMPLAINT SEEKING A DECLARATION THAT DEFENDANTS' APPRAISER, GEORGE KEYS, WAS NOT COMPETENT AND DISINTERESTED AS REQUIRED BY THE POLICIES

Plaintiffs, (collectively, the "Insurers"),[1] hereby request the Court to enter an order granting them summary judgment on Count II of the Amended Complaint (DE 104), and for the Court to enter a judgment declaring that: (1) Defendants' (collectively, "Portofino") chosen appraiser, George Keys, was not competent and disinterested; (2) as a result, was ineligible to serve as Portofino's appraiser; and

---

[1] Westchester Surplus Lines Insurance Company, Arch Specialty Insurance Company, AXIS Surplus Insurance Company, Colony Insurance Company, Evanston Insurance Company, Aspen Specialty Insurance Company, Independent Specialty Insurance Company, Interstate Fire & Casualty Company, Lloyd's of London (Consortium #9226), James River Insurance Company, Maxum Indemnity Company, Landmark American Insurance Company, and Homeland Insurance Company of New York.

(3) because the appraisal awards are only valid if agreed to by at least two eligible appraisers, that the "Incurred Only" award stands because it was agreed to by all three appraisers, but the awards for "Various Bldgs" and Towers 1, 2, 3, 4, and 5 must be vacated since they were only agreed to by Messrs. Keys and Doan, yet Mr. Keys was ineligible.[2]

## **INTRODUCTION**

The requirement that each party's appraiser and their jointly selected umpire each be competent and disinterested is the lynchpin of the appraisal process. This is because appraisal is intended to begin at the culmination of a disputed insurance claim, resulting in a final adjudication by consummate professionals whose objective is to arrive at the truth absent any personal interest in the outcome or bias in favor of any party. Unfortunately, Portofino's chosen appraiser, George Keys and his company, Keys Claims Consultants ("Keys Claims" and collectively, "Mr. Keys"), failed to meet this requisite competence and neutrality while performing their work in this case, violating the insurance policies' appraisal provisions and disqualifying their involvement.

Importantly, Plaintiffs do not challenge Mr. Keys' qualifications for purposes

---

[2] The Plaintiffs joining in this motion, with the exception of Westchester Surplus Lines Insurance Company, were not parties to the appraisal that is the subject of this action. However, because Portofino claims these insurers are somehow bound by the appraisal and the appraisal award, these insurers are joining this motion due to the fact that Portofino's appraiser was not competent and disinterested/impartial as required by the applicable policies.

of this motion. Yet during discovery, and particularly during Mr. Keys' deposition, Plaintiffs established that his conduct in this case deviated substantially from that which even Mr. Keys himself would demand from a competent and disinterested appraiser.

To begin, it was uncovered that Mr. Keys' payment arrangement with Portofino provided him with a significant interest in the outcome of the appraisal. This is because Portofino successfully negotiated for Mr. Keys to "defer" all payment for his work until *after* there was a recovery from the Insurers, all the while requiring Mr. Keys to advance more than $600,000 out of his own pocket for Portofino's expenses.

Discovery further established that although Mr. Keys purported to be a neutral arbiter of the facts, his behavior did not support this position. For example, e-mails revealed that when Mr. Keys conducted his investigation, he specifically sought Portofino residents that were "friendly to the HOA,"[3] while ignoring residents and information that would not support his narrative.

Likewise, when Portofino dumped over 50,000 pages of documents on the primary insurer's appraiser, Patrick Lewis, on the Friday before the Monday appraisal hearing, Mr. Keys vehemently (and successfully) opposed Mr. Lewis' reasonable request for a one-week continuance to review the new materials. Further,

---

[3] DE 225-1 at p. 152; 225-17 at p. 2.

the way Mr. Keys conducted himself in this appraisal was at odds, and in many instances directly contrary to that which Mr. Keys had previously touted as acceptable and competent appraisal practice.

In sum, the undisputed material facts, articulated more fully herein, make clear that Mr. Keys did not conduct himself as a competent and disinterested appraiser as required by both the insurance policies and Florida law. Instead, this case is like those where courts found that Mr. Keys lacked the requisite neutrality to serve as an appraiser and necessarily vacated awards procured under such circumstances. This Court should do the same and enter an order granting summary judgment in Plaintiffs' favor.

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

<u>**The Insurance Policies and Appraisal Demand**</u>

1.     At the time that Hurricane Sally hit, Portofino's property (the "Property") was insured by a tower of insurance (the "Tower") with coverage totaling $242,232,927.[4]

2.     The Tower was split between a primary coverage layer of $15 million subject to a $4,707,418.50 deductible, and several excess layers providing a total of $227,232,927 in additional coverage.[5]

---

[4] DE 222-1 at pp. 7-9.
[5] *Id.*

3.      Each insurer in the Tower issued its own policy, but all include the Master Property Policy form subject to their respective terms and conditions (collectively, the "Policies"). The Master Property Policy form contained the following appraisal provision:

> If the Insured and this Company fail to agree on the amount of loss, each, upon the written demand either of the Insured or of this Company made within 60 days after receipt of proof of loss by the Company, **shall** select a **competent and disinterested appraiser**. The appraisers **shall** then select a **competent and disinterested umpire**.... The Insured and this Company **shall each pay his or its chosen appraiser** and shall bear equally the other expenses of the appraisal and of the umpire.[6]

4.      Certain insurers had endorsements modifying the appraisal provision, although each maintained the requirement that all appraisers be competent and disinterested/impartial:[7]

> **The Evanston Policy:**
> [E]ach party will select a **competent and impartial appraiser.** The two appraisers will select an umpire.... a. Pay its chosen appraiser; and b. Bear the other expenses of the

---

[6] DE 222-1 at p. 35, ¶ 50.

[7] The terms "disinterested" and "impartial" are used interchangeably in this context. *See, e.g., May S&P, LLC v. Axis Surplus Ins. Co.*, No. 8:22-CV-2254, 2023 WL 9953408, *2 (M.D. Fla. Sept. 11, 2023) ("While the Policy requires an 'impartial' appraiser as opposed to a 'disinterested' appraiser, the two terms could be used interchangeably."); *7635 Mandarin Drive, LLC v. Certain Underwriters at Lloyd's, London*, 4D2023-2474, 49 Fla. L. Weekly D1744a, (Fla. 4th DCA Aug. 21, 2024) (utilizing the terms interchangeably by noting that after an objection that an appraiser "was not impartial," a "disinterested third party" was appointed); *State Farm Fla. Ins. Co. v. Crispin*, 290 So. 3d 150, 153 (Fla. 5th DCA 2020) (the court drew no distinction between the two terms in attempting to define "disinterested," although noted that one dictionary lists "impartial" as a synonym for disinterested whereas another notes that "a disinterested observer is not merely 'impartial' but has nothing to gain").

appraisal and umpire equally....[8]

**<u>The Landmark Policy:</u>**
[E]ither party may request, in writing, an appraisal.... [with] the selection of a **<u>disinterested, competent, and impartial appraiser</u>** (who does not have a financial interest in the claim and/or appraisal award, including a contingent interest in the outcome of the claim or appraisal award).... [T]he two appraisers will select **<u>an umpire, who is disinterested, competent, and impartial</u>**....[9]

**<u>The Homeland Policy</u>**
[E]ach party will select a **<u>competent and impartial appraiser</u>**.... The two appraisers will select an umpire.... Each party will: 1. Pay its chosen appraiser; and 2. Bear the other expenses of the appraisal and umpire equally....[10]

5.       On or about September 16, 2020, Hurricane Sally struck and caused damage to the Property.[11] The next day Portofino's insurance agent, Gallagher, provided notice of the loss but only to those carriers insuring the primary layer.[12]

6.       In early December 2020, a dispute arose between the carriers in the primary layer and Portofino regarding the amount of payment due to Portofino.[13]

7.       On December 11, 2020, Portofino, through its counsel, Edward Fleming, sent correspondence to the primary layer carriers and Jeff Hellman demanding appraisal of the loss ("Appraisal Demand Letter"), and submitted a

---

[8] DE 222-6 at p. 45, ¶ B.2.
[9] DE 222-9 at p. 47.
[10] DE 222-11 at p. 46, ¶ I.
[11] DE 244-20 at p. 2, ¶ 3.
[12] *Id.* at ¶ 4.
[13] DE 104; DE 108 at ¶ 53.

sworn proof of loss totaling $6,479,380.60, an amount within the primary layer of coverage.[14] The primary layer carriers disputed the amount in the sworn proof of loss.[15]

8.    Portofino's Appraisal Demand Letter appointed Corinne Heller, Esq. as Portofino's appraiser.[16] On December 31, 2020, the primary layer carriers appointed Mr. Lewis as their party-appointed appraiser.[17]

9.    On February 8, 2021, Portofino replaced Ms. Heller with Mr. Keys and Keys Claims.[18]

10.    The party-appointed appraisers selected Jon Doan to serve as the umpire.[19]

11.    On February 19, 2021, Jeff Hellman asked Portofino's counsel to submit the rest of their claim. On February 26, 2021, Portofino responded that the "investigative work [was] underway" and it was "anticipated that it [would] be completed in 30 to 60 days." Portofino included a supplemental proof of loss, increasing their total claim to $13,625,952.43, a disputed amount still within the primary coverage layer.[20]

---

[14] DE 231-6.
[15] DE 234-1 at p. 299.
[16] DE 231-6.
[17] DE 231-7.
[18] DE 104 at ¶ 62; DE 108 at ¶ 62.
[19] DE 108 at p. 106, ¶ 44; DE 123 at ¶ 44.
[20] DE 227-9.

12.     On August 2, 2022, just weeks before the appraisal hearing, Portofino and Mr. Keys submitted the Insured's updated appraisal claim submission that increased the claimed loss from the previous $13.6 million to $233,030,601.80.[21]

**George Keys (Background)**

13.     Mr. Keys has been in this line of business for approximately 40 years and has handled "thousands upon thousands" of appraisals.[22] He testified that he used to work for an insurance carrier (Commercial Union), but after a "grueling decision" decided to switch sides because "the powers that be decided that they were going to move me into either Boston or Ruston, Louisiana, because of my job position with them, and I wasn't going to live in either one of those places, especially on the money that they were paying me."[23]

14.     Yet after further questioning about an interview that Mr. Keys had given in which he revealed acrimony with the insurance industry and claimed the real reason he "left [was] because [he] w[as] being told to deny claims that should have been paid," Mr. Keys capitulated and changed his answer explaining, "[y]es, that would be true."[24]

15.     Mr. Keys also testified that "without fail" he manages to obtain awards

---

[21] DE 226-19.
[22] DE 225-1 at 156-157.
[23] *Id.* at 159-60.
[24] *Id.* at 160-61.

that are higher than the insurance carriers' loss estimates, noting that he is "proud of [his] work" and is referred to as a "legend."[25]

16.    When questioned further, Mr. Keys attributed his so-called legendary success to his having "pioneered several aspects of damage claims which were long overlooked,"[26] referring specifically to his theory that windows and doors often suffer "damages that aren't readily available to the naked eye...."[27]

17.    In this case, Mr. Keys and Portofino claimed a total of $89,384,662.43 for these so-called damages to Portofino's windows and doors.[28]

18.    Mr. Keys also addressed "testimonials" that he uses to market his services.[29] Among them are the following:

- "The amount of the settlement greatly exceeded our expectations;"[30]

- "The claim settled for over 10 times what the adjuster had offered;"[31] and

- "The results of our association with your organization are far beyond any expectations of mine. We were in pretty bad financial straits and the settlement you negotiated for us has put us in an easy running situation."[32]

---

[25] *Id.* at 156-57.
[26] *Id.* at 163-64.
[27] *Id.* at 164.
[28] DE 237-17 at p. 17 ($17,687,558.84 for Tower 1) and the exact same amount for Towers 2, 3, 4, and 5 (*id.* at pp. 49, 79, 110, and 141); *Id.* at p. 159 ($63,209.86 for the Guard House); *Id.* at p. 179 ($846,415.42 for the Spa and Lifestyle Center); *Id.* at p. 213 ($37,242.95 for the Tennis Shop).
[29] DE 225-1 at 209.
[30] *Id.* at 218-219.
[31] *Id.* at 219.
[32] *Id.* at 220-21.

19.    Mr. Keys was questioned about the recurring praise from his clients that their awards were "way beyond [their] expectations."[33] He agreed that the client's "expectations were that [he] would get them the amount of money that it cost to make th[e] repairs,"[34] and that if his clients received more than their expectations that meant they received more money than the damages actually suffered.[35]

20.    Mr. Keys publishes a chart describing his past "appraisal awards." Therein, he singles out multiple well-known insurance carriers by name, and then for each lists their "original offer" (i.e., loss estimate) followed by the "final award" that Mr. Keys managed to obtain. The chart touts that Mr. Keys' appraisal awards vary from triple (300%) the insurance carriers' estimates to as much as 197-times (19,700%) the damages calculated by the insurance professionals.[36]

**George Keys (Professional Fees)**

21.    The primary layer carriers requested a copy of Mr. Keys' retainer agreement with Portofino on February 18, 2021 to determine whether he had a pecuniary interest in the outcome of the appraisal but Portofino's counsel, Ed Fleming, refused.[37]

22.    The primary layer carriers' concern was grounded in the number of

---

[33] *Id.* at 209.
[34] *Id.* at 212-213.
[35] *Id.* at 213.
[36] DE 226-2.
[37] DE 249-30 at p. 18.

court cases, in multiple jurisdictions, which have addressed Mr. Keys' inability to serve as a disinterested/impartial appraiser because his fee arrangements and undisclosed relationships with the insured's counsel made him biased in favor of the insured and provided him with an interest in the outcome.[38]

23.    Specifically, Mr. Keys has a long and public history of taking appraisal retentions on a contingency fee basis, calculated as a percentage of the amount he successfully increases the appraisal award above the estimate provided by the insurance carrier's appraiser.[39] Sometimes the fee is a flat percentage of the increase, whereas other times he purports to charge an hourly fee that is "capped" at a

---

[38] DE 225-1 at p. 249. *See also, e.g., Parrish v. State Farm Fla. Ins. Co.*, 356 So. 3d 771 (Fla. 2023); *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 886 F. 3d 852 (10th Cir. 2018); *Peleus Ins. Co. v. Edgewater Beach Resort Cmty. Ass'n., Inc.*, Case No.: 5:23-cv-141-AM-MJF, 2023 WL 11760950 (N.D. Fla. Sep. 19, 2023); *Travelers Indem. Co. v. GSL Group, Inc.*, Case No.: 2020-cv-32891, 2022 Colo. Dist. LEXIS 94 (Dist. Co. Denver, Cnty., Mar. 3. 2022); *Creekside Crossing Condo. Ass'n v. Empire Indem. Ins. Co.*, Case No.: 2-20-cv-136-JLB-MRM, 2022 WL 962743 (M.D. Fla. Jan. 31, 2022); *Mela Props., LLC v. Certain Underwriters at Lloyd's of London*, Case No.: 2:18-cv-404-FTM, 2019 WL 423317 (M.D. Fla. Feb. 4, 2019); *East Quincy Holding LLC v. Cont'l West Ins. Co.*, Case No.: 8-cv-01102-REB-NYW, 2018 WL 6990395 (Dist. Co. Dec. 11, 2018); *Copper Oaks Master Home Owners Ass'n v. Am. Family Mut. Ins. Co.*, Case No.: 15-cv-01828-MSK-MJW, 2018 WL 3536324 (Dist. Colo. July 23, 2018); *Phila. Indem. Ins. Co. v. College Hills Filing 8 Condo. Ass'n.*, Case No.: 16-cv-01644, 2017 U.S. Dist. LEXIS 182948 (Dist. Co. Aug. 7, 2017); *Axis Surplus Ins. Co. v. City Ctr. W. Lp.*, Case No.: 2016-CV-30453, 2016 Colo. Dist. LEXIS 2 (Co. Dist. Ct., Weld Cnty., Mar. 15, 2016); *The Monaco Beach Club, Inc. v. George W. Keys, Jr., et al.,* Case No.: 12-18208-CA-27 (Fla. 11th Jud. Cir. 2012); *Monaco Beach Club, Inc. v. Citizens Prop. Ins. Co., et al.,* Case No.: 06-2066-CA (Fla. 20th Jud. Cir. 2006).

[39] DE 225-1 at p. 249. *See also, e.g, Auto-Owners Ins. Co,* 866 F. 3d at 859 ("The district court found that Summit Park had acted in bad faith partly by concealing the existence of Mr. Keys' initial agreement, which had capped his fee based on the amount of his appraisal. Under the agreement, the fee cap would increase as the amount of the appraisal award increased. This compensation agreement was replaced by one without a contingent cap.").

percentage of the increase to avoid the appearance of a contingency.[40]

24.    Portofino eventually provided a copy of Mr. Keys' retainer agreement 18-months after it was requested, and buried it within a 50,000 page document dump that was made on the Friday before the Monday appraisal hearing.[41]

25.    Mr. Keys' retainer agreement with Portofino disclaims any contingency. Yet e-mails between Mr. Keys and Portofino, the manner in which billing was generated by Mr. Keys, that the bill was essentially 1% of the $153 million increase.[42]

26.    Specifically, in this case, the following appraisal awards were issued:

Agreed to by Appraiser for Primary Insurers
- Incurred Costs: $14,180,768.64[43]

Not Agreed to by Appraiser for Primary Insurers (ACV)[44]
- Tower 1: $31,930,431.10[45]
- Tower 2: $31,029,891.95[46]
- Tower 3: $32,666,787.46[47]
- Tower 4: $30,761,601.95[48]

---

[40] *See, e.g., Travelers Indem. Co.*, 2022 Colo. Dist. LEXIS at 34 (citing two prior cases involving George Keys, *Summit Park* and *Copper Oaks*, and explaining: "the court found that the policyholder's appraiser, again George Keys, worked in reality on a capped contingent fee even though they had attempted to modify his initial contract to misrepresent he was being paid hourly.").

[41] DE 231-9.

[42] DE 231-1 at pp. 42-42.

[43] DE 225-2 at pp. 1-2.

[44] "ACV" means "actual cash value" which is the net amount to be paid, pursuant to the appraisal awards, regardless of whether Portofino actually completes the work.

[45] DE 225-2 at p. 9.

[46] *Id*. at p. 15.

[47] *Id.* at p. 21.

[48] *Id*. at p. 27.

- Tower 5: $30,931,908.39[49]
- Various Buildings: $951,334.08[50]
  Total: $158,271,954.93

  Minus: $4,707,418.50 policy deductible[51]
  **Total Payable Increase in Award: $153,564,536.43**

27.  Thus, Mr. Keys obtained an appraisal award that was an increase of $153,564,536.43 of the appraisal estimate agreed to by the primary insurers. Mr. Keys' bill to Portofino for all work through the end of the appraisal (December 31, 2022), minus costs, was $1,519,553.75,[52] which is 0.99% of the increase in the appraisal award[53] and entirely consistent with his traditional fee arrangement of a purported hourly fee capped by a percentage (1%) of the increase. Adding the $20,525 that Mr. Keys charged for post-appraisal work[54] increases the total fee to exactly 1.002%,[55] again, consistent with a 1% fee cap as is his testimony that his so-called hourly billing is merely "our best guess as to what it is," explaining opaquely that he spent time on this file that was never billed.[56]

28.  Also consistent with Mr. Keys' fee being directly connected to the

---

[49] *Id*. at p. 33.
[50] *Id*. at pp. 39-40.
[51] DE 222-1 at p. 12 (providing the formula for calculating the deductible for a "named storm").
[52] DE 226-10 ($2,143,702.90 invoice amount minus Keys Claim Expenses of $177,232.07 and Advanced Costs of $446,917.08).
[53] Mr. Keys' fees divided by the total payable increase in the appraisal award ($1,519,553.75 ÷ $153,564,536.43 = 0.99%)
[54] DE 226-10.
[55] Mr. Keys' total professional fee ($1,519,553.75 + $20,525.00 = $1,540,078.75) divided by the total payable increase in the appraisal award ($1,540,078.75 ÷ $153,564,536.43 = 1.002%).
[56] DE 225-1 at p. 71.

outcome of the appraisal is the following:

- The Appraisal Agreement provides that "KCC agrees to defer payment of its fees until this action is concluded;"[57]

- The Appraisal Agreement contemplates that Mr. Keys will advance costs, including for experts and consultants;[58]

- Mr. Keys claims to have actually advanced $446,917.08 out of his own pocket for the payment of Portofino's experts and consultants, in addition to $177,232.07 for his office's expenses;[59]

- Despite purporting to provide his services on an hourly basis, Mr. Keys never kept contemporaneous time records;[60]

- Mr. Keys testified that when his time records were created after the fact, he delegated the task to "clerks" in his office who generated time entries for him based upon an "educated estimate;"[61]

- No periodic billing was ever prepared or sent to Portofino;[62]

- In other files that Mr. Keys has handled, such as one for Gadsden County, Florida, in which the retainer agreement called for payment on an hourly basis, Mr. Keys actually prepared and submitted bills on a monthly basis;[63]

- When Mr. Keys asked Portofino to pay its share for the Umpire's fee, its counsel, Ed Fleming, sent an e-mail to Mr. Keys stating that it was Portofino's understanding Mr. Keys was advancing all costs "with reimbursements to be made from claim proceeds;"[64]

---

[57] DE 231-9 at p. 1, ¶ 7.
[58] *Id.* at ¶ 4.
[59] DE 226-10.
[60] DE 226-12 at p. 1, ¶ 2, p. 3; DE 225-1 at pp. 69-71.
[61] DE 225-1 at p. 70.
[62] DE 225-1 at pp. 249-50.
[63] DE 225-1 at pp. 253-55.
[64] DE 231-10 at p. 2.

- Mr. Keys only ever prepared three invoices on this file—one dated December 31, 2022 after the appraisal hearing had concluded; another dated August 25, 2023 to include an additional $20,525 in fees; and one attached to an e-mail dated March 1, 2024 stating: "We realize your association is waiting payment from the insurers; however, may we ask that you place our previously forwarded interim billing in line for payment as soon as possible;"[65]

- Yet when Portofino's corporate representative was asked at her August 9, 2024 deposition how come still no payment had been made on Mr. Keys' bill supposedly "dated" December 31, 2022, she testified that "we just got a final bill in March of this year;"[66]

- To date, Portofino has paid nothing to Mr. Keys; and[67]

- Despite Mr. Keys' public history of suing clients who do not pay his bills, he has not initiated any legal action against Portofino despite payment being (supposedly) more than a year overdue.[68]

**The Claim Submitted by Mr. Keys and Portofino at Appraisal**

29.    On July 22, 2022, at the request of Mr. Doan and Mr. Lewis, Keys Claims provided a Statement of Loss in the amount of $212,949,543.49.[69]

30.    On August 2, 2022, Keys Claims submitted amended estimates and an amended Statement of Loss, increasing the amount to $233,030,601.80 which was 96% of the total $242,232,927 limit under the Policies[70] even though each and every building remained standing, fully occupied, with many apartments still being bought

---

[65] DE 225-1 at p. 240.
[66] DE 231-1 at p. 43; DE 225-1 at pp. 22-23.
[67] DE 225-1 at p. 23.
[68] DE 225-1 at p. 22.
[69] DE 225-1 at pp. 258-59.
[70] DE 222-1 at pp. 7-9.

and sold for more than $1 million each.

31.    Of the $233 million, $216,645,159.39 was comprised entirely of estimates prepared by Keys Claims' costing expert, Larry McCallister of LJB Restorations Services ("LJB").[71]

32.    Despite consisting of five separate towers; each with different apartments, contents, and interiors, Mr. McCallister claimed that all five suffered nearly identical damages, almost to the dollar. Specifically, his estimates claim Tower Two's repairs are 99.94% the cost of those suffered by Tower One, Tower Three's is 99.98% of Tower Two's, Tower Four's is 99.90% of Tower Three's, and Tower Five's is 100.04% of Tower Four's.[72]

33.    Mr. McCallister testified that rather than estimating the actual cost to repair the damages, he was tasked with "producing à la carte pricing so that later on once the scope was determined and awarded by the umpire, he had the pricing in front of him."[73] Mr. McCallister testified that his estimates contained "redundancies,"[74] and conceded that no "thinking person" would actually ever pay the $217 million set forth in this estimates to do the work.[75]

34.    Mr. McCallister testified that Mr. Keys instructed him to prepare the

---

[71] DE 225-13; DE 230-8.
[72] *Id.*
[73] DE 230-1 at p. 58.
[74] *Id.* at p. 47.
[75] *Id.* at p. 43.

estimate in this matter, but Mr. Keys characterized Mr. McCallister's testimony as "blatantly false."

35.    Despite Mr. Keys' concession that Mr. McCallister's estimates were (at best) a "starting point" for the umpire to reduce,[76] Mr. Keys nevertheless adopted them verbatim; redundancies and errors included; and submitted them during the appraisal claiming they represent the cost "to actually do the work" of repairing the hurricane damage.[77]

**George Keys' Undisclosed Relationships**

36.    Courts have previously disqualified Mr. Keys and vacated appraisal awards due to his undisclosed relationships. In those cases, the courts have focused on, among other things, undisclosed relationships with counsel, including those stemming from speaking engagements.[78]

37.    Mr. Keys never disclosed that he and his employees are members of an organization named the Windstorm Insurance Network, alongside Mr. McCallister and Portofino's counsel in this case, the law firm of Goede, DeBoest & Cross.[79]

## SUMMARY OF ARGUMENT

The Policies and Florida law required Mr. Keys to conduct himself in **both** a

---

[76] DE 225-1 at pp. 341-42.
[77] *Id.* at 116.
[78] *Id.* at fn. 38.
[79] DE 226-5; 226-6; 226-7.

competent and impartial/disinterested manner, but, unfortunately, he did not satisfy either benchmark. While this case is replete with examples of Mr. Keys' bias and self-interest, the Court need not perform a deep dive to conclude that summary judgment is appropriate. This is because courts which have previously disqualified Mr. Keys—including the Florida Supreme Court—have focused predominantly on his fee structure and whether it provides him with an interest in the outcome of the appraisal. Further, here, even if the Court ignored that Mr. Keys' "hourly fee" (crafted after the fact by his secretary), equals 1% of the increased recovery, summary judgment is still warranted.

This is because the undisputed material facts make clear that Mr. Keys was working for free for nearly two years, advancing more than $600,000 to front his client's expenses, hoping that Portofino would eventually prevail and then pay him back. While Mr. Keys' recovery may not be "contingent" on Portofino's recovery insofar as Mr. Keys expects to be paid regardless of whether Portofino recovers, his willingness to wait until Portofino wins before seeking his fees is a quintessential interest in the outcome and, in reality, is a contingency fee agreement. *See, e.g., Alvarez Crespo v. Home Depot U.S.A., Inc.,* No. 16-60086-CIV-COHN/SELTZER, 2016 WL 3854585, *2 (S.D. Fla. July 15, 2016) *quoting Carnival Corp. v. Jimenez,* 112 So. 3d 513, 520 (Fla. 2d DCA 2013) ("Florida courts have recognized that a letter of protection gives the treating physician a 'financial interest in the outcome'

of the litigation; it is evidence that a physician is more likely to testify favorably on behalf of a plaintiff because of that financial interest in the case."). Indeed, at this time Portofino has yet to be paid, and as a result, neither has Mr. Keys.

Moreover, while the Court could (and should) declare that Mr. Keys must be disqualified on this basis alone, summary judgment and disqualification are also appropriate because he failed to perform his work in a competent manner. As discussed *infra*, Mr. Keys has previously lectured regarding appraiser competence in a podcast that was played during his deposition. Therein, he made clear that many of the things he did in this case—such as adopting Mr. McCallister's faulty estimates as his own; injecting bias into Mr. McCallister's work by allowing Mr. McCallister to believe he might get the contract for the repair work if Portofino obtains a big appraisal award; and even proceeding with an appraisal before knowing the extent of his damages—are so improper (according to Mr. Keys) that even a "young appraiser" should know better. Accordingly, the Court should enter an order granting summary judgment on Count II of the Amended Complaint in the Insurers' favor.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court "must view all the evidence and draw all reasonable factual inferences in favor of the nonmovant." *Moore v. GEICO*

*Gen. Ins. Co.*, 633 F. App'x 924, 927 (11th Cir. 2016). Further, while "[i]t is not the court's role to weigh conflicting evidence or to make credibility determinations" as those are questions for the jury, *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012), "[t]he mere existence of some evidence to support the nonmoving party is not sufficient for denial of summary judgment[.]" *Snell v. United Specialty Ins. Co.*, 102 F.4th 1208, 1214 (11th Cir. 2024). To the contrary, "there must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

As discussed herein, the undisputed material facts demonstrate that Mr. Keys' actions were not performed in a competent and disinterested manner. Defendants cannot present "sufficient evidence" otherwise from which a jury could return a verdict in their favor on this issue, and as such the Court should grant summary judgment on Count II in Plaintiffs' favor.

## ARGUMENT

### I.    MR. KEYS IS NOT DISINTERESTED AS REQUIRED BY THE APPRAISAL PROVISIONS

#### a. The fee arrangement provides Mr. Keys with an impermissible pecuniary interest in the outcome

The Master Policy form, which is incorporated into each of the individual Policies, mandates that each party "shall select a competent and **disinterested** appraiser." (DE 222-1 at p. 35, ¶ 50). Although the Master Policy does not define

the term "disinterested," the Florida Supreme Court recently did so in a case disqualifying Mr. Keys and held that it requires, among other things, that the appraiser "not hav[e] a pecuniary interest in the matter at hand." *See Parrish v. State Farm Fla. Ins. Co.*, 356 So. 3d 771, 776 (Fla. 2023) (quoting *Black's Law Dictionary* (10th ed. 2014)). Importantly, the Florida Supreme Court explained that its opinion "breaks no new ground," *Parrish*, 356 So. 3d at 778, noting that in other cases the District Courts of Appeal have consistently held that "[w]hen an appraiser has a direct financial interest in the outcome of the appraisal, the appraiser is not disinterested." *See State Farm Fla. Ins. Co. v. Valenti*, 285 So. 3d 958, 961 (Fla. 4th DCA 2019) (Kuntz, J., concurring).

Although Portofino has argued—and no doubt will do so in response to this motion—that Mr. Keys is disinterested because his retainer agreement uses the "magic words" that he is working on an hourly basis and not on a contingency, such position strains credulity. This is because the undisputed material facts articulated *supra* make clear that Mr. Keys:

- Advanced all costs, totaling $600,000, from his own pocket;

- Never kept contemporaneous time records;

- Did not generate any periodic billing;

- Had his secretary create all his time entries after the fact which, by complete coincidence, just to happen to total exactly 1% of the amount that he was able to increase the appraisal award by— nearly to the penny; and

- Even though his retainer claims payment is to be made at the conclusion of the appraisal, nearly two years have passed and he has yet to be paid a single penny.

These facts are simply inconsistent with the fiction that Mr. Keys is being compensated hourly as opposed to from the recovery in this case. And importantly, while "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion," that same rule does not require this Court to "blindly credit everything the non-movant says" either. *See Williams v. Mallet*, 707 F. Supp. 3d 1340, 1345 (S.D. Fla. 2023) (citing *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).[80] *See also Travelers Indem. Co.*, 2022 Colo. Dist. LEXIS at 34 (citing two prior cases involving George Keys, *Summit Park* and *Copper Oaks*, and explaining: **"the court found that the policyholder's appraiser, again George Keys, worked in reality on a capped contingent fee even though they had attempted to modify his initial contract to misrepresent he was being paid hourly."** Emphasis added).

Regardless, the conclusion that Mr. Keys had an impermissible pecuniary interest *does not* hinge on resolution of whether he was working on an hourly basis

---

[80] Notably, and to provide insight into Mr. Keys thinking during the relevant time period, Mr. Keys testified that he never understood *Parrish* and the cases before it to prohibit an appraiser from receiving a contingency fee. Instead, according to Mr. Keys, that line of cases—ostensibly dating back to at least 2016 when the Tenth Circuit ruled against him in *Summit Park*—merely hold that an appraiser cannot receive a contingency if he or she was *also* the public adjustor on a file. (DE 225-1 at p. 16). Of course, these cases say no such thing, and by the second day of his deposition Mr. Keys testified that he now realized as much and conceded that he must be disqualified if his fee in this case was connected to the outcome. (*Id.* at pp. 246-47).

or a flat 1% fee. This is because the issue is not whether Mr. Keys would be paid *more* if Portofino recovered more, but rather whether the net effect of his payment arrangement is such that the more Portofino recovers "the likelier it is that Mr. Keys will himself be in a position to be paid," which is indisputably the case here. *See Parrish*, 356 So. 3d at 778. This is because by negotiating this sort of payment arrangement Portofino made clear that it had no desire to pay Mr. Keys or any of the appraisal costs from its cash on hand, or by borrowing from a line of credit, or even by issuing a special assessment. Instead, Portofino wished to pay Mr. Keys at the end, from some other source of funds that had yet to be recovered, thereby "align[ing] Mr. Keys' economic interests with" Portofino's, and making it so that the more Portofino recovers "the likelier it is that Mr. Keys will himself be in a position to be paid," which is in clear violation of *Parrish*. *Id*.

Finally, the Insurers suspect that Portofino may respond to this argument by proclaiming that, after its August 9, 2024 corporate representative's deposition during which this critical issue was raised, and right before Mr. Keys' deposition during which Portofino had a reason to ensure that Mr. Keys testified favorably, that Portofino decided it would impose a special assessment to pay Mr. Keys thereby resolving this entire issue. Yet this change in circumstances has no bearing on the matter at all because the bias and partiality that cases like *Parrish* seek to avoid is that which occurs during the appraisal process, and that was well before any

supposed special assessment was contemplated. Indeed, if anything the curious timing of Portofino's revelation that it would pay Mr. Keys by special assessment raises the issue of witness tampering and makes matters worse for Portofino, not better. *See United States v. Urrea*, 45 F.3d 428 (4th Cir. 1995) (rejecting, as being "clearly without merit," the argument that it cannot be witness tampering when the offer is to pay a debt already owed).

In sum, the undisputed material facts make clear that Mr. Keys' fee arrangement provided him with an impermissible pecuniary interest in the outcome of the appraisal, and as a result, he was not disinterested. The Court should grant summary judgment for the Insurers on Count II of the Amended Complaint.

> **b.    Mr. Keys' actions during the appraisal process demonstrated bias which constitutes a completely independent basis for the Court to conclude that he was not disinterested**

Although many cases focus on pecuniary interest, courts have made clear that the requirement an appraiser be disinterested does not refer to finances alone. Indeed, as the United States District Court for Colorado ruled when it disqualified Mr. Keys and vacated an appraisal award that he had obtained, a qualified appraiser must "exercise a high degree of impartiality, without the slightest degree of friendship or favor toward either party." *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, No. 14-CV-03417-LTB, 2016 WL 1321507, *4 (D. Colo. Apr. 5, 2016), *aff'd,* 886 F.3d 852 (10th Cir. 2018). Yet far from satisfying this standard, during the course of

the appraisal in this case. Mr. Keys engaged in conduct that not only made clear he favored Portofino, but actively sabotaged the ability of the panel to consider all available evidence and thereby arrive at a true and just result.

For example, despite Mr. Keys' agreement during his deposition that the goal of an appraiser is to "arrive at truth and be impartial," (DE 225-1 at pp. 148-49), e-mails reflect that when Mr. Keys conducted his investigation, he specifically sought Portofino residents that were "friendly to the HOA"[81] while ignoring residents and information that would not support his narrative. Similarly, when a resident put in writing that his unit did not suffer any damage, e-mails reflect that Mr. Keys' colleague Tim Rothring called the resident to convince him otherwise. (DE 225-16).

Even more concerning is Mr. Keys' clear partiality regarding the 50,000 pages of documents that—despite having been requested more than a year earlier—were inexplicably dumped on Mr. Lewis the Friday before the Monday appraisal hearing. Although Mr. Keys claimed to have taken no part in the production let alone had anything to do with the delay, discovery has revealed otherwise. As it turns out, Portofino provided the proposed document production to Mr. Keys and Portofino's counsel ahead of time. Yet, Mr. Keys did not immediately forward the documents to Mr. Lewis unaltered, as would clearly have been expected of any impartial professional. Instead, discovery has uncovered that while Mr. Keys sat on the

---

[81] DE 225-1 at 152.

documents, someone from the Portofino side removed a number of the materials before forwarding them to Mr. Lewis. Among these missing documents were things such as roof maintenance records that Portofino's maintenance director, Dmitri Krivosheyev, testified that he had collected and provided. Yet by the time the documents were dumped on Mr. Lewis, the folder titled "Bayshore Roofing" was entirely empty.

Even more concerning are the missing documents that would have supported Mr. Lewis' proposal that the windows and doors be reglazed at a modest cost, which was contrary to Mr. Keys' position that repair was impossible and instead $89 million was needed for their complete replacement. As Mr. Krivosheyev testified, Portofino had successfully reglazed the windows and doors after Hurricanes Ivan and Dennis in 2006 which had remained leak-free until Hurricane Sally hit nearly 14-years later. While Mr. Krivoshheyev testified that he provided Mr. Keys with documents demonstrating that this had been an effective repair, they were mysteriously absent from what was ultimately dumped on Mr. Lewis. The net result was that even if Mr. Lewis had possessed the herculean ability to meaningfully review 50,000 pages of materials produced on the Friday before the Monday appraisal hearing, it would have been in vain since the most pertinent (and damaging) documents were inexplicably withheld. Without a doubt, such machinations are entirely inconsistent with Mr. Keys' duty to remain impartial.

As if this were not egregious enough, Mr. Keys then went on to oppose Mr. Lewis' reasonable request for a one-week continuance to review the 50,000 page document dump. This, yet again, is entirely inconsistent with Mr. Keys' obligation to remain impartial. This is because if Mr. Lewis felt that he needed to review these documents and required a week to do so, opposing the request served no purpose other than to deprive Mr. Lewis of the opportunity to prepare as he deemed fit. Unlike civil litigation in which attorneys are adversarial and might oppose a similar request in the interest of zealous advocacy, such considerations are per-se improper during the appraisal process because being disinterested demands persistent neutrality and not opposing a request to favor Portofino.[82]

Mr. Keys attempted to justify his opposition on the ground that he had no interest in reviewing the documents because he had already made his mind up before receiving them. (DE 225-1 at pp. 128-29). Mr. Keys also testified that he was concerned regarding the cost to Portofino since he would have billed his hourly fee for having reviewed them. (*Id.* at p. 127). But neither of these purported justifications are consistent with Mr. Keys' duty to remain impartial. Instead, when Mr. Keys testified that he had already made up his mind, and then regardless, made the

---

[82] Although more appropriately characterized as a failure to act competently, Mr. Keys admitted that he never even bothered to review the materials before (or after) opposing the requested continuance. This runs contrary to what Mr. Keys had previously lectured in his podcast about competent appraisal practice, during which he emphasized the absolute necessity for an impartial appraiser to review everything and know the contents of an appraisal file inside and out before stepping foot into the hearing room. (DE 225-1 at pp. 140-43).

decision not to review the documents because of supposed cost to Portofino, he plainly favored Portofino's interests and expenses over his obligation to review all materials and impartially arrive at the truth. This decision, in-and-of-itself, is a violation of his obligation to remain disinterested.[1]

Finally, Mr. Keys violated his obligation to remain disinterested when he repeated the same error in this case that he made in *Summit Park.* In that case, Mr. Keys failed to disclose he had participated in panel discussions with the insured's counsel at a conference sponsored by the Windstorm Insurance Network. The District of Colorado and then the Tenth Circuit cited that lack of candor, among other failures, as a basis for disqualifying Mr. Keys and vacating the appraisal award that he obtained. Yet just like in *Summit Park*, in this case Mr. Keys again failed to disclose his participation in the Windstorm Insurance Network, and particularly at conferences at which employees of Keys Claims, of the law firm now representing Portofino, and Mr. McCallister are all presenters.

Simply stated, this case is replete with instances in which Mr. Keys either failed to disclose that which he was required to, favored Portofino's interests over those of the Insurers, or even favored his own personal interests over those of everyone else. Each time that Mr. Keys did so he disregarded the objective of this neutral process, and worse, his duty to remain impartial and disinterested. For these reasons, the Court should grant summary judgment in the Insurers' favor on Count

II of the Amended Complaint.

## II.    MR. KEYS FAILED TO CONDUCT HIMSELF IN A COMPETENT MANNER AS REQUIRED BY THE APPRAISAL PROVISION

### a.    Just because Mr. Keys is experienced does not mean that he acted competently in this instance

The Master Property Policy clearly and unambiguously provides that each party must select a "competent" appraiser. (DE 222-1 at p. 35, ¶ 50). And while several of the policies have endorsements that modify the language of this provision, each reiterates the competency requirement. (DE 222-6 at p. 45, ¶ B.2; 222-9 at p. 47; 222-11 at p. 46, ¶ I). Compliance with this provision is pivotal not only because "[i]n matters of appraisal, the contract language controls," *Certain Underwriters at Lloyd's v. Lago Grande 5-D Condo. Ass'n, Inc.*, 337 So. 3d 1277, 1280 (Fla. 3d DCA 2022), but also because it makes good sense. Indeed, if the appraisers involved do not act competently then it is impossible to achieve a fair and accurate reconciliation of disputed loss estimates which, of course, is the purpose of appraisal.

The Insurers expect that Portofino will respond to this argument by touting Mr. Keys vast experience, but that would be mere obfuscation. This is because the Policies do not call for the appointment of "experienced" appraisers, but rather ones that are "competent." These two words are not synonymous, and the case law is replete with instances of experienced professionals who, for one reason or another, are found to have performed their work in an incompetent manner. *See, e.g., In re*

*Elec. Mach. Enters., Inc.*, 416 B.R. 801, 895–96 (Bankr. M.D. Fla. 2009), *aff'd in part,* 474 B.R. 778 (M.D. Fla. 2012) ("While both of the primary joint venture partners brought numerous experienced construction managers to the Project, in the final analysis the combined group simply did not perform competently.").

This is precisely what occurred here. While Mr. Keys is well-credentialed, experienced, and may have very well served as a competent appraiser in other settings, the undisputed material facts make clear that he did not serve competently in this instance.

### b.    The attributes of a competent appraiser, as testified to by Mr. Keys, and his admitted failure to meet that standard

As previous courts have observed, sometimes the most effective mechanism for evaluating the conduct of a professional such as Mr. Keys is to compare his actions in this case with what he has said and done in the past. *See, e.g., Paramount Media Grp., Inc. v. Vill. of Bellwood*, 308 F.R.D. 162, 166 (N.D. Ill. 2015), *objections overruled,* (Sept. 10, 2015) (noting the practice of considering an expert's "prior opinions and us[ing] them as a gauge against what he's done in this case."). Here, during his deposition Mr. Keys was played clips from a podcast he recorded and asked to juxtapose his prior lecture on appraiser competence with his conduct in this case. The results were astounding.

To begin, Mr. Keys criticized the competency of any appraiser involved in a case in which the matter was brought to appraisal *before* the full extent of damages

was known. This, of course, makes good sense given that the purpose of appraisal is to resolve a dispute regarding competing damage estimates—not to attempt to ascertain the amount of damages in the first instance. As Mr. Keys explained during his lecture:

> And what I'm seeing is, is that a lot of these guys, girls, when they get out there, they don't even know what the damages are. You can ask -- you can -- sometimes you can ask them, you know, 'Do you have interior damages?' 'Well, I don't know. Let's go look.' **Well, it's a little late for that in appraisal.**

(DE 225-1 at p. 121). Yet this is *precisely* what Mr. Keys did in this case. As articulated more fully in the Insurers' Motion for Summary Judgment on the Appraisal Process, Mr. Keys testified that he did not know the actual extent of Portofino's supposed damages until August 2, 2022, more than 18-months *after* he became involved and began to actively pursue appraisal for Portofino. Importantly, the Insurers do not contend that this alone would warrant a finding that Mr. Keys behaved incompetently requiring disqualification, but, unfortunately, this is merely the tip of the proverbial iceberg.

The primary point of contention, and indeed where Mr. Keys' lack of competence was most astounding, concerned his reliance (if not wholesale abdication of his appraisal responsibilities) to Mr. McCallister. As discussed more fully in the Insurers' Motion for Summary Judgment on the Appraisal Process, Mr. McCallister is a contractor who prepared a $216 million dollar repair estimate for

the supposed damages to Portofino. Though Mr. McCallister testified that no "thinking person" would actually pay the amount set forth in these estimates, Mr. Keys copied the estimates verbatim and adopted as his own. (DE 230-1 at pp. 91-92; DE 225-13).

However, as discussed during his deposition, in his podcast lecture on appraiser competence Mr. Keys harshly rejected any appraiser who would do such a thing, explaining as follows:

> Well, you see a lot of appraisers, these young -- young individuals that will go out and they will actually participate in the appraisal process but yet they don't even write an estimate. **They say I'm going to go by this contractor's estimate**, I'm going to go by this individual's estimate or this PA's estimate or the carrier guy is saying -- I'm just sticking with the carrier's estimate, **that is, in my opinion, a blatant violation of the appraisal provision itself**, because it charges each appraiser with separately and impartially or independently setting the value of the loss and/or the building. That's -- that in itself should help him **but he can't just simply adopt another number**, that they themselves have to at least put an effort in determining, from an impartially [sic] perspective, what the amount of loss is **irrespective of what anybody else thinks, <u>and that's what I do.</u>**

DE 225-1 at pp. 94-95 (emphasis added). Yet that is *precisely* what Mr. Keys did in this appraisal when he conceded that he adopted verbatim the entire $216 million estimate prepared by Mr. McCallister—errors and redundancies included—and made it his own. (DE 225-13). Far from the actions of a competent appraiser, his conduct in this regard was, by Mr. Keys' own definition, "a blatant violation of the appraisal provision itself" because an appraiser "can't just simply adopt another

number." (DE 225-1 at pp. 94-95).

Still, this is not all. Another issue addressed during Mr. Keys' deposition was the well-accepted rule that, to avoid bias, any contractor who consults during the appraisal (i.e. Mr. McCallister) must understand that there is no chance he will receive the contract for the ultimate repair work. In the podcast lecture, Mr. Keys treated this as a hard and fast rule, responding when the host concluded "you can't be in the business of sales if you're in the business of being an expert," with Mr. Keys proclaiming "that is so true and that's well said." (DE 225-1 at pp. 104-05). Yet again, in an inexplicable deviation from the norm of competent appraisal practice, Mr. Keys testified that he understood Mr. McCallister sought the repair contract, and Mr. McCallister testified just the same. (DE 225-1 at p. 98; DE 230-1 at pp. 110-11). And even worse, while Mr. Keys prepared an invoice to Portofino stating that he had advanced Mr. McCallister's fee ($155,029.53) and paid it out of his own pocket, both Mr. McCallister and Mr. Keys testified that was false. To the contrary, Mr. McCallister was not paid a dime for his work, and instead (like Mr. Keys) were waiting for the Insurers to pay the appraisal award before being paid themselves.

Evincing further lack of competence, Mr. Keys testified that he "instructed" Mr. McCallister to prepare estimates reflecting "how much it would cost to actually do the work[.]" (DE 225-1 at p. 116). Nevertheless, Mr. Keys also testified that it

became clear that there were errors and redundancies in Mr. McCallister's estimates and that they *did not* reflect how much it would cost to perform the supposedly needed repair work, but rather were inflated by tens of millions of dollars. (*Id.* at pp. 341-42). Yet even at that time Mr. Keys did not withdraw the knowingly inflated and inaccurate estimates, but instead maintained them regardless.[83]

Finally, Mr. Keys failed to follow his own standards when it came to his vetting of Mr. McCallister—or more appropriately, his lack of any vetting what-so-ever. As Mr. Keys has previously lectured on this topic:

> PODCAST HOST: I guess one of the questions that I have based on, you know, hiring an expert is you have to make sure it's going to be an expert that's going to give you the truth. So when you are hiring a new expert, or when you have hired a new expert, how do you vet them to make sure this is someone that's going to give you the answer instead of what they think you want to hear?
>
> GEORGE KEYS: Well, that's a great – that's another great question. I think that if I'm using a new person, I oftentimes, before I ever retain them, I'll ask them to go out and look at a loss and to give me a proposal on what it is....

(DE 225-1 at pp. 109-10).

Yet in this case, Mr. Keys conceded that he never vetted Mr. McCallister in this manner, not before his work in Portofino or the other two cases in which he used him. (DE 225-1 at p. 110). Mr. Keys' admitted lack of competency on this issue is

---

[83] Interestingly, although Mr. McCallister testified that Mr. Keys instructed him to inflate the estimates in this manner (DE 230-1 at p. 128), Mr. Keys was adamant that Mr. McCallister's testimony on that topic was "blatantly false." (DE 225-1 at 117).

deeply concerning for multiple reasons, not the least of which is because Mr. Keys would come to essentially adopt Mr. McCallister's work as his own and submit it without any modification as conclusive evidence of Portofino's damages.[84]

Stated simply, Mr. Keys set the bar himself for what constitutes competent appraisal practice, only to go on and disregard much of it when handling this case. In doing so, Mr. Keys did not act as a "competent" appraiser, in violation of the Policies' clear language. The Court should enter a summary judgment so declaring, and as a result, vacate the six appraisal awards which were only signed by Messrs. Keys and Doan.

### III. SINCE MR. KEYS WAS NOT A COMPETENT AND DISINTERESTED APPRAISER, THE INSURERS ARE ALSO ENTITLED TO SUMMARY JUDGMENT ON PORTOFINO'S BREACH OF CONTRACT COUNTERCLAIM

For the reasons set forth above, the Insurers cannot be bound by the appraisal

---

[84] Equally concerning is Mr. Keys testimony about what Mr. McCallister led him to believe about his credentials. According to Mr. Keys, at the time he relied upon Mr. McCallister to accurately create $216 million worth of repair estimates, he was led to believe that Mr. McCallister was a career commercial builder with decades of experience and the owner of LJB. (DE 225-1 at p. 86-87). Yet during his deposition, Mr. McCallister repeatedly testified, under oath, that he is not the owner of LJB and reaffirmed the veracity of affidavits he filed in a state court domestic proceeding several years ago in which he represented himself variously as an out-of-work martial arts instructor, or a handyman earning $12 per hour, or a consultant for LJB earning slightly more than minimum wage. (DE 225-1 at pp. 87-88, 273; 225-12 at p. 3). While the Court need not determine whether Mr. Keys was misled or Mr. McCallister simply has a history of providing questionable testimony and affidavits to satisfy the exigency of the moment, it is simply emblematic of the issues that arise because Mr. Keys failed to vet his contractors as he explained that every competent appraiser should. *See also* Insurers' Daubert Motion Regarding Paul Middleton (discussing deposition testimony which revealed that Portofino's expert signed and submitted an expert report in this case that he neither authored nor even understood, as well as his checkered past and questions regarding whether his professional license was procured under false pretenses).

award. Consequently, if the Insurers are not bound by the appraisal award, Portofino's breach of contract counterclaim, in which Portofino seeks recovery of the unpaid appraisal award, must fail. Thus, the Court should enter summary judgment for the Insurers on Portofino's counterclaim as well.

## CONCLUSION

For the reasons articulated herein, the Court should enter an order granting summary judgment on Count II of the Amended Complaint in the Insurers' favor, concluding that: (1) Mr. Keys was not competent and/or disinterested; (2) as a result, was ineligible to serve as Portofino's appraiser; and (3) because the appraisal awards are only valid if agreed to by at least two eligible appraisers, that the "Incurred Only" award stands because it was agreed to by all three appraisers, but the awards for "Various Bldgs" and Towers 1, 2, 3, 4, and 5 must be vacated since they were only agreed to by Messrs. Keys and Doan, yet Mr. Keys was ineligible.

Dated: October 25, 2024

<div style="margin-left:40%;">

Respectfully submitted,

/s/ Jordan S. Kosches
Jack R. Reiter, Esq.
Florida Bar No.: 0028304
jack.reiter@gray-robinson.com
Jordan S. Kosches, Esq.
Florida Bar No.: 49881
jordan.kosches@gray-robinson.com
**GRAYROBINSON, P.A.**
333 SE 2nd Avenue, Suite 3200
Miami, Florida 33131

</div>

Telephone: (305) 416-6880
Facsimile:  (305) 416-6887

*Counsel for Plaintiff Colony Insurance
Company*

/s/ David C. Bibb
David C. Bibb, Esq.  (Fla. Bar No.: 190330)
Brian P. Henry, Esq. (Fla. Bar No.: 0089069)
**ROLFES HENRY CO., LPA**
3165 McCrory Place, Suite 174
Orlando, Florida 32803
Telephone: (407) 284-4990
Email: dbibb@rolfeshenry.com
rkitchens@rolfeshenry.com
bhenry@rolfeshenry.com
kmcclintock@rolfeshenry.com

*Counsel for Plaintiffs Independent Specialty
Insurance Company, Interstate Fire &
Casualty Company, and Lloyd's of London*

/s/ Elizabeth D. Salinas
Wayne D. Taylor, Esq.
Georgia Bar No.: 701275
*Admitted in USDC NDFL*
**MOZLEY, FINLAYSON & LOGGINS LLP**
1050 Crown Pointe Parkway, Suite 1500
Atlanta, Georgia 30338
Telephone: (404) 256-0700
Facsimile:  (404) 250-9355
wtaylor@mfllaw.com
Elizabeth D. Salinas, Esq.
Florida Bar No.: 113394
**MOZLEY, FINLAYSON & LOGGINS LLP**
4767 New Broad Street
Orlando, Florida 32814
Telephone: (404) 256-0700
esalinas@mfllaw.com

*Counsel for Plaintiff Landmark American Insurance Company*

/s/ Heidi Hudson Raschke
Heidi Hudson Raschke, Esq.
Florida Bar No.: 61183
hraschke@carltonfields.com
Madison E. Wahler, Esq.
Florida Bar No.: 1019015
mwahler@carltonfields.com
**CARLTON FIELDS, P.A.**
4221 W. Boy Scout Blvd, Suite 1000
Tampa, Florida 33607
Telephone: (813) 223-7000

-and-

Amanda D. Proctor (*admitted pro hac vice*)
Georgia Bar No.: 776848
**CARLTON FIELDS, P.A.**
1201 West Peachtree Street, Suite 3000
Atlanta, Georgia 30309
Telephone: (404) 815-3400
aproctor@carltonfields.com

*Counsel for Plaintiff Homeland Insurance Company of New York*

/s/ Aaron Konstam
Eric A. Hiller, Esq.
Florida Bar No.: 27920
eric.hiller@kennedyslaw.com
Aaron Konstam, Esq.
Florida Bar No.: 104765
aaron.konstam@kennedyslaw.com
**KENNEDYS CMK LLP**
1395 Brickell Avenue, Suite 610
Miami, Florida 33131
Telephone: (305) 371-1111

*Counsel for Plaintiff James River Insurance Company*

/s/ John David Dickenson
John David Dickenson, Esq.
Florida Bar No.: 575801
jdickenson@cozen.com
Alexandra J. Schultz, Esq.
Florida Bar No.: 122100
aschultz@cozen.com
Juan P. Garrido, Esq.
Florida Bar No.: 0118678
jgarrido@cozen.com
**COZEN O'CONNOR**
1801 N. Military Trail, Suite 200
Boca Raton, FL 33431
Telephone: (561) 515-5250
Facsimile:  (561) 515-5230

*Counsel for Plaintiffs Evanston Insurance Company, Aspen Specialty Insurance Company, and Maxum Indemnity Company*

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Local Rule 7.1(F), the undersigned hereby certifies that this motion contains 9,177 words, including headings, footnotes, and quotations, but excluding those portions that the rule exempts from the word count requirement.

<u>/s/ Jordan S. Kosches</u>

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 25, 2024, the foregoing was served via CM/ECF to all counsel of record.

/s/ Jordan S. Kosches