UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

PENSACOLA DIVISION

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY, *et. al.*

      Plaintiffs,

v.                                                            CASE NO. 3:23-cv-00453-MCR-HTC

PORTOFINO MASTER HOMEOWNERS
ASSOCIATION INC., a Florida not-for-
profit Corporation, *et. al.*

      Defendants.

_____/

## **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO FRAUD [D.E. 246]**

Plaintiffs, Westchester Surplus Lines Insurance Company ("Westchester"), Arch Specialty Insurance Company ("Arch"), AXIS Surplus Insurance Company ("AXIS"), Colony Insurance Company ("Colony"), Evanston Insurance Company ("Evanston"), Aspen Specialty Insurance Company ("Aspen"), Independent Specialty Insurance Company ("Independent"), Interstate Fire & Casualty Company ("Interstate"), Lloyd's of London (Consortium #9226) ("Lloyd's"), James River Insurance Company ("James River"), Maxum Indemnity Company ("Maxum"), Landmark American Insurance Company ("Landmark"), and Homeland Insurance

Company of New York [1] (collectively, "Plaintiffs"), file this Opposition to Defendants' Motion for Partial Summary Judgment as to Fraud [D.E. 246] ("Motion"), and state as follows. [2]

## I.    **INTRODUCTION**

On September 16, 2020, Hurricane Sally impacted the Portofino property, a condominium complex consisting of five towers and various other buildings. During the storm, Portofino experienced sustained tropical storm force wind speeds. Following the storm, Defendants, the six condominium associations that own the Portofino property, submitted a claim to the Primary Layer Carriers.[3]

Early in the claim adjustment, a dispute arose between the Primary Layer Carriers - the four carriers that provided the first $15 million in insurance coverage - and Defendants. Defendants subsequently demanded appraisal of the Primary Layer Carriers. Defendants appointed as their appraiser George Keys of Keys Claims Consultants ("Keys Claims"), who is notorious in the insurance industry for

---

[1] Arch, AXIS, Colony, Evanston, Aspen, Independent, Interstate, Lloyds, James River, Maxum, Landmark, and Homeland are collectively the "Excess Carriers."

[2] Defendants only invoked appraisal as to the Primary Layer Carriers. Nonetheless, because Defendants maintain the Appraisal Award is enforceable against the Excess Carriers, the Excess Carriers join in the arguments raised here.

[3] The Primary Layer Carriers are Plaintiff Westchester, Endurance American Specialty Insurance Company ("Endurance"), Everest Indemnity Insurance Company ("Everest"), and Princeton Excess Surplus Lines Insurance Company ("Princeton").

submitting inflated insurance claims and who has been disqualified as an appraiser on numerous occasions.

Mr. Keys submitted a claim of $233 million in damages - 96 percent of the $242 million total insured value of the property.  One would think that the buildings at the property were leveled to the ground with such extensive claimed damages.  On the contrary, the buildings are still standing and in good condition and are portrayed to the public as "meticulously maintained" and "luxurious."[4] Units in the buildings continue to sell for well into the seven figures, even in their purportedly "damaged" state.[5]



*(Exemplar photos of Towers Two and Three taken on September 22, 2021.)*[6]

---

[4] D.E. 257-8.

[5] D.E. 257-25.

[6] D.E. 257-9.

LEGAL\74634010\1

Mr. Keys and his experts, including Larry McCallister of LJB Restoration Services, LLC ("LJB"), intentionally inflated their damages submission, made on behalf of Defendants, by utilizing a "linear" method of estimating, a technique that fails to account for economies of scale. Mr. McCallister expressly admitted that using this method of estimating artificially increases the amount of the claim and that no "thinking person" would ever use it to estimate the amount of storm damage.

Pat Lewis of Lewis Claims Solutions ("Lewis Claims"), the Primary Layer Carriers' appraiser, testified that in 40 years as a building consultant, he has never seen a property owner or general contractor utilize the linear method, which dramatically increases construction costs. As a result of this improper estimation method, the Keys Claims appraisal submission contains wildly overstated alleged damages and plainly duplicative claim components. The appraisal also involved improper advocacy on the part of Mr. Keys, interference by Defendants' counsel, and gamesmanship by Mr. Keys and Defendants' counsel with the exchange of documentation.

The Keys Claims appraisal submission led to an award of $187 million, implicating all but one of the 16 policies in the $242 million insurance tower. Defendants seek to enforce this appraisal award against all Plaintiffs. Plaintiffs filed this declaratory judgment action, *before any awards were issued*, challenging the

propriety of the appraisal process and setting forth various coverage defenses, including fraud. Plaintiffs' fraud claim is the subject of this Opposition.

Defendants' 60-page Motion can be distilled into three main arguments. First, Defendants argue that Plaintiffs have not identified any fraudulent statements, and that any "fraud" in the Defendants' claim submission was simply a difference in opinion. Second, Defendants argue that even if there was fraud, the wrongful acts of Mr. Keys and Mr. McCallister cannot be imputed to Defendants. Finally, Defendants argue that Plaintiffs somehow waived the fraud defense. Plaintiffs will address each of these arguments in turn.

Defendants, who hired Mr. Keys, attempt to distance themselves from his untoward conduct, while still seeking to reap the benefits of that conduct by collecting the $187 million appraisal award. Further, it cannot be disputed that numerous factual questions preclude the granting of summary judgment. It is well settled under Florida law that the question of whether an insured has made a material misrepresentation of fact is a jury question. For the reasons set forth below, Defendants' motion for summary judgment must be denied.

## II.    RESPONSE TO DEFENDANTS' STATEMENT OF FACTS[7] [8]

1.    Undisputed.

2.    The tower of insurance provides a total of $242,232,927 in excess of the deductible.[9] It is unclear what "participating insurers" means. The definition of "market" means the insurers participating in the handling and investigating of a claim, and the insurers who are on notice of a claim.[10]

3.    The Primary Layer Carriers did not fail to timely pay for interior repairs; the claim was still being adjusted when Defendants demanded appraisal.[11] The appraisal was not limited to interior repairs, which is not possible under the terms of the contract, the law, or even as a practical matter.[12] Defendants demanded appraisal of the entire Hurricane Sally loss at issue of the four Primary Layer Carriers.[13] Plaintiffs agree that submission of a proof of loss is a condition precedent

---

[7] Local Rule 56.1 requires a party moving for summary judgment to "include a statement of facts generally in the form that would be appropriate in an appellate brief." The Motion contains a Statement of Facts section containing 13 numbered paragraphs.  Immediately following is a separate section called "Allegations of Fraud," which is approximately nine pages long.  It is unclear whether Defendants intend for this section to be part of the "Statement of Facts." The "Allegations of Fraud" section is not numbered.  This statement fails to satisfy the Rule 56.1 requirement that the statement be "generally in the form that would be appropriate in an appellate brief."  In an abundance of caution, Plaintiffs treat the "Allegations of Fraud" as a continuation of Defendants' Statement of Facts and will attempt to address all of the issues raised therein.

[8] For all deposition transcripts cited in this brief, the pagination refers to the transcript pagination. For all other exhibits, the pagination refers to the CM/ECF pagination.

[9] *See, e.g.*, D.E. 222-1 p. 9.

[10] *See* D.E. 224-1 p. 183 ln. 14 – 189 ln. 14.

[11] D.E. 224-1 p. 190 ln. 3 – 191 ln. 16.

[12] *See* ¶4 below.

[13] D.E. 251-4.

for an appraisal demand and that at the time of the appraisal demand, Defendants had only submitted proofs of loss for damages totaling less than $15 million.

4.      The April 5, 2021 letter attached as Exhibit 5 to the Motion was sent on behalf of the Primary Layer Carriers only and speaks for itself.  Defendants' position that they demanded appraisal only of the interior damages is a fiction both factually and legally.   Defendants' position is further a transparent effort to cure the fact that they demanded appraisal of the entire loss and, due to a belief that their claim did not exceed the primary layer of coverage, or simply due to ignorance as to how the tower of insurance worked, directed the demand only to the Primary Layer Carriers. As Mr. Keys explained, there is no such thing as an appraisal of only a part of the loss.[14] The Appraisal Demand Letter's "Re" line read: "Portofino – Hurricane Sally property damage claim."  The letter further stated that "Pursuant to requirements of the insurance policies (see paragraph 50 of the 'Master Policy Form' of the above-referenced insurance policies), the Insureds listed above are initiating the appraisal process.   The Insureds demand an appraisal of the loss at issue in the above-referenced matter."[15]  There is no limitation to the interior damages, which would have been improper.  The Primary Layer Carriers did not demand appraisal of the entire loss, which was already in appraisal as a result of Defendants' December 11,

---

[14] D.E. 225-1 p. 277 ln. 24 – p. 278 ln. 10; p. 119 ln. 3 – 7.

[15] D.E. 251-4.

2020 appraisal demand. While the Primary Layer Carriers maintained that Defendants had demanded appraisal of the entire loss, by letter dated April 5, 2021, they "echoed" Defendants' appraisal demand and clarified that the appraisal was for the whole loss.[16]

5.    See response to fact no. 4. Defendants, not Plaintiffs, demanded appraisal of the entire loss.

6.    Plaintiffs did not demand appraisal. The remainder of fact no. 6 is undisputed.

7.    Undisputed.

8.    Defendants and their representatives did not cooperate in the appraisal. First, they massively expanded the claim in appraisal necessitating the multiple inspections referenced. Then, Defendants and their representatives refused to timely provide relevant documentation to the Primary Layer Carriers' appraiser, and, in many cases, entirely failed to provide documentation.[17]    Defendants placed unreasonable conditions on the Primary Layer Carriers' appraiser's ability to conduct inspections, including forcing Plaintiffs to pay Defendants' roofing contractor in advance for the ability to perform destructive testing of the roof.[18]    The Primary Layer Carriers' appraiser was not permitted to choose a roofing contractor

---

[16] D.E. 251-19.

[17] See Section III, ¶21-36.

[18] Ex. 1 - 2/17/2022 letter.

for this testing.  Further, Defendants or their representatives dangerously flew drones in and around the Primary Layer Carriers' appraiser's team. [19]   Additionally, Defendants' appraisal team specifically sought out unit owners who would be "friendly" to Defendants,[20] coached unit owners,[21] and insisted on inspecting units that were not claimed to be damaged.[22]

9.      It is not the conclusions of the Umpire that Plaintiffs seek to overturn. Plaintiffs' fraud claim relates to the claim submission Mr. Keys made on behalf of Defendants.  This action was filed as a result of that claim submission *before* the Umpire had rendered any conclusions.

10.      Plaintiffs' fraud claim relates to the claim submission Mr. Keys made on behalf of Defendants.  This submission was finalized on August 2, 2022, less than two weeks before the appraisal panel hearings began.[23]

11.      Plaintiffs agree that they filed this action and the Emergency Motion to Stay [D.E. 57] to bring to the Court's attention the misconduct by Defendants and their appraiser.  Indeed, as cited in the Motion to Stay, case law requires the parties to object to and correct improprieties in an appraisal, which is precisely why Plaintiffs filed this action and the Emergency Motion to Stay. The Court denied that

---

[19] D.E. 257-1 pp. 4-6.

[20] D.E. 225-17.

[21] D.E. 235-7.

[22] D.E. 225-16.

[23] D.E. 251-28.

motion, noting that the Plaintiffs retain rights to assert coverage defenses after the appraisal awards are entered. [D.E. 78].

12.    Once Defendants demanded appraisal of the entire loss, before putting the Excess Carriers on notice, there was no investigation to be performed by the Excess Carriers.  As a matter of contract, the determination of the amount of loss was in the hands of the appraisal panel.  Plaintiffs admit that there was a covered loss in part, but coverage is subject to all terms of the Policies, some of which might apply to reduce or eliminate coverage.  Plaintiffs admit there was a dispute as to the amount of loss between Defendants and the Primary Layer Carriers.

13.    The tower of insurance totaled $242,232,927 in excess of the deductible.[24]  Plaintiffs raised concerns and objections to Mr. Keys and Defendants' actions throughout the appraisal[25] and filed this action before the awards were issued. Defendants and their appraiser corrupted the appraisal process beyond recognition, and the awards should be set aside.

## III.    RESPONSE TO "ALLEGATIONS OF FRAUD" AND PLAINTIFFS' ADDITIONAL FACTS

### The Loss and Defendants' Appraisal Demand

---

[24] *See, e.g.*, D.E. 222-1 p. 9.

[25] *See, e.g.* Ex. 2 - 2/18/2021 letter; Ex. 3 - 3/3/2021 letter; D.E. 257-16.

LEGAL\74634010\1

1.     On September 16, 2020, Hurricane Sally impacted Defendants' property.

2.     During the storm, Portofino experienced tropical storm-force winds.[26]

3.     Defendants, through their broker, reported the claim to the Primary Layer Carriers the following day.[27]

4.     On December 11, 2020, Defendants wrote to the Primary Layer Carriers demanding appraisal of the entire loss.[28]

5.     Defendants appointed Mr. Keys as their appraiser.[29]

6.     The Primary Layer Carriers appointed Pat Lewis as their appraiser.[30]

7.     Mr. Keys and Mr. Lewis appointed Jon Doan as the Umpire (Mr. Keys, Mr. Lewis, and Mr. Doan will collectively be referred to as the "Appraisal Panel").[31]

---

[26] Ex. 4 - Branscome report p. 2.

[27] D.E. 257-11. Endurance, Everest, and Princeton were previously plaintiffs in this suit but have dismissed their claims.

[28] D.E. 251-4.

[29] D.E. 104 – Amended Complaint and D.E. 108 – Defendants' Answer and Affirmative Defenses at ¶ 62.

[30] D.E. 251-9.

[31] D.E. 108 – Defendants' Counterclaim and Plaintiffs' Answers to Counterclaim [D.E. 123 – 133] at ¶44.

LEGAL\74634010\1

## Background on Mr. Keys

8.    Mr. Keys has worked in the insurance industry for approximately 40 years and has handled "thousands upon thousands" of appraisals.[32]

9.    Mr. Keys has been disqualified from acting as an appraiser on numerous occasions due to findings that he was not "impartial."[33]

10.    Mr. Keys testified that "without fail," he manages to obtain awards that are higher than the insurance carriers' loss estimates, noting that he is "proud of [his] work" and is referred to as a "legend."[34]

11.    Mr. Keys attributed his so-called legendary success to his having "pioneered several aspects of damage claims which were long overlooked," [35] referring specifically to his theory that windows and doors often suffer "damages that aren't readily available to the naked eye...."[36] Here, Mr. Keys and Defendants claimed that every single window and door at each Portofino Tower required replacement, for a total of $89,384,662.43.[37]

---

[32] D.E. 225-1 p. 40 ln. 12-16.

[33] *See, e.g., Axis Surplus Ins. Co. v. City Ctr. W. LP*, No. 2015 CV 30453, 2016 Colo. Dist. LEXIS 2 (Weld Cnty. Dist. Ct. Mar. 14, 2016); *Church Mut. Ins. Co. v. Broadmoor Cmty. Church*, No. 2015cv32454 (El Paso Cnty. Dist. Ct. July 6, 2016); *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 886 F.3d 863, 871 (10th Cir. 2018); *Copper Oaks Master Home Owners Ass'n. v. Am. Fam. Mut. Ins. Co.*, No. 15-cv-01828-MSK-MJW, 2018 U.S. Dist. LEXIS 122493 (D.C. Col. July 23, 2018); *Parrish v. State Farm Fla. Ins. Co.*, 356 So. 3d 771, 779 (Fla. 2023).

[34] D.E. 225-1 at p. 156 ln. 25 – p. 157 ln. 22.

[35] D.E. 225-1 at p. 163 ln. 23 – p. 164 ln. 3.

[36] D.E. 225-1 at p. 164 ln. 7 - 18.

[37] DE 237-17 at p. 17 ($17,687,558.84 for Tower 1) and the exact same amount for Towers 2, 3,

12.     Mr. Keys uses "testimonials" to market his services as an appraiser. Examples include: "The amount of the settlement greatly exceeded our expectations;" "The claim settled for over 10 times what the adjuster had offered;" and "The results of our association with your organization are far beyond any expectations of mine. We were in pretty bad financial straits and the settlement you negotiated for us has put us in an easy running situation."[38]

13.     Mr. Keys agreed that the client's "expectations were that [he] would get them the amount of money that it cost to make th[e] repairs."[39] He admitted that if his clients received more than their expectations, that meant they received more money than the amount of damages actually suffered.[40]

## **Mr. Keys' Fee Agreement**

14.     Defendants provided a copy of Mr. Keys' retainer agreement 18 months after it was initially requested and buried it within a document dump that was made by Defendants one business day before the appraisal panel hearing.[41]

---

4, and 5 (*id*. at pp. 49, 79, 110, and 141); *Id.* at p. 159 ($63,209.86 for the Guard House); *Id.* at p. 179 ($846,415.42 for the Spa and Lifestyle Center); *Id*. at p. 213 ($37,242.95 for the Tennis Shop).

[38] D.E. 225-1 at p. 218-221.

[39] D.E. 225-1 at p. 213 ln. 3-6.

[40] D.E. 225-1 at p. 213 ln. 7-12.

[41] D.E. 257-16 p. 6.

15. Mr. Keys' agreement provides that Keys Claims would defer payment of its fees until the action is concluded and that Keys Claims would advance costs, including for experts and consultants.[42]

16. Keys Claims advanced $446,917.08 out of its own pocket for the payment of Defendants' experts and consultants, plus $177,232.07 for its office's expenses.[43]

17. Despite purporting to provide services on an hourly basis, Mr. Keys never kept contemporaneous time records. When his time records were created after the fact, he delegated the task to "clerks" in his office who generated time entries for him based upon an "educated estimate."[44]

18. No periodic billing was ever prepared or sent to Defendants, unlike in other claims that purportedly called for payment on an hourly basis, where Mr. Keys actually prepared and submitted bills on a monthly basis.[45]

19. When Mr. Keys asked Defendants to pay their share of the Umpire's fee, Defendants' counsel, Edward Fleming, expressed that it was Defendants' understanding Mr. Keys was advancing all costs "with reimbursements to be made from claim proceeds."[46]

---

[42] D.E. 251-15.

[43] D.E. 226-10.

[44] D.E. 225-1 pp. 70.

[45] D.E. 225-1 at p. 249 ln 19 – p. 250 ln. 2; p. 253 ln. 1 - p. 256 ln. 21.

[46] D.E. 231-10 p. 2.

20.    To date, Defendants have paid nothing to Mr. Keys. Despite Mr. Keys' public history of suing clients who do not pay his bills, he has not initiated legal action against Defendants despite payment being (supposedly) more than a year overdue.[47]

## **The Document Dump**

21.    During the appraisal, the Primary Layer Carriers learned that Defendants possessed meeting minutes, condominium documents, repair records, and contracts that would assist the Appraisal Panel in determining which damages may have predated Hurricane Sally and therefore should not be included in the appraisal award. On August 17, 2021, Mr. Lewis requested this documentation. Mr. Lewis also requested "access to all Condominium Association meeting notes, from the time the building was built, through current."[48] He explained that "[t]he purpose of this request is to see the history of construction issues, maintenance, repairs, causation of issues and potential incurred costs from Hurricane Sally . . . ."[49]

22.    Mr. Keys refused to obtain or provide the requested documentation and referred Mr. Lewis to Defendants' counsel.[50]

---

[47] D.E. 225-1 p. 258 ln. 10 – p. 261 ln. 13.

[48] D.E. 257-3 p. 3.

[49] D.E. 257-3 p. 4-5.

[50] D.E. 257-3 p. 4.

LEGAL\74634010\1

23.    Over the next several months, the law firm representing the Primary Layer Carriers sent several letters to Defendants' counsel requesting the documents.[51]  Mr. Lewis also continued to request the documents.[52]

24.    Defendants did not begin to search for the requested documents until July 2022.[53]

25.    On August 3, 2022, certain Plaintiffs requested that Portofino submit to an examination under oath.[54]

26.    On August 10, 2022, Defendants refused to submit to an examination under oath.[55]

27.    No documentation was provided until shortly before the appraisal panel hearing, when Defendants' counsel first provided more than 40,000 pages of documents.  In total, between August 5, 2022 (six business days before the appraisal panel hearing) and August 12, 2022 (one business day before the appraisal panel hearing), Defendants produced more than 3,900 documents totaling tens of thousands of pages, with the bulk received between August 10 – 12, 2022.[56]

---

[51] D.E. 257-1 at pp. 2-3, p. 6, pp. 10-11, pp. 14-15, pp. 22-24, D.E. 257-16.

[52] D.E. 247-1 p. 463 ln. 1-3.

[53] D.E. 231-1 at p. 76 ln. 3 - p. 85 ln. 11; D.E. 257-27; D.E. 257-28; D.E. 257-29.

[54] D.E. 257-1 p. 23.

[55] Ex. 5 - 8/10/2022 letter.

[56] D.E. 257-5 ¶8; D.E. 257-1 p. 26-34; D.E. 247-1 at p. 189 ln. 3-11, p. 207 ln. 9 – p. 208 ln. 1, p. 220 ln. 19 – p. 221 ln. 7.

28.    The Umpire refused to postpone the appraisal hearing, notwithstanding the delayed document production.[57]  Mr. Lewis participated in the hearing under protest.[58]

29.    Included in the last-minute production were documents reflecting that, before Hurricane Sally, one of the Towers had obtained a quote to "protect the windows from further damage caused by the elements (etching)."[59]  This is particularly relevant because Mr. Keys' fenestrations expert, Paul Beers of GCI, presented to the Umpire that the windows and doors needed to be replaced, in part, due to scratches on the glass.[60]

30.    The document production was also notable for what it did *not* contain. Defendants' maintenance director, Dmitri Krivosheyev, testified that he collected all of the roofing maintenance records for the properties and provided those to Defendants' counsel for "privilege review."[61]  The last-minute document dump did not contain any roofing-related documents. A folder entitled "Bayshore Roofing"[62] included in the document dump was conspicuously empty.  Defendants' counsel was

---

[57] D.E. 257-3 pp. 7-8; D.E. 257-3 p. 17.

[58] D.E. 257-3 p. 15.

[59] D.E. 257-4 p. 16.

[60] D.E. 247-1 at p. 196 ln. 19 – p. 198 ln. 2.

[61] D.E. 235-1 at p. 89 ln. 1 – p. 90 ln. 20.

[62] Bayshore Roofing is a contractor that Defendants have regularly used for roof maintenance work. D.E. 235-1 at p. 72 ln. 14-21.

notified of this omission in an August 16, 2022 letter.[63]  The documents have never been provided.

31.    Further, Mr. Lewis specifically requested materials relating to the history of repairs at Portofino.[64]  The property's fenestrations were wet sealed and reglazed after Hurricanes Ivan and Dennis in 2006.[65] According to Mr. Krivosheyev, after those repairs were performed, those fenestrations did not leak again until Hurricane Sally, fourteen years later.[66]

32.    Mr. Lewis proposed wet sealing and reglazing fenestrations that leaked during Sally and requested information to evaluate the effectiveness of that repair protocol.[67]

33.    Defendants had materials associated with prior repairs that clearly demonstrate that wet sealing and reglazing repairs were not just effective, but highly successful[68] and, of course, significantly less expensive than removing and replacing all fenestrations.[69]

---

[63] D.E. 257-16 p. 4.

[64] *See, e.g.,* D.E. 257-3 p. 3.

[65] D.E. 235-1 at p. 42 ln. 2-13; D.E. 257-17. Sealing and glazing windows is a repair method that eliminates water intrusion by repairing the seals around the edges of the glass.

[66] D.E. 235-1 at p. 50 ln. 13-19; D.E. 257-32 at ¶12.

[67] D.E. 257-17 at ¶4.

[68] D.E. 235-1 at p. 43 ln. 2 – p. 50 ln. 19; D.E. 257-32.

[69] D.E. 257-17 ¶5.

LEGAL\74634010\1

34.    Tim Rothring of Keys Claims asked Defendants for these documents on July 15, 2022.[70]

35.    Defendants soon thereafter provided these documents directly to Keys Claims.[71]

36.    Defendants' representatives withheld those materials from Mr. Lewis.[72]

## The Keys Claim Submission

37.    On July 11, 2022, Keys Claims submitted their "estimates for the above referenced appraisal."[73]

38.    On August 2, 2022, Keys Claims submitted amended estimates and an amended Statement of Loss, increasing the claimed loss to $233,030,601.80.[74]

39.    Of the $233,030,601.80 total, $216,645,159.39 was comprised of the LJB Estimates.[75]

40.    The Keys Claims Statement of Loss included line items described as "Repairs as Per LJB Restoration Estimate" for each tower.[76]  The LJB Estimates were incorporated in full into the Statement of Loss.

---

[70] D.E. 257-28 p. 3.

[71] D.E. 231-1 at p. 81 ln. 21 – p. 85 ln. 11; D.E. 257-29; D.E. 235-1 at p. 82 ln. 7 – p. 86 ln. 6, 89 ln. 20 – p. 90 ln. 20; D.E. 257-33; D.E. 257-17.

[72] D.E. 257-17 at ¶6.

[73] D.E. 251-26.

[74] D.E. 251-28.

[75] D.E. 251-29.

[76] D.E. 251-29.

LEGAL\74634010\1

41.    Keys Claims and Mr. McCallister by their own admission, submitted costs to the appraisal panel that were wildly inflated, by the use of a linear method of estimating that was "not [a] methodology that would be selected by a thinking person,"[77] and one that Mr. McCallister admitted effectively inflates the estimates.[78]

42.    The linear method calculates each trade group individually, with general conditions added specifically to each trade group, instead of applying general conditions across multiple trade groups.  For example, instead of estimating the period of restoration needed to complete a project as a whole and then determining the number of project managers to oversee the entire project, the linear method of estimating adds project management to each trade group, artificially inflating the project management cost and not accounting for any overlap in the general conditions.[79]  The effect of utilizing the linear method of estimating in an appraisal is that it grossly and artificially inflates the cost of repair, leading to a higher appraisal award.[80]

43.    Mr. McCallister's estimates revealed the following examples of how the linear method of estimating artificially inflated the repair costs:

---

[77] D.E. 230-1 at p. 47 ln. 3 – p. 48 ln. 8.

[78] D.E. 230-1 at p. 42 ln. 13 – p. 43 ln. 7.

[79] Ex. 6 - Klein report p.11.

[80] D.E. 247-1 at p. 451 ln. 13 – p. 452 ln. 15.

LEGAL\74634010\1

- Mr. Keys and his experts claimed in their presentation at the appraisal panel hearings the need for a separate crane for each trade at a condominium building, rather than allowing for the same crane to be used by various contractors for roof repair and repairs of the windows and doors.[81] In fact, the LJB Estimates and Statements of Loss called for the assembly and disassembly of a 600-ton crane 50 times (10 times per tower).[82]

- The LJB Estimates claimed 410 months of temporary toilets, amounting to two temporary toilets per building for each of the five condominium buildings for 17 years.[83]

- The LJB Estimates include project supervision amounting to 40 hours of supervision per week for nearly three decades.[84]

- The LJB Estimates included $51,758,382.08 to replace the roofs, $39,816,993.63 (77%) of which were support costs that could have been economized if not for the linear method of estimating. By comparison, Will Klein, an estimating expert Plaintiffs retained in this case to review the Keys Claim submission, obtained a "can-do" estimate to complete the roof replacements for $13,623,192.09.[85]

---

[81] D.E. 257-5 at ¶ 19.

[82] Ex. 6 - Klein report p.19.

[83] D.E. 257-5 at ¶ 20.

[84] D.E. 257-5 at ¶ 21.

[85] Ex. 6 - Klein report p.6.

44.     Mr. Keys represented to the Appraisal Panel that the $233 million claim submission was the cost to repair damages from Hurricane Sally.  Specifically, on July 11, 2022, Keys Claims sent an email to the Umpire submitting their "estimates for the above referenced appraisal."[86]  In response to an inquiry from Mr. Lewis about Mr. Keys' "position on total loss and damage values," Mr. Keys explained in a July 21, 2022 email that the estimates submitted were the "estimate[s] of damages for all towers."[87]  The Keys Claims Statement of Loss included line items for "Repairs as Per LJB Restoration Estimate" for each tower.[88]

45.     Kevin Bryant, Mr. Lewis' costing expert, testified that Mr. McCallister never represented to him that his estimates were an "a la carte menu," and he understood that the $217 million LJB estimates were Defendants' claim presentation for damages resulting from Hurricane Sally.[89]

46.     Mr. Lewis testified that in his 40-year career as a building consultant, he has never seen a property owner actually pay for the construction or reconstruction of a property based upon the linear method because "it isn't good for the owner of the building and it isn't good for the contractor because all it does is escalate the costs to a point to where it's undoable."  He has seen the linear method

---

[86] D.E. 251-26.

[87] D.E. 251-30.

[88] D.E. 251-29.

[89] D.E. 228-3 p. 89 ln. 7 – p. 90 ln. 1.

LEGAL\74634010\1

used to generate the highest possible claim figures "many times" by "individuals who don't either know what they're doing or [who] have a goal of not doing it the least costly basis."[90]

### The Appraisal Costing Meeting

47.     Following the appraisal panel hearings, the appraisal panel conducted a follow-up "costing meeting" where each side's estimator presented pricing and estimating considerations.  This meeting with the Umpire occurred on October 5, 2022.[91]  Mr. McCallister attended the meeting for Keys Claims and Kevin Bryant attended for Lewis Claims.

48.     At this meeting, Mr. Bryant specifically identified all the duplicative and hyper-inflated costs and line items contained in the LJB Estimates.[92]  The day after the costing meeting, Mr. Bryant typed a memo containing his notes regarding all of the discussions that took place.  That memo reflects that Mr. McCallister agreed that his estimates contained numerous duplicative and inflated components and that he agreed to revise those estimates.[93]  Mr. McCallister never submitted

---

[90] D.E. 247-1 at p. 450 ln 4 – p. 451 ln. 17.

[91] D.E. 247-1 at p. 67 ln 16 – p. 68 ln 8.

[92] D.E. 247-1 at p. 442 ln. 13 – p. 448 ln. 3.

[93] D.E. 257-23.

revised estimates, and the appraisal awards that Defendants are attempting to enforce in this action were based upon these admittedly inflated and duplicative estimates.[94]

49.    Mr. Lewis testified that Keys Claims and Mr. McCallister failed to rewrite the general conditions for the project after saying they would and that Keys Claims knowingly submitted inflated estimates for consideration. [95]  When asked whether he is accusing Mr. Keys or Defendants of fraud, Mr. Lewis testified that, as a building consultant, he was not qualified to determine whether something constitutes fraud or collusion.[96]

50.    Plaintiffs testified in their depositions that the LJB Estimates were fraudulent.[97]  Plaintiffs also testified that Defendants' attempt to benefit from Mr. Keys' fraudulent actions demonstrates fraud on the part of Defendants themselves.[98]

**Plaintiffs' Declaratory Judgment Action and the Issuance of the Awards**

51.    Before any appraisal awards were issued, on January 12, 2023, Plaintiffs filed a Complaint for Declaratory Judgment [D.E. 1].  The Complaint included a count seeking a declaration that Defendants voided coverage by engaging in fraud.

---

[94] D.E. 247-1 at p. 442 ln. 13 – p. 448 ln. 3.

[95] D.E. 247-1 at p. 446 ln. 11 – p. 448 ln. 3.

[96] D.E. 247-1 at p. 412 ln. 24 – 415 ln. 24.

[97] D.E. 242-1 at p. 241 ln. 6-9.

[98] *See, e.g.*, D.E. 233-1 at p. 153 ln. 12 – 154 ln. 6.

52.    The Appraisal Panel issued an appraisal award in seven parts over five months (collectively, the "Appraisal Award").  The first was issued on February 15, 2023, about a month after this action was filed, and the final of the seven parts of the Appraisal Award was issued on July 16, 2023, totaling approximately $187 million.

## Misrepresentation and Fraud Provisions

53.    The Evanston Policy contains a Concealment, Misrepresentation or Fraud provision, stating that "[t]his insurance is void in case of any fraud by you as it relates to this insurance at any time. It is also void if you or any other insured intentionally conceal or misrepresent a material fact concerning: a. This insurance; b. Any Covered Property; c. Your interest in any Covered Property; or d. A claim under this insurance."[99]  The Aspen, Maxum, and Homeland Policies contain similar provisions.[100]  Additionally, the James River Policy states that it does not "provide broader coverage than that provided by the underlying policy(ies)."[101]

54.    Each of the Plaintiffs' Policies contains appraisal provisions requiring both parties to select an appraiser that is "competent and disinterested," "competent and impartial," or "disinterested, competent, and impartial."[102]

---

[99] D.E. 222-6 p. 46.

[100] D.E. 222-4 p. 52; D.E. 222-10 p. 10; D.E. 222-11 p. 11.

[101] D.E. 222-8 p. 45.

[102] *See, e.g.*, p. 222-1 p. 35; D.E. 222-11 p. 10; D.E. 222-9 p. 47.

LEGAL\74634010\1

## IV.    <u>STANDARD OF REVIEW</u>

### A. <u>Summary Judgment Standard</u>

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1335 (11th Cir. 2024).  "A fact is 'material' if it could affect the outcome of the suit under the governing law." *Id.*  "Accordingly, a genuine dispute of material fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  The movant "has the burden of demonstrating that there are no genuine issues of material fact." *Id.* "In determining whether the movant has met this burden, [the Court] must view the evidence in the light most favorable to the non-moving party" and "also must draw all reasonable inferences in the non-movant's favor." *Id.*

Where, as here, the non-movant will bear the burden of proof at trial on an issue, the moving party must either (1) "show" or "point out to the district court that there is an absence of evidence to support the non-moving party's case," or (2) "support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and

the court need not consider what, if any, showing the non-movant has made." *Id.* at 1116.

### B. <u>Applicable Law on Insurance Fraud</u>

A policy provision voiding coverage if an insured makes a material misrepresentation of fact is valid and enforceable in Florida. *Svetlanovich v. State Farm Fla. Ins. Co.*, 291 So. 3d 1261, 1265 (Fla. 2d DCA 2020). "A misrepresentation is material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented." *In re Sandell*, No. 8:00BL6417KRM, 2005 WL 1429746, at *2 (Bankr. M.D. Fla. June 9, 2005). An example of a material misrepresentation is "exaggerating the extent of the loss." *See Alvarez v. State Farm Fla. Ins. Co.*, 305 So. 3d 5, 7 (Fla. 3d DCA 2019). Notably, the "materiality of a misrepresentation is a question for the jury." *Anchor Prop. & Cas. Ins. Co. v. Trif*, 322 So. 3d 663, 672 (Fla. 4th DCA 2021); *see also Lopes v. Allstate Indem. Co.*, 873 So. 2d 344, 347 (Fla. 3d DCA 2004) ("The question of whether an insured has made a material misrepresentation is a question for the jury to determine."); *Gracia v. Sec. First Ins. Co.*, 347 So. 3d 479, 485 n.4 (Fla. 5th DCA 2022) ("As to the materiality of Gracia's statements, that, too, is generally a fact question reserved for the jury's resolution."); *See also Biscayne Cove Condominium Ass'n, Inc. v. QBE Ins. Corp.,* 951 F. Supp. 2d 1292, 1305-06 (S.D. Fla. 2013) (denying summary judgment where "genuine issue of material fact"

existed as to whether insured's claim involved "intentional inflation or exaggeration" of damage, which, if proven, would void coverage); *200 Leslie Condo. Ass'n, Inc. v. QBE Ins. Corp.*, No. 10-61984-CIV, 2013 WL 150611, at *4 (S.D. Fla. Jan. 14, 2013) (denying summary judgment on fraud and concealment defense because testimony that insured's claim was inflated created issue of fact); *Cypress Chase Condo. Ass'n A v. QBE Ins. Corp.*, No. 10-61987-CIV, 2013 WL 1191413, at *7 (S.D. Fla. Mar. 22, 2013) (denying summary judgment because there was an issue of fact over whether the insured attempted to defraud the insurer, where an estimate was based on an improper extrapolation of damages and included windows and sliding glass doors that were not damaged).

It is well settled that, whether an insurance fraud claim is based on an express policy provision or common law, an insurer need not establish justifiable reliance. *State Farm Mut. Auto. Ins. Co. v. Physicians Inj. Care Ctr., Inc*., No. 6:06-CV-1757-ORL-GJK, 2009 WL 10671942, at *8 (M.D. Fla. Oct. 15, 2009); *see also Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 923 (11th Cir. 1998) ("Moreover, the law of this Circuit is clear that this court will not require that an insurer demonstrate that it relied on the insured's misrepresentations when asserting a policy defense based on fraud; that a material fraud was perpetrated by an insured in pursuing an insurance claim is sufficient."); *Svetlanovich*, 291 So. 3d at 1265 ("When the insurer is acting to enforce a contract provision that voids coverage

based on willful post loss misrepresentations concerning material facts, the insurer need not demonstrate either reliance or prejudice.").

## V.   <u>Response to Defendants' Arguments</u>

### A.   <u>The $233 Million Keys Claim Submission Was the Fraudulent Statement</u>

Defendants repeatedly state that Plaintiffs are unable to identify any fraudulent statement.  The "statement" that is the subject of Plaintiffs' fraud claim is the $233 million Keys Claim Submission.  Defendants have adopted this statement as they attempt to collect the $187 million Appraisal Award obtained based on the fraudulent claim submission.

Mr. McCallister admitted that he submitted an "a la carte" pricing list, rather than an actual practical estimate for performing Hurricane Sally repairs.  Mr. Keys admitted that the figures as stated in Mr. McCallister's estimate would have been redundant if awarded.[103]  But that is not what Mr. Keys represented to the Appraisal Panel.  Keys Claims represented to the appraisal panel that the estimates they submitted were "estimates for the above referenced appraisal."[104]  When directly asked about his "position on total loss and damage values," Mr. Keys explained in a July 21, 2022 email that the estimates submitted were the "estimate[s] of damages

---

[103] D.E. 225-1 at p. 340 ln. 19 – p. 342 ln. 20.

[104] D.E. 251-26.

for all towers."[105]  At no point, prior to the depositions of Mr. McCallister and Mr. Keys, did they represent to the panel that their estimates were an a la carte menu for the Umpire to use as a "starting point."[106]

Incredibly, Defendants characterize the Keys Claims submission as simply a difference of opinion, stating that mere unintentional overvaluation cannot be fraud. What Mr. Keys and Mr. McCallister submitted to the Appraisal Panel was not an accident.  It was not an "opinion" because Mr. McCallister expressly admitted that utilizing the linear method of estimating artificially inflates the amount of the claim:

> Q. And you would agree with me that by doing it that way, meaning by each trade separately and then by each tower separately, ***it has the effect of increasing this number*** that ended up being $217 million; correct?
> A. ***Oh, absolutely***... [107]

Further, Defendants suggest that the "linear method" of estimating is simply a method of estimating repair costs.  Defendants' reliance on *Cincinnati Ins. Co. v. Cannon Ranch Partners, Inc*., 2 So.3d 140 (Fla. 2d DCA 2014), for the proposition that the method of repair is for the appraisal panel to decide, is misplaced.  The linear method of estimating is used for the specific purpose of inflating the estimate.  It is not a real-world estimate of repair, as no reasonable person (or "thinking person"

---

[105] D.E. 251-30.

[106] D.E. 228-3 p. 89 ln. 7 – p. 90 ln. 1.

[107] D.E. 230-1 at p. 42 ln. 13 – p. 43 ln. 7.

according to Mr. McCallister) would ever utilize this manner of estimating when repairing a building.

The suggestion that the gross overestimation of Defendants' damages was just an accident plainly ignores Mr. Keys' and Mr. McCallister's admissions.

### B. Mr. Keys' Partiality Creates a Question of Fact as to Whether He Was Under the Control of Defendants

Defendants erroneously rely on *Norwich Union Fire Ins. Soc. v. Cohn*, 68 F.2d 42, 44 (10th Cir. 1933) for the proposition that "while the appraisers are appointed by the parties, they are not subject to the control of the parties." In doing so, Defendants overlook that this general rule in *Norwich* has an exception. As explained in *Yogeshwar, Inc. v. Soc'y Ins.*, No. C23-1005-LTS-KEM, 2024 WL 3337487, at *19 (N.D. Iowa July 9, 2024), "[c]ourts have recognized an exception to [the *Norwich* rule] when an appraiser does not act in a disinterested manner and collaborates with the insurer or otherwise conducts himself or herself as an agent for the insurer." *See also Niagara Fire Ins. Co. v. Bishop*, 154 Ill. 9, 20, 39 N.E. 1102, 1106 (1894) ("But while it is true that an arbitrator or appraiser is not…the agent of the party appointing him, simply by reason of the fact of his appointment, yet an arbitrator or appraiser may act in such a partial manner, and so manifestly in the interest of the party appointing him, that it may become a question of fact….whether he conducts himself as an agent to such an extent that the party appointing him shall be held responsible for his acts.").

To be clear, Plaintiffs do not suggest that an appraiser is always an agent of the party who retained the appraiser. Appraisers are not supposed to be agents of the parties who appoint them and, if the process works as intended, both appraisers would be disinterested, independent, and competent. In such a case, the actions of an appraiser would not be imputable to the party that hired the appraiser. But where, as here, the appraiser has proven himself to be biased and has corrupted the process to his and the insureds' benefit, the general rule set forth in *Norwich* does not apply.

Plaintiffs have filed a separate Motion for Summary Judgment as to Mr. Keys' partiality and incompetence [D.E. 266]. Those same issues that preclude a finding that Mr. Keys was a disinterested appraiser make Mr. Keys an agent of Defendants here. Rather than simply reaching the objective truth of what the damages are, Mr. Keys prides himself on getting his clients more than merely the amounts they are owed under their policy, which is contrary to the purpose of an independent appraisal performed by disinterested appraisers.

Keys Claims also withheld documents relating to the wet sealing and reglazing performed after Hurricanes Dennis and Ivan, a much less expensive repair than complete replacement of windows and doors with a history of success. Keys Claims did so to increase the Appraisal Award amount. Further, Defendants' fee agreement with Keys Claims, which defers payment until Defendants are paid by

Plaintiffs, all the while requiring Mr. Keys to front almost $500,000, suggests that Mr. Keys is not disinterested and independent.

Moreover, if Defendants are correct that an appraiser can *never* be found to be the agent of the party who hired the appraiser, then no one could ever be held responsible for fraudulent conduct in an appraisal. This is an absurd result. Insureds cannot retain an appraiser such as Mr. Keys, who is notorious in the industry for artificially inflating claims, and then disclaim responsibility for those wrongful acts.[108] The situation here falls squarely within the exception to *Norwich* as acknowledged by *Yogeshwar* and *Niagara*.

## C. Defendants Adopted the Fraud

Even if Defendants are correct that Mr. Keys was not acting as their agent, which Plaintiffs do not concede, it is undisputed that Defendants, who now plainly know of the fraudulent conduct, are nonetheless opposing Defendants' efforts to vacate the Appraisal Award (obtained by fraudulent conduct). Further, by virtue of their breach of contract counterclaims, Defendants seek to enforce the award against Plaintiffs. Thus, even accepting Defendants' statements that they were "hands off,"

---

[108] As a corporate representative for one of the Plaintiffs testified, "If I'm aware that [my appraiser is] doing something so unbelievably untoward and unseemly, yeah, I have a duty to jump in. . . . I can't just build Frankenstein and let him walk into the village and say, I have no responsibility for what he does, okay. I can't do that and neither can the policyholder." D.E. 233-1 at p. 93 ln. 13 – 22.

LEGAL\74634010\1

Defendants are nonetheless adopting the fraud by seeking to recover the award obtained by fraudulent means.

It is a long-established point of law that

[H]e who seeks to avail himself of the advantages of the act of another, after knowledge of its fraudulent character, must be held to adopt the fraud, although at the time of the act he was ignorant of it. The doctrine is elementary, and prevails at law as well as in equity, that a person, though innocent himself, cannot retain an advantage obtained by the fraud of another, in the absence of some consideration moving from himself.

*Cont'l Ins. Co. v. Ins. Co. of Pa.*, 51 F. 884, 887 (2d Cir. 1892); *see also Newco Land Co. v. Martin*, 213 S.W.2d 504, 512 (Mo. 1948) ("The rule is general that if one assumes to do an act which will be for the benefit of another commits a fraud in so doing, and the person to whose benefit the fraud will inure seeks after knowledge of the fraud to avail himself of that act, and to retain the benefit of it, he must be held to adopt the whole act, fraud and all, and to be chargeable with the knowledge of it.") Further, "when an insured relies on or adopts an estimate containing material false statements to support his or her claim, the insured is bound by the estimate and cannot avoid application of the concealment or fraud provision simply because he or she did not prepare the estimate." *Mezadieu v. SafePoint Ins. Co.*, 315 So. 3d 26, 29 (Fla. 4th DCA 2021).

It is without dispute that Defendants seek to benefit from Mr. Keys' fraudulent acts. Accordingly, Defendants are chargeable with knowledge of the fraudulent

estimate and cannot seek to avoid the implications of such by alleging that the estimates were prepared by someone who was not their agent. Even if Defendants were truly not aware of the $233 million claim submission as they assert, they certainly are aware of it now. They were aware of it no later than the time this action was filed, when they opposed Plaintiffs' motion to vacate the Appraisal Award, and when they filed their breach of contract counterclaims against Plaintiffs. Defendants have, without question, adopted the fraud.[109]

## D. **Defendants Are Not Estopped From Bringing Their Fraud Claim**

Finally, Defendants argue that Plaintiffs are estopped from bringing their fraud claim because Plaintiffs allegedly waited too long to inform Defendants of it. Defendants do not cite a single case in which a court excused fraudulent conduct because of a purported delay in notifying the insured of it. Regardless, even if that

---

[109] As Aspen's corporate representative testified:

> Q. And just so that we get down to this, you don't have any evidence that the -- Portofino made any fraudulent representations in this process, do you . . . ?

> A. Well, see, your [sic] parsing it to the point that it means nothing. They're aware of what Keys was doing on their behalf. We're here deposing me today because, apparently, they are standing by a quarter-of-a-billion-dollar-submission. So again, you … can't send a hitman out and say you had nothing to do with the hit, okay? They're involved now. If they didn't know before – and they're supposed to know -- they should have some sense of what's going on. They should also have some sense of who they're hiring to do the job, because, you know, Mr. Keys was pretty well-known in the business to maybe not be the straightest shooter in the world. But now at this point, there is just no question that they know what happened and they're – they're going to try to profit by it. So now it washes onto my policyholder.

were the law (it is not), Defendants' "facts" supporting this argument are based on nothing more than conjecture.

First, it is true that Mr. Lewis updated certain Plaintiffs on the status of the appraisal. However, there is no evidence that the updates provided by Mr. Lewis contained the level of detail that would allow Plaintiffs to truly understand the nature and extent of the fraudulent conduct. Plaintiffs in fact did not understand the extent of the fraud until much later. Accordingly, the dates on which Mr. Lewis may have become aware of certain facts cannot be imputed to Plaintiffs. As the Motion concedes, the criticisms of the LJB estimates were presented to the Umpire at or before closing arguments in the appraisal panel hearings on November 29, 2022, after LJB and Mr. Keys failed to amend their admittedly inflated estimates as promised. This action was filed on January 13, 2023. A period of fewer than two months (with intervening holidays) is certainly reasonable for 16 insurers to collectively decide to prepare and file a lawsuit against their insureds.

## VI.    <u>CONCLUSION</u>

Whether Defendants' Policies are void for fraudulent conduct is rife with issues of fact for a jury to determine. For the reasons set forth above, the Court should deny Defendants' Motion.

## CERTIFICATE OF WORD COUNT

Pursuant to N.D. Fla. Local Rule 7.1(F), the undersigned certifies that this Opposition contains 8,000 words, excluding case style, signature block, and certificate of service.

Respectfully submitted,

*/s/ John David Dickenson*
John David Dickenson
Florida Bar No. 575801
jdickenson@cozen.com
Alexandra J. Schultz
Florida Bar No. 122100
aschultz@cozen.com

**COZEN O'CONNOR**
1801 N. Military Trail, Suite 200
Boca Raton, FL  33431
Telephone:  (561) 515-5250
Facsimile:  (561) 515-5230
*Counsel for Plaintiffs Westchester Surplus Lines Insurance Company, Arch Specialty Insurance Company, AXIS Surplus Insurance Company, Evanston Insurance Company, Aspen Specialty Insurance Company, and Maxum Indemnity Company*

*/s/ Wayne D. Taylor*
Wayne D. Taylor, Esq.
Georgia Bar No. 701275
*Admitted in USDC NDFL*
wtaylor@mfllaw.com
**MOZLEY, FINLAYSON & LOGGINS LLP**
1050 Crown Pointe Parkway, Suite 1500
Atlanta, GA  30338
Telephone:  (404) 256-0700 (Telephone)

Facsimile:  (404) 250-9355 (Facsimile)
wtaylor@mfllaw.com

-and-

Elizabeth D. Salinas, Esq.
Florida Bar No. 113394
esalinas@mfllaw.com
**MOZLEY, FINLAYSON & LOGGINS LLP**
4767 New Broad Street
Orlando, FL  32814
Telephone:  (404) 256-0700

*Counsel for Plaintiff Landmark American Insurance Company*


  /s/ David C. Bibb
David C. Bibb (Fla. Bar No. 190330)
Brian P. Henry, Esq. (Fla. Bar No. 0089069)
**ROLFES HENRY CO., LPA**
3165 McCrory Pl., Suite 174
Orlando, FL  32803
Telephone:  (407) 284-4990
Email: dbibb@rolfeshenry.com
        rkitchens@rolfeshenry.com
        bhenry@rolfeshenry.com
        kmcclintock@rolfeshenry.com

*Counsel for Plaintiffs Independent Specialty Insurance Company, Interstate Fire & Casualty Company, and Lloyd's of London*

  /s/ Jack R. Reiter
Jack R. Reiter, Esq.
Florida Bar No.: 0028304
jack.reiter@gray-robinson.com
Jordan S. Kosches, Esq.
Florida Bar No.: 49881

jordan.kosches@gray-robinson.com
**GrayRobinson, P.A.**
333 SE 2nd Avenue, Suite 3200
Miami, FL  33131
Telephone:  (305) 416-6880
Facsimile:  (305) 416-6887

*Counsel for Plaintiff Colony Insurance Co.*

/s/ Aaron Konstam
**ERIC A. HILLER**
Florida Bar No. 27920
eric.hiller@kennedyslaw.com
**AARON KONSTAM**
Florida Bar No. 104765
aaron.konstam@kennedyslaw.com
**Kennedys CMK LLP**
1395 Brickell Avenue, Suite 610
Miami, FL  33131
Telephone:  (305) 371-1111

*Counsel for Plaintiff James River
Insurance Company*

*/s/ Heidi Hudson Raschke*
Heidi Hudson Raschke
Florida Bar No. 61183
hraschke@carltonfields.com
Madison E. Wahler
Florida Bar No. 1019015
mwahler@carltonfields.com
**CARLTON FIELDS, P.A.**
4221 W. Boy Scout Blvd, Suite 1000
Tampa, Florida 33607
Telephone: 813-223-7000
Facsimile: 813-229-4133

-and-

Amanda D. Proctor (*admitted pro hac vice*)
Georgia Bar No. 776848

**CARLTON FIELDS, P.A.**
1201 West Peachtree Street
Suite 3000
Atlanta, Georgia 30309
Telephone: 404-815-3400
Facsimile: 404-815-3415
aproctor@carltonfields.com

*Counsel for Plaintiff Homeland Insurance
Company of New York*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 16, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will automatically serve all counsel of record.

*/s/ John David Dickenson, Esq.*
John David Dickenson, Esquire

LEGAL\74634010\1