## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY, et al.,

     Plaintiffs,

v.

PORTOFINO MASTER
HOMEOWNERS
ASSOCIATION, INC., a Florida not-for-
profit Corporation, et al.,

     Defendants.

Case No. 3:23-cv-00453-MCR-HTC

## PLAINTIFF LANDMARK AMERICAN INSURANCE COMPANY'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING CLAIMS AND DEFENSES RELATED TO ALLEGED NON-PARTICIPATION IN APPRAISAL

Plaintiff/counterclaim defendant Landmark American Insurance Company ("Landmark"), pursuant to Federal Rule of Civil Procedure 56 and Rule 56.1 of the Local Rules of the United States District Court for the Northern District of Florida, respectfully files this response in opposition to defendants'/counterclaim plaintiffs' motion for partial summary judgment regarding claims and defenses related to alleged non-participation in appraisal [D.E. 261], respectfully showing the Court as follows:

## I.   <u>INTRODUCTION</u>

Defendants' motion concerns Landmark's allegations in count V of plaintiffs' first amended complaint. (*See* [D.E. 104] at 51-55). There, Landmark seeks a judicial declaration of its rights and obligations under the Landmark excess policy of insurance, and precisely, a ruling that Landmark is not bound by the appraisal award because

* Defendants never submitted to Landmark a written request for appraisal;

* Landmark never submitted to defendants a written request for appraisal;

* Landmark never agreed in writing to participate in an appraisal;

* Landmark was not given notice of the loss until [over a year] after the appraisal between defendants and the Primary Layer Carriers had commenced; and

* The appraisal award did not meet the requirements of the Landmark excess policy's Appraisal Clause Amendment;

and for other reasons enumerated in count V of the first amended complaint. *Id.*

Defendants' motion concerns, second, Landmark's affirmative defense numbers five and seven in Landmark's answer ([D.E. 123] at 22-25) to defendants' counterclaim. [D.E. 108]. There, Landmark alleges the appraisal award is not binding on it because defendants never invoked (in writing or otherwise) the appraisal provision in the Landmark excess policy (the "Appraisal Clause Amendment"). Landmark also never agreed (in writing or otherwise) to participate

in an appraisal under the Landmark excess policy's Appraisal Clause Amendment, and the appraisal did not comply with the requirements of the Appraisal Clause Amendment.

The Appraisal Clause Amendment in the Landmark excess policy states precisely that, to invoke appraisal, a party must request appraisal in writing, the other party must agree in writing to participate in the appraisal, and there must be a written appraisal agreement containing an appraisal protocol. Additionally, to be valid under the Landmark excess policy's Appraisal Clause Amendment, the appraisal award must include certain specified elements. None of this happened here.

Defendants instead erroneously argue that Landmark, by its actions, somehow waived its right to enforce the Landmark excess policy's Appraisal Clause Amendment and "acquiesced" to or "ratified" the appraisal. This argument is unsupported by fact and contrary to established law. Defendants' motion, therefore, should be denied.

## II.    <u>RESPONSE TO DEFENDANTS' STATEMENT OF FACTS</u>

### A.    **Defendants' Motion is Procedurally Defective**

Local Rule 56.1(B) requires a motion for summary judgment to include "a statement of facts generally in the form that would be appropriate in an appellate brief. A statement of facts must not be set out in a separate document." Defendants, in violation of this rule, "incorporate[d] by reference the Statement of Facts from

3

their Motion for Partial Summary Judgment as to Fraud/Collusion." (*See* defendants'
motion at 8). This is improper and is not in compliance with Rule 56 of the Federal
Rules of Civil Procedure. *See **United States v. Marder,*** 183 F. Supp. 3d 1231, 1235
(S.D. Fla. 2016) (the rule's "clear procedural directive is intended to reduce
confusion and prevent the Court from having to scour the record and perform time-
intensive fact searching" and is "consistent with determining the appropriateness of
summary judgment."); ***Ocean's 11 Bar & Grill, Inc. v. Indem. Ins. Corp. RRG,*** No.
11-61577-CIV, 2012 WL 2675435 at *3 (S.D. Fla. July 6, 2012) (citing to
depositions and exhibits within the body of the motion to support the facts therein is
insufficient); ***Cottingham v. Wal-Mart Stores E., LP,*** No. 20-61991-CIV, 2022 WL
2068269 at *2 (S.D. Fla. Jan. 21, 2022) (*citing **Celotex Corp. v. Catrett,*** 477 U.S.
317, 323 (1986)) ("Not only has Defendant failed to comply with the Rule, but it has
prejudiced Plaintiff's ability to discern the factual basis for Defendant's Motion.
Moreover, Defendant's failure would force the Court to scour the record to
determine the basis of Defendant's Motion. It is Defendant's responsibility, as the
moving party, to 'inform the district court of the basis for its motion . . . .'"). In light
of defendants' violation of this Court's Local Rules, Landmark requests that this
Court ignore the "facts" that defendants improperly seek to incorporate by reference
to another document.

Landmark submits the following corrections to defendants' incorrect facts as stated in their motion for summary judgment regarding Landmark's non-participation in the appraisal between defendants and the Primary Layer Carriers.

### B. Corrections to Defendants' Statements Regarding the Landmark Excess Policy and Appraisal Clause Amendment

Defendants incorrectly state that the Landmark excess policy ([D.E. 1-1] at 670-725) is a "follow form" policy. ([D.E. 261] at 8). It is not. It is a "stand alone" excess policy. *See* Argument and Citation of Authority below, in section IV B. No language in the Landmark excess policy states it "follows form" to any other insurance policy. This distinction is important, as it shows that there are *not* two separate insurance policies governing the excess coverage provided by Landmark. Rather, there is <u>one</u> Landmark excess policy, whose terms and provisions govern Landmark's and defendants' respective rights and obligations.

Defendants then state inaccurately that "the insurance contract did not provide for any rules as to how the appraisal was to be conducted other than what was provided for in the Master [Property] Policy [form]." ([D.E. 261] at 17-18). This is not true regarding the Landmark excess policy, which contains the following Appraisal Clause Amendment:

*This Endorsement Changes the Policy. Please Read It Carefully*

## APPRAISAL CLAUSE AMENDMENT
_____

This endorsement modifies insurance provided under the following:

## ALL COVERAGE PARTS

This endorsement replaces any and all provisions regarding appraisal.

If we and you disagree on the value of the property or the amount of loss, either party may request, **in writing,** an appraisal of the value of the property and/or the amount of loss. An appraisal may then take place only if the other party agrees **in writing** to participate in the appraisal process pursuant to terms of a **written agreement** between the parties. At a minimum, the **written agreement** between the parties will specify a protocol for the selection of a disinterested, competent, and impartial appraiser (who does not have a financial interest in the claim and/or appraisal award, including a contingent interest in the outcome of the claim or appraisal award), the inspection of the property by the appraisers, the selection of an umpire, communications between and among the appraisers and umpire, specific itemization of each item in dispute, and an award form. If the parties cannot agree on a **written agreement** specifying the protocol, an appraisal will not take place.

If appraisal moves forward, the two appraisers will select an umpire, who is disinterested, competent, and impartial. . . . The appraisers will state separately the value of the property and amount of loss. Specific itemization of each item and amount in dispute is required, including, but not limited to, building-by-building, floor-by-floor, unit-by- unit, and area-by-area allocation. If the appraisers fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

([D.E. 1-1] at 716) (Emphasis added))]. As shown below, none of the requirements in the Landmark excess policy's Appraisal Clause Amendment were followed in the appraisal that defendants now seek to enforce against Landmark.

6

**C.    Corrections to Defendants' Statements Regarding the Appraisal**

**1.    Defendants Never Requested Appraisal From Landmark**

Defendants state they requested appraisal from "the Market," which they unsuitably define as including Landmark. ([D.E. 261] at 19). However, the record facts, including the admissions under oath of defendants' Rule 30(b)(6) corporate representative, prove that defendants did <u>not</u> request appraisal from Landmark in writing (or otherwise).

On December 20, 2020, defendants demanded appraisal from *the Primary Layer Carriers only* under paragraph 50 of the Master Property Policy form. On that day, defendants' legal counsel, Edward P. Fleming, sent a letter addressed to *the Primary Layer Carriers only and their adjuster* - Westchester Surplus Lines Insurance, Endurance American Specialty Insurance Company, Everest Indemnity Insurance Company, AmWINS Special Risk Underwriters, and Jeff Hellman. (*See* [D.E. 241-9], at 2-3) (stating "[t]his letter is sent on behalf of the Named Insureds on those policies."). Fleming's letter specifically referenced the appraisal provision in paragraph 50 of the Master Property Policy form. (*Id.* at 3). Fleming's letter did *not* reference Landmark or the Landmark excess policy's Appraisal Clause Amendment.

Defendants' Rule 30(b)(6) corporate representative Kimberly Lamar even admitted under oath that Fleming's letter of December 20, 2020, was <u>not</u> addressed

to Landmark or any of the other excess carriers. ([D.E. 241-2] at 3, 88:6-25). Defendants did <u>not</u> later send a copy of Fleming's letter to Landmark, its agent, or its representative. ([D.E. 241-1], ¶ 8). Thus, in 2020 and 2021, Landmark did <u>not</u> even know about defendants' claim or the ongoing appraisal between defendants and the Primary Layer Carriers. (*Id.* ¶ 4).

Defendants admit that <u>a subsequent letter from Fleming to Landmark dated June 24, 2022</u>, sent long *after* the appraisal between defendants and the Primary Layer Carriers had commenced,[1] requesting a certified copy of any Landmark policy that might provide coverage for Hurricane Sally damage ([D.E. 241-4]) was the <u>first correspondence that defendants ever sent directly to Landmark</u>. ([D.E. 241-2] at 7, 224:20-226:25).

Defendants also admit that Flemings' December 11, 2020, letter to *only the Primary Layer Carriers* demanding appraisal [under the appraisal provision in the Master Property Policy form] was the only appraisal demand that defendants made to *any* insurer. ([D.E. 241-2] at 4, 153:14-19). Defendants agree that "<u>there is no written request from Portofino [defendants] asking Landmark to stipulate to appraisal</u>." (*Id.* at 10, 228:4-8),  and defendants clearly did *not* submit a written

---

[1] Defendants' Rule 30(b)(6) corporate representative Kimberly Lamar testified that the appraisal had been underway for well over a year before Landmark received notice of defendants' loss. ([D.E. 241-2] at 14, 293:14-20).

request to Landmark for appraisal, which was required by the Landmark excess policy's Appraisal Clause Amendment.

### 2. Landmark Did Not Request or Agree to Appraisal

Defendants, ignoring these inconvenient facts, rely instead upon an April 5, 2021, letter from the Primary Layer Carriers' counsel, J.D. Dickenson, to defendants. ([D.E. 246-5]). Defendants misleadingly state that in this letter, "the Market Insurers" allegedly demanded appraisal from defendants, and "the Market Insurers" participated in the appraisal. ([D.E. 261] at 9-10). In fact, Dickenson's letter begins by specifically referencing the insurance policies issued by *the Primary Layer Carriers only* and explicitly states in the first paragraph that Dickenson represents *the Primary Layer Carriers only.* The letter does not refer to Landmark or the Landmark excess policy.

On December 21, 2021, the Primary Layer Carriers agreed in writing to submit defendants' claim to appraisal. ([D.E. 241-10]). All of this took place *before* Landmark first learned, on March 18, 2022, of the loss and the ongoing appraisal. ([D.E. 241-1] ¶ 4). By this time, the appraisal between defendants and the Primary Layer Carriers had been ongoing for more than one year. ([D.E. 241-2] at 14, 293:14-20). Landmark was not involved in requesting or commencing the appraisal. This process was initiated and conducted without Landmark's knowledge, involvement, or consent.

Defendants' Rule 30(b)(6) corporate representative Kimberly Lamar agreed that <u>Landmark never requested appraisal of the Hurricane Sally loss and never agreed to submit to appraisal</u>. ([D.E. 241-2] at 10-12, 228:10-25; 229:1-3, 22-25; 230:1-6). Defendants cannot escape these admissions of its Rule 30(b)(6) corporate representative. These admissions and the other evidence (below) prove that **Landmark never submitted a written request for appraisal to defendants, Landmark never requested appraisal, and Landmark never agreed in writing to appraisal.**

### D.    Corrections to Defendants' Statements Regarding Agency

Defendants inaccurately state that J.D. Dickenson of the law firm of Cozen O'Conner, which represented the Primary Layer Carriers, purportedly acted as Landmark's agent when he sent his letter dated April 5, 2021, "demanding" defendants submit to appraisal. (*See* [D.E. 261] at 20) (stating that "[t]he appraisal of the entire loss demanded by Dickenson in his April 5 letter involved every Market Insurer in the tower of insurance."). On the contrary, Dickenson, in his letter of April 5, 2021, explicitly introduced himself as counsel for *the Primary Layer Carriers only* – Westchester Surplus Lines Insurance Company, Endurance American Specialty Insurance Company, Everest Indemnity Insurance Company, and The Princeton Excess and Surplus Lines Insurance Company. ([Doc. 246-5]).

Defendants, throughout their motion, refer to Dickenson, his colleague Evan Holober, and their law firm Cozen O'Conner as counsel for "the Market insurers" ([D.E. 261] at 20-21), which defendants define to include Landmark. Yet, in none of the evidence cited by defendants does *Landmark* refer to itself as one of "the Market Insurers" involved in the appraisal between defendants and the Primary Layer Carriers. Indeed, it is unrebutted that Landmark never retained Dickenson, Holober, or Cozen O'Connor as its counsel, and thus these attorneys and their law firm were not authorized to speak on Landmark's behalf. (Second Affidavit of Christine McHugh, ¶ 3, Exhibit 1 to this response).

Defendants state that "the Market" designated Patrick Lewis as "the Market's" appraiser. ([Doc. 261] at 23-24). This is incorrect as to Landmark, which never designated Lewis or anyone as its appraiser. (Second Aff. McHugh ¶ 7). Further, defendants' statement is inconsistent with their Rule 30(b)(6) corporate representative Kimberly Lamar's admission under oath that, by the time Landmark first learned of the damage [on March 18, 2022], the appraisal [with Lewis already having been designated by the Primary Layer Carriers as their appraiser] had been ongoing for over a year. ([D.E. 241-2] at 14, 293:9-16). It, therefore, is clear that the Primary Layer Carriers designated Lewis as their appraiser long *before* Landmark even became aware of defendants' loss, and without any involvement on the part of Landmark.

Defendants state that Lewis "deemed himself the appraiser for all 16 insurers and billed accordingly." ([Doc. 261] at 25). Lewis allegedly said that he was being paid for his services as an appraiser for all the Market Insurers. *Id.* Whatever Lewis may have "deemed" or represented himself to be is not binding upon Landmark, which did not retain Lewis as its appraiser for any appraisal process. (Second Aff. McHugh, ¶ 7). Moreover, there is no evidence that Lewis specifically represented himself as *Landmark's* appraiser.

Contrary to defendants' false assertions on pages 29 and 30 of their motion, Landmark, in its response to defendants' Civil Remedy Notice ([D.E. 241-8] at 8-13), did <u>not</u> represent that Lewis was Landmark's appraiser and did <u>not</u> state that Landmark was participating in the appraisal between defendants and the Primary Layer Carriers. On the contrary, Landmark, in its response to defendants' Civil Remedy Notice, stated that defendants sent "the Primary Market" – referring to the Primary Layer Carriers only – a letter "formally demanding contractual appraisal pursuant to the policies issued by the Primary Market[,]" had designated Corine Heller as appraiser, and that "[o]n December 31, 2020, the Primary Market, through counsel, responded and agreed to participate in the appraisal process." (*Id.* at 9). This language and Landmark's complete statement in its response to defendants' Civil Remedy Notice made it clear that Landmark had not agreed to appraisal and was not participating in the appraisal between defendants and the Primary Layer Carriers.

Defendants state that "the designated loss adjuster under the Master Property Policy [form], binding on all of the insurers unless modified, was Jeff Helman" ([D.E. 261] at 11), and the "Market Insurers" (including Landmark, according to defendants) allegedly referred to Hellman's company, incorrectly identified by defendants as J. S. Held, as "our building consultant." (*Id.* at 22). Even if this were true regarding Landmark (it is not), it is irrelevant to defendants' efforts to enforce the appraisal award against Landmark. The appraisal award was not obtained by virtue of Hellman or J.S. Held adjusting the loss - it was obtained through appraisal to which Landmark was not a party. Hellman's role as an adjuster had nothing to do with the appraisal award.

### E.    Corrections to Statements Regarding Landmark's Alleged "Acquiescence," "Ratification," and "Waiver"

Defendants nakedly assert that "the insurers" hired more than 20 experts and that Landmark paid its "pro-rata share" of $3.9 million in appraisal costs. ([D.E. 261] at 4-5, and n. 8). However, there is nothing in the record that indicates Landmark "hired" any experts. Landmark also did not owe a "share" of the appraisal costs since Landmark did not agree to participate in the appraisal and did not agree the appraisal was binding upon it. Once Landmark became aware of the ongoing appraisal between defendants and the Primary Layer Carriers, it only agreed to contribute to certain appraisal costs, including the cost of experts, in exchange for access to information regarding defendants' claim. (Second Aff. McHugh ¶¶ 4 and 5).

Defendants state that Landmark attended at least six meetings to discuss the ongoing appraisal between defendants and the Primary Layer Carriers. ([D.E. 261] at 32). This does not prove that Landmark "acquiesced in" the appraisal. It merely confirms that Landmark monitored the appraisal to obtain information regarding defendants' claim. (Second Aff. McHugh ¶¶ 4 and 5).

Defendants falsely state that Landmark waited until the fourth day of the appraisal hearings to object to the appraisal. (*See* [D.E. 261] at 31, referring to a letter from Landmark's counsel, Wayne D. Taylor, dated August 18, 2023[2]). However, Mr. Taylor's letter of that date, to which defendants refer (*see* [D.E. 261-9]), concerns Landmark's privilege log only and does not mention the appraisal between defendants and the Primary Layer Carriers. In fact, Landmark first objected to the appraisal on <u>June 14, 2022</u>, when Mr. Mack sent defendants a letter by certified mail objecting to the appraisal on several grounds. ([D.E. 241-1], ¶ 9; [D.E. 241-11 and 12]).

## III.    LANDMARK'S STATEMENT OF ADDITIONAL FACTS

Landmark shows that the following facts are undisputed:

(1)    On September 16, 2020, Hurricane Sally damaged defendants' condominium buildings. No one notified Landmark of the loss. ([D.E. 241-1], ¶ 3).

---

[2] The letter is incorrectly dated on the front page as August 18, 2022, but the headers on each subsequent page reflect the correct date the letter was sent, August 18, 2023.

(2)     On December 20, 2020, defendants' legal counsel, Edward P. Fleming, sent a letter only to the Primary Layer Carriers demanding appraisal of the loss. [D.E. 241-9].

(3)     On December 31, 2021, the Primary Layer Carriers agreed to submit the claim to appraisal. [D.E. 241-10].

(4)     On March 18, 2022, Landmark first learned of the loss and ongoing appraisal between defendants and the Primary Layer Carriers when notified by the Primary Layer Carriers' attorneys at Cozen O'Connor. ([D.E. 241-1], ¶ 4; [D.E. 241-3]).

(5)     On June 14, 2022, Landmark sent defendants a certified letter stating in part:

> At this time, Landmark has not agreed to appraisal and will not be bound by the current appraisal proceedings. It is our understanding that the ongoing appraisal process is proceeding in potential violation of some or all of the[] limitations or conditions [in the Landmark excess policy]. Landmark expressly reserves its right under the terms of the Appraisal Clause Amendment, as well as compliance with any duties required by the Amendment of the policy as a whole.

([D.E. 241-1], ¶ 9; [D.E. 241-11 and 12]).

(6)     On June 24, 2022, defendants, through their legal counsel, sent a letter to Landmark requesting a certified copy of any Landmark policy providing insurance coverage for defendants on September 16, 2020 [the day of Hurricane

Sally]. [D.E. 241-4]. This was defendants' first communication to Landmark. ([D.E. 241-2] at 7, 224:20-226:25).

(7)    On July 25, 2022, defendants filed with the Florida Department of Financial Services a Civil Remedy Notice of Insurer Violation against the Excess Layer Carriers, including Landmark. ([D.E. 241-8] at 1-6).

(8)    On August 3, 2022, J.D. Dickenson, on behalf of his clients, the Primary Layer Carriers, sent a letter to defendants' legal counsel regarding defendants' claim and the ongoing appraisal between defendants and the Primary Layer Carriers. In a footnote, Mr. Dickenson specifically pointed out that "Landmark American Insurance Company is not participating in the appraisal process." ([D.E. 241-13] at 10, n. ii).

(9)    On August 16, 2022, Mr. Dickenson again wrote to defendants' legal counsel regarding defendants' claim and the ongoing appraisal between defendants and the Primary Layer Carriers. Dickenson, in a footnote, correctly wrote that "[o]ur office does not represent . . . Landmark American Insurance Company . . . ." ([D.E. 241-14] at 9-10, n. 1). Dickenson also clearly indicated that "Landmark American Insurance Company is not participating in the appraisal process." (*Id.* at 10, n. ii).

(10)    On August 17, 2022, Landmark, through its legal counsel, notified defendants in writing that "Landmark and Portofino Towers [Defendants] never have entered into a written agreement regarding appraisal. Accordingly, Landmark

is not participating in any appraisal process regarding the above-referenced claim, including that ongoing appraisal process in which the other carriers may be participating." [D.E. 241-15]. Defendants' legal counsel stipulated on the record that the defendants' attorney received the August 17, 2022, letter from Landmark's counsel. ([D.E. 241-2] at 12-13, 230:23-25; 231:1-16).

(11)    On September 22, 2022, Landmark submitted its response to defendants' Civil Remedy Notice filed with the Florida Department of Financial Services, stating in part:

> Portofino did not, and still has not, demanded appraisal to (sic) Landmark. Landmark did not, and still has not, agreed in writing to participate in the appraisal process pursuant to terms of a written agreement between the parties. Further, Landmark is not required under the Landmark Policy to participate in the appraisal process. Accordingly, Landmark is not participating in the appraisal process.

([D.E. 241-8 at 9).

(12)    Landmark, after learning of the ongoing appraisal between defendants and the Primary Layer Carriers, arranged to monitor the appraisal and agreed to pay a portion of certain appraisal costs, including a portion of the Primary Layer Carriers' expert witness fees, in exchange for information obtained during the appraisal regarding defendants' claim. (Second Aff. McHugh ¶¶ 4, 5 and 6).

(13)    At no time before this lawsuit was filed or afterward did Landmark agree in writing to be a party to the appraisal between defendants and the Primary Layer Carriers. ([D.E. 241-1], ¶ 10).

(14)    At no time before this lawsuit was filed or afterward did Landmark sign

a written appraisal agreement. ([D.E. 241-1], ¶ 11).

## IV.    <u>ARGUMENT AND CITATION OF AUTHORITY</u>

### A.    Standard on Motion for Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Because this case is pending before this Court under its diversity

jurisdiction and it arose in Florida, this Court should apply the substantive laws of

Florida, including Florida's laws on insurance policy interpretation. *Sutton v. Wal-*

*Mart Stores E., LP*, 64 F.4th 1166, 1168 (11th Cir. 2023).

### B.    The Landmark Excess Policy is a Stand-Alone Excess Insurance Policy, Not a Follow-Form Excess Policy

The United States District Court for the Southern District of Florida, in

*Fireman's Fund Ins. Co. v. Kettleman,* No. 05-61880-CIV-MORENO, 2006 U.S.

Dist. LEXIS 109552 at *4-8 (S.D. Fla. Sept. 7, 2006), discussed in detail the

difference between a "stand alone" policy and a "follow form" policy. Applying the

criteria in *Kettleman,* the Landmark excess policy does <u>not</u> contain any language

that suggests it follows form to an underlying policy. Instead, the Landmark excess

policy contains *within it* the Master Property Policy form's provisions, ([D.E. 1-1]

at 681), *along with* various endorsements that modify those provisions, including the

Appraisal Clause Amendment, (*Id.* at 716), which modifies the appraisal provision

contained in the Master Property Policy form within the Landmark excess policy. This might seem like a minor distinction, but it shows that there is only <u>one</u> insurance policy applicable to defendants and Landmark – the Landmark excess policy.

### C. The Landmark Excess Policy's Appraisal Clause Amendment is Enforceable According to its Terms as the Only Appraisal Provision Applicable to Landmark

An unambiguous coverage endorsement supersedes other inconsistent language in an insurance policy. "The law in Florida is clear that to the extent an endorsement is inconsistent with the body of the policy, the endorsement controls." *Allstate Fire & Cas. Ins. Co. v. Hradecky*, 208 So. 3d 184, 187 (Fla. 3d DCA 2016); *see also* *Family Care Ctr., P.A. v. Truck Ins. Exch.,* 875 So. 2d 750, 752 (Fla. 4th DCA 2004) ("Even if there were an ambiguity between the endorsement and the body of the policy, the endorsement, which is clear, controls."); *Fireman's Fund Ins. Co. v. Levine & Partners, P.A.,* 848 So. 2d 1186, 1187 (Fla. 3d DCA 2003) ("the terms of an endorsement such as the one sued upon control over anything purportedly to the contrary in any other insuring agreement"); *Steuart Petroleum Co., Inc. v. Certain Underwriters at Lloyd's London,* 696 So. 2d 376, 379 (Fla. 1st DCA 1997) ("to the extent an endorsement is inconsistent with the body of the policy, the endorsement controls").

The Landmark excess policy's Appraisal Clause Amendment, which by its terms is an endorsement to the Landmark excess policy, begins by stating as follows:

*This Endorsement Changes the Policy. Please Read It Carefully*

## APPRAISAL CLAUSE AMENDMENT

_____

This endorsement modifies insurance provided under the following:

## ALL COVERAGE PARTS

This endorsement <u>replaces</u> any and all provisions regarding appraisal.

-----

([D.E. 1-1] at 716) (Emphasis added). This language in the Landmark excess policy could not be clearer. The Appraisal Clause Amendment replaces the appraisal provision in the "Master Property Policy" form of the Landmark excess policy. (*Id.* at 681). Defendants' and Landmark's rights and obligations vis-à-vis appraisal, therefore, are governed solely by the Appraisal Clause Amendment.

Because defendants failed to send Landmark a written request for appraisal, Landmark did not agree in writing to appraisal, and defendants and Landmark did not sign a written appraisal agreement, there was no appraisal of the loss involving Landmark. *See* Landmark excess policy, Appraisal Clause Amendment, stating, "An appraisal may then take place only if the other party agrees in writing to participate in the appraisal process pursuant to terms of a written agreement between the parties." ([D.E. 1-1] at 716).

For this reason, there is no appraisal or appraisal award enforceable against Landmark. Landmark is therefore entitled to a judicial declaration that the appraisal award is not binding on it, and defendants' motion in this regard should be denied.

### D. Landmark Did Not Participate in the Appraisal Between Defendants and the Primary Layer Carriers

Defendants' motion also seeks partial summary judgment on Landmark's defense that it did not participate in the appraisal. For the following reasons, defendants' motion should be denied.

### 1. Landmark Did Not Waive Its Right To Enforce the Appraisal Clause Amendment

"Waiver is 'the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right.'" ***Smith v. Carlton***, 348 So. 3d 52, 56 (Fla. 5th DCA 2022) (*citing **Raymond James Fin. Servs., Inc. v. Saldukas***, 896 So. 2d 707, 711 (Fla. 2005)). When there is no express waiver, the party arguing for waiver must prove an implied waiver based upon the other party's conduct. ***Id.*** 57. "[T]o constitute an implied waiver, there must have been a clear showing that [a party] voluntarily and intentionally relinquished [its] rights…."). ***Id.*** "And '[w]hen a waiver is implied, the acts, conduct or circumstances relied upon to show waiver must make out a clear case.'" ***Id.*** (*quoting **Kirschner v. Baldwin***, 988 So. 2d 1138, 1142 (Fla. 5th DCA 2008)).

Waiver "may be inferred from conduct or acts 'putting one off his guard and leading him to believe that a right has been waived.'" ***Smith***, at 57. (internal citations omitted). When it comes to appraisal, "the primary focus is whether [the insurer] acted inconsistently with [its] appraisal rights." ***Florida Ins. Guar. v. Maroulis***, 153 So.3d 298, 300 (Fla. 5th DCA 2014); *accord* ***State Farm Fla. Ins. Co. v. Nordin***, 312 So. 3d 200, 203 (Fla. 1st DCA 2021); ***Fla. Ins. Guar. Ass'n v. Branco***, 148 So. 3d 488, 493 (Fla. 5th DCA 2014). The totality of the circumstances should be considered. ***Maroulis***, at 300.

The court in ***Smith*** found that the appellants/sellers did not impliedly waive their right to enforce a contractual provision (appellees/buyers must keep the property trash-free) because the appellants' right to enforce that provision had not yet ripened (the closing had not taken place), ***Id.***, and because "[a]ppellants made it clear that they were dissatisfied with and did not accept [a]ppellees' failure to remove the trash, and the suit [for breach of the contract's trash-free clause] was filed in just over three months following closing." ***Id.***

Here, by analogy to ***Smith***, Landmark's right to enforce the Appraisal Clause Amendment did not ripen before at least March 18, 2022, when Landmark first learned of the loss to defendants' property and the ongoing appraisal.[3] On June 14,

---

[3] Arguably Landmark's right to assert its rights under the Appraisal Clause Amendment *never* ripened since defendants never made a claim under the Landmark excess policy and never requested appraisal from Landmark. In Florida, it is well-settled that "[u]ntil the insurer has a

2022, Landmark sent a letter to defendants by certified mail specifically stating that Landmark was *not* participating in the appraisal and was reserving all its rights under the Landmark excess policy, including the right to enforce the Appraisal Clause Amendment. ([D.E. 241-11]). Landmark's actions were *consistent with* its appraisal rights, not inconsistent. Once defendants received Landmark's June 14, 2022, letter disclaiming any involvement in the appraisal, they could <u>not</u> reasonably have been "put[] off their guard and le[d] to believe that [Landmark's] right[s] ha[d] been waived.'" *Id.* at 57.

Defendants cannot point to any action by Landmark that was inconsistent with its rights under the Appraisal Clause Amendment or that led defendants to reasonably believe Landmark was waiving those rights. On the contrary, Landmark, after objecting in its letter of June 14, 2022, to the appraisal between defendants and the Primary Layer Carriers, continued to assert its rights and make clear it was *not* participating in the appraisal. (*See* Landmark's response to Defendants' Civil Remedy Notice, [D.E. 241-8] at 8-13). In addition, counsel for the Primary Layer Carriers made clear in his letters to defendants that Landmark was *not* participating in the appraisal. ([D.E. 241-13], at n. 11; [D.E. 241-14], at n. 11).

---

reasonable opportunity to investigate and adjust the claim, there is no 'disagreement' (for purposes of appraisal) regarding the value of the property or the amount of loss to be appraised.'" ***Fla. Ins. Guar. Ass'n v. Branco***, 148 So. 3d 488, 494 (Fla. 5th DCA 2014) (*quoting* ***Citizens Prop. Ins. Corp. v. Galeria Villas Condo. Ass'n***, 48 So. 3d 188, 191 (Fla. 3d DCA 2010) (reversing prematurely ordered appraisal)).

Landmark agreed to pay a portion of the appraisal costs in exchange for information regarding defendants' claim. (Second Aff. McHugh ¶¶ 4 and 5). Importantly, defendants did not learn of these payments and Landmark's attendance at some of the meetings until Landmark revealed this information during discovery in this action. That Landmark did these things while continuing to stress that it was not participating in the appraisal is not a "clear case" of waiver in light of the totality of the circumstances discussed above. *Maroulis*, at 300. Landmark's actions, of which defendants knew nothing until after this lawsuit was filed, could not have "put[] [defendants] off their guard and le[d] [them] to believe that Landmark's right[s] ha[d] been waived.'" *Smith*, 348 So. 3d at 57.

Defendants, in their motion, emphasize various actions that Landmark allegedly failed to perform *before* learning, on March 18, 2022, of the loss and appraisal between defendants and the Primary Layer Carriers, including Landmark's so-called failure to object to the appraisal. However, Landmark had no opportunity, duty, or even right to object to an appraisal initiated by others under a valid appraisal provision in the Master Property Policy form without notice to Landmark and without its consent. For all these reasons, Landmark did not impliedly waive its rights under the Appraisal Clause Amendment.

## E.    Landmark Did Not "Ratify" the Appraisal or the Appraisal Award

Ratification, a defense to a claim for breach of contract, occurs only "[w]hen a party to a contract knows that a counterparty has failed to live up to its obligations, but does not take remedial action and instead accepts the agreement in its new form[.] [In such cases,] the aggrieved party forfeits the right to later complain of the failure to perform." *Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, No. 13-23046-CIV-COHN/SELTZER, 2014 U.S. Dist. LEXIS 204292 at *7 (S.D. Fla. Nov. 20, 2014).

There is no evidence here from which the trier of fact could find that Landmark "ratified" the appraisal or the appraisal award. On the contrary, Landmark sent defendants a certified letter dated June 14, 2022 [D.E. 241-11] and filed its response to defendants' Civil Remedy Notice. ([D.E. 241-8], at 8-13). In both documents, Landmark objected to being bound by the appraisal between defendants and the Primary Layer Carriers, as it was conducted without written notice to or agreement by Landmark and without complying with the Landmark excess policy's Appraisal Clause Amendment. Landmark's actions were a clear, unequivocal rejection, not ratification, of the appraisal and appraisal award. For these reasons, this Court should reject defendants' motion as it concerns their claim that Landmark ratified the appraisal and appraisal award.

**F.    J.D. Dickenson, Evan Holober, and the Law Firm of Cozen O'Conner Were Not Landmark's Real or Apparent Agents**

"In order to establish apparent agency, three elements must be present: (1) a representation by the principal; (2) reliance on that representation by a third person (here the insured); and (3) detriment to the third party from such reliance." ***Nat'l Indem. Co. v. Consol. Ins. Servs.***, 778 So. 2d 404, 407 (Fla. 4th DCA 2001) (*citing* ***Almerico v. RLI Ins. Co.***, 716 So. 2d 774, 777 (Fla. 1998)). The evidence here is undisputed that J.D. Dickenson, Evan Holober, and the law firm of Cozen O'Conner were *not* Landmark's real agents. Landmark never retained these attorneys or their law firm in this matter, so they were not permitted to speak, write or act on behalf of Landmark in this matter. (Second Aff. McHugh ¶ 3).

These attorneys and their law firm were not Landmark's apparent agents either. There is no evidence of a written or verbal representation *by Landmark* of such agency, and defendants do not argue that such evidence exists. Instead, defendants merely argue that *Dickenson and Holober*, in their correspondence, purported to speak on behalf of Landmark. Even if this were true, it is not sufficient to prove apparent agency. Under Florida law, *the principle* must do or say something to hold out the person as its agent. ***Consol. Ins.***, 778 So. 2d at 407-408. Landmark never did.

Because Dickenson, Holober, and the law firm of Cozen O'Conner were <u>not</u> Landmark's actual or apparent agents, their actions did not constitute a waiver by

Landmark of its rights under the Landmark excess policy's Appraisal Clause Amendment or a ratification of the appraisal or appraisal award.

## V.    <u>CONCLUSION</u>

For the reasons and on the grounds discussed above, defendants' motion for partial summary judgment should be denied.

Respectfully submitted this 16th day of December, 2024.

<div style="margin-left:40%">

<u>/s/ Elizbeth D. Salinas</u>
ELIZABETH D. SALINAS
Florida Bar No. 113394
MOZLEY, FINLAYSON & LOGGINS LLP
4767 New Broad Street
Orlando, FL 32814
(407) 514-2765 Ext. 2317
esalinas@mfllaw.com

-and-

WAYNE D. TAYLOR
Georgia Bar No. 701275
*Admitted pro hac vice*
MOZLEY, FINLAYSON & LOGGINS LLP
1050 Crown Pointe Parkway, Suite 1500
Atlanta, GA 30338
Tel: (404) 256-0700
wtaylor@mfllaw.com
*Counsel for Plaintiff Landmark American Insurance Company*

</div>

## **CERTIFICATE OF WORD COUNT**

Pursuant to N.D. Fla. Local Rule 7.1(F), the undersigned certifies that this motion contains 5,713 words, excluding case style, signature block, and certificate of service.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the preceding pleading using the Court's CM/ECF System, which will automatically send a copy of the same to the following counsel of record:

Heidi Hudson Raschke, Esq.
Madison E. Wahler, Esq.
Amanda D. Proctor (*admitted pro hac vice*)
**CARLTON FIELDS, P.A.**
hraschke@carltonfields.com
mwahler@carltonfields.com
aproctor@carltonfields.com
*Counsel for Plaintiff Homeland Insurance Company of New York*

David C. Bibb, Esq.
Brian P. Henry, Esq.
**ROLFES HENRY CO., LPA**
dbibb@rolfeshenry.com
wgonzalez@rolfeshenry.com
bhenry@rolfeshenry.com
kdeglman@rolfeshenry.com
*Counsel for Plaintiffs Independent Specialty Insurance Company, Interstate Fire & Casualty Company, and Lloyd's Of London*

Jack R. Reiter, Esq.
Jordan S. Kosches, Esq.
**GRAY ROBINSON, P.A.**
jack.reiter@gray-robinson.com
jordan.kosches@gray-robinson.com
*Counsel for Plaintiff Colony Insurance Company*

Eric A. Hiller Esq.
Aaron Konstam, Esq.
Bryan M. Walsh, Esq.
Junaid N. Savani, Esq.
Iliriana Feteja, Esq.
**KENNEDYS CMK LLP**
eric.hiller@kennedyslaw.com
aaron.konstam@kennedyslaw.com
bryan.walsh@kennedyslaw.com
Junaid.savani@kennedyslaw.com
Iliriana.Fteja@kennedyslaw.com
*Counsel for Plaintiff James River Insurance Company*

John David Dickenson, Esq.
Alexandra J. Schultz, Esq.
Juan P. Garrido, Esq.
**COZEN O'CONNOR**
jdickenson@cozen.com
aschultz@cozen.com
jgarrido@cozen.com
*Counsel for Plaintiffs Westchester*
*Surplus Lines Insurance Company,*
*Arch Specialty Insurance Company,*
*Axis Surplus Insurance Company,*
*Evanston Insurance Company, Aspen*
*Specialty Insurance Company, and*
*Maxum Indemnity Company*

Edward P. Fleming, Esq.
Matthew A. Bush, Esq.
Aaron T. McCurdy, Esq.
**MCDONALD FLEMING, LLP**
epfleming@pensacolalaw.com
cat@pensacolalaw.com
mabush@pensacolalaw.com
bushservice@pensacolalaw.com
amccurdy@pensacolalaw.com
absomerset@pensacolalaw.com

Kurtis Jay Keefer
**GOEDE, DEBOEST & CROSS, PLLC**
kkeefer@gadclaw.com
curbanowski@gadclaw.com

Charles F. Beall, Jr., Esq.
**MOORE, HILL & WESTMORELAND, P.A.**
cbeall@mhw-law.com
tstokes@mhw-law.com
*Counsel for Defendants*

This 16th day of December, 2024.

*/s/ Elizabeth D. Salinas*
ELIZABETH D. SALINAS
Florida Bar No. 113394