UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

PENSACOLA DIVISION

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY, *et. al.*

    Plaintiffs,

v.                                                                    CASE NO. 3:23-cv-00453-MCR-HTC

PORTOFINO MASTER HOMEOWNERS
ASSOCIATION INC., a Florida not-for-
profit Corporation, *et. al.*

    Defendants.

_____/

### CERTAIN PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (APPRAISAL PROCESS) [D.E. 251]

Plaintiffs, Westchester Surplus Lines Insurance Company ("Westchester"), Arch Specialty Insurance Company ("Arch"), AXIS Surplus Insurance Company ("AXIS"), Colony Insurance Company ("Colony"), Evanston Insurance Company ("Evanston"), Aspen Specialty Insurance Company ("Aspen"), Independent Specialty Insurance Company ("Independent"), Interstate Fire & Casualty Company ("Interstate"), Lloyd's of London (Consortium #9226) ("Lloyd's"), James River Insurance Company ("James River"), and Maxum Indemnity Company ("Maxum") (collectively, "Plaintiffs"), file this Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment (Appraisal Process) [D.E.

251] ("Motion"), and in response to Defendants' Opposition [D.E. 301] and state as follows.

Defendants' 39-page Opposition[1] misrepresents the history of this case, fails to properly respond to Plaintiffs' Statement of Facts,[2] makes bizarre and speculative accusations about counsel for certain of the carriers, and cites *Poor Richard's Almanack*. Further, it falsely condemns the 13 insurers for "scorched earth" litigation tactics, including having the audacity to each hire counsel to represent them (Plaintiffs note Defendants have three law firms representing their identical interests in this case as well) and filing "no less than nine motions" (in actuality, Plaintiffs filed seven dispositive motions, and Defendants filed six), and otherwise addresses all sorts of tangential issues that are not germane to the straightforward policy-oriented arguments made in the Motion.

Plaintiffs will make their best effort to distill the points in Defendants' Opposition that are actually responsive to Plaintiffs' arguments in the Motion and address them below.

---

[1] While Defendants' Opposition certifies that it contains 7,715 words, it appears that the brief actually exceeds the word limit.

[2] Local Rule 56.1(C) states that a memorandum in opposition to a Motion for Summary Judgment "must respond to the moving party's statement of facts as would be appropriate in an appellate brief. The opposing party must not file a separate document setting out the facts or responding to the moving party's statement of facts."

2

A. **<u>Portofino Did Not Demand Appraisal of the Excess Carriers, and There Was No Requisite Disagreement Between Defendants and the Excess Carriers</u>**

Plaintiffs argue in Section IV of the Motion that: 1) Defendants never demanded appraisal of the Excess Carriers and 2) appraisal could not have been demanded of the Excess Carriers because there was no disagreement as to the amount of loss between Defendants and the Excess Carriers and no proofs of loss were ever submitted to the Excess Carriers. Disagreement and submission of a proof of loss are both express requirements under the appraisal provision in the Master Property Policy form.

Defendants' arguments in opposition to Section IV hinge on two fictions: first, that it was Plaintiffs that demanded appraisal of the loss, and second, that Jeff Hellman, as designated adjuster under the policies, was the agent of all of the insurers. There is no support in the record for either of these positions.

Defendants' revisionist argument that it was Plaintiffs that demanded appraisal of the entire loss is both factually and legally incorrect. On December 11, 2020, Portofino, through its counsel, Edward Fleming, sent correspondence to the Primary Layer Carriers and Jeff Hellman demanding appraisal of the loss ("Appraisal Demand Letter").[3] The Appraisal Demand Letter's "Re" line read: "Portofino – Hurricane Sally property damage claim." The letter stated that it "relate[d] to the following insurance policies, for which you have been designated

---

[3] D.E. 251-4.

by the insurers as the adjuster" and specifically listed the four Primary Layer policies and carriers by name, policy number, and claim number. The letter further stated that "Pursuant to requirements of the insurance policies (see paragraph 50 of the 'Master Policy Form' of the above-referenced insurance policies), the Insureds listed above are initiating the appraisal process. The Insureds demand an appraisal of the loss at issue in the above-referenced matter."

Defendants have argued throughout this litigation that, despite what that letter said, it was only an appraisal demand of the interior damage. This is yet another fiction, plainly unsupported by the language of the letter itself, as discussed above.

Further, neither the appraisal provision in the Master Property Policy form nor the law contemplate or permit an appraisal of only part of a loss. *See Clockwork PH3, LLC v. Clear Blue Specialty Ins. Co.*, No. 2:23-CV-407-SPC-KCD, 2023 WL 6247595, at *6 (M.D. Fla. Sept. 26, 2023) (explaining that an appraisal cannot be bifurcated because "the policy [does not] provide a mechanism to divide the appraisal process" and "[t]he language contains no other limits or conditions," so it would be "improper for [the] Court to redraft the policy to restrict the appraisal process.").

Notably, Defendants' contract with Mr. Keys contains no such limitation and in fact states that the appraisal agreement "arises out of a Hurricane/Wind loss that occurred on 9/16/2020" and appoints Mr. Keys "to serve as their appraiser for

4

the above referenced claim pursuant to the appraisal provision of the policy."[4] In fact, Mr. Keys expressly testified that he was retained to appraise the entire loss, not part of the loss:

> Q. Okay. And does this agreement reflect that George W. Keys of KCC was appointed to serve as appraiser for the Portofino entities that are listed in that first paragraph there?
>
> A. Yes.
>
> Q. And were you appointed to appraise the Hurricane Sally loss?
>
> A. I was.
>
> Q. Were you appointed to appraise the whole Hurricane Sally loss?
>
> A. Yes.
>
> Q. Okay.
>
> A. I don't know -- with all due respect, I don't know how to do it any other way.
>
> Q. I completely agree with you and I would like the record to be clear on that. I think you've already testified in that regard, that there's only one way to appraise a loss and that's to appraise the whole thing, correct?
>
> A. Yes, thank you.[5]

Regardless of what Defendants now claim, there is only one way to appraise a loss and that is to appraise the loss in its entirety, as Defendants' own appraiser

---

[4] D.E. 251-15.

[5] D.E. 225-1 p. 277 ln. 16 – p. 278 ln. 10; *see also* p. 119 ln. 3 – 10 ("When you go to appraisal, you have to appraise the entire loss … you can't just go and say, okay, we're going to … appraise just the water mitigation, hypothetically. That's -- the courts are not going to allow it . . . . They say that you must appraise all aspects of damages when you're in appraisal or we waive it.")

confirmed. That process began when Defendants demanded appraisal of the Primary Layer Carriers on December 11, 2020.[6]

The April 5, 2021 letter from Cozen O'Connor responded, on behalf of the Primary Layer Carriers only, to erroneous contentions from Defendants' counsel that only part of the loss was in appraisal. The letter sets forth in detail why the appraisal provision in the Master Property Policy form does not permit a bifurcated appraisal, and even if it did, that is not what Defendants sought in their December 11, 2020 demand. The letter then continues on to state the following:

> ***However, to the extent that there is any confusion regarding which portions of the Insureds' loss is in appraisal and which portions are not, the Insurers echo the Insureds' appraisal demand pursuant to the above-referenced provision*** and hereby demand appraisal for the entire loss, including whichever portions of the loss the Insureds now incorrectly claim are not in appraisal. Accordingly, the appraisal will encompass all of the Insureds' claim for damages stemming from Hurricane Sally, including, but not limited to, remediation work already performed, exterior damages to the roof, windows and doors, railings, cladding, and other exterior structures. The Insurers name Mr. Patrick Lewis of Independent Consulting Services, LLC and Lewis Claim Solutions as their appraiser for the entire loss. We will presume that the Insureds will continue with Mr. George Keys as appraiser for the entire loss. If the Insureds wish to appoint a different appraiser, please let us know as soon as possible in order to avoid further delay.[7]

---

[6] To the extent Defendants suggest that Plaintiffs could have objected to the December 11, 2020 appraisal demand on the grounds that it was deficient or defective, there was nothing to object to. The December 11, 2020 appraisal demand on its face demanded appraisal of the entire loss. The problem was not with the appraisal demand; the problem was with Defendants' efforts to improperly limit the scope of the appraisal after the process had already started.

[7] D.E. 251-19 p. 3 (emphasis added).

To the extent the above even constitutes an appraisal demand by the Primary Layer Carriers who subscribed to that letter, it certainly did not broaden the scope of what was already in appraisal.  It was made solely to ensure the appraisal process moved forward, despite Defendants' attempts to impede it.

Regardless, even if this Court were to accept Defendants' position that it was the April 5, 2021 letter that initiated appraisal, a critical point that Defendants ignore is that the very first sentence of the April 5, 2021 letter says:

> As you know, our office has been engaged by Westchester Surplus Lines Insurance Company; Endurance American Specialty Insurance Company; Everest Indemnity Insurance Company; and The Princeton Excess and Surplus Lines Insurance Company (collectively, the "Insurers") with respect to the above-referenced claim(s).

Thus, even if the April 5, 2021 letter did somehow broaden the scope of appraisal, which Plaintiffs strongly dispute, it was only the four Primary Layer Carriers defined in the letter as "Insurers" that joined in that letter, and therefore, only the four Primary Layer Carriers even arguably demanded appraisal.[8]  Indeed, at the time that letter was sent, Cozen O'Connor represented (and in fact had only even spoken to) only one of the Excess Carriers (AXIS, which did not join in the letter).[9]  It is inconceivable that any Excess Carrier could be bound by a letter it did not know about, sent by an attorney they had never had any contact with, involving

---

[8] It would not have even made sense for any Excess Carrier to join in an appraisal demand at this point as Defendants had not presented a claim that implicated any excess layer.

[9] *See, e.g*, D.E. 233-1 p. 62 ln. 1-20; D.E. 242-1 p. 49 ln. 7-10; D.E. 237-1 p. 114 ln. 9-12; D.E. 228-11 p. 23 ln. 20 – p. 24 ln. 2.

LEGAL\75035275\1

a claim they knew little, or in some cases nothing, about. Thus, Defendants' distinguishing of *Galindo v. ARI Mut. Ins. Co.,* 203 F.3d 771, 777 (11th Cir. 2000), and reliance on cases such as *Safepoint Ins. Co. v. Gomez*, 263 So. 3d 222, 223 (Fla. 3d DCA 2019), fails, as the arguments Defendants make depend entirely on a finding from this Court that it was Plaintiffs, and not Defendants, who demanded appraisal.

Defendants' next fictitious argument is that Plaintiffs were on constructive notice of the loss since Jeff Hellman was on notice of the loss, and that because Jeff Hellman is the agent of the insurers, the Primary Layer Carriers' disagreement about the amount of loss is somehow imputed to the Excess Carriers through Mr. Hellman. Defendants provide no support or citation, either factual or legal, for the argument that Mr. Hellman, as a designated adjuster under the Master Property Policy form, is the agent of all of the insurers in the entire coverage tower. Simply naming a designated adjuster in a policy for all losses does not make that individual an agent of insurers that have not even been placed on notice of a loss, and Defendants do not cite any support for a contrary position. In fact, Mr. Hellman expressly testified that he was acting only on behalf of the Primary Layer Carriers:

> Q. So you were the adjuster for the market participants on this claim?
> A. To the primary layer, yes.

> Q. Now, where does it say in the contract on your designated adjuster that you only represent the primary layer? Where does it say that?
>
> A. You'd have to look at each of the other policies. I'm not sure if you're refer- -- what policies you're referring to. The policies that you said you're referring to, I -- I took that you were referring to the primary layer insurers.
>
> Q. Well, whether you were -- are you claiming that you had no responsibilities and no duties to anyone other than the primary layer to act as an adjuster?
>
> A. Well, the claim wasn't presented to anybody other than the primary layer.[10]

Moreover, having a designated adjuster named on a policy of insurance does not relieve Defendants of their obligation to comply with the notice and appraisal provisions of the policies. The policies do not confer authority on Mr. Hellman to do anything other than adjust a loss. Nor did Plaintiffs, or Mr. Hellman, ever represent to Defendants that Mr. Hellman was authorized to accept notice of a loss on behalf of any carrier. Rather, Mr. Hellman expressly informed Defendants that they were responsible for notifying the carriers of the loss.[11] Defendants cite no authority to support the proposition that Mr. Hellman could adjust a loss or act on behalf of a carrier that does not even know about the claim.

In light of the above, it simply cannot be disputed that: 1) Defendants never demanded appraisal of the Excess Carriers and 2) there was never a requisite

---

[10] D.E. 224-1 p. 45 ln. 14 – 46 ln. 6.

[11] D.E. 251-1 p. 5.

disagreement between Defendants and the Excess Carriers. The outcome of the appraisal thus cannot be binding on the Excess Carriers.

## B. Defendants Violated the Sworn Proof of Loss Provision

In response to Section III of the Motion, Defendants (again) insist that it was Plaintiffs who demanded appraisal, and that by doing so, Plaintiffs waived compliance with post-loss conditions. Defendants' reliance on cases such as *Gomez*, 263 So. 3d at 222 is misplaced. The holding in *Gomez*–that by demanding appraisal, the insurer waived the requirement of compliance with post-loss obligations as a condition precedent to that appraisal–does not apply here where it was the insured, not the insurer, that demanded appraisal (and only of the Primary Layer Carriers). Indeed, the *Gomez* court "strictly limited" its holding to a determination "under the circumstances presented" in that particular case. *Id.* at 224 n.2. Additionally, it is important to note that the appraisal provision at issue here expressly makes submission of a sworn proof of loss a requirement,[12] whereas the provision at issue in *Gomez* made no mention of a proof of loss. *See id* at n.1.

As stated in the Motion, Westchester was deprived of the ability to meaningfully assess Defendants' claim without a proof of loss that adequately and accurately depicted the claim. Defendants' wild inflation of the claim from $13

---

[12] The appraisal provision at issue states that "[i]f the Insured and this Company fail to agree on the amount of loss, each, upon the written demand either of the Insured or of this Company made within 60 days after receipt of proof of loss by the Company, shall select a competent and disinterested appraiser. . . ." *See, e.g.*, D.E. 222-1 p. 35.

LEGAL\75035275\1

million to $233 million undermines the entire purpose of the requirement that the insureds provide a sworn proof of loss before appraisal can be demanded.

## C. Keys Claims Did Not State the "Amount of Loss"

In Section V of the Motion, Plaintiffs establish that Mr. Keys did not comply with the appraisal provisions, since, by Mr. Keys' own admission, he did not appraise the loss by stating the amount of loss. Defendants argue that Florida law prohibits the Court from looking behind an appraisal award. Plaintiffs do not ask this Court to look beyond the face of the appraisal award to examine either appraiser's presentation to the panel in the Motion. Plaintiffs simply state that, based on Mr. Keys and Mr. McCallister's testimony, Mr. Keys did not do what the appraisal provision requires.

This Court has stated that it will not second-guess the appraisers regarding how they arrived at the award. Plaintiffs agree. However, what this Court certainly can do is review a policy provision and determine whether the appraisers procedurally acted in accordance with the requirements of that provision. Here, Mr. Keys admittedly did not.

The appraisal provision in the Master Property Policy form requires the appraiser to "appraise the loss, stating separately the value at the time of loss and the amount of loss. If the appraisers fail to agree, they shall submit their differences to the umpire." That is not what occurred here.

Defendants state that "[t]he Keys appraisal team developed and presented the two component parts of establishing an amount of loss; i.e., the scope of the damages, and the price of repairing or replacing the damaged building components." [D.E. 301 p. 11]. They do not include a citation for this statement because none exists. Mr. Keys expressly testified at his deposition that what he submitted was a "starting point,"[13] he denied that the estimates were submitted as the amount of money required to repair the damages associated with Hurricane Sally,[14] he denied that the estimates he submitted were the cost of repairs to put the property back in its pre-Sally condition,[15] and expressly testified that if all of the damages contained in his Statement of Loss were awarded, they would have been redundant.[16] Taking Mr. Keys' testimony as true, he submitted a price list, not a scope, and left it to the umpire to come up with a scope. This is not what the Policies require in an appraisal.

Defendants argue that Lewis Claims was also aware of and in agreement with this process.[17] This is disputed, but for purposes of this Motion, the dispute is

---

[13] D.E. 225-1 p. 342 ln. 1-2.

[14] D.E. 225-1 p. 341 ln. 2-7.

[15] D.E. 225-1 p. 341 ln. 18-21.

[16] D.E. 225-1 p. 340 ln. 19 – p. 341 ln. 1.

[17] Defendants cite an email from Kevin Bryant as support for this position. In doing so they take the email out of context; however, it is important to note that the date of that email is January 3, 2023, months after Keys Claims submitted its $233 million "menu" of pricing and months after the appraisal panel hearing. The point is, if Keys Claims' Statement of Loss, submitted on August 2, 2022, was just a pricing list as Mr. Keys and Mr. McCallister claim, then they never stated the "amount of loss." The Policies require them to do so.

immaterial. Even if true, the Policies do not allow the appraisal panel to stray from the requirements of the appraisal provision, even if all members of the panel are in agreement. The Policies require the appraisers to state the value of the loss, and if they cannot agree, the umpire resolves the dispute. The Policies do not say that the appraisers may submit a price list without taking any position regarding the scope and simply let the umpire come up with the scope on his or her own.

### D. Conclusion

For the reasons set forth above, as well as those set forth in the Motion, this Court should grant summary judgment in favor of Plaintiffs.

### CERTIFICATE OF WORD COUNT

The undersigned certifies that this brief contains 3,199 words, excluding case style, signature block, and certificate of service.

Respectfully submitted,

*/s/ John David Dickenson*
John David Dickenson
Florida Bar No. 575801
jdickenson@cozen.com
Alexandra J. Schultz
Florida Bar No. 122100
aschultz@cozen.com

**COZEN O'CONNOR**
1801 N. Military Trail, Suite 200
Boca Raton, FL 33431

Telephone: (561) 515-5250
Facsimile: (561) 515-5230
*Counsel for Plaintiffs Westchester Surplus Lines Insurance Company, Arch Specialty Insurance Company, AXIS Surplus Insurance Company, Evanston Insurance Company, Aspen Specialty Insurance Company, and Maxum Indemnity Company*


   /s/ David C. Bibb
David C. Bibb (Fla. Bar No. 190330)
Brian P. Henry, Esq. (Fla. Bar No. 0089069)
**ROLFES HENRY CO., LPA**
3165 McCrory Pl., Suite 174
Orlando, FL 32803
Telephone: (407) 284-4990
Email: dbibb@rolfeshenry.com
       rkitchens@rolfeshenry.com
       bhenry@rolfeshenry.com
       kmcclintock@rolfeshenry.com

*Counsel for Plaintiffs Independent Specialty Insurance Company, Interstate Fire & Casualty Company, and Lloyd's of London*


   /s/ Jack R. Reiter
Jack R. Reiter, Esq.
Florida Bar No.: 0028304
jack.reiter@gray-robinson.com
Jordan S. Kosches, Esq.
Florida Bar No.: 49881
jordan.kosches@gray-robinson.com
**GrayRobinson, P.A.**
333 SE 2nd Avenue, Suite 3200
Miami, FL 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

*Counsel for Plaintiff Colony Insurance Co.*

/s/ Aaron Konstam
**ERIC A. HILLER**
Florida Bar No. 27920
eric.hiller@kennedyslaw.com
**AARON KONSTAM**
Florida Bar No. 104765
aaron.konstam@kennedyslaw.com
**Kennedys CMK LLP**
1395 Brickell Avenue, Suite 610
Miami, FL  33131
Telephone:  (305) 371-1111

*Counsel for Plaintiff James River Insurance Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 10, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will automatically serve all counsel of record.

 /s/  John David Dickenson, Esq.
John David Dickenson, Esquire

15

LEGAL\75035275\1