## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY, et al.,

      Plaintiffs,

v.                                  CASE NO. 3:23cv00453-MCR-HTC

PORTOFINO MASTER
HOMEOWNERS ASSOCIATION,
INC, et al.,

      Defendants.

_____/

## <u>ORDER</u>

This action arises from Hurricane Sally, which slammed into the Gulf Coast on September 16, 2020.  At the center of this dispute is a $187 million insurance appraisal award ostensibly reflecting the storm damage sustained by a collection of Pensacola Beach condominiums, colloquially known as the Portofino Towers. Plaintiffs, thirteen commercial property insurers (collectively, the "Insurers"),[1] broadly request that the Court either declare the award invalid and unenforceable

---

[1] The Plaintiffs are Arch Specialty Insurance Company ("Arch"), Aspen Specialty Insurance Company ("Aspen"), AXIS Surplus Insurance Company ("AXIS"), Colony Insurance Company ("Colony"), Evanston Insurance Company ("Evanston"), Homeland Insurance Company of New York ("Homeland"), Independent Specialty Insurance Company ("Independent"), Interstate Fire & Casualty Company ("Interstate"), James River Insurance Company ("James River"), Lloyd's of London (Consortium #9226) ("Lloyd's"), Landmark American Insurance Company ("Landmark"), Maxum Indemnity Company ("Maxum"), and Westchester Surplus Lines Insurance Company ("Westchester").

under the terms of their respective polices, *see* 28 U.S.C. §§ 2201, 2202, or vacate the award under Florida's Arbitration Code, Fla. Stat. § 682.13. Defendants, the homeowners' associations holding the insurance policies (collectively, "Portofino"),[2] fiercely defend the award and bring counterclaims against the Insurers for breach of contract based on the Insurers' refusal to abide by it. This has culminated in twenty-two motions presently before the Court, accompanied by hundreds of pages of briefing and thousands of pages of exhibits,[3] and a two-day evidentiary hearing on a motion to vacate the appraisal award, where the Court heard hours of witness testimony and attorney argument. Ultimately, the Court concludes that the appraisal award cannot stand because it is undisputed that Portofino's appointed appraiser, George Keys, did not fulfill his raison d'être: he never stated

---

[2] Defendants named in this action are Portofino Tower One Homeowners Association at Pensacola Beach, Inc., Portofino Tower Two Homeowners Association at Pensacola Beach, Inc., Portofino Tower Three Homeowners Association at Pensacola Beach, Inc., Portofino Tower Four Homeowners Association at Pensacola Beach, Inc., Portofino Tower Five Homeowners Association at Pensacola Beach, Inc., and Portofino Master Homeowners Association at Pensacola Beach, Inc.

[3] Specifically, the Insurers filed numerous motions for summary judgment on a variety of issues, ECF Nos. 236, 241, 245, 248, 251, 266; several *Daubert* motions, ECF Nos. 238, 239, 240; a renewed motion to vacate pursuant to Fla. Stat. § 682.13, ECF No. 257; and certain Insurers filed individual notices of joinder to some of those motions, ECF Nos. 258, 259, 260, 263, 264. Likewise, Portofino filed its own motions for summary judgment, ECF Nos. 246, 250, 255, 261, 262, 265; *Daubert* motions, ECF No. 232, 252, 253, 254, 256; and, most recently, a motion to strike certain testimony offered at the evidentiary hearing on the renewed motion to vacate, ECF No. 347. The Court has given careful and due consideration to each motion.

the "amount of loss" to Portofino's property caused by Hurricane Sally as required

by the applicable insurance policy provisions.[4]  The Court will therefore grant the

Insurers' motion for summary judgment on this score, the appraisal award will be

declared invalid under the terms of the policies, and the parties will be ordered to

conduct a new appraisal before a new panel.  *See* ECF Nos. 251, 260, 263.[5]

## I.    Background[6]

When Hurricane Sally made landfall, Portofino insured its five condominium

towers and other neighboring structures through the Insurers and other non-parties.

*See generally* ECF No. 222; *see also* ECF No. 104-1.[7]  After the storm subsided,

Portofino submitted a claim for the damage to its insured properties, and the parties

---

[4] In the long run, this may be a pyrrhic victory for the Insurers, as they acknowledge that Portofino's claim for the damage caused by Hurricane Sally will survive notwithstanding the Court's decision, but it is the result the law compels, nonetheless.  *See* ECF No. 352.

[5] As discussed in more detail below, the Court alternatively grounds its decision in Fla. Stat. § 682.13(1)(b)(3) and vacates the award.

[6] Given the length and complexity of the factual and procedural history, and because the Court writes primarily for the parties, the background provided here is abbreviated to cover only those facts necessary to resolve the issue at hand and any obligatory context.  The below facts are undisputed and viewed in the light most favorable to the nonmovants, Portofino.

[7] The non-parties are three other insurers, Princeton Excess Surplus Lines Insurance Company, Endurance American Specialty Insurance Company, and Everest Indemnity Insurance Company, who were originally parties to this action, but dismissed their claims without prejudice pursuant to Rule 41 of the Federal Rules of Civil Procedure.  *See* ECF Nos. 84, 85, 86.  Recently, Evanston and Portofino notified the Court of a "settlement of all claims by and between" them. *See* ECF No. 366.  To date, however, neither party has moved for or stipulated to a dismissal of their claims.

proceeded to appraisal in accordance with the policies when they were unable to agree as to the "amount of loss" caused by Sally.  *See* ECF No. 246-4; ECF No. 246-5; ECF No. 251-4.[8]  Subject to a few exceptions, which are not material for present purposes, the operative appraisal provisions state:

> **APPRAISAL** - If the Insured and this Company fail to agree on the amount of loss, each, upon the written demand either of the Insured or of this Company made within 60 days after receipt of proof of loss by the Company, shall select a competent and disinterested appraiser. The appraisers shall then select a competent and disinterested umpire. If they should fail for 15 days to agree upon such umpire, then upon the request of the Insured or of this Company, such umpire shall be selected by a judge of a court of record in the county and state in which such appraisal is pending.  Then, at a reasonable time and place, the appraisers shall appraise the loss, *stating separately the value at the time of loss and the amount of loss*.  If the appraisers fail to agree, they shall submit their differences to the umpire.  An award in writing by any two shall determine the amount of loss.  The Insured and this Company shall each pay his or its chosen appraiser and shall bear equally the other expenses of the appraisal and of the umpire.

*See* ECF No. 104-1 at 33 (emphasis added).[9]  Each side appointed an appraiser who they believed to be "competent and disinterested."  The Insurers appointed Patrick

---

[8] A number of the pending motions address "notice" and "participation" issues with respect to the appraisal process.  *See, e.g.*, ECF Nos. 248, 251, 255.  Today's decision does not reach those arguments.

[9] The applicable Landmark, Homeland, and Evanston policies each contain diverging appraisal clauses.  Those differences are not material for the matter at hand, however, because these policies still require the appraisers appointed by the parties to "state separately the value of the property and amount of loss," and, if they are unable to agree, submit their differences to a mutually selected umpire.  *See* ECF No. 104-1 at 265–66 (Evanston), 578 (Landmark), 594 (Homeland).

Lewis as their appraiser, *see* ECF 251-9 at 4, and Portofino ultimately selected George Keys to serve as its appraiser, *see* ECF No. 262-5.

The appraisal provisions demanded fairly little of the two appraisers. Their delegated responsibilities fell into four discrete categories, which track the phases of the appraisal process outlined by the policy language:

*Umpire Appointment.* The appraisers were required, if possible, to jointly designate a "competent and disinterested umpire."[10]

*Separate Appraisal of Loss.* Then, the appraisers were to earn their namesake and "appraise the loss." To do so, each appraiser was required to state the value of Portofino's insured property "at the time of the loss" as well as the "amount of loss" to Portofino's property caused by Hurricane Sally.

*Agreement or Submission of Differences.* Next, the appraisers were tasked with conferring as to whether they could agree as to the "amount of loss." If unable to agree, the appraisers were instructed to "submit" their dispute to the umpire, who would be tasked with breaking the deadlock.

*Award.* Finally, if the two appraisers were able to agree as to the "amount of loss," then they would issue an award in writing. Otherwise, one appraiser would

---

[10] Keys and Lewis agreed to select Jon Doan as the umpire. *See* ECF No. 246-17.

CASE NO. 3:23cv00453-MCR-HTC

join the umpire in doing the same. Regardless of the combination, an award in writing by any two panel members would "determine the amount of loss " to Portofino's property caused by Hurricane Sally.[11]

Lewis appraised the loss attributable to Hurricane Sally at approximately $18 million. *See* ECF No. 247-1 at 210:24. Though Portofino preliminarily claimed around $13 million in damages, Keys ultimately submitted a document entitled "Statement of Loss" in the amount of $233 million. *See* ECF No. 230-9; *see also* ECF No. 251-11 at 3–4. That document, by Keys' own admission, did not reflect "the amount of money required to repair the damages associated with Hurricane Sally." *See* ECF No. 225-1 at 341:2–21. According to Keys and his team, it was instead a "starting point," *id.* at 342:1–2, which largely provided the umpire with a "price list" that he could use when fashioning the ultimate appraisal award, *see* ECF No. 230-1 at 123:12. Keys' appraisal team ultimately deferred to the umpire to determine the extent of damages produced by the storm—and therefore the "amount of loss" to Portofino's property. *Id.* at 58:11–14 ("**A.** [W]hat we were tasked with [was] producing à la carte pricing so that later on once the scope was determined and awarded by the umpire, he had the pricing in front of him . . . ." (citation modified)).

---

[11] Less likely still, the appraisal panel could reach impasse and no award would issue.

Indeed, Portofino admits in its summary judgment briefing that Keys' appraisal team never "computed a final number" reflecting the "amount of loss" to Portofino's property caused by Hurricane Sally.  *See* ECF No. 301 at 5–6 (citation modified).

The appraisal panel met for a two-week hearing in August 2022.  *See* ECF No. 225-1 at 47:4–18.  After the hearing, the umpire scheduled another meeting in early October 2022 with Lance McCallister, the expert Keys tasked with pricing the repair work, and Kevin Bryant, the expert Lewis charged with doing the same.  *See* ECF No. 246-3 at ¶ 9.  The umpire requested during that meeting for each side to submit "information regarding pricing sources" for verification as well as "competing cost estimates" to repair each tower individually.  *See id.*  The appraisal panel met for closing statements in late November 2022.  *See* ECF No. 225-1 at 57:11–19.  On a rolling basis between February and July 2023, the $187 million appraisal award issued in seven parts.  *Compare* ECF No. 104 at ¶¶ 140–149 *with* ECF No. 108 at 40–41, ¶¶ 140–149.[12]  The umpire and Keys signed each portion of

---

[12] The Insurers filed the instant declaratory judgment action before any portion of the award was announced.  *See* ECF No. 1.  After the first part of the award issued, the Insurers filed an emergency motion requesting the Court to stay the appraisal during the pendency of this lawsuit. *See* ECF No. 57.  The Court denied that emergency relief, permitting the appraisal process to play out.  *See* ECF No. 78.  Then, following the issuance of the last part of the appraisal award, the Insurers filed a motion to vacate the award pursuant to Fla. Stat. § 682.13.  *See* ECF Nos. 116, 117, 118, 119.  The parties jointly requested to stay resolution of the motion to vacate pending the completion of discovery.  *See* ECF No. 136.  The Court recognized the "good sense" in granting the requested stay, but for docket management reasons, denied the motion to vacate without

the award; Lewis refused to sign all but one.  *See* ECF No. 257-24.[13]

The Insurers' operative pleading (and subsequent motions for summary judgment) attack the appraisal award from nearly every angle, alleging, among other things, that the award was procured by fraud, issued without the requisite notice and participation, and otherwise produced by a process that did not comply with the appraisal provisions in the policies, including because Portofino's chosen appraiser, Keys, was not "disinterested" in the appraisal's outcome.  *See* ECF No. 104.  The Insurers primarily request a declaratory judgment that they "do not have any obligation to pay the appraisal award because Portofino failed to comply with the appraisal provision."  *Id.* at ¶ 152 (citation modified).  The Insurers' motion to vacate sings a similar tune.  *See* ECF Nos. 257, 258, 259, 264.  That motion argues, under Fla. Stat. § 682.13, that the appraisal award must be vacated because it was procured by "corruption, fraud, or undue means," Keys committed "misconduct" throughout the appraisal that prejudiced the Insurers' rights, and the umpire erred by failing to

---

prejudice and with leave to renew the motion after the close of discovery.  *See* ECF No. 141.  The renewed motion to vacate was filed in compliance with the Court's earlier instruction.  *See* ECF Nos. 257, 258, 259, 264.

[13] Lewis signed the portion of the appraisal award covering costs that Portofino had already incurred repairing its property after Hurricane Sally.  ECF No. 257-24 at 2–3; *see also* ECF No. 247-1 at 15:17–16:1.

postpone the appraisal hearings after Keys orchestrated a "last-minute document dump." *See* ECF No. 351.[14]

As previewed, the discussion that follows is limited to the Insurers' argument that they are entitled to summary judgment because Keys' failure to state the "amount of loss" renders the appraisal award invalid under the policies*, see* ECF Nos. 251, 260, 263, and, alternatively, that this failure amounted to "misconduct" such that the award must be vacated under Fla. Stat. § 682.13(1)(b)(3). The Court need not, and therefore does not, address the multitude of other issues raised by the pending motions.

## II.    Legal Standard

Summary judgment is appropriate where the record reflects that there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). A dispute of fact is "genuine" if "the evidence is such

---

[14] The Court held a two-day evidentiary hearing on the renewed motion to vacate, *see* ECF Nos. 345, 346, and ordered additional briefing on the interplay between the Insurers' statutory and contractual arguments, ECF No. 336. *See* ECF Nos. 352, 359.

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex*, 477 U.S. at 323). Once that burden is met, the nonmoving party must "go beyond the pleadings" and present competent record evidence showing the existence of a genuine, material factual dispute for trial. *Celotex*, 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The evidence and factual inferences drawn therefrom are viewed in the light most favorable to the non-moving party. *See Liberty Lobby*, 477 U.S. at 255.

## III.    Discussion

A federal court sitting in diversity applies the substantive law of the forum state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). The parties agree that Florida law applies to the present dispute. The Court is accordingly required to decide this matter "as would the Florida Supreme Court," and is bound by the decisions of "Florida's District Courts of Appeal absent some indication that the

Florida Supreme Court would hold otherwise." *ECB USA, Inc. v. Savencia Cheese USA, LLC*, 148 F.4th 1332, 1340 (11th Cir. 2025) (internal marks and citations omitted).

"Under Florida law, insurance contracts are construed according to their plain meaning." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So.2d 528, 532 (Fla. 2005). Where "a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Id.* (internal marks and citations omitted). "Courts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Id.* (citation modified); *see also Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir. 1985) (interpretation of an insurance contract is a question of law to be decided by courts).

"Appraisals are creatures of contract and the subject or scope of appraisal depends on the contract provision." *Fla. Ins. Guar. Ass'n v. Branco*, 148 So.3d 488, 491 (Fla. 5th DCA 2014). In Florida, appraisals are designed "for a limited purpose—the determination of 'the amount of the loss.'" *Positano Place at Naples I Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, 84 F.4th 1241, 1248 (11th Cir. 2023) (quoting *Citizens Prop. Ins. v. Mango Hill #6 Condo. Ass'n*, 117 So.3d 1226, 1230 (Fla. 3d DCA 2013)); *see also Am. Coastal Ins. Co. v. San Marco Villas Condo.*

*Ass'n, Inc.*, 379 So.3d 1099, 1102 (Fla. 2024) (portraying appraisal as "an informal out-of-court dispute resolution process . . . . where there is a disagreement as to the 'amount of loss'"); *State Farm Fla. Ins. Co. v. Crispin*, 290 So.3d 150, 151 (Fla. 5th DCA 2020) (describing appraisal as "an insurance contract's alternative dispute resolution process" for a "disputed amount of loss").  "All issues other than those contractually assigned to the appraisal panel are reserved for determination in a plenary action." *Positano Place*, 84 F.4th at 1248 (citation modified); *see also San Marco Villas*, 379 So.3d at 1104 ("All other disputes—including those involving coverage or legal matters—are beyond the scope of appraisal and must be decided in court.").  Simply put, "while an agreement to arbitrate ordinarily encompasses the disposition of the entire controversy between the parties, an agreement for appraisal extends merely to the resolution of the . . . 'amount of loss.'" *Mango Hill*, 117 So.3d at 1229 (citation modified).

For that reason, "appraisal is—by its nature—a different process than arbitration." *NCI, LLC v. Progressive Select Ins. Co.*, 350 So.3d 801, 807 (Fla. 5th DCA 2022).  The Florida Supreme Court describes appraisal as "informal," and distinct from the "quasi-judicial" nature of arbitration. *See Allstate Ins. v. Suarez*, 833 So.2d 762, 764–65 (Fla. 2002).  But although appraisals lack the same procedural safeguards as arbitration, it isn't a free-for-all: "Once a party to an

insurance contract properly invokes appraisal, the parties should conduct those proceedings in accord with the agreed-on policy provisions." *NCI*, 350 So.3d at 808.

To downright tedium, state and federal courts in Florida have repeatedly stated that mere errors of fact or law by an appraiser are not enough to set aside an appraisal award. *See, e.g.*, *Biscayne Beach Club Condo. Ass'n, Inc. v. Westchester Surplus Lines Ins. Co.*, 2022 WL 18776152, at *7 (S.D. Fla. Mar. 1, 2022), *aff'd*, 111 F.4th 1182 (11th Cir. 2024); *Karsel Holdings, L.L.C. v. Scottsdale Ins. Co.*, 2023 WL 2087935, at *6 (S.D. Fla. Jan. 18, 2023)*, appeal dismissed sub nom. Karsel Holdings, LLC v. Scottsdale Ins. Co.*, 2023 WL 4058290 (11th Cir. May 2, 2023); *A.L. Gary & Assocs., Inc. v. Travelers Indem. Co. of Conn.*, 2008 WL 11333729, at *7 (S.D. Fla. Aug. 27, 2008). For appraisal to be a meaningful alternative to litigation on "amount of loss" issues, interests in finality weigh heavily in favor of letting sleeping dogs lie. *See State Farm Fire & Cas. Co. v. Middleton*, 648 So.2d 1200, 1201–02 (Fla. 3d DCA 1995) (noting that appraisal evokes the "general, even overwhelming, preference in Florida for the resolution of conflicts through any extra-judicial means, . . . for which the parties have themselves contracted").[15] So,

---

[15] By the same token, "a post-appraisal submission of increased costs is not a legally sufficient basis for re-opening the existing appraisal or conducting a new one." *Noa v. Fla. Ins. Guar. Ass'n*, 215 So.3d 141, 142 (Fla. 3d DCA 2017).

when parties run to the courts following an appraisal and complain that an award is supernaturally high or riddled with duplicative costs, judges generally react with a shoulder shrug—after all, this is the process the parties knowingly bargained for, and appraisers are often better equipped to measure these sorts of damages. *See Citizens Prop. Ins. Corp. v. River Manor Condo. Ass'n, Inc.*, 125 So.3d 846, 854 (Fla. 4th DCA 2013) (holding that it is "not the trial court's duty to ascertain whether the amounts awarded were in fact duplicative," and "an alleged mistake of that nature raises an issue directly related to the 'amount of loss' sustained to the particular property—an issue solely within the province of the appraisers" (citation modified)); *First Protective Ins. Co. v. Hess*, 81 So.3d 482, 485 (Fla. 1st DCA 2011) ("After the parties have gone through the appraisal process, the trial court may not consider evidence beyond the face of the appraisal award."); *see also Karsel Holdings*, 2023 WL 2087935, at *6 (courts cannot "second guess the appraisers" on the "amount of the loss").

The present case, though, is different. And it's different because Portofino's appraiser, George Keys, concedes that he never stated the "amount of loss" as required by the applicable appraisal provisions in the policies. *See* ECF No. 225-1 at 341:2–7 ("**Q.** But isn't it true that you submitted those numbers . . . as the amount of money required to repair the damages associated with Hurricane Sally? . . . .

**A.** Not true."), 341:18–21 ("**Q.** [D]idn't you submit those estimates as the cost of repairs to put the property back in its pre-Sally condition?  **A.** No, sir.").[16]  Keys testified that the $233 million presented as the "statement of loss" incurred by Portofino's property due to Hurricane Sally was instead just a "starting point," and was not reflective of the "real world" money needed to restore the property.  *Id.* at 334:4–342:20.  The reason, according to Keys, was the estimate prepared by his pricing expert, Larry McCallister.  *Id.* at 35:15–16.  About $217 million, or approximately 93% of the total "statement of loss" submitted by Keys, was attributable to the pricing estimate prepared by McCallister.  *See* ECF No. 230-9. But what McCallister provided, in his words, was a "price list," ECF No. 230-1 at 123:12, that was not reflective of any "market price" to restore Portofino's property. *See id.* at 43:8–16 ("**Q.** Would anyone pay $217 million to do the work proposed in these estimates?  **A.** I don't think that anyone would select that methodology.  There

---

[16] Counsel for Portofino objected to the form of these questions posed to Keys.  *See* ECF No. 225-1 at 341:6, 341:22–23.  Portofino has not argued in its subsequent briefing that Keys' testimony is inadmissible, however.  *Cf. Henderson v. B & B Precast & Pipe, LLC*, 2014 WL 4063673, at *1 (M.D. Ga. Aug. 14, 2014) ("Simply stating 'objection to form' does not necessarily preserve the objection. When 'objection to form' does not indicate what is wrong with the form so that the questioner can correct the problem, it becomes nothing more than a statement that the objector finds the question 'objectionable.'").  To the extent those objections are still live, they are overruled.  Even so, the Court may consider inadmissible evidence at this stage if it may be presented in an admissible form at trial.  *See Celotex Corp.*, 477 U.S. at 324.  That bar is likewise cleared.

are cheaper ways to do it.").[17]  Oddly enough, the best analogy for Portofino's appraisal team's submission is food.  According to McCallister, he merely supplied "à la carte pricing" for the project.  *Id.* at 65:11–12 (citation modified).  He testified that no "thinking person" would use his "price list" as a stand in for the total dollar value of the damage caused by Hurricane Sally for the same reason that "most people wouldn't eat all the food" on "a menu for an entire restaurant" just because the option is (at least in theory) available.  *Id.* at 47:18–19, 122:21–23; *see also id.* at 125:1–3 ("**A.** [I]f you go to Subway and you look at all their sandwiches, you're not going to order all their sandwiches.").[18]  The issue, in other words, is that Keys never

---

[17] McCallister testified that he prepared the "price list," not only for the appraisal process, but also to potentially secure a role in the future repair work.  *See* ECF No. 230-1 at 108:18–20 ("**A.** I didn't solely put this together with the only possible theory of it being used for an insurance claim.  I put this together so that I could get awarded the work."); *see also id.* at 110:13–24 ("**Q.** [I]t's your hope that you get awarded the contract as a result of this estimate; correct?  **A.**  It's my hope that I get awarded a contract.").

[18] McCallister further explained his approach using a hypothetical roof replacement project.  There are two replacement options in McCallister's hypothetical: "Option A" is a shingle roof and "Option B" is a metal roof.  *See* ECF No. 230-1 at 104:20–25.  Although no homeowner would ultimately install both a metal and shingle roof, an estimate might include price points for each alternative for the homeowner to choose from—though, the homeowner will only pay for the roof they select.  By McCallister's telling, the estimate he prepared for the damage to Portofino, across the board, included the cost for *both* the hypothetical metal and shingle roofs, which naturally resulted in an estimate that is "higher than what the actual cost would be" to make the repairs.  *See id.* at 112:2–23.  No one associated with Portofino's appointed appraisal team played the role of the hypothetical homeowner by selecting amongst the alternates provided—so Keys never supplied a dollars to donuts statement of the "amount of loss" caused by Hurricane Sally.  Keys and McCallister left that to the umpire in contravention of the insurance policies.  *See id.* at 58:11–14.

established a final scope for the proposed repair work before he submitted the $233 million "statement of loss" for the damage caused by Hurricane Sally—or ever. *Cf. Cincinnati Ins. Co. v. Cannon Ranch Partners, Inc.*, 162 So.3d 140, 143 (Fla. 2d DCA 2014) (noting that "the scope of damage to a property . . . necessarily dictates the amount and type of repairs needed to return the property to its original state" (citation modified)).[19]  Determining the scope was instead outsourced to the umpire, meaning that, in Portofino's words, "Keys' appraisal team did not compute a final number" reflecting the "amount of loss" as required by the appraisal provisions. *See*

---

[19] McCallister testified that he "never had a full scope" and never received one from Keys or the umpire. *See* ECF No. 230-1 at 45:4–7, 48:5–16; *see also id.* at 121:18–23 ("**A.** At this point, we did not have a scope, so we just put together pricing."), 158:21–23 ("**Q.** Have you ever seen anything where [the umpire] prepared a scope of what he determined the damages to be? **A.** No."). This is not to say that McCallister had no marching orders whatsoever as to scope.  He knew, for example, that other experts on Portofino's appointed appraisal team believed that "windows, doors, and roofs were all damaged by the hurricane and needed to be replaced." *See* ECF No. 246-3 at ¶¶ 5–6.  However, McCallister's "price list" did not actually calculate the true cost of replacing all those things (*e.g.*, the construction work), because he believed that the scope and project duration were ultimately a question for the umpire. *Id.* at ¶ 13.  Under Florida law, the term "amount of loss" is understood to encompass more than the cost of a damaged item, such as a broken window; it also includes the cost of replacing or repairing that item, such as labor, equipment rentals, and the like. *See State Farm Fire & Cas. Co. v. Licea*, 685 So.2d 1285, 1288 (Fla. 1996) ("We interpret the appraisal clause to require an assessment of the amount of a loss. This necessarily includes determinations as to the cost of repair or replacement . . . ."); *Cannon Ranch Partners*, 162 So.3d at 143 ("In evaluating the amount of loss, an appraiser is necessarily tasked with determining both the extent of covered damage and the amount to be paid for repairs." (citation modified)); *River Manor*, 125 So.3d at 854 ("The appraisers determine the amount of the loss, which includes calculating the cost of repair or replacement of property damaged . . . .").  In a project as large and complex as this, those costs are in the millions.  That, too, is another reason why Portofino and its appointed appraisal team have been forced to concede that their side never stated the "amount of loss."

ECF No. 301 at 5–6; *cf. First Acceptance Ins. Co., Inc. v. At Home Auto Glass, LLC*, 365 So.3d 1278, 1281 (Fla. 6th DCA 2023) (interpreting analogous appraisal provision and observing that it reflects a "need" for the appraiser "to place a monetary value on the amount of a loss").

These concessions, quite simply, are the death knells to Portofino's cause. Appraisals, under Florida law, are undoubtedly "preferred, as they provide a mechanism for prompt resolution of claims and discourage the filing of needless lawsuits." *Fla. Ins. Guar. Ass'n, Inc. v. Olympus Ass'n, Inc.*, 34 So.3d 791, 794 (Fla. 4th DCA 2010). But appraisals must—and there is no wiggle room here—still be conducted "in accord with the agreed-on policy provisions." *NCI*, 350 So.3d at 808; *see Suarez*, 833 So.2d at 765 (holding that while appraisal may be less formal than arbitration, its proceedings should still be conducted pursuant to the contract provisions). Here, it is undisputed that Portofino's appraiser, by failing to state the "amount of loss," did not comply with the most basic—and fundamental—aspect of the process set forth in the appraisal provisions. *Cf. Liberty Mut. Fire Ins. Co. v. Hernandez*, 735 So.2d 587, 589 (Fla. 3d DCA 1999) (evaluating similar policy language and concluding "the clause contemplates . . . valuation by each appraiser individually, not a trial-type hearing."). The award produced by this flawed process is therefore invalid and cannot be enforced against the Insurers. *See A.L. Gary &*

*Assocs.*, 2008 WL 11333729, at *8 (concluding that appraisal award "must be vacated because it was entered in violation of the clear and unambiguous terms of the Policy").[20]

The arguments that Portofino lobs to avoid this result smack of desperation. Initially, Portofino urges the Court not to indulge in a cumbersome post-mortem of the appraisal award, because the "amount of loss" is a question exclusively for the appraisal panel and "the law is clear in that the Court may not substitute its judgment for that of the panel." *Mont Claire at Pelican Marsh Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, 2021 WL 3476406, at *6 (M.D. Fla. May 24, 2021), *report and recommendation adopted*, 2021 WL 3205694 (M.D. Fla. July 29, 2021) (citation modified). This is beside the point. Even by Portofino's telling, the Court's role is limited to determining whether the appointed appraisers "did the job they were told

---

[20] This distinguishes the instant case from *Three Palms Pointe, Inc. v. State Farm Fire & Cas. Co.*, 362 F.3d 1317 (11th Cir. 2004). There, the Eleventh Circuit observed that, under Florida law, "if an insurer and an insured party go to appraisal, the insurer can only dispute coverage for the "'loss as a whole.'" *Id.* at 1319 (quoting *Licea*, 685 So.2d at 1288). Thus, "once an award has been made, the only defenses that remain for the insurer to assert are lack of coverage for the entire claim, or violation of one of the standard policy conditions (fraud, lack of notice, failure to cooperate, etc.)." *Id.*; *but see Baptist Coll. of Fla., Inc. v. Church Mut. Ins. Co., SI*, 656 F.Supp.3d 1290, 1294 (N.D. Fla. 2023) (noting that "a significant number of Florida's intermediate appellate courts have determined that the Eleventh Circuit misinterpreted [Florida law] in *Three Palms Pointe*"). In *Three Palms Pointe*, however, there was no question that the appraisal award was issued pursuant to the process set forth in the parties' agreement—a fact that was "central" to the Eleventh Circuit's analysis. *See* 362 F.3d at 1318 (citation modified). The defendant simply disputed that certain expenses included in the award (namely, relocation costs for residents) were recoverable under the insurance policy. *Id.* at 1319.

to do—not whether they did it well, or correctly, or reasonably, but simply whether

they did it." ECF No. 298 at 11. Yet, it is undisputed that Keys did not accomplish

the task Portofino appointed him to perform and the policies required—he admitted

as much. *See* ECF No. 225-1 at 341:18–21.[21] This does not require the Court to

"rehear, reweigh, or reevaluate" the evidence that ostensibly supplied the basis of

the ultimate appraisal award, ECF No. 326 at 21 (citation modified), or otherwise

probe "the accuracy of the panel's process," *Mont Claire at Pelican Marsh Condo.*

*Ass'n, Inc. v. Empire Indem. Ins. Co.*, 2024 WL 4635575, at *3 (11th Cir. Oct. 31,

2024); the Court only needs to take Portofino's appraiser at his word.[22] To be sure,

---

[21] Perhaps sensing the walls closing in, Portofino makes a curious argument: "The Keys appraisal team developed and presented the two component parts of establishing an amount of loss; i.e., the scope of damages, and the price of repairing or replacing the damaged building components." ECF No. 301 at 11. Those mental gymnastics, however, are without citation to the record and even that bare argument implicitly concedes that Portofino's chosen appraiser never stated the "amount of loss" as required by the policies.

[22] Portofino repeatedly characterizes the aforementioned deposition testimony from Keys and McCallister as cherry-picked and misleading and argues that the Insurers' false portrayal is "soundly rebutted" by Keys' later-filed sworn declaration. ECF No. 301 at 9. The Court reviewed both transcripts in their entirety and found the excerpts cited by the Insurers to be entirely consistent with both Keys' and McCallister's broader testimony. Curiously, Portofino did not call Keys, who ostensibly resides outside of the Court's subpoena power, as a live witness at the evidentiary hearing on the motion to vacate to expound on his prior testimony. And noticeably absent from Keys' newly filed declaration is any averment that he stated the "amount of loss" caused by Hurricane Sally. *See* ECF No. 298-1. Likewise, the later-filed affidavit by McCallister doubles down on his earlier testimony by claiming any "final estimates *had to* be determined by the Umpire based on *his* conclusions as to scope." ECF No. 246-3 at ¶ 13 (emphasis added); *cf.* ECF No. 230-1 at 127:9–14 ("**A.** I put together pricing. It was not our task to put together scope. The umpire put together the scope. Once he put together the scope, he applied our pricing or whoever he agreed with, mine or the other side, and then he issued the award.").

the same policy concerns that animate the general rule barring courts from looking under the hood of an appraisal or second guessing its outcome—namely, Florida's "overwhelming" preference for extra-judicial conflict resolution—weigh strongly in favor of finding the appraisal award invalid here. *See Middleton*, 648 So.2d at 1201–02. If appraisal is to be a viable alternative for resolving "amount of loss" issues, rather than the first step on the long road of litigation, parties must be able to trust that awards produced by the agreed-upon process will be binding *and* that one side cannot rip up the rules (however limited they might be) of that process by fiat. *See Suarez,* 833 So.2d at 765.[23]

Notably, Portofino has not identified any policy language or provision that supports its appraiser's actions. Rather, Portofino insinuates that the appraisal panel agreed to modify the applicable policy language such that Keys was not required to state the amount of loss and could instead submit a "price list" for the umpire to use

---

[23] Perhaps what is most striking about Keys' and McCallister's respective testimony is the obstinance with which each insisted that, for one excuse or another, they were somehow not required to state the "amount of loss" to Portofino's property caused by Hurricane Sally. They both conceded that they *knew* the $233 million estimate did not reflect what it would cost to restore Portofino's property. Each concededly *knew* the à la carte pricing list could never serve as a "market price" for the repairs. ECF No. 230-1 at 43:8–16. Yet they submitted it anyway—as a "starting point." ECF No. 225-1 at 342:1–2. Not only did this forsake Keys' core function under the appraisal provisions, but it also torched any chance of an agreement with the Insurers' appraiser, as contemplated by the policy language. How could Lewis agree that an amorphous catalogue of prices represented a true calculation of the hurricane damage incurred by Portofino's property? Keys and McCallister didn't even buy that.

when determining the appraisal award.  Portofino, though, does not venture to articulate how the appraisers (or the umpire for that matter) possessed the power or authority to modify the appraisal provisions bargained for and agreed to by the parties.  In fact, the evidence cuts decisively the opposite way; Portofino's engagement agreement with Keys states that he was to serve as "an independent appraiser and not an employee or agent" of Portofino.  *See* ECF No. 262-5 at 1; *see also* ECF No. 291-1 at ¶ 32 (averring that neither Keys nor his experts "were under Portofino's control or direction").  There is, in other words, no indication that even Portofino's appointed appraiser was authorized to negotiate contractual modifications on its behalf.[24]

In a final effort, Portofino argues that the exclusive grounds for setting aside an appraisal award are enumerated in Florida's Arbitration Code, specifically, Fla. Stat. § 682.13.  Keys' noncompliance with the appraisal provisions, so the argument goes, does not fit within any of the statutory bases for vacatur and is therefore not

---

[24] This argument also hinges on revisionist history.  True, following the appraisal panel hearings in August 2022, the umpire requested that both Keys and Lewis submit pricing information.  *See* ECF No. 246-3 at ¶ 9.  But it is undisputed that Keys presented an à la carte "price list" as the "statement of loss" to Portofino's properties *before* that was ever requested by the umpire.  *See* ECF No. 230-1 at 130:4–25 (McCallister testifying that he was given the "exact same instructions" by Keys and the umpire "at different times").

remediable.[25]    Portofino contends that the Florida Supreme Court's decision in

*Visiting Nurse Ass'n of Fla., Inc. v. Jupiter Med. Ctr., Inc.*, 154 So.3d 1115 (Fla.

2014) settles the issue.  This, too, is easily dispelled.  In *Visiting Nurse*, the Florida

Supreme Court held that Fla. Stat. § 682.13 "sets forth the only grounds upon which

an award of an arbitrator may be vacated."  *Id.* at 1134.  However, *Visiting Nurse*

dealt with neither a property insurance dispute nor an appraisal—which, again, the

Florida Supreme Court has stressed is fundamentally different than arbitration due

to its relative informality and because it ordinarily resolves only the "amount of loss"

question, rather than the entirety of the dispute.  *See Suarez*, 833 So.2d at 765;

*Mango Hill*, 117 So.3d at 1229; *see also San Marco Villas*, 379 So.3d at 1103

(rejecting caselaw as inapposite because it "had nothing to do with appraisal or

interpretation of an insurance policy").  Indeed, in a case concerning an insurance

appraisal decided just last year, the Florida Supreme Court took as a given that "a

judge or jury" would decide whether a policyholder "made misrepresentations

sufficient to warrant voiding the policy" under its terms.  *See San Marco Villas*, 379

So.3d at 1104.  Florida's high court made no mention of the statutory grounds for

vacating an arbitration award (which includes a section covering fraud, *see* Fla. Stat.

---

[25] Portofino has hardly been consistent on this score.  It previously asserted that Florida's
Arbitration Code doesn't even apply to appraisal awards.  *See* ECF No. 345 at 22:9–19.

§ 682.13(1)(a)) and instead premised its discussion on the contractual provisions in the underlying policy itself. *Id.*; *see also Parrish v. State Farm Fla. Ins. Co.*, 356 So.3d 771, 774 (Fla. 2023) (looking to the "text of the insurance policy" to resolve dispute over appraisal process).[26]  It therefore seems quite clear that, under Florida law, the Insurers' attacks on the appraisal award are not confined to Fla. Stat. § 682.13.  *See McMahan v. Toto*, 311 F.3d 1077, 1079 (11th Cir. 2002) ("When [federal courts] write to a state law issue, we write in faint and disappearing ink." (citation modified)); *see also Towne Realty, Inc. v. Safeco Ins. Co. of Am.*, 854 F.2d 1264, 1269 n.5 (11th Cir. 1988) (federal courts are duty-bound to decide diversity cases the way that it appears a state's highest court would and may properly consider dicta in so doing).[27]  But even if they were so confined, the Court alternatively concludes that the award must be vacated because Keys committed "misconduct" that prejudiced the Insurers' rights in the appraisal proceeding.  *See* Fla. Stat.

---

[26] The Court is, of course, mindful that the discussion in *San Marco Villas* concerned whether a "coverage defense" like fraud must be adjudicated before the parties proceeded to an appraisal.  *See* 379 So.3d at 1104.

[27] To be sure, the Court has not identified any Florida court case expressly holding that attacks on appraisal awards must be made under Fla. Stat. § 682.13.  If anything, courts apply Fla. Stat. § 682.13 with some hesitance to appraisal awards.  And, more to the point, counsel for Portofino conceded at the evidentiary hearing that the Insurers could pursue both contractual and statutory attacks on the appraisal award (albeit maintaining that those arguments should rise and fall together).  *See* ECF No. 346 at 251:23–252:8.

§ 682.13(1)(b)(3).[28]    Admittedly, a precise definition of "misconduct" under Florida's Arbitration Code has yet to take shape in the caselaw.  The place to start is the text of the statute.  *See Lab'y Corp. of Am. v. Davis*, 339 So.3d 318, 323 (Fla. 2022).  "The words of a statute are to be taken in their natural and ordinary signification and import; and if technical words are used, they are to be taken in a technical sense."  *Id.* (internal marks and citation omitted).  Black's Law Dictionary defines "misconduct" as "a dereliction of duty; unlawful, dishonest, or improper behavior, especially by someone in a position of authority or trust."  *Misconduct*, BLACK'S LAW DICTIONARY (12th ed. 2024) (citation modified); *see Raymond James*

[28] Years after the initial motion to vacate was filed, hundreds of pages of briefing, and a two-day evidentiary hearing, Portofino presses for the first time in its closing statement that the majority of the Insurers' arguments under Fla. Stat. § 682.13 are untimely.  *See* ECF No. 360 at 5–12; *but see* ECF No. 108 at 94, ¶ 28 (listing as an affirmative defense that "any allegations related to vacating the appraisal awards pursuant to Florida Statutes § 682.13 fail to the extent they were not timely pursued" (citation modified)).  Portofino does so—again, for the first time—by portraying the $187 million appraisal award as six distinct awards issued on separate dates.  *See* ECF No. 360 at 5–12.  As Portofino now tells it, the motion to vacate under Fla. Stat. § 682.13 was made outside of the mandated 90-day window for all but one of the six awards.  *Id.* at 7.  But Portofino can't outrun its earlier admissions.  In its Answer to the Amended Complaint, Portofino admitted—without qualification—that there was one, singular appraisal award that issued "in seven parts."  *Compare* ECF No. 104 at ¶¶ 140–149 *with* ECF No. 108 at 40–41, ¶¶ 140–149.  Absent amendment, "a party is bound by the admissions in his pleadings," and Portofino cannot spin a brand-new narrative that runs counter to its prior factual admissions moments before the clock strikes midnight.  *Best Canvas Prods. & Supplies, Inc. v. Ploof Trust Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983).  "Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them."  *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1178 (11th Cir. 2009) (quoting *Hill v. Federal Trade Comm'n*, 124 F.2d 104, 106 (5th Cir. 1941)).  And the Court would be remiss if it did not note that Portofino previously agreed to stay consideration of the original motion to vacate, filed nearly two years ago, without so much as a peep about its timeliness (or lack thereof).  *See* ECF No. 136.

*Fin. Servs., Inc. v. Phillips*, 126 So.3d 186, 191 (Fla. 2013) (looking to Black's Law Dictionary to determine plain meaning of undefined statutory term). Portofino does not quibble with that definition and the few Florida decisions on the subject closely align. *See Ferraro L. Firm, P.A. v. Royal Merch. Holdings, LLC*, 394 So.3d 672, 675 (Fla. 3d DCA 2024) (arbitrator committed misconduct by basing award on unpleaded claim); *Quesada v. City of Tampa*, 96 So.3d 924, 926 (Fla. 2d DCA 2012) (arbitrator committed misconduct by conducting independent research beyond the evidence presented at arbitration hearing). Keys' intentional decision to submit a $233 million "starting point," which punted the scope of repairs question to the umpire, in lieu of stating the "amount of loss" caused by Hurricane Sally easily qualifies as a dereliction of the duty ascribed to him under the appraisal provisions.[29]

---

[29] Portofino does not seriously dispute that Keys' actions qualify as "misconduct" in its closing statement on the renewed motion to vacate. *See* ECF No. 360. Instead, Portofino contends that (i) the Insurers are attempting to improperly "repackage" an unpleaded argument that Keys "exceeded his authority" under Fla. Stat. § 682.13(1)(d), which the Court indicated at the hearing that it would not consider; and (ii) the Court ruled out any possibility that Keys' actions could amount to "misconduct" when it excluded the expert testimony of William Klein at the evidentiary hearing. *See id.* at 28, 45. Not so. As to the former, the renewed motion to vacate expressly stated that it was seeking vacatur, in part, because Keys' estimate "did not actually represent the amount of loss caused by Hurricane Sally" and identified "misconduct" under Fla. Stat. § 682.13(1)(b)(3) as one of the statutory grounds for relief. ECF No. 257 at 24 (emphasis omitted). Plus, Keys' failure to discharge the task he was appointed by Portofino to do—state the amount of loss attributable to Hurricane Sally—fits more neatly within misconduct; to be sure, it's difficult to characterize someone not doing their job as exceeding the authority granted to them. As to the latter, the Court's evidentiary ruling swept no further than striking Mr. Klein's testimony. Mr. Klein's testimony invited the Court to engage in a granular, after-the-fact analysis of Keys' submission to purportedly demonstrate that specific figures were inflated and that Keys'

And the prejudice flowing from Keys' misconduct is evident: It almost immediately derailed the appraisal process prescribed by the policies, triggering a domino effect that frustrated any possibility that the appointed appraisers could reach an agreement on the "amount of loss" and effectively required the umpire to formulate his own estimate rather than resolve the differences between the appraisers, as contemplated by the policy language.[30]  It was, in many ways, the original sin.[31]  As such, vacatur under Fla. Stat. § 682.13 is likewise appropriate.

---

methodology departed from industry standards.  Going down that rabbit hole is not sanctioned by Fla. Stat. § 682.13.  Critically, however, doing so is unnecessary in this case, where Keys admitted (and Portofino concedes) that he never stated the "amount of loss."

[30] Indeed, under the agreed-upon appraisal process set forth in the policies, the umpire only enters the picture if the appraisers disagree as to the "amount of loss."  *See* ECF No. 104-1 at 33, 265–66, 578, 594.

[31] The Court has other, grave concerns with Keys' actions throughout the appraisal.  The Court needn't dwell on them, since this matter is neatly resolved on the narrower grounds discussed above.  Though, the Court will offer one modest observation: The facts here are eerily similar to and coincide with the other cases, of which there are several, where Keys was found to have an improper interest in the outcome of an appraisal.  *See, e.g.*, *Parrish*, 356 So.3d at 779 ("Because [Keys] is to be compensated via contingency fee, he has a pecuniary interest in the outcome of the claim and cannot qualify as a 'disinterested' appraiser."); *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 886 F.3d 852, 857 (10th Cir. 2018) (affirming district court's order disqualifying Keys and finding appraisal award was "invalid under the terms of the insurance policy"); *Creekside Crossing Condo. Ass'n v. Empire Indem. Ins. Co.*, 2022 WL 962743 (M.D. Fla. Jan. 31, 2022) (disqualifying Keys); *Copper Oaks Master Home Owners Ass'n v. Am. Family Mut. Ins. Co.*, 2018 WL 3536324, at *5–*6 (D. Colo. July 23, 2018) (noting that Keys' billing arrangement bore none of the "traditional indicia of an hourly rate agreement," and "Keys' billing of clerical time at inflated rates," as well as "Keys' own lackadaisical reaction to questions at trial about his lax timekeeping also suggest . . . that Keys' 'hourly' billings were simply a facade intended to conceal what was, in reality, a standard contingent fee"; "the fact that Keys eventually submitted an error-riddled, sometimes inflated invoice that just happened to amount to [a preset percentage] of the value of the appraisal award was no coincidence" (citation modified)).

CASE NO. 3:23cv00453-MCR-HTC

At the end of the day, the appraisal award was produced by a process that neither the Insurers nor Portofino bargained for or agreed to. The policies placed very few guardrails on the two appraisers—it did not mandate they follow a specific methodology, perform particular tests on the damaged property, or substantiate their work—it simply required that they each state separately the "amount of loss." Keys never did. Accordingly, the Insurers' motion for summary judgment on this issue is **GRANTED** and the appraisal award is **DECLARED** invalid pursuant to 28 U.S.C. § 2201. Alternatively, the award is **VACATED** pursuant to Fla. Stat. § 682.13(1)(b)(3). The parties are **ORDERED** to conduct a new appraisal before a new panel. The Clerk is directed to enter judgment in favor of the Insurers, tax and costs against Portofino, and close the file.[32]

**DONE AND ORDERED** this 22nd day of September 2025.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[32] Portofino's counterclaims for breach of contract sink or swim with the validity of the appraisal award. Because the appraisal award is not valid, Portofino's counterclaims necessarily fail.

CASE NO. 3:23cv00453-MCR-HTC